## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Marc Susselman and Martin Leaf,

      Plaintiffs,

vs.                                    Case No.:  2:25-cv-10660

Michigan Attorney Grievance Commission,
Commissioners of the Michigan Attorney
Grievance Commission, in their official capacities,
and Michael Goetz, Administrator of the Michigan Attorney
Grievance Commission, in his official capacity,

      Defendants.

_____/

Marc M. Susselman (P29481)
Attorney for Plaintiffs
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

Martin Leaf (P43202)
Attorney for Plaintiffs
33228 W 12 Mile Rd., #345
Farmington Hills, MI 48335
(248) 687-9993
leafmartin@gmail.com

_____/

# In Memory of
# The Six Million Jews Who Perished In The Holocaust,
# And For Those Who Survived, And Their Children,
# Who Lived, And Continue To Live, With Its Lifelong Trauma

# Never Again!  Never Forget!

## COMPLAINT

Now Come Plaintiffs Marc Susselman and Martin Leaf, alleging violations of their rights under the First and Fourteenth Amendments of the Constitution, and state as their Complaint against the Defendants as follows:

## PRELIMINARY STATEMENT

The Plaintiffs are licensed attorneys in the State of Michigan.  They are both Jewish. Within the last year, the Michigan Attorney Grievance Commission ("Commission") has issued Requests For Investigation to both attorneys requiring that they file written Answers to the Requests which charge each attorney with having violated the Michigan Rules of Professional Conduct.  The allegations of professional misconduct are related to statements which each attorney made in legal briefs, in which they were representing different clients, statements which asserted that the presiding judge had made statements in legal opinions, and/or had engaged in conduct, which they claimed had the appearance of being anti-Semitic.  The Requests for Investigation accuse Plaintiffs of having engaged in unethical conduct by virtue of their claims that a presiding judge's rulings and/or conduct had the appearance of being anti-Semitic.

Plaintiffs regard the issuance of these Requests For Investigation as a form of weaponizing the Commission, and the Rules of Professional Conduct, against Jewish attorneys who assert that a presiding judge has made biased statements, or expressed biased conduct and opinions, which have the appearance of being anti-Semitic.

2

Plaintiffs do not take this action lightly, and they appreciate the gravity, seriousness and provocative nature of what they are doing.  But continued silence is not an option. Plaintiffs recognize that improper accusations of anti-Semitism can constitute playing "the Jew card" and can be unfairly used, for example, to purge good-faith criticisms of Israel as part of a cancel culture.  At the same time, criticizing and retaliating against an attorney's claim that a judge's actions and rulings have the distinct appearance of being anti-Semitic, supported by evidence, can be used to purge legitimate criticism of unlawful judicial bias as part of a cancel culture.  Plaintiffs maintain that this lawsuit is about the latter, not the former.

Plaintiffs maintain that the issuance of these Requests For Investigation constitutes an effort to muzzle and penalize Plaintiffs, and thereby make an example of them, and represents a dangerous, and unconstitutional, violation of their right of free speech under the First Amendment, and of Equal Protection under the Fourteenth Amendment.  They are requesting equitable relief in the form of a declaratory judgment and an injunction.

> The opposite of love is not hate, it's indifference.  The opposite of art is not ugliness, it's indifference.  The opposite of faith is not heresy, it's indifference.  And the opposite of life is not death, it's indifference.

> There may be times when we are powerless to prevent injustice, but there must never be a time when we fail to protest.

Wherever men and women are persecuted because of their race, religion, or political views, that place must-at that moment-become the center of the universe.

For in the end, it is all about memory, it's sources and its magnitude, and, of course, its consequences.

For the dead and the living, we must bear witness.

Elie Wiesel

Silence is complicity with the status quo.

Albert Einstein

The past is never dead. It's not even past.

William Faulkner

## JURISDICTION AND VENUE

1.      This action arises under the First and Fourteenth Amendments of the United States Constitution.

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(3).

3.      Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the Eastern District of Michigan.

## PARTIES

4.    Marc Susselman is an attorney licensed to practice law by the State of Michigan.  He resides in Wayne County, Michigan.  Mr. Susselman is Jewish.

5.    Martin Leaf is an attorney licensed to practice law by the State of Michigan.  He resides in Oakland County, Michigan.  Mr. Leaf is Jewish.

6.    The Michigan Attorney Grievance Commission is the governmental agency responsible for overseeing and monitoring the conduct of attorneys in Michigan and their adherence to the Michigan Rules of Professional Conduct issued by the Michigan Supreme Court.  Its office is located in Oakland County, Michigan.

7.    The Board of Commissioners of the Michigan Attorney Grievance Commission is the governing body of the Attorney Grievance Commission.  It has nine members, who are currently Layota M. Willis, Chairperson; J. Paul Janes, Vice Chairperson; Kathleen Hickey, Secretary; Kendrah Robinson, attorney member; Dr. Samy Wassef, lay person member; Amani El-Edlebi, lay person member; Kathryn Swedlow, attorney member; James Moritz, lay person member; and Alexander Pahany, attorney member.

8.    Michael Goetz is the Administrator of the Michigan Attorney Grievance Commission.

## STATEMENT OF RELEVANT FACTS RELATING TO
## MARC SUSSELMAN'S CLAIMS

9.     On July 3, 2024, Mr. Susselman received an email from the Michigan Attorney Grievance Commission.  The email indicated that a Request For Investigation ("Request") had been filed against him and directed that he had 21 days to file an Answer to the Request.  The Request was attached to the email.  It had been filed with the Commission two months earlier, on April 30, 2024, by an individual named Michelle Kinnucan.  Mr. Susselman had never heard of Ms. Kinnucan, who lived in Washington state, and he had no idea who she was.  He had never met her; never spoken to her; never communicated with her in any way; and he had never represented her in any legal proceeding.  In the Request, Ms. Kinnucan accused Mr. Susselman of having unethically violated the Michigan Rules of Professional Conduct ("MRPC") by virtue of statements he had made in various legal briefs he had filed in a lawsuit in the United States District Court in Detroit against protesters in front of the Beth Israel synagogue in Ann Arbor, Michigan.  The facts of the lawsuit are set forth below.

10.     In 2019, Marc Susselman was informed that a group of protesters were picketing in front of Beth Israel synagogue in Ann Arbor, Michigan.  He went to Ann Arbor to see the picketing for himself.  It turned out that the picketers had been protesting in front of the synagogue every Saturday morning, since 2003, using blatantly anti-Semitic signs, bearing such messages as "Jewish Power Corrupts";

6

"Resist Jewish Power"; "No More Holocaust Movies."  Commingled with the anti-Semitic signs were signs protesting Israel's role in the Israeli-Palestinian conflict, offering cover for the anti-Semitic signs.

11.    The signs numbered some twenty signs in all, with half directly in front of the synagogue, and the other half across Washtenaw Ave. facing the synagogue. (Photographs of the sign are attached as Exhibits 1 and 2.) The signs were placed on both sides of the street in the public right-of way.   They also displayed the Israeli flag in front of the synagogue, with the Jewish Star of David, the recognized symbol of the Jewish people, defaced with a red circle and a red slash across the circle – the international symbol meaning "Prohibited," reviving the Nazi propaganda that Jews were expendable. (Photograph of the defaced Israeli flag is attached as Exhibit 3.)  Several of the protesters were avowed Holocaust deniers, and had publicly said so.[1]

_____

[1] Although the ringleader of the protesters, Henry Herskovitz, was born Jewish, he is an avowed Holocaust denier.  On April 26, 2014, Herskovitz posted an article about a vigil which was held at the Holocaust Memorial Center in Farmington Hills, Michigan. https://blog.deiryassin.org/2014/04/30/report-on-beth-israel-vigil-04-26-14/       The article stated:   "Jewish Witnesses for Peace and Friends staged a protest at the Holocaust Memorial Center on their commemoration of 'Yom HaShoah Holocaust Day of Remembrance', Sunday April 27th.  The reason for this protest was to challenge the power these museums have for manipulating peoples' emotions to ensure that criticism of Israel relegates those who do to hateful status."  The article included a sign held by Herskovitz stating, "Free Ernst Zündel."  Zündel was the author of several books denying the Holocaust, including "The Hitler We Knew And Loved," and who was prosecuted and imprisoned in Germany for denying "the fate of destruction for the Jews planned by the National Socialist powerholders and justified this by saying that the

12.     Mr. Susselman decided to do some legal research to determine whether anything could be done to curtail the protest.  In the course of his research he learned that Ann Arbor had a sign ordinance which unambiguously prohibited placing any signs in the public right-of-way.  Because the ordinance prohibited the placement of signs in the public right-of-way, regardless their message, in legal terms the ordinance was "content and viewpoint neutral," i.e., the ordinance did not selectively allow some signs, and prohibit other signs, based on their content.  Because the ordinance was neutral, it could

---

mass destruction in Auschwitz and Treblinka, among others, were an invention of the Jews and served the repression and extortion of the German people." https://en.wikipedia.org/wiki/Ernst_Z%C3%BCndel.

In an interview of another of the protesters, Rudy List, in CounterCurrents.Org https://countercurrents.org/2016/08/obscured-american-rudy-list-the-retired-math-professor/, Mr. List offered the following choice opinions:

> The Holocaust is the core element in the foundation of Jewish power, of Zionism.  Without that, the whole thing collapses.  The same with 9/11.  Once 9/11 goes, everything goes.
>
> . . .
>
> Jews declared economic war on Germany, and they were having an effect.  The Jews controlled higher education, media and the entertainment industry in Germany in the '30's.  They controlled much of the banking sector.  Jews were fighting tooth and nail, economically, with whatever means they could, and Hitler said, "We've got to sort out this country, for the Germans," and Germany supported him.  Hitler revived the economy.  He started Volkswagen and gave people jobs.  Most Germans were elated.
> . ….                                               . ….
>
> On scientific and historic terms, the argument is finished.  The revisionists have won.  There were no gas chambers.

be enforced against any violators without infringing on their First Amendment protected freedom of speech. *See R.A.V. v. St. Paul*, 505 U.S. 377 (1992); *Ward v. Rock Against Racism,* 491 U.S. 781 (1989). Yet the City of Ann Arbor had never enforced the ordinance against the protesters over the 16 years that they had been protesting every Saturday morning in front of the synagogue, as members of the synagogue, many with children, entered the synagogue to engage in their Sabbath worship, even though there were Ann Arbor police stationed near the synagogue, and could see the signs illegally placed in the public right-of-way.

13.    Mr. Susselman anticipated that the protesters would claim that their use of the signs was protected by the First Amendment's freedom of speech provision.  They would rely, for example, on the case which had involved the neo-Nazi march in Skokie, Illinois, where many Holocaust survivors lived, who had attempted to prevent them from marching.  Their effort was rejected by the courts, because the survivors did not constitute what is referred to as "a captive audience" – i.e., the First Amendment does not protect speech which is forced on listeners or readers against their will.  A speaker cannot require listeners to hear or see a message they do not wish to hear or see. *Lehman v. City of Shaker Heights,* 487 U.S. 298 (1974). The courts held, however, that the survivors were not a captive audience.  The neo- Nazis intended to march in downtown Skokie, not through the residential area where the survivors lived.  The survivors could avoid seeing the neo-Nazis marching in their Nazi uniforms by simply avoiding going

9

downtown.  They therefore did not qualify as a captive audience.

14.     Likewise regarding an analogy with the Westboro Church homophobic protests at funerals for members of the U.S. military.  In the lawsuit by the father of a deceased soldier, at which the members of the Westboro Church showed up displaying their insulting homophobic signs, the Supreme Court reversed a judgment in favor of the father for intentional infliction of emotional distress on the basis that neither the father, nor any of the other funeral attendees, could see the signs during the  funeral.    The signs were too far away from the funeral to be visible. Consequently, the Court held, the father and the attendees were not a captive audience. *Snyder v. Phelps,* 562 U.S. 443 (2011).

15.     By contrast, the protesters in front of the synagogue were placing their signs in direct view of the members of the synagogue as they entered, with their children, to participate in their Sabbath worship.  They were deliberately placing their signs there so that the synagogue members would see them; the synagogue members were not going out of their way to where the signs were displayed in order to see them.  The protesters were intentionally coming to the synagogue, targeting the synagogue members every Saturday morning, going where they knew they could find Jews to harass.

16.     The Beth Israel synagogue is located in a residentially zoned area of Ann Arbor.  The Supreme Court had previously sustained state laws which restricted

residential picketing.  The Supreme Court had also sustained the constitutionality of an injunction which placed reasonable time, place and manner restrictions on anti-abortion protesters in proximity to an abortion clinic, when the right to abortion was still deemed to be a constitutionally protected right, as was the right of the synagogue members under the Freedom of Religion Clause of the First Amendment to worship without being harassed.  *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994).

17.    After he concluded his legal research, Mr. Susselman felt reasonably confident that the protesters did not have an absolute First Amendment right to picket in front of the synagogue every Saturday morning using anti-Semitic signs which insulted and vilified the congregation members, even if commingled with signs addressing the Israeli-Palestinian conflict.  He prepared a legal memorandum explaining the First Amendment law and proposing a lawsuit against the protesters in federal court seeking issuance of an injunction placing reasonable time, place and manner restrictions on their conduct, e.g., requiring that they be a certain distance from the synagogue property; that they be prohibited from protesting during the time period when the Sabbath service was being conducted; and that the number of protesters, and the number of signs they used, be limited to a reasonable number.  The legal memorandum was provided to the synagogue and was transmitted to the synagogue's Board of Directors and it was distributed among the congregation members.

18.    Mr. Susselman, who was not a member of the synagogue, began attending

11

services at the synagogue to try to identify members of the congregation who would be willing to be named as plaintiffs in the lawsuit. After several weeks of discussion with members of the congregation, he succeeded in identifying two members to agree to be plaintiffs in the lawsuit, Marvin Gerber and Dr. Miriam Brysk, a Holocaust survivor. Dr. Brysk worshipped at an annex connected to the synagogue. She also had concerns about retaliation. She agreed to be a plaintiff on one condition – that if there were a trial, that she would be called as a witness so that she could testify regarding her experience during the Holocaust. Mr. Susselman promised her that he would do so.

19.   Representing Mr. Gerber and Dr. Brysk on a contingency fee basis, Mr. Susselman filed a lawsuit in the United States District Court in Detroit in December, 2019, naming five of the then protesters as defendants.   (Case No. 19-13726) Photographs of the signs were attached to the Compliant. He also named the City of Ann Arbor as a defendant, based on its failure to enforce its sign ordinance against the protesters, which he claimed constituted "state action" by inaction. In addition to requesting an injunction placing reasonable time, place and manner restrictions on the protesters' conduct, he included several claims based on a number of federal civil rights statutes which make it unlawful to engage in certain conduct which targets people based on their ethnicity or religion. In the Complaint, he cited federal case law supporting each of the claims that the federal civil rights statutes had been violated by

12

t h e  p r o t e s t e r s . He requested monetary damages against the protesters for violating these statutes.

20.     The Plaintiffs alleged in the Complaint, and the First Amended Complaint, that they experienced extreme emotional distress at seeing the signs in front of their house of worship as they entered to celebrate the Jewish Sabbath.  In the Complaint, and in the legal briefs filed in the lawsuit, they acknowledged that the protesters had a First Amendment freedom of speech right to express both their views regarding the Israeli-Palestinian conflict, as well as their anti-Semitic views regarding Jews.  They had the right to express these views on any public street they wished, anywhere in Ann Arbor, or in Michigan, or in the United States. Plaintiffs maintained, however, that the protesters did not have a First Amendment right to express these views in proximity to a Jewish house of worship, whose members had a countervailing right under the Freedom of Religion Clause of the First Amendment to practice their religion without being harassed and insulted directly in front of their house of worship.  They maintained that this right was not restricted just to Jews, but that hate speech in proximity to any house of worship, of any religion, was not protected by the First Amendment.  Would signs in front of a Catholic church on a Sunday morning accusing the worshippers of supporting pedophiles be protected by the Constitution, purportedly being about an issue of public concern, expressed in a public forum?  Would signs in front of a mosque on a Friday evening referring to the worshippers as camel jockeys and supporters of

Isis be protected by the Constitution, purportedly being about an issue of public concern, expressed in a public forum?  Would signs in front of a predominantly African-American church placed by the Ku Klux Klan on a Sunday morning using the N-word, or a photograph of a burning cross, and referring to alleged Black crime be protected by the Constitution, purportedly being about an issue of public concern, expressed in a public forum?  And what if this occurred not on just one day of worship, but for multiple days of worship, year after year?  At what point does freedom of speech cross a line into unprotected religious or racial harassment, and become unprotected "fighting words"?  *Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942).  Never?

21.     After the legal complaint was filed in the federal court in Detroit, it was assigned to the Hon. Victoria Roberts.  Early in the lawsuit, Judge Roberts entered an order imposing a protocol that no motions would be allowed to be filed unless concurrence of opposing counsel was requested, and if denied, the moving party would have to submit a two-page explanation of the parties' competing positions, and the court would only allow the motion to be filed if approved based on the letter.

22.     Mr. Susselman proposed to file a motion to request a preliminary injunction imposing reasonable time, place and manner restrictions on the protesters' conduct.  The defense attorneys opposed the motion, so he submitted a letter to the court setting forth the parties' respective positions.  The ordinary procedure for such a motion is that it must be filed early in the lawsuit; the moving party must demonstrate that the

client has a likelihood of prevailing on the merits; that failure to issue the injunction would cause the party irreparable harm; and that granting the injunction would not materially injure the other party.  Judge Roberts denied Mr. Susselman the right to file the motion, although the standard procedure was to allow the filing of such a motion, and then to evaluate the motion on the merits, and deny the motion if one or more of the prerequisites were not satisfied.  Instead, Judge Roberts pre-judged the motion and would not allow it to be filed.

23.    Mr. Susselman next proposed to file a motion for partial summary judgment against the City of Ann Arbor based on its failure to enforce its own sign ordinance against the protesters over a period of now 17 years.  The motion requested a ruling that the ordinance was content and viewpoint neutral, was unambiguous and prohibited displaying any signs in the public right-of-way, and could be enforced without violating the protesters' First Amendment Rights.  He again submitted a letter to Judge Roberts setting forth the positions of the parties.  Again, Judge Roberts denied the plaintiffs permission to file the motion.

24.    Thereafter, Mr. Susselman proposed filing a motion requesting leave to file a Second Amended Complaint which would add a claim against Ann Arbor alleging that it was violating the Equal Protection Clause of the 14th Amendment by enforcing its sign ordinance against some residents and businesses in Ann Arbor, while failing to enforce the ordinance against the protesters.  Another letter was submitted to Judge

Roberts setting forth the positions of the parties, and again Judge Roberts denied the plaintiffs permission to file the motion.  These were all standard procedural motions which would routinely be granted in a federal court, yet Judge Roberts was denying the plaintiffs permission to file any of them.

25.    The defendants proceeded to file motions to dismiss the lawsuit on two grounds.  First, they claimed that the plaintiffs did not have standing to sue, on the basis that their avowed emotional distress was not sufficient to permit them to sue. The second basis was that the protesters' conduct was protected by the First Amendment, and therefore none of the claims pled in the legal complaint, or the amended complaint, stated valid legal claims.

26.    After the filing of briefs and counter-briefs, Judge Robets issued her decision.  She dismissed the lawsuit on the basis that the plaintiffs did not have standing to sue, stating that their emotional distress did not constitute a "concrete" injury.  She then proceeded to state that the claims pled in the amended complaint were also invalid, because the defendants' conduct was protected by the First Amendment, stating: "[T]he First Amendment more than protects the expressions by Defendants of what Plaintiffs describe as 'anti-Israeli, anti-Zionist, an[d] antisemitic.' Peaceful protest speech such as this – on sidewalks and streets – is entitled to the highest level of constitutional protection, even if it disturbs, is offensive, and causes emotional distress."  In making this latter ruling, Judge Roberts exceeded her jurisdictional authority, because once she

16

ruled that the plaintiffs did not have standing to sue, she had no authority to address the merits of the legal claims themselves. The Supreme Court had held in *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83 (1998), that if plaintiffs do not have standing to sue, there is nothing further for a federal court to rule on. Judge Roberts in fact stated: "Plaintiffs do not sufficiently allege Article III standing. The Court lacks subject matter jurisdiction and must dismiss this case." Nonetheless, Judge Roberts addressed the merits of the First Amendment issue anyway, stating that the protesters' speech was entitled to "the highest level of constitutional protection" Why did she insist on addressing an issue on the merits which she acknowledged she did not have jurisdiction to address once she ruled that the plaintiffs did not have standing to sue?

27.    Reading Judge Roberts' ruling, Mr. Susselman thought that her assertion that the plaintiffs' emotional distress at seeing anti-Semitic signs in front of their synagogue was not a "concrete" injury was absurd. What was she saying, that she did not believe their emotional distress was genuine? How would she know that? And, if genuine, on what basis was it not "concrete"? In *Bucholz v. Meyer Njus Tanick, PA,* 946 F.3d 855 (6th Cir. 2020), the Sixth Circuit recognized that the emotional distress experienced by the recipient of repeated telephonic contacts by a debt collector could qualify as a "concrete" injury affording the recipient standing to sue. In *Losch v. Nationstar Mortg.,* 995 F.3d 937 (11th Cir. 2021), the Court ruled that the emotional distress caused by an inaccurate credit report qualifies as a "concrete" injury affording

standing to sue.  In *Clemens v. ExecuPharm Inc.,* 48 F.4[th] 146 (3d Cir. 2022), the Court ruled that the emotional distress caused by concerns about potential future identity theft constitutes a "concrete" injury affording standing to sue.  In *Robins v. Spokeo, Inc.,* 867 (F.3d 1168 9th Cir. 2017) (on remand from the Supreme Court), the 9th Circuit Court of Appeals ruled that the emotional distress caused by concerns of future unemployment attributable to misinformation contained in a credit report regarding marital status and income qualified as a "concrete" injury affording standing to sue. Yet, according to Judge Roberts, the emotional distress experienced by Jewish worshippers, harassed, insulted, and demeaned on a weekly basis, over a period of 16 ½ years, by visible anti-Semitic messages in front of their house of worship did not rise to the level of concrete injuries caused by repeated telephone calls by a debt collector; or inaccurate information contained in a credit report; or concerns about future identity theft.  Why was the emotional distress of two Jews seeing anti-Semitic signs in front of their synagogue less "concrete" than that of debtors harassed by debt collectors, or consumers whose identity had been stolen or whose credit report contained inaccurate information?  Why was the emotional distress of Jews deficient in the eyes of Judge Roberts? Judge Roberts' ruling struck Mr. Susselman as blatantly anti- Semitic itself – an anti-Semitic statement in a federal decision.

28.    In her decision, Judge Roberts, who is African-American, stated that the plaintiffs had failed to cite a single case in which the emotional distress of the plaintiff

was deemed sufficient in the context of a First Amendment defense to grant standing to sue. Mr. Susselman filed a motion for reconsideration, pointing out that this statement was erroneous. He had cited a decision from the federal court in the Southern District of Ohio, *Wells v. Rhodes,* 928 F. Supp.2d 920 (S.D. Ohio 2013), in which two Caucasian teenagers had set fire to a cross on the lawn of a house which was being rented by an African-American family. The family sued the teenagers for violating their civil rights, citing the very same statutes Mr. Susselman had cited in the lawsuit against the protesters. The federal judge in that case noted that none of the members of the African-American family had suffered a physical or medical injury; the property was not damaged, which the family did not own in any event, they were renting. Their only injury was the emotional distress they suffered seeing a burning cross in front of the house. The judge did not dismiss the lawsuit, saying that the emotional distress of the members of the African-American family did not constitute a "concrete" injury. He did not rule that they did not have standing to sue. Moreover, the Supreme Court had already held in *Virginia v. Black,* 538 U.S. 343 (2003), that the act of burning a cross was protected by the free speech provision of the First Amendment and could not be criminalized without evidence that the individual committing the act did so with the intention of threatening African-Americans. The judge in the Ohio case, rather than dismissing the lawsuit, ruled in favor of the plaintiffs and granted them summary judgment in their favor, based on the same civil rights statutes, 42 U.S.C. § 1982 and §

1985(3). which plaintiffs were relying on.  This was a case in which the plaintiffs had been granted standing to sue based on their emotional distress, in a context involving the First Amendment. For the Jewish congregants, seeing the flag of Israel with the Jewish Star of David defaced with a symbol meaning "Prohibited," with the Holocaust fresh in their memories, would be just as traumatizing for Jews as would seeing a burning cross be for African-Americans.  The case had been cited in plaintiffs' brief opposing the defendants' motions to dismiss.  It was recited in plaintiffs' motion for reconsideration.  Yet Judge Roberts denied the motion for reconsideration without once addressing the *Wells* decision, and without explaining how that case was distinguishable from the plaintiffs' case, other than that the plaintiffs in the Ohio case were African-American, and the plaintiffs in the case before her were Jewish.

29.     In addition, included among the state law claims which Mr. Susselman had pled in the complaint was a claim under the Michigan Elliott-Larsen Civil Rights Act, which prohibits discriminating against individuals based on their race, ethnicity or religion. Judge Roberts had issued a landmark decision ruling that the statute could be used by a group of Black teenagers who were being harassed in a Michigan high-school by other students using racial epithets. *Williams v. Port Huron Area School Dist. Board of Education,* Case No. 06-14556 (E.D. Mich. 2010).  She also held that this created a hostile environment for the Black students and that the school district could be held liable under the same statute for failing to take adequate measures to

prevent the creation of the hostile environment.  Judge Roberts did not rule in that case that the racial epithets were protected by the First Amendment, nor that the emotional distress of the Black students did not constitute a concrete injury.  Mr. Susselman pled the same claim in the complaint he had filed, applying the same statute and asserting that the failure of the City of Ann Arbor to enforce its sign ordinance against the protesters also created a hostile environment for the Jewish congregants.  Rather than apply her prior ruling to the comparable claim asserted by the Jewish plaintiffs, Judge Roberts declined to assert jurisdiction over any of the state law claims, which a federal judge has the prerogative of doing.  But why did she exercise that prerogative, in light of the fact that she had not declined jurisdiction over the same state law claim when it involved Black students?  Why didn't she assert jurisdiction and apply her ruling in the high school case to the harassment of Jews as they entered their synagogue to participate in the Sabbath service?  Why didn't the failure of the City of Ann Arbor to enforce its sign ordinance create a hostile environment, in violation of the Michigan statute, as she had held the failure of the school district to prevent the harassment of the Black students created a hostile environment?

30.    Judge Roberts' ruling that the conduct of the protesters was protected by the First Amendment had no bearing on the question of whether the plaintiffs' emotional distress constituted a concrete injury affording them standing to sue.  A litigant can suffer emotional distress affording standing to sue regardless whether the

speech causing the emotional distress is protected by the First Amendment, as did Rev. Falwell with respect to the Hustler Magazine cartoon depicting him having sexual intercourse with his mother in an outhouse. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). The Supreme Court held that the cartoon, as offensive as it was, constituted protected speech under the First Amendment. The ruling did not diminish Falwell's emotional distress, nor his standing to sue. The emotional distress of the plaintiffs caused by seeing the anti-Semitic signs in front of their house of worship every Saturday morning for 16 ½ years was no less "concrete" than Falwell's, regardless Judge Roberts' conclusion – rendered even though once she ruled that the plaintiffs did not have standing to sue, she no longer had jurisdiction to address the merits of the First Amendment issue – that the signs were "more than protected" by the First Amendment.

31.    Mr. Susselman filed an appeal in the Sixth Circuit Court of Appeals, contesting Judge Roberts' ruling that the emotional distress of the plaintiffs did not constitute a "concrete" injury affording them standing to sue. In the appellate brief, he raised the issue regarding the failure of Judge Roberts to address the *Wells* decision. He asked, in failing to address the *Wells* decision, which he had cited twice, was Judge Roberts claiming that the emotional distress of Jews was not as significant as that of African- Americans? The panel of appellate judges who presided over the oral argument consisted of Chief Judge Jeffrey Sutton and judges David McKeague and Eric

22

Clay.  Mr. Susselman had barely begun his oral argument on April 27, 2021, when Judge Clay, who is African-American, interrupted him  and asked, "Mr. Susselman, where did you find the temerity to accuse a federal judge of being racist?"  Mr. Susselman was flabbergasted.  Momentarily flummoxed, he gathered his thoughts and responded that he believed Judge Clay was referring to the *Wells* decision, which Judge Roberts had failed to address, although it was a central case in the lawsuit.  Judge Clay responded that there could be a host of reasons why a judge would not discuss a particular case.  Mr. Susselman responded, stating that it was a significant case, yet Judge Roberts had not even addressed it. Judge Clay rejoindered that it did not matter whether the case was significant.  At this point, Judge Sutton intervened and said that Mr. Susselman was welcome to go down that road if he wished, but he would have a rough row to hoe with the Court.  He then suggested that Mr. Susselman apologize. Mr. Susselman was stunned, and felt like Shylock being reprimanded in a Venetian court for having had the audacity to challenge the integrity of a Christian debtor.  He was stuck between a rock and a hard place, so he abjectly apologized, stating that it was not his intention to accuse Judge Roberts of racism, but to make a point on behalf of his clients.  Judge Clay then offhandedly told him to proceed with his argument.

32.    The Court issued a 2-1 decision reversing Judge Roberts' ruling that the plaintiffs' emotional distress did not create a sufficiently concrete injury to afford them standing to sue, stating, "All in all, the congregants have standing to sue because they

have credibly pleaded an injury – extreme emotional distress – that has stamped a plaintiff's ticket into court for centuries." *Gerber v. Herskovitz,* 14 F.4th 500, 506 (1921). In his combined dissent/concurrence, Judge Clay dissented from the majority ruling on standing, agreeing with Judge Roberts that the plaintiffs' emotional distress was not sufficient to give them standing to sue. The Court proceeded to rule that although the plaintiffs had standing to sue, the protesters' signs, including the anti-Semitic signs, were addressing a matter of public concern in a public forum, and were therefore protected by the First Amendment, and were immune from even obtaining an injunction placing reasonable time, place and manner restrictions on where, when and how the signs were deployed.  The Court failed to even address the issue relating to Ann Arbor's failure to enforce its sign ordinance against the protesters. In light of Judge Sutton's recommendation that Mr. Susselman apologize, apparently a group of neo-Nazi, Holocaust denying protesters had a First Amendment right to harass Jews as they entered their house of worship to pray, but the First Amendment right of a Jewish attorney advocating for the rights of his Jewish clients in a federal court of law, having the temerity to question the motives of an African-American federal judge for ruling that the emotional distress of the Jews being harassed does not qualify as a "concrete" injury, is circumscribed by the purported dictates of propriety.

33.     Mr. Susselman decided to file a petition for *en banc* review by the entire Sixth Circuit Court of Appeals.  Before he could file the petition, Mr. Gerber terminated

Mr. Susselman as his attorney, accusing him of losing the appeal by insulting Judge Roberts and failing to apologize quickly enough.  He retained a new attorney to file the petition for him.  Both petitions for *en banc* review were denied by the Court, with not a single judge on the Court voting in favor of rehearing.

34.     Mr. Susselman continued the case representing only Dr. Brysk and filed a petition for *certiorari* in the Supreme Court, as did the new attorney representing Mr. Gerber. Mr. Susselman argued that anti-Semitic speech in proximity to a Jewish house of worship was not speech addressing a matter of public concern and therefore was not entitled to First Amendment protection.  He contended that the same was true of hate speech in proximity to any house of worship of any religion.  He thought that surely the Supreme Court would appreciate that the Sixth Circuit's decision infringed on the congregants' freedom of religion under the First Amendment.  Was the freedom of religion less entitled to protection than a woman's then constitutional right to obtain an abortion, which the Court had held could be protected against anti-abortion protesters using an injunction, even when the protesters did not qualify as state actors?  *Madsen v. Women's Health Center, Inc., supra.*   The Supreme Court, however, in a confidential vote not available to the petitioners, denied both petitions.

35.     The fact that the Supreme Court denied the petitions for *certiorari* was not a decision on the merits and did not constitute affirmance of the Sixth Circuit's decision rejecting the plaintiffs' 1st Amendment argument.  *See Young v. Fire Ins. Exchange,*

338 U.S. 912, 919 (1950) ("Inasmuch …as all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should be granted, this Court has rigorously insisted that such a denial carries with it no implications whatever regarding the Court's views on the merits of a case which it has declined to review. The Court has said this again and again; again and again the admonition has to be repeated.")

36.     Emboldened by their victory, the protesters added a new sign to their panoply of anti-Semitic signs: "Israel attacked America 9/11/2001." To add insult to injury, the protesters, while the petitions for *certiorari* were pending, filed a motion before Judge Roberts requesting that they be awarded attorney fees. The general law with regard to an award of attorney fees in cases involving constitutional or federal civil rights is that they are typically awarded to plaintiffs who prevail on one or more of the issues they raise. The threshold for awarding attorney fees to prevailing defendants, however, is higher. A prevailing defendant must argue and prove that the lawsuit was frivolous and entirely without merit in order to justify being awarded attorney fees. The Supreme Court had held that just because a plaintiff has lost a lawsuit on the merits, it did not mean that the lawsuit was frivolous. *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,* 434 U.S. 412 (1978); *Hughes v. Rowe,* 449 U.S. 5 (1980). It had also held that awarding attorney fees to prevailing plaintiffs' attorneys in such cases, and not awarding prevailing defendants attorney fees, is

intended to encourage attorneys to take such cases, despite the risk, in order to protect the constitutional and civil rights of American citizens. *Riverside v. Rivera,* 477 U.S. 561 (1986). Since such cases are generally taken on a contingency fee basis, attorneys representing plaintiffs seeking to vindicate their constitutional and/or civil rights will not be willing to take the risk of representing such plaintiffs if they can be penalized by awarding the defendants attorney fees, which are generally paid on an hourly basis, to the defense attorneys. Even though the plaintiffs lost on the merits regarding the scope of the First Amendment protection in this context, and had won on the issue of standing, surely a lawsuit seeking an injunction placing reasonable time, place and manner restrictions on the use of anti-Semitic signs by a bunch of neo-Nazis to harass Jews as they entered their house of worship every Saturday morning for over 17 years could not be regarded as a frivolous lawsuit. Surely even Judge Roberts would not agree that the lawsuit was frivolous. The Court of Appeals had even asserted as much in its decision, stating, "Plaintiffs' claims may be wrong and ultimately unsuccessful, but the fourteen pages that the concurrence devotes to analyzing the constitutional issues belie the conclusion that they are frivolous." 14 F.4th at 508.

37.     Judge Roberts, however, agreed with the protesters that the lawsuit was "frivolous." She awarded the neo-Nazi, anti-Semitic protesters $158,721.75, to be paid by Mr. Gerber, Dr. Brysk, and Mr. Susselman "jointly and severally." Judge Roberts was requiring that Dr. Brysk, a Holocaust survivor, pay a group of anti-Semitic, neo-

Nazis $158,721.75 for the privilege of harassing and ridiculing her as she entered her Jewish house of worship to pray. Moreover, Judge Roberts not only awarded them attorney fees for the time they expended on the First Amendment issue, on which they had prevailed; she awarded them attorney fees for the time they expended on the standing issue, an issue on which they did not prevail, an issue on which they had lost.

38.     By this point Mr. Susselman was convinced that Judge Roberts' rulings were motivated either by anti-Semitic sentiments, or by anti-Israel, pro-Palestinian sentiments, or by both.  How else to explain her multiple adverse rulings against the Jewish plaintiffs – her refusal to allow them to file standard procedural motions from the very inception of the lawsuit; her ruling that their emotional distress did not constitute a "concrete" injury so that they did not have standing to sue; and now this, an outrageous award of attorney fees to anti-Semitic, neo-Nazis.  He was reminded of the plight of Dr. Michael Siegel, a Jewish attorney who had complained to the police regarding the treatment of one of his Jewish clients, who was then forced by Hitler's Brown Shirts to march through the streets of Munich on March 10, 1933, with a sign draped around his neck, stating, "Ich bin Jude, aber ich werde mich nie mehr bei der Polizei beshweren" – "I am a Jew, but I will never again complain to the police."  (*See* copy of photograph attached as Exhibit 4.)

39.     Mr. Susselman wishes to dispel any suggestion that his claim that Judge Roberts was biased against his clients was motivated by racism against African-

Americans.  He had supported the struggle for civil rights of African-Americans since he was in elementary school.  He has, throughout his life, been vehemently opposed to racism of any kind, against any racial, ethnic or religious group, and has acted throughout his life in accordance with his convictions.  He has been practicing law for over 45 years, in the course of which he has represented African-Americans in litigation in federal and state court, including representing an African-American female police officer employed by the Pontiac Police Dept. in a lawsuit in federal court alleging she had been discriminated against based on her race and gender, a lawsuit which resulted in a favorable monetary settlement for the plaintiff.  He had represented an African-American widow of an African-American public school teacher who sued in a Michigan circuit court claiming that the school district had failed to honor a life insurance policy pursuant to which she was entitled to life insurance proceeds, which resulted in a judgment in her favor.  In addition, the undersigned represented an Asian-American organization titled "Americans Citizen For Justice" seeking to obtain justice for Vincent Chin, a Chinese-American who was brutally beaten to death with a baseball bat in 1982 by two laid-off auto-workers who thought he was a Japanese-American, and who were sentenced in the Wayne County Circuit Court to probation and payment of a fine of $3,000.00.

Mr. Susselman's claim that Judge Roberts' rulings were motivated by bias was not motivated by his own racial animus towards Judge Roberts; nor by any retaliatory

29

motive for the adverse decision which was entered by her or the Sixth Circuit against his clients and himself.  It was motivated by his commitment to seeing that justice is done, regardless of the race, ethnicity, or religion of the litigants, and regardless of the race, ethnicity, or religion of the presiding judge.  On the lintel above the United States Supreme Court, the following message is engraved:  "Equal Justice Under Law."  This means equal justice regardless of the race, religion, or ethnicity of the litigants or their attorney, and regardless of the race, religion, or ethnicity of the presiding judge.  Equal justice if the litigants are African-American, and/or their attorney is African-American, and the judge is Caucasian and/or Jewish; equal justice which demands the abrogation of any appearance of impropriety.  And it applies with equal force to an African-American judge presiding over a legal proceeding involving litigants who are Caucasian and/or Jewish, and whose attorney is Caucasian and/or Jewish.  The fact that Judge Roberts is African-American did not insulate her from criticism that she had failed to adhere to her obligation to comply with the requirement of equal justice to all.

40.     Mr. Susselman filed an appeal in the Sixth Circuit.  In the course of the appeal, he filed a reply brief to the defendants' defense of the attorney fee award in which he argued that Judge Roberts' rulings, taken together in their entirety – including her refusal to allow the plaintiffs to file routine motions; her assertion that their emotional distress did not constitute a "concrete" injury; and her award of attorney fees in the amount of over $158,000 to a group of anti-Semitic neo-Nazis - had the distinct

appearance of being anti-Semitic. W h i l e under 28 U.S.C. § 352(b)(1)(A)(ii), a claim

of judicial bias may not be "directly related to the merits of a decision or procedural

ruling," there is a recognized exception to this limitation. As the Supreme Court stated

in *Liteky v. United States,* 510 U.S. 540, 545 (1994), in the context of a motion for

recusal:

> [J]udicial remarks during the course of a trial that are critical or
> disapproving of, or even hostile to, counsel, the parties, or their cases,
> ordinarily do not support a bias or partiality challenge. They *may* do so if
> they reveal an opinion that derives from an extrajudicial source; and they
> *will* do so **if they reveal such a high degree of favoritism or antagonism
> as to make fair judgment impossible**. (Italics in the original; emphasis
> added.)

Justice Kennedy, stated in a concurrence, joined by Justices Blackmun, Stevens

and Souter, *id.* at 558:

> The statute does not refer to the source of the disqualifying partiality. And
> placing too much emphasis upon whether the source is extrajudicial or
> intrajudicial distracts from the central inquiry. **One of the very objects
> of law is the impartiality of its judges in fact and appearance.** So, in
> one sense, it could be said that any disqualifying state of mind must
> originate from a source outside law itself. That metaphysical inquiry,
> however, is beside the point. **The relevant consideration under § 455(a)
> is the appearance of partiality … , not where it originated or how it
> was disclosed.** … (Emphasis added; citation omitted.)

41. In his reply brief, Mr. Susselman argued that Judge Roberts' rulings, taken

together in their entirety, came within the exception set forth in *Liteky.* He focused on

a particular statement Judge Roberts had made in her first decision, ruling that the

plaintiffs did not have standing to sue because their emotional distress was not

31

"concrete" enough, after which she stated: "Indeed, the First Amendment *more than* protects the expressions by Defendants of what Plaintiffs describe as 'anti-Israeli, anti-Zionist, an[d] antisemitic.'" (Italics added.) But why would *this particular speech* be more protected than other speech, he asked? Speech is either protected or it is not. There is no hierarchy of protected speech. There were three possibilities. Judge Roberts could have been referring to the anti-Semitic speech as deserving more protection; or to the anti-Israeli, anti- Zionist speech as deserving more protection; or to the combination of the two as deserving more protection. But a federal judge should not allow her personal sentiments regarding international events – concealed sentiments which go unrebutted - to influence her decisions regarding the rights of the litigants before her.

42.     Appreciating that most people, including appellate judges, given the history of slavery, racism, and persecution of African-Americans in this country would be reluctant to conclude that an African-American judge was herself racist or anti-Semitic, Mr. Susselman offered empirical evidence that such an explanation was not beyond the realm of possibility. The evidence was offered in the brief not to prove that Judge Roberts was anti-Semitic, but to rebut the assumption that she could not possibly be anti-Semitic. He noted in the brief that a 2016 survey by the Anti-Defamation League indicated that the rate of anti-Semitism was significantly higher in the African-American community (23%) than in the general population (14%), and attached a copy

of the survey to the brief as an exhibit.  He noted that a study published in the Social Science Journal 46 (2009), analyzing James Baldwin's 1967 essay, "Negroes Are Anti-Semitic Because They Are White," concluded:  "One analysis indicates that while some anti-Semitic attitudes are strongly associated with anti-White attitudes, African-Americans are still significantly more likely than White, Latino, and Asian groups to express anti- Semitic views when the level of anti-White sentiment is held constant (p < .05)."  https://scholar.harvard.edu/files/jsimes/files/ssj_simes_2009.pdf.  He noted that  this higher rate of anti-Semitism in the African-American community had been linked to the Israeli-Palestinian conflict and the tendency of African-Americans to identify with the Palestinians as the victims of Israeli oppression, which they equate to their oppression as the victims of slavery and segregation under the Jim Crow laws. ("We Know Occupation: The Long History of Black Americans' Solidarity with Palestinians,"        https://www.politico.com/news/magazine/2021/05/30/black-lives-matter-palestine-history-491234).  He noted that in the publication "Black Antisemitism in America: Past and Present," https://www.inss.org.il/publication/black-antisemitism/, the author wrote, at *19: "Although the [Black Lives Matter] movement has generally levelled its charges at 'Zionists,' frequently antisemitism appears undisguised. Updating the centuries-old blood libel, BLM marchers chanted, 'Israel, we know you kill children too!' and signs proclaimed, 'Defend Gaza: the New Warsaw Ghetto' – the Jews cast as the Nazis annihilating innocent people of color (Lapkin, 2020; Torok,

2021). Addressing a conference on Human Rights in 2015, Patrisse Cullors, one of the three co-founders of the movement, characterized the Palestinian cause as our generation's South Africa' and urged the audience to 'step up boldly and courageously to end the imperialist project that's called Israel,' concluding that 'we're doomed' if Israel is not brought to an 'end' (Chamberlain, 2021)." Mr. Susselman stated that the stigma of this country's reprehensible history of slavery and its continuing residual effects did not give Judge Roberts the liberty to express her own bias in her rulings, any more than the rulings of a Caucasian judge which had the distinct appearance of anti-Black bias would be tolerated. He stated that he was by no means claiming that Judge Roberts was a neo-Nazi, or that she consciously or subconsciously supported Hitler's Final Solution. He asserted, however, that if Judge Roberts' rulings, and her statement that the protesters' speech was "more than protected" by the First Amendment, were in any way the product of empathy with the Palestinian cause and/or antipathy for Israel and Zionism, those rulings were improper.

43.    The Court issued a decision, written by Chief Judge Sutton, affirming the attorney fee award, agreeing that the lawsuit was "frivolous."  In the decision, Judge Sutton wrote the following:

> Lastly, Susselman, of his own accord, accuses the district court of antisemitism. The basis for this serious allegation? A "series of questionable rulings." … The only external source for the allegation is a study supposedly finding higher-than average rates of antisemitic attitudes in the African American community. From this, Susselman concludes that

the district judge – who is African American – must have been biased against the congregants.  This argument rests on offensive, essentialist stereotypes.  It involves enormous logical leaps.  And it disserves Susselman's client by distracting from the merits of the fee issue.  If this is the quality of Susselman's advocacy, the fee award hardly comes as a surprise.  Susselman's bias arguments "find no support in the record," … and are "not well received[.]"

These statements totally distorted the argument Mr. Susselman was making.

First, among the "questionable rulings" was a flagrantly anti-Semitic ruling by Judge Roberts that the emotional distress of two Jewish congregants caused by seeing anti-Semitic signs in front of their synagogue every Saturday morning for over 17 years did not qualify as a "concrete" injury.  Second, not only one study was cited reporting that there was a higher than average degree of anti-Semitism in the African-American community. Two were cited.  Third, the studies were cited not to prove that Judge Roberts "must have been biased against the congregants," but to counter the instinctive response that it was not possible that an African-American judge could be biased. Fourth, the reference to the studies was made *in conjunction* with the reference to Judge Roberts' multiple "questionable rulings."  Fifth, while Judge Sutton denounced the studies as "offensive essentialist stereotypes," he ruled that the offensive essentialist stereotypes being used by the anti-Semitic neo-Nazis who were harassing the Jewish congregants in front of their synagogue were protected by the First Amendment. Sixth, his claim that Mr. Susselman's accusation of bias against Judge Roberts "distract[ed] from the merits of the fee issue" was specious, since he had already ruled that the fee

award was warranted because the lawsuit was "frivolous" – the contention that Judge Roberts was biased did not distract him from a decision he had already made. He proceeded to accuse Mr. Susselman, in a federal decision, of being an unethical, unprofessional, disingenuous attorney whose advocacy is not to be trusted.

44. Mr. Susselman filed a petition for *certiorari* in the Supreme Court seeking to overturn an attorney fee award to a group of anti-Semitic neo-Nazis as they continued to harass and vilify Beth Israel's Jewish congregants – an award which was not only outrageous, but which was contrary to numerous Supreme Court decisions which discussed the parameters of the bases for awarding attorney fees against a plaintiff in a lawsuit seeking to vindicate the constitutional and/or federal civil rights of an American citizen. In the petition for *certiorari*, he addressed Judge Sutton's affirmance of the attorney fee award and his retaliatory comments against him for having raised the subject of Judge Roberts' bias, stating:

> Rather than dealing with the claim that Judge Roberts' rulings had the distinct appearance of being biased against plaintiffs and their attorney, the Court retaliated against Mr. Susselman, in effect accusing him of being racist for having even raised the issue. But Judge Roberts was not immune from having her rulings challenged as violating the Code of Conduct of United States Judges because she is African-American. Her race was not the issue; her conduct was. The lintel of the Supreme Court states, "Equal Justice Under Law"–equal justice regardless the race, religion, ethnicity, gender, or age of the litigants, as well as of the judge(s) presiding over the case. Judge Roberts' race did not give her license to allow her biases, whether conscious or subconscious, to play any role in her rulings against plaintiffs or their attorney.

On August 26, 1963, standing in front of the Lincoln Memorial, Dr. King gave his eloquently moving "I have a dream speech": "I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character." It is by the content of our character that we all should be judged, with no presumptions *for* or against us based on the color of our skin, our race, our religion, our ethnicity, our gender, or our age. None of these characteristics should be a basis for any adverse judgments; nor should they be a basis for *refraining* from judgment. Expiation for the sins of slavery and past discrimination will not be accomplished by introducing double standards. Judge Roberts' race or skin color did not vitiate the issue regarding whether her decisions showed a distinct bias against plaintiffs and their attorney based on their Jewish religion or heritage. What was at issue was the content of her character, and that content was revealed in the only available evidence - her distinctly biased rulings. J'accuse!

45.    The Supreme Court, once more, denied the petition. Mr. Susselman filed a petition for rehearing, refusing to accept that such a gross injustice against Jewish Americans could occur in the country in which he was raised, a country which prided itself on its just and fair treatment of minorities. In the petition for rehearing, he stated:

During the four years that the case was in the courts, the Supreme Court ruled that the City of Boston violated the Constitutional rights of a Christian organization by denying its request to fly a Christian flag from a flagpole in front of the Boston City Hall. *Shurtleff v. City of Boston, Mass.,* 142 S. Ct. 1583 (2022).

It ruled that a public school district violated the religious rights of a high school football coach by prohibiting him from reciting a religious prayer on the 50-yard line after every football game. *Kennedy v. Bremerton School Dist.,* 142 S. Ct. 2407 (2022).

It ruled that the religious rights of a Christian postal worker were violated by UPS because it failed to accommodate his request not to work on Sundays. *Groff v. DeJoy,* No. 22-174, 143 S. Ct. 2279 (2023).

It ruled that the State of Colorado violated the free speech rights of a Christian wedding announcement designer by ordering her to design

wedding announcements for gay couples. *303 Creative LLC v. Elenis,* No. 21-476, 143 S. Ct. 2298 (2023).

All of these American citizens have rights protected by the Constitution or federal law, the Supreme Court states.

But the right of Jews to enter their house of worship without being insulted and verbally spat upon, according to the federal courts, is not protected by the Constitution or federal law.

Their lawsuit is ruled "frivolous" and they must compensate the anti-Semitic Holocaust denying protesters their attorney fees.

The federal courts, including the Supreme Court, issue decisions expressing their concern to protect the Constitutional rights of Christians.

But to the Jews, they issue decisions which say, "You must compensate your harassers for the time their attorneys spent reviling you!"

On October 7, 2023, members of the terrorist organization Hamas invade Israel, and indiscriminately slaughter Israeli men, women and children. Perhaps they were inspired by the commitment of the U.S. government and its courts to protect Jews.

Enough is enough.

In several speeches following the Hamas massacre, President Biden stated that silence in the face of anti-Semitism constitutes complicity.

What message does the silence of the Supreme Court convey?

When will the Supreme Court stand by George Washington's pledge in 1790 to the Hebrew Congregation of Newport, Rhode Island, that, "the Government of the United States, which gives to bigotry no sanction, to persecution no assistance requires only that they who live under its protection should demean themselves as good citizens, in giving it on all occasions their effectual support."

Did the plaintiffs who sued the anti-Semitic protesters seeking protection against their anti-Semitic slurs as they sought to exercise their freedom of worship fail to "demean themselves as good citizens" as not to be deserving of the protection of the United States government, or of the

Supreme Court?

Did not the award of attorney fees give assistance to persecution by a group of anti-Semites?

The Jewish plaintiffs did the civilized thing and sought protection in the courts for their right to worship without being verbally harassed and to redress their grievance under the First Amendment.

For this they get penalized.

Would the courts prefer that next time the Jews resort to self-help?

The Supreme Court's response?  Petition for rehearing denied.

46.     In Mr. Susselman's opinion, the decisions in this case represent the most anti-Semitic rulings in the history of American jurisprudence.  Not since the lynching of Leo Frank in Georgia in 1915, and the rejection in 1939 of the M.S. St. Louis, with its cargo of Jewish refugees, forced to return to Europe to die in Hitler's death camps, have Jews been treated so shabbily and unjustly by the United States.

47.     On October 18, 2022, Mr. Susselman filed a Formal Complaint of Judicial Misconduct by Judge Roberts with the Sixth Circuit Court of Appeals, charging that by virtue of the statements in her decisions which, taken together, had the distinct appearance of being anti-Semitic and/or anti-Israel she had violated the Canons of the Code of Conduct of United States Judges.  He requested that, pursuant to Rule 26 of the Rules For Judicial-Conduct And Judicial-Disability Proceedings, that the Chief Judge submit a request to Chief Justice Roberts that the Complaint be transferred to the judicial council of another Circuit. In a footnote at the end of the Formal Complaint,

Mr. Susselman stated: "To preserve the confidentiality of this Complaint, the undersigned has not served a copy of the Complaint on any of the attorneys of record who have appeared in either appeal.  If the Court believes that the undersigned has an obligation to provide opposing counsel with a copy, he requests that the Court so advise him and he will serve a copy on each of the attorneys of record."  The Court did not direct Mr. Susselman to provide any of the attorneys of record with a copy of the Formal Complaint, and, to the best of his knowledge, none of the attorneys were provided a copy.

48.    On September 7, 2023, Chief Judge Sutton issued a Memorandum And Order dismissing the Formal Complaint, without honoring Mr. Susselman's request that the Complaint be referred to another Circuit Court of Appeals.  On October 3, 2023, Mr. Susselman filed a petition in the Sixth Circuit Court of Appeals requesting that Judge Sutton's Memorandum and Order, and the original Formal Complaint, be reviewed by a judicial council of the Sixth Circuit.  On March 26, 2024, the Court issued an Order affirming Judge Sutton's dismissal of the Formal Complaint against Judge Roberts, and informed Mr. Susselman that there was no further avenue for him to have his Formal  Complaint of Judicial Misconduct reviewed.

49.    Miriam Brysk passed away on May 28, 2022.  She did not live to see the worst massacre of Jews since the Holocaust on October 7, 2023, by Hamas in Israel, and the abduction of over 100 Israelis.  After the Hamas massacre, Mr. Susselman

returned to Beth Israel synagogue to see what new signs the protesters may be using. They had added two new signs: "Anti- Semitism, Always Earned, Never Given"; and "Gas Chambers? REALLY?!" (Photographs of the new signs are attached as Exhibit 5.)

The protesters are still there, with their signs, every Saturday morning, protected by the Constitution.

50.    As stated above, on July 3, 2024, Mr. Susselman received an email from the Michigan Attorney Grievance Commission. Attached to the email was a Request For Investigation which had been filed against him two months earlier, on April 30, 2024, by an individual named Michelle Kinnucan, whom he did not know, had never communicated with, and had never represented in a legal proceeding. (A copy of the Request is attached as Exhibit 6.) Ms. Kinnucan lived in Washington state, several thousand miles from Michigan, where the lawsuit against the protesters had been litigated. It had been filed by Ms. Kinnucan one month after the Sixth Circuit had sent Mr. Susselman its letter, dated March 26, 2024, informing him that the Court was affirming Judge Sutton's dismissal of his Formal Complaint against Judge Roberts, and that he had no further avenue for review of the Formal Complaint or of Judge Sutton's dismissal of the Formal Complaint. As noted above, in order to preserve its confidentiality, Mr. Susselman had never provided a copy of his Formal Complaint against Judge Roberts to any of the attorneys of record. Was the temporal proximity of

Ms. Kinnucan's filing of her Request for Investigation one month after the Sixth Circuit had informed Mr. Susselman that the dismissal of the Formal Complaint against Judge Roberts was the end of the road, a mere coincidence?

51.    In the Request, Ms. Kinnucan accused Mr. Susselman of violating several of the MRPC based on some of the statements he had made in his appellate briefs related to the lawsuit against the protesters in front of Beth Israel synagogue, in which he claimed that Judge Roberts had displayed anti-Semitic bias against Mr. Susselman's clients.  Mr. Susselman did not know who Ms. Kinnucan was.  He had never spoken to her or communicated with her in any way.  He had never met her.  He had never represented her in any legal matter.  She had not been involved, to his knowledge, in any of the events related to the synagogue protests.[2]  How had she learned about the lawsuit and the appeals which followed years after she had left Michigan, and how had she obtained copies of the briefs and court decisions, referenced throughout her Request?  Mr. Susselman was flummoxed by the Request filed by a total stranger regarding a legal proceeding she had nothing to do with.

52.    Mr. Susselman requested an extension of the due date of his Answer to the Request, which was granted.  He filed his Answer to Ms. Kinnucan's Request on August

---

[2] Mr. Susselman later learned from Miriam Brysk's widowed husband, Henry Brysk, that Ms. Kinnucan had lived in Ann Arbor in 2003, when the protests in front of the synagogue had begun.  According to Mr. Brysk, Ms. Kinnucan, who at the time was Mr. Kinnucan, had administered a virulently anti-Semitic blog.  She left Ann Arbor sometime thereafter and moved to California, and then to Washington state.

19, 2024.  (Copy of the Answer is attached as Exhibit 7, minus exhibits.)  In his Answer,

Mr. Susselman provided a history of the synagogue protester litigation and the basis of

his claim that Judge Roberts had displayed anti-Semitic and/or anti-Israel sentiments in

her rulings.  He addressed in detail each of Ms. Kinnucan's accusations that he had

violated numerous provisions of the MRPC.  In the Conclusion of his Answer, Mr.

Susselman stated:

>  Ms. Kinnucan's Request for Investigation of Respondent is an effort
> to engage in character assassination of an attorney whom she has never
> met, has never communicated with, and who has never represented her in
> a court of law.  Query:  How did an individual who does not reside in
> Michigan, who lives several thousand miles from Michigan, learn about
> the lawsuit and the decisions relating to the protesters in front of Beh Israel
> synagogue in Ann Arbor, Michigan? Who informed her of the decisions
> and provided her with copies of the decisions, including an unpublished
> decision which she quoted from, and may have urged her to file the
> grievance?  What motivated her to file the Request for Investigation of an
> attorney whom she has never met, never communicated with, and who
> never represented her in any legal matter?

>  Ms. Kinnucan's allegations and charges are totally devoid of any
> legal merit.  Respondent finds it disturbing that the Michigan Attorney
> Grievance Commission has seen fit to transmit her Request for
> Investigation to Respondent without questioning her motives, and
> requiring that Respondent expend the time and energy to respond to her
> meritless charges.  The Request for Investigation should be rejected and
> be dismissed in its entirety.

53.     Mr. Susselman was required to give a sworn statement at the offices of the

Commission on October 23, 2024, regarding Ms. Kinnucan's Request, and three other

Requests which had been filed against him.[3]  He appeared at the Commission on that date and, under oath, answered questions which were directed to him by Sarah Lindsey, General Counsel of the Commission., regarding the Kinnucan Request and the three other Requests.  At the conclusion of the meeting, Ms. Lindsey requested that Mr. Susselman provide her with additional information, which Mr. Susselman did in an email dated October 24, 2024.

54.     In another email sent to Ms. Lindsey on October 24, 2024, Mr. Susselman made the following request:  "I would be curious to know how many Requests for Investigation have been filed with the Michigan Attorney Grievance Commission in the last five years by individuals who do not live in Michigan, and who have never been represented by the Michigan attorney against whom the complaint was filed; how many of those were referred to the attorney in question requiring a response, and how many of such attorneys were thereafter required to provide a sworn statement.  I would appreciate your providing me with this information, without divulging the identities of either the complainant(s) or the attorney(s) in question."  Mr. Susselman repeated the request in another email sent to Ms. Lindsey on October 25, 2024, stating:  "I would appreciate a

---

[3] Two of the three other Requests involved issues relating to how Mr. Susselman was managing his business account.  The fourth Request had been filed by Dr. Brysk's daughter accusing Mr. Susselman of having "bullied" her mother into being a plaintiff in the synagogue protest lawsuit, an accusation which Mr. Brysk, who had been present at every meeting between his wife and Mr. Susselman, whereas their daughter had not been present at any of the meetings, has vehemently denied.  None of the three other Requests are the subject of this lawsuit.

response to my request for information regarding other Requests For Investigation filed against Michigan attorneys by complainants who do not reside in Michigan and how those requests were treated by the Commission, i.e., were the attorneys required to respond to such Requests For Investigation, or to give sworn statements. I appreciate that if such requests were filed, the identities of the complainants and the attorneys against whom the grievances were filed is confidential, and would require that this information be redacted. Please respond to my request."

55.     Ms. Lindsey responded to Mr. Susselman's request with an email on October 25, 2024, stating, in relevant part:  "As to your request, we do not keep such statistics.  Further, our investigations are privileged from disclosure and confidential (see MCR 9.126).  So, I could not produce any such information to you even if we had any way to obtain it.  Moreover, before formal charges are filed, the Commission has no discovery obligations.  After formal charges are filed, discovery obligations are limited to what is provided in MCR 9.115."

56.     As of the date of this Complaint, no formal charges have been issued by the Commission against Mr. Susselman regarding any of the pending Requests.

## STATEMENT OF RELEVANT FACTS RELATING TO
## MARTIN LEAF'S CLAIMS

57.     On September 22, 2022, Mr. Leaf filed a lawsuit on behalf of the H. P. Benson Association, Inc. ("Benson"), alleging that a video advertisement on the internet sponsored by Nike, Inc., contained both overt and subliminal anti-Semitic images and references, as well as pornographic images and references.  Benson is a non-profit corporation organized under the laws of Michigan.  The Complaint requested a declaratory judgment that the Nike video advertisement violated the Michigan Consumer Protection Act, MCL 445.901, *et seq.* ("MCPA").  The lawsuit was filed in the Ottawa County Circuit Court, located in Grand Haven, Ottawa County, Michigan, where Nike does business.

58.     The video advertisement, titled "The Last Game," can be found here: https://www.youtube.com/watch?v=CJ2xU9GUPVY

59.     The video advertisement portrays a struggle for the survival of soccer between the prevailing soccer champions and their European challengers.  The prevailing champions are depicted as villains.  Their jerseys are emblazoned with the Star of David, an obvious reference to Jews.  (Photograph of the jerseys is attached as Exhibit 8.)  The stadium in which their conflict plays out also shows a billboard with the Star of David.  (Photograph attached as Exhibit 9.)  Strewn throughout the video are numerous subliminal images containing anti-Semitic messages which Mr. Leaf

46

itemized in the Complaint.  (*See* copy of the Complaint, attached as Exhibit 10.)  The Times Of Israel published a story about the video advertisement titled *Nike ad features evil 'Jewish' clones,* [https://www.timesofisrael.com/nike-ad-features-evil-jewish-clones/](https://www.timesofisrael.com/nike-ad-features-evil-jewish-clones/).  The success of the Jewish clones in soccer was intended to be a metaphor for the age-old anti-Semitic trope that Jews are seeking world domination.  Even the title "The Last Game" evoked the message of a last stand against the Jews taking over the world.  Mr. Leaf had retained a psychological and media expert on the use of such subliminal messages to influence unknowing audiences.

60.     Mr. Leaf claimed that the video advertisement was misleading and violated the prohibition in the MCPA against deceptive advertising, i.e., the video advertisement purported to be promoting the sale of Nike products, when its primary purpose was to disseminate anti-Semitic messages.

61.     Nike filed a motion to dismiss, pursuant to MCR 2.116(C)(8), arguing that since the Nike video advertisement was available for free on the internet, watching it did not constitute a "transaction" under the MCPA.  Before Mr. Leaf even filed his response to the motion, the presiding judge, Hon. Jon Hulsing, entered an Order stating that the lawsuit "may be based on a questionable legal theory; that Leaf had a history of filing frivolous claims against Nike; and questioned why Leaf had filed the lawsuit in Ottawa County, when the parties' attorneys had offices in southeast Michigan.  (Copy of Order attached as Exhibit 11.)  Judge Hulsing ordered Leaf to appear in person in

court to argue the motion, but stated that Nike's counsel could appear "by remote technology."

62.    Mr. Leaf filed a motion to disqualify Judge Hulsing on the basis that his Order that he appear in person, while allowing Nike's attorney to appear via Zoom, raised an appearance of lack of impartiality, attributable to Leaf's being Jewish. (Copy of motion to disqualify attached as Exhibit 12.)  Judge Hulsing denied the motion, stating that Leaf had failed to cite a case "in which it was found to be erroneous for a court to require a person or party to physically appear in court."  But this was not the point.  The point was Judge Hulsing's disparate treatment of Mr. Leaf, who is Jewish, compared to his treatment of Nike's attorney, Naseem Ramin, who was evidently not Jewish.  Judge Hulsing in addition stated that because HP Benson Association, Inc., was a corporation, "a corporation cannot be of any ethnicity or religion because it is an artificial entity."   This assertion was erroneous, since the case law is replete with lawsuits filed by corporate entities and associations claiming unlawful discrimination. *See, e.g., NAACP v. Button,* 371 U.S. 415 (1963); *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.,* 745 F.3d 703 (4th Cir. 2014).  Judge Hulsing also denied that he knew of the ethnicities or religion of either counsel.  This assertion was false, since Mr. Leaf had identified himself as Jewish in his motion requesting that Judge Hulsing recuse himself.  (Exhibit 12, p. 10)  Moreover, the assertion failed to address the disparate treatment, given that ¶5 of the Complaint cited the provision of the MCPA

which allows an action to be brought in any county in which the defendant does business, and Nike did business in Ottawa County. A review of the Complaint indicated that Benson's attorney had a thorough knowledge of historical anti-Semitic references, and therefore was likely Jewish. Moreover, the disparate treatment applied to the parties themselves. Benson was obviously opposing anti-Semitism, whereas Nike was being accused of promoting anti-Semitism. He could have required both attorneys to appear via Zoom, rather than requiring only the attorney who was claiming the Nike video advertisement promoted anti-Semitism to appear in person, and allowing the Nike attorney to appear via Zoom.

63.     Mr. Leaf filed a response to the motion to dismiss and cited case law and language of the MCPA indicating that the statute did not require that there be a payment in order to qualify as a transaction subject to the MCPA's regulations. He cited case law indicating that the statute is to be liberally interpreted to protect the public. Moreover, the MCPA provided that individuals who filed lawsuits under the MCPA could do so for the purpose of acting as "private attorney generals," in order to protect the public from deceptive practices and advertising. Venue under the MCPA applied in any county in Michigan where the defendant did business. Nike does business in Ottawa County.

64.     In the course of the litigation, Judge Hulsing made repeated denigrating and insulting references to Mr. Leaf on the record. Even assuming that Judge Hulsing did

not know that Mr. Leaf was Jewish, by denigrating Mr. Leaf he was also denigrating the claim that the Nike video advertisement was permeated with anti-Semitic tropes and messages, a claim that was supported by the evidence, and which, in a motion to dismiss for failure to state a claim pursuant to MCR 2.116(C)(8), was required to be assumed to be true.  In so doing, Judge Hulsing was being dismissive of legitimate concerns that a publicly available video advertisement on the internet was promoting, and thereby fortifying, anti-Semitic sentiments on the internet, particularly among young and impressionable viewers.

65.    Judge Hulsing granted Nike's motion to dismiss on the basis that since no payment was required to view the video advertisement, it did not qualify as a "transaction" under the MCPA.  He also assessed a sanction against Mr. Leaf, ruling that the lawsuit was "meretricious" and "frivolous," and required that he pay Nike its attorney fees in the amount of $27,266.40.

66.    In his decision granting Nike's motion to dismiss, Judge Hulsing compared Mr. Leaf's argument that the Nike video advertisement violated the MCPA because it was misleading and failed to warn the viewer of its hidden anti-Semitic messages to an advertisement for free cookies which failed to include a warning that the cookies contained "fats and sugars which could lead to obesity, early death and additional health costs to society, the hazards of which were 'not disclosed' to the unsuspecting victim of an urge to munch down cookies."  (Opinion and Order on

Motion for Summary Disposition, attached as Exhibit `13.)  The comparison was specious and insulting.  Judge Hulsing did not understand that the MCPA applies to broad consumer business conduct such as the distribution of a product, and the language of the statute does not require a monetary payment to qualify as a transaction. Distributing a product or service with deceptive content is prohibited under the MCPA, whether it is free or not.  An advertisement for cookies which failed to provide a warning regarding its potential adverse health effects was not simultaneously including a subliminal message that would indoctrinate the reader with a racist ideology.  The fact that Judge Hulsing made this totally inapt comparison, and trivialized concerns about the Nike video advertisement's anti-Semitic messages, underscored the appearance of his anti-Semitic sentiments.

67.    Judge Hulsing's rejection of Mr. Leaf's request that he recuse himself based on the appearance of hostility and a lack of impartiality was inconsistent with protocols which he himself had issued to other judges against whom judicial complaints had been filed, protocols set forth in letters he had sent to the judges in his capacity as Chairperson of the Michigan Judicial Tenure Commission.  (*See* letters attached as Exhibit 14.)

68.    Mr. Leaf appealed the decision dismissing the lawsuit, as well as the imposition of the monetary sanction, to the Michigan Court of Appeals.  The Court of Appeals affirmed both rulings in an unsigned, *per curiam* unpublished decision dated

51

November 11, 2024. (Copy attached as Exhibit 15.) Regarding Judge Hulsing's refusal to recuse himself, the Court made the observation that since Mr. Leaf filed the lawsuit in Ottawa County, he had no basis to complain that Judge Hulsing required that he appear in person in court to argue Nike's motion to dismiss. This, again, missed the point regarding the disparate treatment.

69.      Mr. Leaf filed a motion for reconsideration in the Court of Appeals, which has been denied. He has filed an Application For Leave To Appeal in the Michigan Supreme Court, which is currently pending.

70.      On January 27, 2025, the Commission emailed to Mr. Leaf a Request For Investigation. (A copy of the Request is attached as Exhibit 16). January 27, 2025, was, coincidentally, the 80th Anniversary of the liberation of the Auschwitz concentration camp, and Holocaust Remembrance Day.

71.      The Request is signed by Defendant Goetz. Nowhere in the Request does it identify an individual who filed the Request, other than Mr. Goetz. The Request makes clear that it is based on Mr. Leaf's filing of the lawsuit against Nike and quotes from the Michigan Court of Appeals decision affirming Judge Hulsing's grant of Nike's motion to dismiss and affirming the sanction against Mr. Leaf. The Request requires that Mr. Leaf provide, "A full and fair description of the facts and circumstances surrounding the events leading to the aforementioned statements" relating to the *Benson v. Nike* lawsuit.

72.      Nowhere in the Request does it identify the specific Michigan Rules of

Professional Conduct that Mr. Leaf purportedly violated during the Nike litigation.

73.     Mr. Leaf has requested, and has been granted, an extension of the due date for filing his Answer to the Request.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF MARC SUSSELMAN'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

74.     All of the prior averments are incorporated herein as if fully stated herein.

75.     While a lawsuit against a State, or a subdivision of a state by a citizen of that state, is barred by the 11th Amendment, *Hans v. Louisiana,* 134 U.S. 1 (1890), a citizen may obtain equitable relief in the form of an injunction and/or a declaratory judgment by naming as a defendant a state agency and/or officer responsible for enforcing a state statute or legislative provision which the citizen claims violates the Constitution. *Ex parte Young*, 209 U.S. 123 (1908).

76.     "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike. *Plyler v. Doe,* 457 U.S. 202, 216 (1982)." *Cleburne v. Cleburne Living Center, Inc.* 473 U.S. 432, 439 (1985).

77.     The 14th Amendment prohibits discrimination based on race. *McLaughlin*

*v. Florida,* 379 U.S. 184 (1964).  Jews qualify as a race under 42 U.S.C. § 1983, which was enacted pursuant to Section 5 of the 14th Amendment.  *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987).  Discrimination based on religion is also prohibited by the 1st and 14th Amendments.  *Torcano v. Watkins,* 367 U.S. 488 (1961); *Fulton v. City of Philadelphia,* 141 S. Ct. 1868 (2021). Race and ethnic classifications also constitute suspect categories subject to strict scrutiny under the Fourteenth Amendment. *University of California Regents v. Bakke,* 438 U.S. 265, 290 (1978).  Mr. Susselman maintains that the Commission's issuance of its Request based on the allegations by Ms. Kinnucan violates the Equal Protection Clause because it unconstitutionally targets him based on his race, his religion, and his ethnicity, because he is Jewish.

78.     Under *Younger v. Harris,* 401 U.S. 37 (1971), federal courts are required to abstain from adjudicating lawsuits which would involve the federal court interfering with an ongoing state criminal proceeding.  *But see Dombrowski v. Pfister,* 389 U.S. 479 (1965) (abstention not appropriate where criminal prosecution threatens a substantial loss or impairment of freedom of expression).  In *Middlesex Ethics Comm. v. Garden State Bar Assn,* 457 U.S. 423 (1982), the Supreme Court extended the application of *Younger* abstention to state disciplinary proceedings against attorneys charged with violating the state's ethical or professional regulations.

79.     The holding in *Middlesex* applies only if disciplinary charges have already been issued by the state. *See Fieger v. Thomas,* 74 F.3d 740 (6th Cir. 1996).  In addition,

there is an exception to the application of *Middlesex* even after charges have been issued, if the state's disciplinary proceeding does not permit the attorney to raise and prove claims that the proceeding violates the attorney's constitutional rights. "T]he federal court should not exert jurisdiction if the plaintiffs 'had an *opportunity* to present their federal claims in the state proceedings.'" *Moore v. Sims,* 422 U.S. 415, 425 (1979) (italics in the original). *See also Fieger, supra,* 74 F.3d at 745.

80.    In the instant case, no formal charges have been issued by the Commission against Mr. Susselman, so *Younger* abstention does not apply.

81.    In addition, as Ms. Lindsey's email indicates, any constitutional claim raised by Mr. Susselman in a prospective disciplinary proceeding would be subject to the rules of discovery under MCR 9.115. Mr. Susselman is claiming that his right to Equal Protection is being violated by the failure of the Commission to issue Requests for Investigation in every instance where the Request is filed by an individual who does not reside in Michigan, and/or who has not been represented by the attorney against whom the Request is made, and that the Request which was issued to him is distinguishable by the fact that he is Jewish, whereas comparable Requests against attorneys who are not Jewish are not pursued.

82.    MCR 9.115(F)(4) provides, in relevant part:

(4) Discovery.  Pretrial or discovery proceedings are not permitted except as follows:
(a) Within 21 days after the service of a formal complaint, a party

55

may demand in writing that documentary evidence that is to be introduced at the hearing by the opposing party be made available for inspection or copying. …

(i)  Within 21 days after the service of a formal complaint, a party may demand in writing that the opposing party supply written notification of the name and address of any person to be called as a witness at the hearing. …

(ii)   Within 21 days following the filing of an answer, the administrator and respondent shall exchange the names and addresses of all persons having knowledge of relevant facts and comply with reasonable requests for

(1) nonprivileged information and evidence relevant to the charges against the respondent, and

(2) other material upon good cause shown to the chair of the hearing panel.

(b) A deposition may be taken of a witness who lives outside the state or is physically unable to attend the hearing.  For good cause shown, the hearing panel may allow the parties to depose other witnesses.

83.    None of the provisions in MCR 9.115(F)(4) would allow Mr. Susselman to obtain the information he needs regarding how the Commission has treated other Requests filed by individuals who do not reside in Michigan, or who have not been represented in a legal matter by the attorney against whom the Request is filed, in order to show a disparity to prove that the Commission has violated his rights under the Equal Protection Clause.  This information would not be available for two reasons: (1) MCR 9.115(F)(4)(a)(ii)(1) only allows discovery of non-privileged information.   As Ms. Lindsey stated in her email, information regarding other Requests is privileged and not subject to discovery. (2) As she further stated, the Commission has no data regarding Requests filed by individuals not living in Michigan, or by individuals filing Requests

against attorneys who have not represented them.  But even if the Commission does not keep such data, the Requests themselves would still be in the Commission's possession from which such information could be extracted.  But it would not make this information available to Mr. Susselman, because it is privileged.  Without this information, it is not possible for Mr. Susselman to prove that the Commission's issuance of Ms. Kinnucan's Request against him violates the Equal Protection Clause.

84.   Consequently, Mr. Susselman does not have an opportunity to present his federal equal protection claim that the Commission's procedure violates the Equal Protection Clause in the state proceeding.  Abstention under *Middlesex* therefore does not apply to Mr. Susselman's equal protection claim.

85.   Plaintiffs recognize that under MCR 9.126(A), investigations by the Commission and its staff are "privileged from disclosure, confidential, and may not be made public."  However, given the limitations on discovery set forth in the Court Rules, as stated above, Plaintiffs have no other option than to disclose the investigations against them in order to protect their constitutional rights.

86.   Since the information regarding other Requests is solely within the possession of the Commission, by virtue of its inability or unwillingness to provide this information to Mr. Susselman, Mr. Susselman's burden of proving that the Commission has violated the Equal Protection Clause shifts to the Commission to prove that it has *not* violated the Equal Protection Clause.  *See United States v. N.Y., N.H.H.R. Co.,* 355 U.S.

253, 256, note 5 (1957) (the law does not place the burden of proof on a party when the material information is peculiarly within the knowledge of his adversary); *Shatterproof Glass Corp. v. Libbey-Owens-Ford,* 482 F.2d 317, 324 (6th Cir. 1973) (where material evidence is solely within the possession of the defendant, the burden of proof shifts to the defendant); *Sacerdote v. N.Y. Univ.,* 9 F.4[th] 95, 113 (2d Cir. 2021) (same); *Cent. Of Ga. R. Co. v. Occup. S. H. R. Comm'n,* 576 F.3d 620, 624 (5th Cir. 1978) (same); *Estate of Barton v. ADT Security Services Pension Plan,* 820 F.3d 1060, 1066 (9th Cir. 2016) (same).

87.    Without the information regarding how Requests by individuals who do not live in Michigan, or against attorneys who have not represented the individual filing the Request, the Commission cannot carry its burden of proving that *it has not* violated Mr. Susselman's rights under the Equal Protection Clause.

88.    Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Susselman requests that the Court enter a declaratory judgment that the Commission has violated Mr. Susselman's rights under the Equal Protection Clause by requiring him to respond to Ms. Kinnucan's Request for Investigation and issue an injunction precluding the Commission from proceeding with

disciplinary action against Mr. Susselman based on Ms. Kinnucan's Request.

## COUNT II

## VIOLATION OF MR. SUSSLEMAN'S RIGHT OF FREE SPEECH UNDER THE FIRST AMENDMENT

89.     All of the prior averments are incorporated herein as if fully stated herein.

90.     The statements which Mr. Susselman included in his legal briefs in which he claimed that Judge Roberts' rulings, taken in their entirety, displayed a distinct appearance of being anti-Semitic and/or anti-Israel were protected by his right of free speech under the First Amendment.

91.     Freedom of speech under the First Amendment is a fundamental right. *Thornhill v. Alabama,* 310 U.S. 88 (1940).  The right applies to the states under the Due Process Clause of the Fourteenth Amendment.  *Young v. American Mini Theatres,* 427 U.S. 50 (1976).  As such, abridgement of that right by a state government, or any of its agencies, is subject to strict scrutiny and may only be justified if the state has a compelling state interest justifying its abridgement of the right.  *See Reed v. Town of Gilbert,* 576 U.S. 155 (2015); *Republican Party of Minn. v. White,* 536 U.S. 765 (2002).

92.     The Commission does not have a compelling state interest to discipline Mr. Susselman for expressing the view in his legal briefs, on behalf of his Jewish clients, that statements by Judge Roberts in her rulings, taken together in their entirety, displayed a distinct appearance of being anti-Semitic and/or anti-Israel, particularly

when fortified by his right as his clients' advocate to petition the government for a redress of their grievances, also protected by the First Amendment.  *See Railroad Trainmen v. Virginia Bar,* 377 U.S. 1 (1964); *Bounds v. Smith,* 470 U.S. 817 (1977).

93.    Given that under Count I the Court may not abstain from adjudicating this lawsuit, there is no basis for the Court to abstain from adjudicating Mr. Susselman's claim that the Commission's issuance of Ms. Kinnucan's Request against him also violated Mr. Susselman's freedom of speech under the First Amendment.

94.    Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Susselman requests that the Court enter a declaratory judgment that the Commission has violated Mr. Susselman's right of freedom of speech under the First Amendment by requiring him to respond to Ms. Kinnucan's Request for Investigation and issue an injunction precluding the Commission from proceeding with disciplinary action against Mr. Susselman based on Ms. Kinnucan's Request.

## COUNT III

## VIOLATION OF MARTIN LEAF'S RIGHT TO
## EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

95.     All of the prior averments are incorporated herein as if fully stated herein.

96.     Nowhere in the Request issued to Mr. Leaf does it identify what Rules of Professional Conduct he purportedly violated during the *Benson v. Nike* lawsuit.

97.     Upon information and belief, the Request was issued based on Judge Hulsing's ruling that the lawsuit was frivolous and his sanctioning Mr. Leaf by requiring that he pay the attorney fees of Nike's attorney.

98.     Mr. Leaf maintains that his right to Equal Protection is being violated by the failure of the Commission to issue Requests for Investigation in every instance where an attorney has been sanctioned by a judge for purportedly filing a frivolous complaint or other pleading.

99.     Mr. Leaf maintains that the Commission's issuance of its Request based on Judge Hulsing's sanction of him violates the Equal Protection Clause because it has unconstitutionally targeted him based on his race, his religion, and his ethnicity because he is Jewish, whereas comparable Requests have not been issued to other attorneys who are not Jewish who have been sanctioned by a judge.

100.    Since no formal charges have been issued by the Commission against Mr. Leaf, *Younger* abstention does not apply.

101.   Upon information and belief, based on Ms. Lindsey's email to Mr. Susselman, the Commission does not have data regarding the number of Requests which are issued to attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading.

102.   None of the provisions in MCR 9.115(F)(4) would allow Mr. Leaf to obtain the information he needs regarding how the Commission has treated other Requests issued to attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading.  This information would not be available for two reasons: (1) MCR 9.115(F)(4)(a)(ii)(1) only allows discovery of non-privileged information.   As Ms. Lindsey stated in her email, information regarding other Requests is privileged and not subject to discovery. (2)  The Commission does not have data regarding how many Requests are issued to attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading.  Although the Commission does not collect such data, it has in its possession the Requests from which such data could be extracted.  But it will not make that information available to Mr. Leaf, because it is privileged.  Without this information, it is not possible for Mr. Leaf to prove that the Commission's issuance of the Request to him violates the Equal Protection Clause.

103.   Consequently, Mr. Leaf does not have an opportunity to present his federal claim that the Commission's procedure violates the Equal Protection Clause in the state proceeding.  Abstention under *Middlesex* therefore does not apply to Mr. Leaf's equal

protection claim.

104.   Since the information regarding other Requests is solely within the possession of the Commission, by virtue of its inability or unwillingness to provide this information to Mr. Leaf, the burden of proving that the Commission has violated the Equal Protection Clause shifts to the Commission to prove that it has *not* violated the Equal Protection Clause.  *See N.Y., N.H.H.R. supra; Shatterproof Glass Corp., supra; Sacerdote, supra; Cent. Of Ga. R. Co, supra; Estate of Barton, supra.*

105.   Without the information regarding whether Requests are issued to other attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading, the Commission cannot carry its burden of proving that *it has not* violated Mr. Leaf's rights under the Equal Protection Clause.

106.   Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Steffel v. Thompason,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Leaf requests that the Court enter a declaratory judgment that the Commission has violated Mr. Leaf's rights under the Equal Protection Clause by requiring him to respond to its Request for Investigation and issue an injunction precluding the Commission from proceeding with disciplinary action against Mr. Leaf based on the Request.

## COUNT IV

## VIOLATION OF MR. LEAF'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

107.   All of the prior averments are incorporated herein as if fully stated herein.

108.   A fundamental requirement of due process under the Fourteenth Amendment is notice and an opportunity to be heard.  *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306 (1950).

109.   Where a state seeks to deprive an individual of liberty or property, notice of the charges being alleged against the individual must be articulated with sufficient clarity that the individual knows what s/he is accused of.  This applies in the case of a prison inmate accused of misconduct (*Hewitt v. Helms,* 459 U.S. 460 (1983)); a public employee facing disciplinary action (*Gilbert v. Homar,* 520 U.S. 924 (1997)); a business charged with improperly discharging an employee (*Brock v. Roadway Express, Inc.,* 481 U.S. 252 (1987)); and an attorney charged with violating the state's professional code (*Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626 (1985)).

110.   Mr. Leaf has a property interest in his profession as an attorney, and a liberty interest in protecting his professional reputation.  *Greene v. McElroy,* 360 U.S. 474 (1959) (property interest); *Board of Regents v. Roth,* 408 U.S. 564 (1972) (property and liberty interests).

111.   Nowhere in the Request issued to Mr. Leaf has Mr. Goetz identified

specifically which Rule(s) of Professional Conduct Mr. Leaf purportedly violated in the course of his litigating the *Benson v. Nike* lawsuit.  By failing to provide this information, the Request fails to provide Mr. Leaf the notice he is entitled to under the Due Process Clause of the Fourteenth Amendment.

112.   Given that under Count III the Court may not abstain from adjudicating Count III, there is no basis for the Court to abstain from adjudicating Mr. Leaf's claim that the Commission's issuance of its Request to him also violated Mr. Leaf's right to due process under the Fourteenth Amendment.

113.   Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Leaf requests that the Court enter a declaratory judgment that the Commission has violated Mr. Leaf's right to due process under the Fourteenth Amendment by requiring him to respond to its Request for Investigation without specifying the MRPC he allegedly violated and issue an injunction precluding the Commission from proceeding with disciplinary action against Mr. Leaf based on the Request.

## COUNT V

## VIOLATION OF MR. LEAF'S RIGHT OF FREE SPEECH
## UNDER THE FIRST AMENDMENT

114.   All of the prior averments are incorporated herein as if fully stated herein.

115.   The statements which Mr. Leaf included in his legal briefs in which he claimed that Judge Hulsing's rulings and conduct displayed a distinct appearance of being anti-Semitic were protected by his right of free speech under the First Amendment.

116.   Freedom of speech under the First Amendment is a fundamental right. *Thornhill, supra.*  The right applies to the states under the Due Process Clause of the Fourteenth Amendment.  *Young, supra;*  As such, abridgement of that right by a state government, or any of its agencies, is subject to strict scrutiny and may only be justified if the state has a compelling state interest justifying its abridgement of the right.  *See Reed, supra; Republican Party of Minn., supra.*

117.   The Commission does not have a compelling state interest to discipline Mr. Leaf for expressing the view in his legal briefs, on behalf of his client, that statements and conduct by Judge Hulsing displayed a distinct appearance of being anti-Semitic, fortified by his right as his client's advocate to petition the government for a redress of grievances, also protected by the First Amendment.  *Railroad Trainmen, supra; Bounds, supra.*

66

118.   Given that under Count III the Court may not abstain from adjudicating Count III, there is no basis for the Court to abstain from adjudicating Mr. Leaf's claim that the Commission's issuance of its Request to him also violated Mr. Leaf's freedom of speech under the First Amendment.

119.   Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Leaf requests that the Court enter a declaratory judgment that the Commission has violated Mr. Leaf's right of freedom of speech under the First Amendment by requiring him to respond to its Request for Investigation and issue an injunction precluding the Commission from proceeding with disciplinary action against Mr. Leaf based on the Request.

/s/  Marc M. Susselman

Marc M. Susselman (P29481)

Attorney for Plaintiffs

43834 Brandywyne Rd.

Canton, Michigan 48187

(734) 416-5186

marcsusselman@gmail.com


/s/ Martin H. Leaf

Martin H. Leaf (P43202)

Attorney for Plaintiffs

33228 W. 12 Mile Rd., Ste. 345

Farmington Hills, Michigan 48334

(248) 687-9993

Dated:  March 9, 2025          leafmartin@gmail.com

## **JURY DEMAND**

Plaintiffs demand a jury as to all issues of fact as to which they are entitled to a

jury.

/s/  Marc M. Susselman
Marc M. Susselman (P29481)
Attorney for Plaintiffs
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com


/s/ Martin H. Leaf
Martin H. Leaf (P43202)
Attorney for Plaintiffs
33228 W. 12 Mile Rd., Ste. 345
Farmington Hills, Michigan 48334
(248) 687-9993

Dated:  March 9, 2025                          leafmartin@gmail.com

## **INDEX OF EXHIBITS**

Exhibit 1      Photographs of signs in front of Beth Israel synagogue.

Exhibit 2      Photographs of signs across Washtenaw Ave. facing the synagogue.

Exhibit 3      Photograph of the defaced Israel flag.

Exhibit 4      Photograph of Dr. Siegel being marched through Munich.

Exhibit 5      Photographs of new signs after October 7, 2023.

Exhibit 6      Copy of Request for Investigation issued to Mr. Susselman.

Exhibit 7      Copy of Mr. Susselman's Answer to the Request for Investigation.

Exhibit 8      Photograph of the clones' jerseys in the Nike advertisement.

Exhibit 9      Photograph of the billboard with the Star of David in the Nike ad.

Exhibit 10    Copy of Complaint filed by Mr. Leaf in the lawsuit against Nike.

Exhibit 11    Copy of the Order issued by Judge Hulsing requiring that Mr. Leaf appear in court in person.

Exhibit 12    Copy of Mr. Leaf's Motion For Disqualification of Trial Judge.

Exhibit 13    Copy of Opinion and Order granting motion to dismiss.

Exhibit 14    Copies of letters sent to judges by Judge Hulsing in his capacity as Chairperson of the Michigan Judicial Tenure Commission.

Exhibit 15    Copy of Michigan Court of Appeals decision affirming Judge Hulsing's decision.

Exhibit 16    Copy of Request for Investigation issued to Mr. Leaf on January 27, 2025, Holocaust Remembrance Day

# EXHIBIT 1



















**EXHIBIT 2**

















# EXHIBIT 3



**EXHIBIT 4**

# The photo that alerted the world

POSTED ON NOVEMBER 7, 2016



This is a photo shot on the streets of Munich, Germany on 10th March 1933; just six weeks after Hitler came to power. The picture, published across the world and later in many history books, was a chilling portent of the hellish events that were about to consume Germany and much of the rest of the planet. Many have seen this photo, but few know the background behind it.

Dr Michael Siegel, an eminent 50-year-old German Jewish lawyer, is shown in the photo, bruised, barefoot, trousers ripped, being marched by Nazi 'brown-shirt' auxiliary police. The sign hanging from his neck was scrawled with the message, *'Ich bin Jude, aber ich werde mich nie mehr bei der Polizei beschweren'* – **I am a Jew, but I will never again complain to the police'.**

**EXHIBIT 5**





**EXHIBIT 6**

State of Michigan

**Attorney Grievance Commission**

755 W. Big Beaver Rd. - Suite 2100
Troy, MI 48084
www.agcmi.org

**Request for Investigation**

*As provided for by MCR 9.112(A) this request is submitted in a document other than the form provided by the Grievance Administrator.*

Respondent Attorney Information:   Marc M. Susselman (P29481)

43834 Brandywyne Rd.

Canton, Michigan 48187

(734) 416-5186

Complainant Information:   Michelle J. Kinnucan

(206) 245-8610

agcmi2024@mailbox.org

**Date**: April 30, 2024      **Signature**: _Michelle J. _____

**Relationship to Respondent Attorney**: None

**Date Attorney Hired/Retained**: Respondent not hired/retained by Complainant

**Type of Case Involved**: Civil

**Relevant Cases**:

- *Gerber et al. v. Herskovitz et al.*, No. 19-13726, 2020 WL 4816145, (E.D. Mich., Aug. 19, 2020; *recons den* Sep. 3, 2020; *aff'd* 14 F.4th 500 (6th Cir., Sep. 15, 2021); *aff'd* (unpublished) 6th Cir., Feb, 22, 2023)
- *Gerber et al. v. Herskovitz et al.*, No. 20-1870 (6th Cir., *en banc rehearing den* Nov. 2, 2021)
- *Susselman v. Gerber et al.*, No. 21-001148-NO (Mich. 22nd Cir., *dismissed* Oct. 28, 2022; *recons den* Jan. 11, 2023)

- *Brysk v. Herskovitz et al.*, No. 21-1024 (S. Ct., *cert den* Mar. 21, 2022)
- *Brysk v. Herskovitz et al.*, No. 22-1075 (6th Cir., *en banc rehearing den* Apr. 4, 2023)
- *Brysk et al. v. Herskovitz et al.*, No. 23-10 (S. Ct., *cert den* Oct. 2, 2023; *rehearing den* Nov. 20, 2023)
- *Herskovitz et al. v. Gerber et al.*, No. 23-009003-CZ (Mich. 3rd Cir., *filed* Jul. 14, 2023)

**Statement of Alleged Misconduct:** As set forth more fully below, it is alleged that Respondent Susselman has violated Rules 3.1, 3.5(d), 6.5(a), and 8.2(a) of the Michigan Rules of Professional Conduct (MRPC; last updated 9/1/2023).

**Background:** When Respondent Susselman filed the initial action in federal district court in December 2019, he represented only Gerber. Brysk was added as a co-plaintiff in the amended complaint in January 2020.

On October 1, 2021, Gerber discharged Susselman as his attorney.[1] Gerber also informed him that Brysk had likewise terminated him.[2] That same day, Susselman went to the home of Brysk, who denied that she had discharged him. Susselman then "asked Dr. Brysk to sign a statement he had prepared in which she indicated that she did not wish to terminate Plaintiff as her attorney." Brysk "indicated that she did not want to sign any legal papers." Later, that same day, Gerber sent Susselman an image of a signed, typed statement from Brysk that read: "You are fired as my attorney immediately."

A week later Susselman returned to Brysk's home and confronted Brysk about the signed statement. Brysk said she did not recall signing it and denied any desire to terminate Susselman. However, Brysk's husband confirmed both the signature as his wife's and her agreement with Gerber to discharge Susselman. Describing the period during and after when Susselman's continuing representation of Brysk was in jeopardy Susselman stated she "was in declining health" and "is in failing health". Indeed, Brysk died less than eight months later.[3]

In retaliation for his termination as Gerber's counsel, Susselman filed suit against Gerber and his wife in state court for "breach of contract, *quantum meruit*, and tortious interference with a contractual relationship" and seeking, among other relief, $361,200 in compensatory damages. (Case No. 21-001148-NO, First Amended Complaint at 1, 9).[4]

---

1   Gerber's litigation with new counsel was similarly unsuccessful at all trial and appellate court levels.

2   The précis presented here of Gerber's and Brysk's termination of Susselman as counsel relies solely upon Susselman's account in filed pleadings. (*See* Case No. 20-1870, ECF 61 at 3-7 & Case No. 21-001148-NO, First Amended Complaint at 6-8, 10, Exhs. 1, 2.)

3   Miriam Brysk, DETROIT NEWS, Jun. 6, 2022, <https://www.detroitnews.com/obituaries/det114402> last accessed Mar. 13, 2024.

4   Evincing a misapprehension or disregard of MRPC 1.16, Susselman reportedly said: "A client can fire an attorney at any time. And I accept that' s true. But if they don't fire them for good reason, like attorney malpractice or missed deadlines … then there are consequences. Gerber has the right to fire me, but not the way he did it." (Andrew Lapin, Judge orders Ann Arbor congregants to pay legal fees for the 18-year protesters outside their synagogue, JEWISH TELEGRAPHIC AGENCY, Feb. 1, 2022,

In the initial action, the federal district court dismissed the complaint and awarded fees under 42 U.S.C. § 1988, jointly and severally, against the plaintiffs and their attorney, Susselman. (Case No. 19-13726, Order, ECF 103 at 19). The court of appeals affirmed the award of fees on the grounds that "[e]ach claim" of the underlying complaint "plainly lacked one or more elements required under settled precedent", it was "frivolous under *Christianburg*", and, quoting *Wolfe*, it "was clearly defective at the outset of the case" (Case No. 22-1075, Opinion, ECF 49-2 at 3, 5).[5]

I am unaware of any formal sanctions, other than attorney fees, imposed upon Susselman. The fees due to the counsel of the protester defendants have been paid with Gerber as the assignee of judgment (Case No. 19-13726, Assignment of Judgment, ECF 126 & Case No. 23-009003-CZ).

**Detailed Allegations of Misconduct:** Susselman was admonished for content in a brief in Case No. 20-1870. In his concurrence (14 F.4th 500, 519, n. 4), Circuit Judge Eric L. Clay wrote:

> Plaintiffs, in their brief, suggest that the district court's failure to cite *Wells* may have been indicative of racial bias ... We previously concluded that a "suggestion that bigotry underlay" the district court's decision, "a claim completely unsupported in the record before this court, was not well received [] and will not be countenanced in the future by this court. Counsel are advised that personal aspersions, whether they be cast at opposing counsel or members of the judiciary, have no place in argument before us unless they are strictly pertinent to a legal issue, such as the imposition of Rule 11 sanctions or claims of judicial or prosecutorial misconduct."

In the Corrected Third Appellate Brief (Case No. 22-1075, ECF 45 at 58) Susselman acknowledged:

> At the oral argument, Judge Clay interrupted the Plaintiffs' counsel [i.e. Susselman], asking him where he had found "the temerity" to imply that the district judge was racially biased. Plaintiffs' counsel responded that it was a significant case in support of the Plaintiffs' position on standing. Judge Clay responded, "That doesn't matter. A judge may fail to cite a case for all kinds of reasons." Prompted by Judge Sutton, Plaintiffs' counsel apologized for the purported implication that Judge Roberts was racist, and proceeded with his argument.

Yet, instead of heeding Judge Clay's warnings Susselman doubled down. The title of Section C

---

<https://www.jta.org/2022/02/01/united-states/judge-orders-ann-arbor-congregants-to-pay-legal-fees-for-the-18-year-protesters-outside-their-synagogue> last accessed Feb. 17, 2024.) It is left to the discretion of the Commission to determine whether Susselman should also be investigated for violations of MRPC 1.16 in the matter of his termination(s) as counsel and/or MRPC 3.1 for filing a frivolous lawsuit against Gerber in state court.

5   It is also left to the discretion of the Commission to determine whether Susselman should also be investigated for a violation of MRPC 3.1 for filing a frivolous lawsuit in federal district court.

of the Corrected Third Appellate Brief is "Judge Roberts' Rulings, Taken Together In Their Entirety, Have The Distinct Appearance Of Being Anti-Semitic." Below is another excerpt from Susselman's brief from that section:

> The undersigned has no way of knowing what is in Judge Roberts' heart, but as stated in Matthew 7:16, "By their deeds you will know them." What do Judge Roberts' deeds in the course of this litigation tell us about her motives …
>
> In her decision dismissing the lawsuit, Judge Roberts stated … "Indeed, the First Amendment **more than** protects the expressions by Defendants of what Plaintiffs describe as 'anti-Israeli, anti-Zionist, an[d] antisemitic.' " (Emphasis added [by Susselman].) Why would **this particular speech** be more protected than other speech? There are three possibilities. Judge Roberts could have been referring to the anti-Semitic speech as deserving more protection; or to the anti-Israeli, anti-Zionist speech as deserving more protection; or to the combination of the two as deserving more protection. All three explanations have support in the empirical data. A 2016 survey by the Anti-Defamation League indicated that the rate of anti-Semitism was significantly higher in the African- American community (23%) than in the general population (14%) … A study published in the Social Science Journal … analyzing James Baldwin's 1967 essay, "Negroes Are Anti-Semitic Because They Are White [*sic*]," concluded: "One analysis indicates that while some anti-Semitic attitudes are strongly associated with anti-White attitudes, African-Americans are still significantly more likely than White, Latino, and Asian groups to express anti-Semitic views when the level of anti-White sentiment is held constant …" … This higher rate of anti-Semitism in the African-American community has been linked to the Israeli-Palestinian conflict and the tendency of African-Americans to identify with the Palestinians as the victims of Israeli oppression … The stigma of this country's reprehensible history of slavery and its continuing residual effects does not give Judge Roberts the liberty to express her own bias in her rulings, any more than the rulings of a Caucasian judge which had the distinct appearance of anti-Black bias would be tolerated. This is by no means a claim or suggestion that Judge Roberts is a neo-Nazi, or that she consciously or subconsciously supports Hitler's Final Solution. If, however, Judge Roberts' rulings, and her statement that the Protesters' speech was "more than protected" by the First Amendment, were in any way the product of empathy with the Palestinian cause and/or antipathy for Israel and Zionism, those rulings were improper …
>
> The capstone of Judge Roberts' rulings was her decision awarding attorney fees to the Protesters in the amount of $158,721.75 … What could possibly explain Judge Roberts' motive for making such an antithetical decision, a decision requiring that an 87 year-old Holocaust survivor pay $158,721 to a group of anti-Semitic neo-Nazis …

Susselman's sinister spin on the phrase "more than protects" evinces bad faith on his part. Judge

Roberts actually quoted *Terminiello* ("a function of free speech under our system of government is to invite dispute") in the very same paragraph as the sentence to which Susselman objects. (Case No. 19-13726, Order, ECF 66 at 10-11). There is also a similar, more recent precedent in the Sixth Circuit to the effect that the First Amendment does more than protect speech: "The purpose of the First Amendment is to encourage discussion ..." *Glasson v. City of Louisville*, 518 F.2d 899, 905 (6th Cir. 1975).

In addition to maligning Judge Roberts on the basis of her rulings and her race/ethnicity, Susselman also impugns opposing counsel in the matter of the payment of attorney fees. As an attorney, Susselman presumably knows full well those fees go to the attorneys for the costs of litigation and yet he maligns Judge Roberts and opposing counsel for "a decision requiring that an 87 year-old Holocaust survivor pay $158,721 to a group of anti-Semitic neo-Nazis ... " One inference here being that opposing counsel comprise, or are part of, a group of "anti-Semitic neo-Nazis".

Susselman concludes Section C as follows:

> Although there is no way to know what is in Judge Roberts' heart, and while any one of the considerations discussed above taken alone would not necessarily imply anti-Semitism, considering all of her rulings, taken together in their entirety, the appearance of anti-Semitism is undeniable. Her rulings do a disservice to the history of Jews who staunchly defended the rights of African-Americans during the Civil Rights movement, Jews who marched arm in arm with Martin Luther King, and Jews who gave their lives – Andrew Goodman and Michael Schwerner – defending those rights.

> This is not an issue that may be minimized, rationalized, or swept under the carpet. The specter of the appearance of racial, ethnic or religious bias in the rulings of any judge, regardless the judge's own race, ethnicity or religion, must be forthrightly addressed, investigated and, if sustained, sanctioned. When such bias seeps into the judiciary, it becomes a cancer which undermines the administration of justice in this country. J'Accuse. [emphasis in original]

It bears emphasizing that Susselman explicitly called for Judge Roberts to be investigated for bias and, potentially, sanctioned. Moreover, if there was any doubt that Susselman is indeed accusing Judge Roberts of anti-Semitism then, after pointedly concluding Section C with "J'Accuse" (French for "I accuse"), Susselman elaborates as follows in his footnote 11:

> At the end of Emile Zola's monograph titled "J'Accuse," denouncing the French government for its anti-Semitic mistreatment of Alfred Dreyfus, a Jewish French army officer ... Zola wrote: "I have only one passion, that of light in the name of humanity which has suffered so much and which has the right to happiness. My fiery protest is only the cry of my soul. So dare you put me on trial and let the investigation take place! I wait."

Susselman's quotation of Zola at the end of his note does not seem to be merely explanatory. Rather, it reads as a defiant challenge to anyone who objects to Susselman's unfounded allegations of judicial bias.

In a later, unpublished Opinion (Case No. 22-1075, ECF 49-2 at 7-8) the court of appeals noted:

> ... Susselman, of his own accord, accuses the district court of antisemitism. The basis for this serious allegation? A "series of questionable rulings." ... Not content to stop there, Susselman accuses Judge Clay of racially motivated hypocrisy too. Well-founded allegations of judicial bias, we appreciate, deserve a serious-minded accounting. But Susselman grounds his allegations almost entirely in adverse rulings, which rarely "constitute a valid basis for a" claim of judicial bias. *Liteky v. United States*, 510 U.S. 540, 555 (1994). The only external source for the allegation is a study supposedly finding higher-than-average rates of antisemitic attitudes in the African American community. From this, Susselman concludes that the district judge—who is African American—must have been biased against the congregants. This argument rests on offensive, essentialist stereotypes. It involves enormous logical leaps. And it disserves Susselman's client by distracting from the merits of the fee issue. If this is the quality of Susselman's advocacy, the fee award hardly comes as a surprise. Susselman's bias arguments "find no support in the record," *Dixon v. Clem*, 492 F.3d 665, 679 (6th Cir. 2007), and are "not well received," Gerber, 14 F.4th at 519 n.4 (Clay, J., concurring) (quotation omitted).

With respect to the seriousness of unfounded allegations of bias in judicial proceedings the Commission may take notice of the December 17, 2021, Memorandum Opinion and Order (*see* ECF 297 at 11-12) in *Freshub v. Amazon.com et al* (No. 21-00511, W.D. Texas). There the court found:

> Freshub's counsel failed to articulate any coherent argument as to how Defendants' counsel engaged in any racist or anti-Semitic conduct at trial. Without any evidentiary support, these serious allegations are particularly disturbing.

> The Court finds that Freshub's inflammatory allegations are nothing but baseless attacks on the integrity of this Court and the reputation of Defendants' counsel. Freshub's motion is apparently the result of its dissatisfaction with the verdict and counsel's difficulty in making sense of the unfavorable outcome ... a bitter losing party's difficulty in explaining its loss is never a proper basis for counsel to invoke baseless allegations of racism and anti-Semitism ... Such vitriolic and unsubstantiated allegations are not only shocking, but also offensive to this Court.

In the *Freshub* case the plaintiff's counsel alleged that opposing counsel were racist or anti-Semitic. By contrast, Susselman aimed his allegations directly at Judge Roberts and Judge Clay.

Page 6 of 8

Furthermore, it may be noted that Susselman's allegations of judicial bias on the part of Judge Roberts attracted significant media attention. Here are three examples:

- "Attorney Marc Susselman argued on behalf of the synagogue members, and was confronted by U.S. Circuit Judge Eric Clay immediately after he made his opening statement. Clay ... took issue with a portion of Susselman's brief that characterized Judge Roberts as racially biased because she failed to cite a certain case in her decision to dismiss his client's complaint."[6]
- " 'Considering all of her [Judge Roberts'] rulings, taken together in their entirety, the appearance of antisemitism is undeniable,' the lawyer, Marc Susselman, wrote in a brief filed Thursday appealing the order."[7]
- "Susselman has accused the district court judge — who deemed the case frivolous and assigned attorneys' fees — of being antisemitic or anti-Israel."[8]

**Conclusion:** To summarize, it is alleged that:

1. Susselman violated MRPC 3.1 by frivolously "assert[ing] ... an issue" of judicial bias by Judge Roberts; and,
2. Susselman violated MRPC 3.1 by frivolously "assert[ing] ... an issue" of judicial bias and/or, "racially motivated hypocrisy" by Judge Clay; and,
3. In making his unfounded accusations of judicial bias Susselman "engag[ed] in undignified or discourteous conduct toward the tribunal" resulting in violations of MRPC 3.5(d); and,
4. In making his unfounded accusations of judicial bias Susselman also contravened his duty to "treat with courtesy and respect all persons involved in the legal process" resulting in violations of MRPC 6.5(a); and,
5. In making his unfounded accusations of judicial bias Susselman also contravened his duty to "take particular care to avoid treating such a person discourteously or disrespectfully because of the person's race, gender, or other protected personal characteristic" resulting in violations of MRPC 6.5(a); and,
6. In characterizing opposing counsel, explicitly or otherwise, as "anti-Semitic neo-Nazis" Susselman contravened his duty to "treat with courtesy and respect all persons involved in the legal process" in violation of MRPC 6.5(a); and,
7. In making his unfounded accusations of judicial bias Susselman contravened his obligation to "not make a statement that the lawyer knows to be false or with reckless disregard

---

6    Kevin Koeninger, Michigan Jewish Community Argues for Ban on Protests Outside Synagogue, COURTHOUSE NEWS SERVICE, Apr. 27, 2021, <https://www.courthousenews.com/michigan-jewish-community-argues-for-ban-on-protests-outside-synagogue/> last accessed Feb. 17, 2024.

7    Stewart Ain, Lawyer in Michigan synagogue-protest case accuses judge of being antisemitic, FORWARD, July 29, 2022, <https://forward.com/fast-forward/512599/lawyer-in-michigan-synagogue-judge-of-being-antisemitic/> last accessed Feb. 17, 2024.

8    Marc Rod, Holocaust survivor's estate appeals court order for payout to antisemitic picketers, JEWISH INSIDER, Aug 10, 2023 <https://jewishinsider.com/2023/08/miriam-brysk-holocaust-survivor-supreme-court-antisemitic-picketers/> last accessed Feb. 6, 2024.

as to its truth or falsity concerning the ... integrity of a judge" resulting in violations of MRPC 8.2(a).

It is left to the discretion of the Commission to determine whether Susselman should also be investigated for violations of MRPC 8.4(a) and/or 8.4(c) in the event any of the misconduct allegations made above are substantiated.

**EXHIBIT 7**

Marc M. Susselman, J.D., M.P.H.
43834 Brandywyne Rd.
Canton, Michigan 48187
marcsusselman@gmail.com
(734) 416-5186

August 19, 2024

**RESPONDENT'S ANSWER TO AGC FILE NO. 24-1244**
**Michelle J. Kinnucan as to Marc M. Susselman**

**I.    Michelle J. Kinnucan Does Not Have Standing To Bring This Request For Investigation**

Respondent does not know Ms. Kinnucan; Respondent has never met Ms. Kinnucan; Respondent has never spoken to or otherwise communicated with Ms. Kinnucan; Respondent has never represented Ms. Kinnucan in any legal matter; Ms. Kinnucan is not a resident of Michigan, and as best as Respondent can determine, Ms. Kinnucan lives in the State of Washington.

Under these circumstance, how can Ms. Kinnucan invoke the jurisdiction of the Michigan Attorney Grievance Commission to investigate the Respondent for alleged violations of the Michigan Rules of Professional Conduct?  Ms. Kinnucan did not even submit her request on the standard form required by the Commission, which requires that the grievant provide her address.  Ms. Kinnucan has not provided this information.

Does the resident of any state in the United States other than Michigan have standing to claim that a Michigan licensed attorney with whom they

1

have never communicated and by whom they have never been represented in a legal matter, have standing to claim that the attorney violated the Michigan Rules of Professional Conduct, regarding a legal matter in which the grievant was not even a party, and there is no indication that the grievant has any familial or legal relationship to any party involved in the legal matter? On what basis does such an individual have standing to file such a complaint? In any legal matter, the plaintiff has the burden of demonstrating that she has standing to sue based on an injury which the plaintiff has suffered by virtue of the events and conduct alleged in the complaint. How have the actions which Ms. Kinnucan has alleged in her complaint against the Respondent – actions which Respondent will demonstrate below have not been accurately represented and were legally justified - injured Ms. Kinnucan?

Can a resident of a state claim that the legal actions of an attorney licensed in another state, who never represented them in any legal matter, offended their sensibilities, their sense of justice, their ethical code, or caused them emotional distress, as a basis for filing a claim of a professional ethical violation? Are we going to start authorizing residents of Blue states to file ethical grievances against attorneys licensed to practice law in Red states, or residents of Red states to file ethical grievances against attorneys

licensed in Blue states, whom they have never met, never communicated with, never been represented by in any legal matter, for taking legal positions they disagree with, or find offensive?

Ms. Kinnucan has alleged that Respondent violated the MRPC with regard to statements and arguments which he made representing clients as their legal advocate in briefs filed in the Sixth Circuit Court of Appeals. If this were the case, the Sixth Circuit would have had the right to bring charges of such violations to the attention of the Michigan State Bar pursuant to Fed. R. App. P. 46. The Court has not done so. By what authority does Ms. Kinnucan, a resident of another state, whom Respondent has never met, never spoken to, and never legally represented, have such a right?[1]

Moreover, since Respondent has never represented Ms. Kinnucan in any legal matter; has never communicated with her; has never given her any legal advice, he owed her no legal duty, and she could not sue him for legal malpractice. *Friedman v. Dozorc,* 412 Mich. 1 (Mich. 1981). Under what

---

[1] Ms. Kinnucan is a political propagandist, with a particular obsession with Israel. *See Kinnucan v. Nat'l Sec. Agency,* Case No. C20-1309 MJP, W. D. Wash. Nov. 4, 2022), In which Ms. Kinnucan sued the National Security Agency, the Central Intelligence Agency, the Defense Intelligence Agency, and the Department of Defense, for failing to provide her information pursuant to a FOIA request relating to the attack on the U.S. Liberty by Israeli forces during the 1967 Arab-Israeli War.

legal authority, then, does she have standing to file a legal grievance against him? There is none.

## II. Ms. Kinnucan's Allegations That Respondent Violated The MRPC By Virtue Of Statements And Arguments Which He Made In Appellate Briefs Are Entirely Without Merit.

### A. Background Of The Case Which Is The Subject Of Ms. Kinnucan's Allegations.

In order to evaluate the validity, or lack thereof, of Ms. Kinnucan's allegations of unethical conduct by Respondent, it is necessary to inform the Commission of the background of the lawsuit in which Ms. Kinnucan claims Respondent engaged in the allegedly unethical conduct.

In 2019, the Respondent was informed that a group of protesters were picketing in front of a synagogue in Ann Arbor, Michigan. Respondent went to Ann Arbor to see the picketing for myself. It turned out that the picketers had been protesting in front of the Beth Israel synagogue every Saturday morning, since 2003, using blatantly anti-Semitic signs, bearing such messages as "Jewish Power Corrupts"; "Resist Jewish Power"; "No More Holocaust Movies." Commingled with the anti-Semitic signs were signs protesting Israel's role in the Israeli-Palestinian conflict, offering cover for the anti-Semitic signs. The signs numbered some twenty signs in all, with half directly in front of the synagogue, and the other half across the street facing the synagogue. The signs were placed on both sides of

4

the street in the public right-of way.  They also displayed the Israeli flag in front of the synagogue, with the Jewish Star of David – the historically recognized symbol of the Jewish people - defaced with a red circle and a red slash across the circle – the international symbol meaning "Prohibited," reviving the Nazi propaganda that Jews were expendable.  Several of the protesters were avowed Holocaust deniers, and had publicly said so.

Respondent learned that a history professor at the University of Michigan who teaches a course on the Israeli-Palestinian conflict was a member of the synagogue's congregation.   Respondent asked the professor how such an anti-Semitic protest could be allowed to occur for 16 years in front of a Jewish house of worship. The professor indicated that he had tried for years to have the synagogue and the City of Ann Arbor take legal action to put a stop to the protest, without success. Respondent decided to do some legal research to determine whether anything could be done to curtail the protest.  In the course of his research, he learned that Ann Arbor had a sign ordinance which unambiguously prohibited placing any signs in the public right-of-way.  Because the ordinance prohibited the placement of signs in the public right-of-way, regardless their message, in legal terms the ordinance was "content and viewpoint neutral," i.e., the ordinance did not selectively allow some signs,

and prohibit other signs, based on their content.  Because the ordinance was neutral, it could be enforced against any violators without infringing on their First Amendment protected freedom of speech. Yet the City of Ann Arbor had never enforced the ordinance against the protesters over the 16 years that they had been protesting every Saturday morning in front of the synagogue, as members of the synagogue, many with children, entered the synagogue to engage in their Sabbath worship, even though there were Ann Arbor police stationed near the synagogue, and could see the signs illegally placed in the public right-of-way.

Respondent anticipated that the protesters would claim that their use of the signs was protected by the First Amendment's freedom of speech clause.  They would rely, for example, on the case which had involved the neo-Nazi march in Skokie, Illinois, where many Holocaust survivors lived, who had attempted to prevent them from marching.  Their effort was rejected by the courts, because the survivors did not constitute what is referred to as "a captive audience" – i.e., the First Amendment does not protect speech which is forced on listeners or readers against their will.  A speaker cannot require listeners to hear a message they do not wish to hear or see. The courts held, however, that the survivors were not a captive audience.  The neo-Nazis intended to march in downtown Skokie,

6

not through the residential area where the survivors lived.  The survivors could avoid seeing the neo-Nazis marching in their Nazi uniforms by simply avoiding going downtown.  They therefore did not qualify as a captive audience.

Likewise, regarding an analogy with the Westboro Church homophobic protests at funerals for members of the U.S. military.  In the lawsuit by the father of a deceased soldier, at whose funeral the members of the Westboro Church showed up displaying their insulting homophobic signs, the Supreme Court reversed a judgment in favor of the father for intentional infliction of emotional distress on the basis that neither the father, nor any of the other funeral attendees, could see the signs during the funeral.  The signs were too far away from the funeral to be visible.  Consequently, the Court held, the father and the attendees were not a captive audience.

By contrast, the anti-Semitic protesters in front of the synagogue were placing their signs in direct view of the members of the synagogue as they entered their house of worship, with their children, to participate in their Sabbath service.  They were deliberately placing their signs there so that the synagogue members would see them; the synagogue members were not going out of their way to where the signs were displayed in order

to see them.  The protesters were intentionally coming to the synagogue, targeting the synagogue members every Saturday morning, going where they knew they could find Jews to harass.

The Beth Israel synagogue is located in a residentially zoned area of Ann Arbor.  The Supreme Court had previously sustained state laws which restricted residential picketing.  The Supreme Court had also sustained the constitutionality of an injunction which placed reasonable time, place and manner restrictions on anti- abortion protesters in proximity to an abortion clinic, when the right to abortion was still deemed to be a constitutionally protected right, as was the right of the synagogue members under the Freedom of Religion Clause of the First Amendment to worship without being harassed.

Consequently, after Respondent concluded his legal research, he felt reasonably confident that the protesters did not have an absolute First Amendment right to picket in front of the synagogue every Saturday morning using anti-Semitic signs which insulted and vilified the congregation members, even if commingled with signs addressing the Israeli-Palestinian conflict.  He prepared a legal memorandum explaining the First Amendment law and proposing a lawsuit against the protesters in federal court seeking issuance of an injunction placing reasonable time,

place and manner restrictions on their conduct, e.g., requiring that they be a certain distance from the synagogue property; that they be prohibited from protesting during the time period when the Sabbath service was being conducted; and that the number of protesters, and the number of signs they used, be limited to a reasonable number. The legal memorandum was provided to the history professor who was a member of the congregation, and he in turn provided it to the synagogue's Board of Directors, and it was distributed among the congregation members.

Respondent began attending services at the synagogue to try to enlist members of the congregation to agree to be plaintiffs in the lawsuit. Although there were many members who were angry and disgruntled regarding the protesters' conduct, they were also concerned that publicity could make things worse, and might incentivize Muslim residents in nearby Dearborn to join the protesters. After several weeks of discussion with members of the congregation, Respondent succeeded in enlisting two members to agree to be plaintiffs in the lawsuit, Marvin Gerber and Dr. Miriam Brysk, a Holocaust survivor. Dr. Brysk worshipped at an annex connected to the synagogue. She also had concerns about retaliation. She agreed to be a plaintiff on one condition – that if there were a trial, that Respondent would call her as a witness so that she could testify regarding

her experience during the Holocaust.  Respondent promised her that he would do so.

Representing Mr. Gerber and Dr. Brysk *pro bono,* Respondent filed the lawsuit in the United States District Court in Detroit in December, 2019, naming five of the current protesters as defendants.  He also named the City of Ann Arbor as a defendant, based on its failure to enforce its sign ordinance against the protesters, which he claimed constituted "state action" by inaction. He alleged that the plaintiffs had standing to sue because seeing the anti-Semitic signs in front of their synagogue every Saturday morning, as they entered the synagogue to pray, caused them extreme emotional distress, a standard injury providing standing to sue in literally thousands of cases. In addition to requesting an injunction placing reasonable time, place and manner restrictions on the protesters' conduct, Respondent included several claims based on a number of federal civil rights statutes which make it unlawful to engage in certain conduct which targets people based on their ethnicity or religion.  He requested monetary damages against the protesters for violating these statutes.

In the legal complaint, and in the several briefs which were filed in the course of the litigation, Respondent acknowledged that the protesters

had a First Amendment freedom of speech right to express both their views regarding the Israeli-Palestinian conflict, as well as their anti-Semitic views regarding Jews.  They had the right to express these views on any public street they wished, anywhere in Ann Arbor, or in Michigan, or in the United States.  He contended, however, that they did not have a First Amendment right to express these views in proximity to a Jewish house of worship, whose members had a countervailing right under the Freedom of Religion Clause of the First Amendment to practice their religion without being harassed and insulted directly in front of their house of worship.  He maintained that this right was not restricted just to Jews; that hate speech in proximity to any house of worship, of any religion, was not protected by the First Amendment.  Protesters do not and should not have a right, for example, to protest on a Friday evening in front of a mosque, using signs which state such things as "The members of this mosque support ISIS" or "Camel jockeys go back to Saudi Arabia."  They do not and should not have a First Amendment right to protest in front of a Catholic church on a Sunday morning using signs which state, for example, "The members of this church support pedophile priests" or "The members of this church sexually abuse children." Members of the Ku Klux Klan do not and should not have the right to protest in front of a predominantly African-American

church on a Sunday morning using signs which state, for example, "N…ers go back to Africa" or "The N…er mothers who attend this church use crack cocaine." Such conduct, arguably addressing matters of public concern, in a public forum should not be permissible on even one occasion, let alone on every day of worship of the respective religion over multiple years.

After the legal complaint was filed in the federal court in Detroit, it was assigned to the Hon. Victoria Roberts. Respondent commenced contacting various Jewish organizations to seek financial support for what he expected would be an expensive lawsuit. Mr. Gerber had agreed to finance part of the litigation costs, but not all of it. The only Jewish organization which agreed to finance the lawsuit was the Lawfare Project, an organization which supports litigation to combat anti- Semitism. They agreed to finance the lawsuit against the synagogue protesters on the condition that Respondent would agree to allow an attorney on the staff of the Lawfare Project appear as his co-counsel. He agreed, on the condition that he would have final say regarding the litigation strategy and the contents of any motions and briefs which would be filed. An attorney on the Lawfare staff who was licensed in New York accordingly filed an appearance as Respondent's co-counsel.

After filing her appearance, the Lawfare attorney asked Respondent

what the race of the presiding judge was. When he told her that Judge Roberts was African-American, she responded that they were going to lose. Respondent objected that this was a racist statement; that Judge Roberts was about his age and was aware of the role that Jews had played in supporting the Civil Rights movement; that she was aware of the two Jewish voting rights advocates who had been murdered in Mississippi; that she had taken an oath to support the Constitution. In addition, she had been the first, and only, female African-American President of the Michigan State Bar. The first law firm she had been employed in had Jewish partners. It was inconceivable to Respondent that a federal judge, regardless of race or religion, would harbor anti-Semitic views.

The Lawfare attorney responded that Respondent was naïve and that he did not know what was going on in New York, that the African-American community in New York was hostile to Jews. He disagreed that a federal judge would succumb to such sentiments. He had been a stalwart supporter of civil rights for African-Americans since he had been in elementary school, and was brought up in a home in which racism was absolutely forbidden. In 1967, when Respondent was a junior at Rutgers University, the race riots in Newark broke out. A student wrote a letter printed in the Rutgers student newspaper referring to the rioters as

"animals."  Respondent wrote a scathing letter denouncing the writer's racism.  As an attorney, Respondent had represented African-Americans in lawsuits. The notion that African-Americans would be anti-Semitic, given their shared history of persecution and oppression, was unacceptable to him, and it was inconceivable to him that an African-American federal judge would be anti-Semitic.

As the litigation progressed, however, Respondent's views began to change.  During the first telephone conference to discuss the defendants' request for an extension to answer the legal complaint, Judge Roberts sounded hostile, questioning why the complaint was so long.  Respondent tried to explain that the case involved complicated First Amendment issues which had required that he address the expected First Amendment defense by providing a lengthy analysis of First Amendment law in the complaint. It was not feasible, he asserted, to draft a complaint sufficient to withstand a motion to dismiss which was a short and plain statement of the plaintiffs' claims, which numbered 13 federal claims, and 7 state claims.

Early in the lawsuit, Judge Roberts entered an order imposing a protocol that no motions would be allowed to be filed unless concurrence of opposing counsel was requested, and if denied, the moving party would

have to submit a two-page explanation of the parties' competing positions, and the court would only allow the motion to be filed if approved based on the letter.  Respondent proposed to file a motion to request a preliminary injunction imposing reasonable time, place and manner restrictions on the protesters' conduct.  The defense attorneys opposed the motion, so Respondent submitted a letter to the court setting forth the parties' respective positions.  The ordinary procedure for such a motion is that it must be filed early in the lawsuit; the moving party must demonstrate that the client has a likelihood of prevailing on the merits; that failure to issue the injunction would cause the party irreparable harm; and that granting the injunction would not materially injure the other party.  Judge Roberts denied Respondent the right to file the motion, although the standard procedure was to allow the filing of such a motion, and then to evaluate the motion on the merits.

Respondent next proposed to file a motion for partial summary judgment against the City of Ann Arbor based on its failure to enforce its own sign ordinance against the protesters over a period of now 17 years. The motion requested a ruling that the ordinance was content and viewpoint neutral, was unambiguous and prohibited displaying any signs in the public right-of-way, and could be enforced without violating the

protesters' First Amendment Rights.  He again submitted a letter to Judge Roberts setting forth the positions of the parties.  Again, Judge Roberts denied the plaintiffs permission to file the motion. Thereafter, Respondent proposed filing a motion requesting leave to file an Amended Complaint which would add a claim against Ann Arbor alleging that it was violating the Equal Protection Clause of the 14th Amendment by enforcing its sign ordinance against some residents and businesses in Ann Arbor, while failing to enforce the ordinance against the protesters.  Another letter was submitted to Judge Roberts setting forth the positions of the parties, and again Judge Roberts denied the plaintiffs permission to file the motion. These were all standard procedural motions which would routinely be granted in a federal court, yet Judge Roberts was denying the plaintiffs permission to file any of them.  Respondent was beginning to question Judge Roberts' motives.

The defendants proceeded to file motions to dismiss the lawsuit on two grounds.  First, they claimed that the plaintiffs did not have standing to sue, on the basis that their avowed emotional distress was not sufficient to permit them to sue. The second basis was that the defendants' conduct was protected by the First Amendment, and therefore none of the claims pled in the complaint, stated valid claims.  Several months after the parties

had completed filing briefs and counter-briefs, judge Roberts issued her decision. She dismissed the lawsuit on the basis that the plaintiffs did not have standing to sue, stating that their emotional distress did not constitute a "concrete injury." She then proceeded to state that the claims pled in the amended complaint were also invalid, because the defendants' conduct was protected by the First Amendment. In making this latter ruling, Judge Roberts exceeded her jurisdictional authority, because once she ruled that the plaintiffs did not have standing to sue, she had no authority to address the merits of the legal claims themselves – the Supreme Court has held that if plaintiffs do not have standing to sue, there is nothing further for a federal court to rule on.

Reading Judge Roberts' ruling, Respondent thought her assertion that the plaintiffs' emotional distress at seeing anti-Semitic signs in front of their synagogue was not a "concrete injury" was absurd. What was she saying, that she did not believe their emotional distress was genuine? How would she know that? And, if genuine, on what basis was it not "concrete"? Federal courts, including the Sixth Circuit Court of Appeals, had held that plaintiffs who claimed the emotional distress they experienced from being harassed on the telephone by debt collectors was sufficient to give them standing to sue. Plaintiffs who claimed that they had suffered emotional

distress by having their identity stolen, or based on inaccurate information in a credit report, had standing to sue.  Why was the emotional distress of two Jews seeing anti-Semitic signs in front of their synagogue less "concrete" than that of debtors harassed by debt collectors, or consumers whose identity had been stolen or whose credit report contained inaccurate information?  Why was the emotional distress of Jews deficient in the eyes of Judge Roberts?  Judge Roberts' ruling struck Respondent as blatantly anti-Semitic itself – an anti-Semitic statement in a federal decision.

In her decision, Judge Roberts stated that the plaintiffs had failed to cite a single case in which the emotional distress of the plaintiff was deemed sufficient in the context of a First Amendment defense to grant standing to sue.  Respondent filed a motion for reconsideration, pointing out that this statement was erroneous.  He had cited a decision from the federal court in the Southern District of Ohio, *Wells v. Rhodes,* 928 F. Supp.2d 920 (S.D. Ohio 2013), in which two Caucasian teenagers had set fire to a cross on the lawn of a house which was being rented by an African-American family.  The family sued the teenagers for violating their civil rights, citing the very same statutes Respondent had cited in the lawsuit against the protesters.  The federal judge in that case noted that

none of the members of the African-American family had suffered a physical or medical injury; the property was not damaged, which the family did not own in any event, they were renting.  Their only injury was the emotional distress they suffered seeing a burning cross in front of the house.  The judge did not dismiss the lawsuit, saying that the emotional distress of the members of the African-American family did not constitute a "concrete injury."  He did not rule that they did not have standing to sue.

Moreover, the Supreme Court had already held in *Virginia v. Black,* 538 U.S. 343 (2003), that the act of burning a cross was protected by the free speech provision of the First Amendment and could not be criminalized without evidence that the individual committing the act did so with the intention of threatening African-Americans.  The judge in the Ohio case, rather than dismissing the lawsuit, ruled in favor of the plaintiffs and granted them summary judgment in their favor, based on the same civil rights statute which plaintiffs were relying on.  Thus, this was a case in which the plaintiffs had been granted standing to sue based on their emotional distress, in a context involving the First Amendment. For the Jewish congregants, seeing the flag of Israel with the Jewish Star of David defaced with a symbol meaning "Prohibited," with the Holocaust fresh in their memories, would be just as traumatizing for Jews as would seeing a

burning cross be for African-Americans. The case had been cited in plaintiffs' brief opposing the defendants' motions to dismiss. It was recited in plaintiffs' motion for reconsideration. Yet Judge Roberts denied the motion for reconsideration without once addressing the *Wells* decision, and without explaining how that case was distinguishable from the plaintiffs' case, other than that the plaintiffs in the Ohio case were African-American, and the plaintiffs in the case before her were Jewish.

In addition, included among the state law claims which Respondent pled in the complaint was a claim under the Michigan Elliott-Larsen Civil Rights Act, which prohibits discriminating against individuals based on their race, ethnicity or religion. Judge Roberts had issued a landmark decision, *Williams v. Port Huron Area School Dist. Board of Education,* Case No. 06-14556 (E.D. Mich. 2010), ruling that the statute could be used by a group of Black teenagers who were being harassed in a Michigan high-school by other students using racial epithets. She also held that this created a hostile environment for the Black students and that the school district could be held liable under the same statute for failing to take adequate measures to prevent the creation of the hostile environment. Judge Roberts did not rule in that case that the racial epithets were protected by the First Amendment, nor that the emotional distress of the

Black students did not constitute a concrete injury.  Respondent pled the same claim in the legal complaint he had filed, applying the same statute and asserting that the failure of the City of Ann Arbor to enforce its sign ordinance against the protesters also created a hostile environment for the Jewish congregants.  Rather than apply her prior ruling to the comparable claim asserted by the Jewish plaintiffs, Judge Roberts declined to assert jurisdiction over any of the state law claims, which a federal judge has the prerogative of doing.  But why did she exercise that prerogative, in light of the fact that she had not declined jurisdiction over the same state law claim when it involved Black students?  Why didn't she assert jurisdiction and apply her ruling in the high school case to the harassment of Jews as they entered their synagogue to participate in the Sabbath service?  Why didn't the failure of the City of Ann Arbor to enforce its sign ordinance create a hostile environment, in violation of the Michigan statute, as she had held the failure of the school district to prevent the harassment of the Black students created a hostile environment?

## THE FIRST APPEAL

Respondent filed an appeal in the Sixth Circuit Court of Appeals, contesting Judge Roberts' ruling that the emotional distress of the plaintiffs did not constitute a "concrete injury" affording them standing to sue.  In the

appellate brief, he raised the issue regarding the failure of Judge Roberts to address the *Wells* decision.  He asked, in failing to address the *Wells* decision, which he had cited twice, was Judge Roberts claiming that the emotional distress of Jews was not as significant as that of African-Americans?  The panel of appellate judges who presided over the oral argument consisted of Chief Judge Jeffrey Sutton and judges David McKeague and Eric Clay. Respondent had barely begun his oral argument when Judge Clay, who is African-American, interrupted him and asked, "Mr. Susselman, where did you find the temerity to accuse a federal judge of being racist?" Respondent was flabbergasted.  Momentarily flummoxed, he gathered his thoughts and responded that he believed he was referring to the *Wells* decision, which Judge Roberts had failed to address, although it was a central case in the lawsuit.  Judge Clay responded that there could be a host of reasons why a judge would not discuss a particular case. Respondent pushed back, stating that it was a significant case, yet Judge Roberts had not even addressed it.  Judge Clay rejoindered that it did not matter whether the case was significant.  At this point, Judge Sutton intervened and said that Respondent was welcome to go down that road if he wished, but he would have a rough row to hoe with the Court.  He then suggested that Respondent apologize. Respondent was stunned, and felt

like Shylock being reprimanded in a Venetian court for having had the audacity to challenge the integrity of a Christian debtor.  He was stuck between a rock and a hard place, so he abjectly apologized, stating that it was not his intention to accuse Judge Roberts of racism, but to make a point on behalf of his clients.  Judge Clay then offhandedly told him to proceed with his argument.

The Court issued a 2-1 decision reversing Judge Roberts' ruling that the plaintiffs' emotional distress did not create a sufficiently concrete injury to afford them standing to sue, stating, "All in all, the congregants have standing to sue because they have credibly pleaded an injury – extreme emotional distress – that has stamped a plaintiff's ticket into court for centuries."  Judge Clay dissented from this stading ruling, agreeing with Judge Roberts that the plaintiffs' emotional distress was not sufficient to give them standing to sue.

The Court proceeded to rule that although the plaintiffs had standing to sue, the use of the signs by the protesters, including the anti-Semitic signs, were addressing a matter of public concern in a public forum, and were therefore protected by the First Amendment, and were immune from even obtaining an injunction placing reasonable time, place and manner restrictions on where, when and how the signs were deployed.  The Court

failed to even address the issue relating to Ann Arbor's failure to enforce its sign ordinance against the protesters.  In light of Judge Sutton's recommendation that Respondent apologize, apparently a group of Jew hating, neo-Nazi, Holocaust denying protesters had a First Amendment right to harass Jews as they entered their house of worship to pray, but the First Amendment right of a Jewish attorney advocating for the rights of his Jewish clients in a federal court of law, having the temerity to question the motives of an African-American federal judge for ruling that the emotional distress of the Jews being harassed did not qualify as a "concrete injury," was circumscribed by the purported dictates of propriety.

Respondent decided to file a petition for *en banc* review by the entire Sixth Circuit Court of Appeals.  Before he could file the petition, Mr. Gerber terminated him as his attorney, accusing him of losing the appeal by insulting Judge Roberts and failing to apologize quickly enough.  At the point of his termination, Respondent had represented Gerber expending over 1,000 hours of his time, *pro bono.*  Gerber retained a new attorney to file the petition for him.  Both petitions for *en banc* review were denied by the Court, with not a single judge on the Cour voting in favor of rehearing.

Respondent continued the case representing only Dr. Brysk and

filed a petition for *certiorari* in the Supreme Court, as did the new attorney representing Gerber.  Respondent argued that anti-Semitic speech in proximity to a Jewish house of worship was not speech addressing a matter of public concern, regardless whether it was made in a public forum, and therefore was not entitled to First Amendment protection.  He contended that the same was true of hate speech in proximity  to  any house  of  worship  of  any  religion.    Was the freedom of religion less entitled to protection than a woman's then constitutional right to obtain an abortion, which the Court had held could be protected against anti-abortion protesters using an injunction?  The Court denied both petitions. The lawsuit was dismissed.

## THE SECOND APPEAL

Emboldened by their victory, the protesters added a new sign to their panoply of anti-Semitic signs: "Israel attacked America 9/11/2001." To add insult to injury, the protesters, while the petitions for *certiorari* were pending, filed a motion before Judge Roberts requesting that they be awarded attorney fees. The general law with regard to an award of attorney fees in cases involving civil or constitutional rights is that they are typically awarded to plaintiffs who prevail on one or more of the issues they raise. The threshold for awarding attorney fees to prevailing defendants,

however, is higher. A prevailing defendant must argue and prove that the lawsuit was frivolous and entirely without merit in order to justify being awarded attorney fees. The Supreme Court has held that just because a plaintiff has lost a lawsuit on the merits, it does not mean that the lawsuit was frivolous. Since such cases are taken on a contingency fee basis, attorneys representing plaintiffs seeking to vindicate their civil and/or constitutional rights will not be willing to take the risk of representing such plaintiffs if they can be penalized by awarding the defendants' attorney fees, which are generally paid on an hourly basis to the defense attorneys. Even though the plaintiffs lost on the merits regarding the scope of the First Amendment protection in this context, surely a lawsuit seeking an injunction placing reasonable time, place and manner restrictions on the use of anti-Semitic signs by a bunch of neo-Nazis to harass Jews as they entered their house of worship every Saturday morning for over 16 years could not be regarded as a frivolous lawsuit. Surely even Judge Roberts would not agree that the lawsuit was frivolous. The Court of Appeals had even asserted as much in its decision, stating, "Plaintiffs' claims may be wrong and ultimately unsuccessful, but the fourteen pages that the concurrence devotes to analyzing the constitutional issues belie the conclusion that they are frivolous."

Respondent was wrong.  Judge Roberts agreed with the protesters that the lawsuit was "frivolous."  She awarded the neo-Nazi, anti-Semitic protesters $158,721.75, in attorney fees, to be paid by Mr. Gerber, Dr. Brysk, and Respondent, "jointly and severally."   Judge Roberts was requiring that Dr. Brysk, a Holocaust survivor, pay a bunch of anti-Semitic, neo-Nazis $158,721.75 for the privilege of harassing and ridiculing her as she entered her Jewish house of worship to pray. Moreover, Judge Roberts not only awarded them attorney fees for the time they expended on the First Amendment issue, on which they prevailed; she awarded them attorney fees for the time they expended on the standing issue, an issue on which they did not prevail, an issue on which they lost. Even though Respondent pointed this out in a motion for reconsideration, and in his appellate briefs, the money which the protesters sought to be compensated for the time their attorneys expended on the standing issue, on which they lost, was never deducted.

By this point, Respondent was convinced that his co-counsel was correct - Judge Roberts' rulings were motivated either by anti-Semitic sentiments, or by anti-Israel, pro- Palestinian sentiments, or by both combined.  How else to explain her multiple adverse rulings against the Jewish plaintiffs – her refusal to allow them to file standard procedural

motions from the very inception of the lawsuit; her ruling that their emotional distress did not constitute a "concrete injury" so that they did not have standing to sue; and now this, an outrageous, indefensible award of attorney fees to anti-Semitic neo-Nazis.  Respondent was reminded of the plight of Dr. Michael Siegel, a Jewish attorney who had complained to the police regarding the treatment of one of his Jewish clients, who was then forced by Hitler's Brown Shirts to march through the streets of Munich on March 10, 1933, with a sign draped around his neck, stating, "Ich bin Jude, aber ich werde mich nie mehr bei der Polizei beshweren" – "I am a Jew, but I will never again complain to the police." (See photograph, attached as Exhibit 1.)

Respondent filed an appeal in the Sixth Circuit.  In the course of the appeal, he filed a reply brief to the defendants' defense of the attorney fee award in which he argued that Judge Roberts' rulings, taken together in their entirety – including her refusal to allow the plaintiffs to file routine motions; her assertion that their emotional distress did not constitute a "concrete injury"; and her award of attorney fees in the amount of over $158,000 to a group of anti-Semitic neo-Nazis - had the distinct appearance of being anti-Semitic.  He focused on a particular statement she had made in her first decision, that the protesters' signs, including the

anti-Semitic signs, were protected by the First Amendment, stating, "Indeed, the First Amendment *more than* protects the expressions by Defendants of what Plaintiffs describe as 'anti-Israeli, anti-Zionist, an[d] antisemitic.'" (Emphasis added.) But why would *this particular speech* be more protected than other speech? There were three possibilities. Judge Roberts could have been referring to the anti-Semitic speech as deserving more protection; or to the anti-Israeli, anti-Zionist speech as deserving more protection; or to the combination of the two as deserving more protection. But clearly, a federal judge should not allow her personal sentiments regarding international events – concealed sentiments which go unrebutted - to influence her decisions regarding the rights of the litigants before her.

Appreciating that most people, including appellate judges, would be reluctant to accuse an African-American judge of being racist or anti-Semitic, as he had been when his co-counsel had accused him of being naïve, Respondent offered empirical evidence that such an explanation was not beyond the realm of possibility. The evidence was offered in the brief not to prove that Judge Roberts was anti-Semitic, but to disabuse the notion that she could not possibly be anti-Semitic. Respondent noted in the brief that a 2016 survey by the Anti-Defamation League indicated

that the rate of anti-Semitism was significantly higher in the African-American community (23%) than in the general population (14%), and attached a copy of the survey to the brief as an exhibit.  He noted that a study published in the Social Science Journal 46 (2009), analyzing James Baldwin's 1967 essay, "Negroes Are Anti-Semitic Because They Are White," concluded:  "One analysis indicates that while some anti-Semitic attitudes are strongly associated with anti-White attitudes, African-Americans are still significantly more likely than White, Latino, and Asian groups to express anti- Semitic views when the level of anti-White sentiment is held constant ($p < .05$)."

https://scholar.harvard.edu/files/jsimes/files/ssj_simes_2009.pdf.

Respondent  noted  that  this higher rate of anti-Semitism in the African-American community had been linked to the Israeli-Palestinian conflict and the tendency of African-Americans to identify with the Palestinians as the victims of Israeli oppression, which they equate to their oppression as the victims of slavery and segregation under the Jim Crow laws.  ("We Know Occupation: The Long History of Black Americans' Solidarity with Palestinians,"

https://www.politico.com/news/magazine/2021/05/30/black-lives-matter-palestine-history-491234). Respondent noted that in the publication

"BlackAntisemitism in America: Past and Present,"

https://www.inss.org.il/publication/black-antisemitism/, the author wrote,

at *19:  "Although the [Black Lives Matter] movement has generally

levelled its charges at 'Zionists,' frequently antisemitism appears

undisguised.  Updating the centuries-old blood libel, BLM marchers

chanted, 'Israel, we know you kill children too!' and signs proclaimed,

'Defend Gaza: the New Warsaw Ghetto' – the Jews cast as the Nazis

annihilating innocent people of color (Lapkin, 2020; Torok, 2021).

Addressing a conference on Human Rights in 2015, Patrisse Cullors, one

of the three co-founders of the movement, characterized the Palestinian

cause as our generation's South Africa' and urged the audience to 'step

up boldly and courageously to end the imperialist project that's called

Israel,' concluding that 'we're doomed' if Israel is not brought to an 'end'

(Chamberlain, 2021)."

Respondent stated that the stigma of this country's reprehensible

history of slavery and its continuing residual effects did not give Judge

Roberts the liberty to express her own bias in her rulings, any more than

the rulings of a Caucasian judge which had the distinct appearance of

anti-Black bias would be tolerated.  He stated that he was by no means

claiming that Judge Roberts was a neo-Nazi, or that she consciously or

subconsciously supported Hitler's Final Solution.  If, however, Judge

Roberts' rulings, and her statement that the protesters' speech was

"more than protected" by the First Amendment, were in any way the

product of empathy with the Palestinian cause and/or antipathy for Israel

and Zionism, those rulings, he maintained, were improper.

The Court issued a decision, written by Chief Judge Sutton, affirming

the attorney fee award, agreeing that the lawsuit was "frivolous."  In the

decision, Judge Sutton wrote the following:

> Lastly, Susselman, of his own accord, accuses the district
> court of antisemitism.  The basis for this serious allegation?  A
> "series of questionable rulings." …  The only external source
> for the allegation is a study *supposedly* finding higher-than
> average rates of antisemitic attitudes in the African American
> community.  From this, Susselman concludes that the district
> judge – who is African American – must have been biased
> against the congregants.  This argument rests on offensive,
> essentialist stereotypes.  It involves enormous logical leaps.
> And it disserves Susselman's client by distracting from the
> merits of the fee issue.  If this is the quality of Susselman's
> advocacy, the fee award hardly comes as a surprise.
> Susselman's bias arguments "find no support in the record,"
> … and are "not well received[.]"  (Italics added.)

These statements totally distorted the argument that Respondent

was making.  First, among the "questionable rulings" was a flagrantly anti-

Semitic ruling by Judge Roberts that the emotional distress of two Jewish

congregants caused by seeing anti-Semitic signs in front of their

synagogue every Saturday morning for over 16 years did not qualify as a

"concrete injury."  Second, not only one study was cited reporting that there was a higher than average degree of anti-Semitism in the African-American community. Two were cited. Third, why did Judge Sutton use the word "supposedly"? Did he question the empirical validity of these statistical studies, and if so, why?    Fourth, the studies were cited not to prove that Judge Roberts "must have been biased against the congregants," but to counter the instinctive response that it was not possible that an African-American judge could be biased.  Fifth, the reference to the studies was made *in conjunction* with the reference to Judge Roberts' multiple "questionable rulings."  Sixth, while Judge Sutton denounced the studies as "offensive essentialist stereotypes," he ruled that the offensive essentialist stereotypes being used by the anti-Semitic neo-Nazis who were harassing the Jewish congregants in front of their synagogue were protected by the First Amendment. Seventh, his claim that Respondent's accusation of bias against Judge Roberts "distract[ed] from the merits of the fee issue" was specious, since he had already ruled that the fee award was warranted because the lawsuit was "frivolous" – the contention that Judge Roberts was biased did not distract him from a decision he had already made. He proceeded to stigmatize Respondent as an unethical, unprofessional,

racist attorney in a federal decision.

Respondent once more filed a petition for *certiorari* in the Supreme Court seeking justice, seeking to overturn an outrageous, indefensible award of attorney fees to a group of anti-Semitic neo-Nazis as they continued to harass and vilify Beth Israel's Jewish congregants – an award which was not only outrageous, but which was contrary to numerous Supreme Court decisions which discussed the parameters of the bases for awarding attorney fees against a plaintiff in a lawsuit seeking to vindicate the civil or constitutional rights of an American citizen. In the petition for *certiorari*, Respondent addressed Judge Sutton's affirmance of the attorney fee award and his retaliatory comments against him for having raised the subject of Judge Roberts' bias, stating:

> Rather than dealing with the claim that Judge Roberts' rulings had the distinct appearance of being biased against plaintiffs and their attorney, the Court retaliated against Mr. Susselman, in effect accusing him of being racist for having even raised the issue. But Judge Roberts was not immune from having her rulings challenged as violating the Code of Conduct of United States Judges because she is African-American. Her race was not the issue; her conduct was. The lintel of the Supreme Court states, "Equal Justice Under Law"–equal justice regardless the race, religion, ethnicity, gender, or age of the litigants, as well as of the judge(s) presiding over the case. Judge Roberts' race did not give her license to allow her biases, whether conscious or subconscious, to play any role in her rulings against plaintiffs or their attorney.

On August 26, 1963, standing in front of the Lincoln

Memorial, Dr. King gave his eloquently moving "I have a dream speech": "I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character." It is by the content of our character that we all should be judged, with no presumptions *for* or against us based on the color of our skin, our race, our religion, our ethnicity, our gender, or our age. None of these characteristics should be a basis for any adverse judgments; nor should they be a basis for *refraining* from judgment. Expiation for the sins of slavery and past discrimination will not be accomplished by introducing double standards. Judge Roberts' race or skin color did not vitiate the issue regarding whether her decisions showed a distinct bias against plaintiffs and their attorney based on their Jewish religion or heritage. What was at issue was the content of her character, and that content was revealed in the only available evidence- her distinctly biased rulings. J'accuse!

The Supreme Court, once more, denied the petition. Respondent filed a petition for rehearing, refusing to accept that such a gross injustice against Jewish Americans could occur in the country in which he was raised, a country which prided itself on its just and fair treatment of minorities. In the petition for rehearing, Respondent stated:

During the four years that the case was in the courts, the Supreme Court ruled that the City of Boston violated the Constitutional rights of a Christian organization by denying its request to fly a Christian flag from a flagpole in front of the Boston City Hall. *Shurtleff v. City of Boston, Mass.,* 142 S. Ct. 1583 (2022).

It ruled that a public school district violated the religious rights of a high school football coach by prohibiting him from reciting a religious prayer on the 50-yard line after every football game. *Kennedy v. Bremerton School Dist.,* 142 S. Ct. 2407 (2022).

It ruled that the religious rights of a Christian postal worker

were violated by UPS because it failed to accommodate his request not to work on Sundays. *Groff v. DeJoy,* No. 22-174, 143 S. Ct. 2279 (2023).

It ruled that the State of Colorado violated the free speech rights of a Christian wedding announcement designer by ordering her to design wedding announcements for gay couples. *303 Creative LLC v. Elenis,* No. 21-476, 143 S. Ct. 2298 (2023).

All of these American citizens have rights protected by the Constitution or federal law, the Supreme Court states. But the right of Jews to enter their house of worship without being insulted and verbally spat upon, according to the federal courts, is not protected by the Constitution or federal law. Their lawsuit is ruled "frivolous" and they must compensate the anti-Semitic Holocaust denying protesters their attorney fees. The federal courts, including the Supreme Court, issue decisions expressing their concern to protect the Constitutional rights of Christians. But to the Jews, they issue decisions which say, "You must compensate your harassers for the time their attorneys spent reviling you!"

When will the Supreme Court stand by George Washington's pledge in 1790 to the Hebrew Congregation of Newport, Rhode Island, that, "the Government of the United States, which gives to bigotry no sanction, to persecution no assistance requires only that they who live under its protection should demean themselves as good citizens, in giving it on all occasions their effectual support."

Did the plaintiffs who sued the anti-Semitic protesters seeking protection against their anti-Semitic slurs as they sought to exercise their freedom of worship fail to "demean themselves as good citizens" as not to be deserving of the protection of the United States government, or of the Supreme Court?

Did not the award of attorney fees give assistance to persecution by a group of anti-Semites? The Jewish plaintiffs did the civilized thing and sought protection in the courts for their right to worship without being verbally harassed and to

redress their grievance under the First Amendment.

For this they get penalized. Would the courts prefer that next time the Jews resort to self-help?

The Supreme Court's response?  Petition for rehearing denied.

To Respondent's mind, the decisions in this case represent the most anti-Semitic rulings in the history of American jurisprudence.  Not since the lynching of Leo Frank in Georgia in 1915, and the rejection in 1939 of the M.S. St. Louis, with its cargo of Jewish refugees, forced to return to Europe to die in Hitler's death camps, have Jews been treated so shabbily and unjustly by the United States.

**B.   Ms. Kinnucan's Claim That Respondent Violated The MRPC By His Statements And Arguments Asserting That Judge Roberts Was Racially Biased Against The Plaintiffs Are Entirely Without Merit.**

In *Liteky v. United States,* 510 U.S. 540, 545 (1994), the Supreme Court stated, in the context of a motion for recusal:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so **if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible**. (Italics in the original; emphasis added.)

Justice Kennedy, stated in a concurrence, joined by Justices Blackmun, Stevens and Souter, *id.* at 558:

The statute does not refer to the source of the disqualifying partiality.  **And placing too much emphasis upon whether the source is extrajudicial or intrajudicial distracts from the central inquiry.**  One of the very objects of law is the impartiality of its judges in fact and appearance.  So, in one sense, it could be said that any disqualifying state of mind must originate from a source outside law itself.  That metaphysical inquiry, however, is beside the point.  **The relevant consideration under § 455(a) is the appearance of partiality … , not where it originated or how it was disclosed.** …  (Emphasis added; citation omitted.)

In *Davis v. Board of School Com'rs of Mobile City,* 517 F.2d 1044 (5th Cir. 1975), the Court articulated similar concerns, stating, *id.* at 1051:

[T]here could be a case where the cause of the controversy with the lawyer would demonstrate bias of such a nature as to amount to a bias against a group of which the party was a member – e.g., all Negroes, Jews, Germans, or Baptists.  This, then would be bias of a continuing and "personal" nature over and above mere bias against a lawyer because of his conduct.

And in *King v. United States District Court for the Central District,* 16 F.3d 992 (9th Cir. 1994), the Court asserted, *id.* at 994

[W]e have made it clear that there is an exception to the general rule that courtroom statements are not enough to warrant recusal and that "*extrajudicial*" bias is required.   That exception is applicable when the petitioner can demonstrate through expressions of opinion **and rulings** made *in the course of judicial proceedings* that the bias is "pervasive."   *United States v. Monaco,* 852 F.2d 1143, 1147 (9th Cir. 1988) (An exception to the extrajudicial bias rule is made "when a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party.")  (Italics in the original; emphasis added; footnote omitted.)

*See also Wolfson v. Palmieri,* 396 F.2d 121, 124 (2d Cir. 1968) ("[T]o establish the extra-judicial source of bias and prejudice would often be difficult or impossible and this is not required.  Comments and rulings by a judge during the trial of a case may well be relevant to the question of the existence of prejudice.")

Respondent maintains that in this instance the exception applies - that Judge Roberts' rulings in the course of the litigation against the anti-Semitic, Holocaust denying protesters, who were harassing the congregants of Beth Israel synagogue as they entered their house of worship, with their children, to participate in the Sabbath service, taken together, in their entirety, had the appearance of a pervasive bias against the plaintiffs and their attorney and that these rulings can only rationally be explained as being motivated by a judicially improper sentiment of anti-Semitism and/or judicially inappropriate sentiments of hostility towards Israel and its policies with respect to the Palestinian people.  Judge Roberts' rulings, taken together – her ruling that the emotional distress of the plaintiffs did not constitute a "concrete injury" according them standing to sue; her refusal to allow their attorney to file standard procedural motions; her assertion that the anti-Semitic signs of the protesters were "more than protected" by the First Amendment; and, finally, her decision to award $158,000 as attorney fees to the anti-Semitic,

Holocaust denying protesters, jointly and severally against the plaintiffs, including a Holocaust survivor – demonstrated such a complete lack of empathy for the plaintiffs and the fact that they were being harassed and reviled on a weekly basis as they exercised their First Amendment right of freedom of religion, that the inference of anti-Semitism and/or bias in favor of the Palestinians was valid, and by no means a violation of Respondent's responsibilities under the MRPC.  Rather, they were consistent with the right and obligation of Respondent to represent his clients' interests vigorously and within the parameters of the law.

Ms. Kinnucan's groundless accusations against Respondent represent a tactic used by the cancel culture, an effort to muzzle those who express viewpoints with which they disagree, in this case the claim that an African-American judge's rulings were based on her own racism.  Judge Roberts' race did not insulate or immunize her from claims of racial bias; her skin color did not allow her own racism to be expressed via her rulings with impunity. She was subject to the same imperatives of impartiality as a Caucasian or Jewish judge would be subject to, who would be precluded from expressing racism in rulings against an African-American litigant, or the litigant's African-

American attorney.[2]  She was entitled to no special treatment because of her

race, if her own pervasive racist bias was evidenced by her rulings, as they

were here.  Respondent violated no rules of professional ethics by pointing

this out in his appellate briefs.  To sustain such a charge against Respondent

would constitute implementing a double standard - but the law, the Equal

Protections Clause, and jurisprudential integrity and fair play abhor double

standards.

So, let's look at Ms. Kinnucan's erroneous allegations of fact and

specious allegations of unethical conduct by Respondent.  On p. 2, Ms.

Kinnucan asserts: "Brysk's husband confirmed both the signature as his

---

[2] *See, e.g.,* White Supremacy From The Bench, Johnson, 27 Lewis & Clark
L Rev 1 (https://law.lclark.edu/live/files/34777-3271johnson;

Louisiana Judge Pressed to Resign After Racist Remarks
https://eji.org/news/louisiana-judge-pressed-to-resign-after-racist-remarks/

Court rules Alabama judge accused of racist, sexist remarks must be
removed from office
https://www.nbcnews.com/news/us-news/court-rules-alabama-judge-
accused-racist-sexist-remarks-must-be-n1282750

San Diego judge accused of racism refuses to recuse himself
https://www.nbcsandiego.com/news/investigations/san-diego-county-judge-
accused-of-racism-refuses-to-recuse-
himself/3418850/#:~:text=San%20Diego%20County%20judge%20accused
%20of%20racism%20refuses%20to%20recuse%20himself,-
Public%20defenders%20and

wife's and her agreement with Gerber to discharge Susselman."  This assertion is false.  Henry Brysk attested in a Declaration, signed under penalty of perjury, that Mr. Gerber and his wife showed up at the Brysk home, uninvited, and proceeded to bully Miriam Brysk, as she lay in pain suffering from a back injury, into signing a statement terminating Respondent, against her will.  (*See* copy of Henry Brysk's Declaration, attached as Exhibit 2.)

On p. 3, note 5, Ms. Kinnucan proposes that Respondent be cited "for a violation of MRPC 3.1 for filing a frivolous lawsuit in federal district court." First, to characterize a lawsuit by Jewish plaintiffs seeking primarily injunctive relief against weekly harassment by anti-Semitic, Holocaust denying protesters, a protest which had been occurring over a 16-year period, in front of the plaintiffs' house of worship, beggars belief.  This "quibble" aside, MRPC 3.1 states, in relevant part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein unless there is a basis for doing so that is not frivolous.  A lawyer may offer good-faith argument for an extension, modification, or reversal of existing law."  Plaintiffs' argument that hate speech perpetrated on a weekly basis, for over 16 years, in front of a house of worship as congregants enter the sanctuary to exercise their freedom of religion, if not the current state of First Amendment jurisprudence, certainly qualified as a "good-faith argument for an extension, modification,

or reversal of existing law."  Moreover, the federal courts have their own mechanism for sanctioning attorneys for filing frivolous lawsuits, over and above assessing attorney fees.  The fact that the Sixth Circuit Court of Appeals did not do so in the instant case demonstrates that the Court did not regard such a sanction as being called for.  There is no basis for the Michigan Attorney Grievance Commission to step into the breach and impose an additional, unwarranted sanction, at the request of an individual who does not reside in Michigan and who was never represented by Respondent in this lawsuit, or in any other legal matter.

On pp. 4-5, Ms. Kinnucan takes issue with Respondent's claim that Judge Roberts' assertion that the First Amendment "more than protects" the protesters' signs, including the anti-Semitic signs, raised the specter of anti-Semitism on Judge Roberts' part.  Ms. Kinnucan claims that this accusation is a "sinister spin on the phrase," citing in support of her contention *Terminiello v. Chicago,* 337 U.S. 1 (1949), and *Glasson v. City of Louisville,* 518 F.2d 899, 905 (6th Cir. 1975).[3]  The point Respondent was making is that under the First Amendment, speech is either protected, or it is not protected. There is no hierarchy of protected speech, with some protected speech being

---

[3] Curiously, Ms. Kinnucan, who is apparently not an attorney, was able to provide a legal citation to the *Glasson* case.  How did she find it, and who informed her of how to provide the proper citation?

more protected than other protected speech.  Judge Roberts' suggestion that the protesters' signs, including the anti-Semitic signs, enjoyed some higher level of protection than other speech was, from Respondent's perspective, suggestive of anti-Semitism.    Neither *Terminiello* nor *Glasson* has any language which proposes a hierarchy of levels of protection of protected speech under the First Amendment, thereby rebutting Respondent's inference.  The inference was justified, and hardly constituted a "sinister spin" on Judge Roberts' inaccurate phraseology.

On p. 5, Ms. Kinnucan asserts that Respondent's assertion that Judge Roberts' attorney fee award required that Dr. Brysk, a Holocaust survivor, pay the anti-Semitic, Holocaust denying protesters $158,000 in attorney fees maligned Judge Roberts and opposing counsel, suggesting that the opposing counsel "comprise, or are part of, a group of 'anti-Semitic Nazis.'" This contention by Ms. Kinnucan is a total distortion of Respondent's statement.  The attorney fees were, in fact, awarded to the protesters, not to their attorneys.  The money was to be paid to the protesters, who would then convey the money to their attorneys.   This is clearly demonstrated by the assignment of the debt to Gerber, referred to on p. 3.  The assignors of the assignment are the protesters themselves, which entails that they were the recipients of the attorney fees, to be reconveyed by them to their attorneys.

(*See* copy of the Assignment, attached as Exhibit 3.)   Respondent's assertion that the attorney fee award was outrageous because it required that a Holocaust survivor pay her harassers $158,000 in attorney fees was accurate.  The suggestion that the anti-Semitic, neo-Nazi, Holocaust denying protesters did not derive a benefit from this payment to them, even though it was to be conveyed to their attorneys, is nonsense.

On p. 5, Ms. Kinnucan states, "In addition to maligning Judge Roberts on the basis of her rulings and her race/ethnicity … ."  This, too, is a distortion of Respondent's contention that Judge Roberts was biased against the plaintiffs based on their race/ethnicity.  Respondent's point was that Judge Roberts' expressions of anti-Semitism and/or anti-Israel/pro-Palestinian views in her rulings were not excused by virtue of her race or ethnicity, or by the likelihood that her ancestors had been the victims of the reprehensible culture of slavery in the ante bellum South.  This did not qualify as maligning her race or her ethnicity. It was recognizing the legitimacy of her own expected antipathy for racism, an antipathy which Respondent expected would inform her decision-making when confronted with racism against Jews.

Ms. Kinnucan's citation of *Freshub v. Amazon.com et al,* 576 F. Supp. 3d (W.D. Tex. 2021), on p. 6 is inapposite.  In *Freshub,* the plaintiff, an Israeli

company, alleged that Amazon had infringed on several of Freshub's patents relating to computer technology.  The jury ruled in favor of Amazon, rejecting Freshub's patent infringement claim.  Freshub moved for a new trial, arguing that Amazon's attorney had biased the jury against Freshub by making anti-Semitic allusions during the trial.  The Court censured Freshub's attorney, stating, *id.* at 466:  "The Court finds that Freshub's inflammatory allegations are nothing but baseless attacks on the integrity of this Court and the reputation of Defendants' counsel."  There are multiple distinctions between the conduct of Freshub's attorney and Respondent's conduct.  Respondent never accused the protesters' attorneys of themselves being anti-Semitic or neo-Nazis by virtue of their representation of the protesters, or by virtue of any statements or arguments they made on behalf of their clients.  The evidence, however, that their clients were anti-Semitic, neo-Nazi Holocaust deniers was ample, and was in the record.  The evidence that Judge Roberts' rulings, in favor of the anti-Semitic, neo-Nazi Holocaust denying protesters, ignoring their anti-Semitic, neo-Nazi, Holocaust denying views and messages on their signs, was also in the record, and supported Respondent's contention that her rulings evidenced that she harbored anti-Semitic and/or anti-Israel/pro-Palestinian views, unlike the absence of evidence in *Freshub* that Amazon's attorneys had made anti-Semitic

46

references during the trial which biased the jury against Freshub, references which Freshub's attorney failed to even register objections to during the trial. The *Freshub* case accordingly has no bearing whatsoever on the issues which Ms. Kinnucan has raised against Respondent.

On p. 7, Ms. Kinnucan lists a litany of violations of the MRPC which she attributes to Respondent.   None of these allegations have any merit whatsoever.

1.    Respondent did not violate MRPC 1.3.  His claim of judicial bias against Judge Roberts was not frivolous.  It was supported by the series of rulings she made, including the blatantly anti-Semitic assertion that the plaintiffs' emotional distress caused by seeing flagrantly anti-Semitic signs in front of their house of worship every Saturday morning, for then 16 plus years, did not constitute a "concrete injury," including seeing the Star of David defaced.[4]  Why was their emotional distress deemed deficient and not a concrete injury, as compared to the victims of predatorial debt collection practices or identify theft, which afforded other litigants standing to sue?

---

[4] It should be noted that after the protesters were awarded attorney fees, they added two new signs to their panoply of anti-Semitic signs: "Gas Chambers?  REALLY?!" and "Anti-Semitism, Always Earned, Never Given." They can still be seen picketing in front of Beth Israel synagogue with their signs every Saturday morning.  Who says the United States protects its Jewish citizens from anti-Semitic attacks?

2.      Respondent did not "frivolously 'assert[] an issue' of judicial bias and/or, 'racially motivated hypocrisy' by Judge Clay[.]"  Ms. Kinnucan does not cite to anything in the record where Respondent allegedly made such a claim.  In one brief, he questioned whether Judge Clay would rule that signs displayed by the Ku Klux Klan in front of a predominantly African-American church bearing the N- word were protected by the First Amendment.  This was a legitimate question, given Judge Clay's assertion that the anti-Semitic signs in front of the synagogue were protected by the First Amendment.  In addition, Respondent questioned whether Judge Clay had had *ex parte* communications with Judge Roberts regarding either appeal while either appeal was pending before the Sixth Circuit Court of Appeals, which Respondent had every right to question, given the vehemence of his castigation of Respondent during his oral argument.   Such *ex parte* communications, if they occurred, would have been a clear violation of Canon 3(A)(4) of the Code of Conduct for United States Judges.

3.      Respondent's claims of bias by Judge Roberts were not "unfounded," but were supported by the anti-Semitic, pro-Palestinian sentiments evidenced by her multiple rulings against the Jewish plaintiffs and their Jewish attorney.   Respondent's claims, since they were not "unfounded," did not constitute "undignified or discourteous conduct toward

the tribunal," in violation of MRPC 3.5(d).  Ms. Kinnucan's specious claim is aimed at seeking to penalize an attorney's efforts to represent the interests of his clients in a vigorous and lawful manner.

4.    Respondent's claims of bias by Judge Roberts were not "unfounded," but were supported by the anti-Semitic, pro-Palestinian sentiments evidenced by her multiple rulings against the Jewish plaintiffs and their Jewish attorney.    Respondent's claims, since they were not "unfounded," did not constitute a violation of MRPC 6.5(a) by failing to "treat with courtesy and respect all persons involved in the legal process."    Ms. Kinnucan's specious claim is aimed at seeking to penalize an attorney's efforts to represent the interests of his clients in a vigorous and lawful manner.

5.    Respondent's claims of bias by Judge Roberts were not "unfounded," but were supported by the anti-Semitic, pro-Palestinian sentiments evidenced by her multiple rulings against the Jewish plaintiffs and their Jewish attorney.    Respondent's claims, since they were not "unfounded," therefore did not contravene his duty to "take particular care to avoid treating … a person discourteously or disrespectfully because of the person's race, gender, or other protected personal characteristic" in violation of MRPC 6.5(a).  Ms. Kinnucan's specious claim is aimed at seeking to

penalize an attorney's efforts to represent the interests of his clients in a vigorous and lawful manner.

6.     This accusation is demonstrably false.  Respondent did not at any time characterize opposing counsel, explicitly or otherwise, as "anti-Semitic neo-Nazis," and did not violate his duty to "treat with courtesy and respect all persons involved in the legal process" in violation of MRPC 6.5(a). Respondent characterized opposing counsels' protester clients, not their attorneys, as anti-Semitic neo-Nazis, and there was, and is, ample support for that characterization.  The protesters were not entitled to be treated with courtesy and respect given that they did not treat Respondent's Jewish clients with courtesy and respect by insulting their religion and ethnicity every Saturday morning as they entered their house of worship to engage in their exercise of their freedom of religion under the First Amendment.

7.     Respondent's claims of bias by Judge Roberts were not "unfounded," but were supported by the anti-Semitic, pro-Palestinian sentiments evidenced by her multiple rulings against the Jewish plaintiffs and their Jewish attorney.     Respondent's claims, since they were not "unfounded," did not contravene his duty to "not make a statement that the lawyer knows to be false or with reckless disregard for [their] truth or falsity." Respondent knows the claims to be true, not false, and therefore they were

not made with reckless disregard for their truth or falsity.  Ms. Kinnucan's specious claim is aimed at seeking to penalize an attorney's efforts to represent the interests of his clients in a vigorous and lawful manner.

There is absolutely no basis for the Commission to investigate whether Respondent violated MRPC 8.4(a) or 8.4(c), as Ms. Kinnucan urges. Respondent's conduct did not violate any of the Michigan Rules of Professional conduct, nor was it prejudicial to the administration of justice. His conduct was an effort to enhance the administration of justice.

## CONCLUSION

Ms. Kinnucan's Request for Investigation of Respondent is an effort to engage in character assassination of an attorney whom she has never met, has never communicated with, and who has never represented her in a court of law.  Query:  How did an individual who does not reside in Michigan, who lives several thousand miles from Michigan, learn about the lawsuit and the decisions relating to the protesters in front of Beh Israel synagogue in Ann Arbor, Michigan? Who informed her of the decisions and provided her with copies of the decisions, including an unpublished decision which she quoted from, and may have urged her to file the grievance?  What motivated her to file the Request for Investigation of an attorney whom she has never met,

never communicated with, and who never represented her in any legal matter?

Ms. Kinnucan's allegations and charges are totally devoid of any legal merit. Respondent finds it disturbing that the Michigan Attorney Grievance Commission has seen fit to transmit her Request for Investigation to Respondent without questioning her motives, and requiring that Respondent expend the time and energy to respond to her meritless charges. The Request for Investigation should be rejected and be dismissed in its entirety.

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
marcsusselman@gmail.com

Dated: August 19, 2024

52

# EXHIBIT 8



**EXHIBIT 9**



# EXHIBIT 10

STATE OF MICHIGAN
IN THE OTTAWA COUNTY CIRCUIT COURT

HP BENSON ASSOCIATION INC.

       Plaintiff,                           Hon:

  -V-                                   Case:

NIKE, INC.

        Defendant.               **COMPLAINT FOR**
**DECLARATORY JUDGMENT**

_____.

Martin H. Leaf (P43202)
Counsel for Plaintiff
33228 W 12 Mile Rd Suite 345
Farmington Hills, MI 48334
248.687.9993
leafmartin@gmail.com

_____.

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, HP BENSON ASSOCIATION INC., through Attorney

Martin Leaf state the following for its Complaint for Declaratory

Judgment:

1

## A.    Parties, Jurisdiction, and Venue

1.    Plaintiff  HP Benson Association Inc. is a non-profit corporation organized and existing under the laws  of the State of Michigan.

2.    Defendant Nike is an Oregon corporation, with principal offices in Beaverton Oregon and created a film called *The  Last Game* which is currently being streamed on Defendant Nike's  ad agency Weiden + Kennedy's website and other websites.

3.    Nike sells and manufactures apparel, and sporting goods, and transacts business in the State of Michigan, and has a Michigan registered agent: United Agent Group Inc., 28175 Haggerty Road, Novi, MI 48377.

4.    Through this lawsuit, the Plaintiff seeks a declaratory judgment pursuant to MCR 2.605, and the Michigan Consumer Protection Act, MCL 445.901 *et. seq*.   This Court has jurisdiction to provide such relief, under MCL 445.911.

5.   Venue is also appropriate in Ottawa County Michigan under MCL 600.1621 which permits an action to be brought in: "(a) The county in which a defendant resides, has a place of business, or conducts business, or in which the registered office of a defendant corporation is located, is a proper county in which to commence and try an action..." Since upon

2

information and belief, Nike conducts business in Ottawa county, venue is appropriate.

**B.    Background**

6.      Nike released the Nike Film *The Last Game in 2014*, during the World Cup of Soccer that year in Rio de Janeiro Brazil and the film has been seen by *billions* , including because of the fact that it was shown during live coverage of the World Cup.

7.      The film is about the heroes of soccer playing a team of clones created by the Perfect Corporation for the fate of the world.

8.      In the Nike Film the Perfect Corporation is taking over all the businesses including basketball. The weather becomes dreary, and the Clones and the Perfect Corporation ruin everything for everyone.

*9.*      The Nike Film's lead animator – Irish National Conor Ryan - has posted himself on social media as Adolf Hitler.

**Lead Animator Conor
"Hitler" Ryan**

 

Ex. 1. The Nike Film's lead animator      Ex. 2. Nazi Führer Adolf Hitler.
posts himself on Instagram as Hitler.

10.     The logo of the Perfect Corporation and on the Clones bears a strong

resemblance to a Star of David, i.e., a Jewish Star.



Ex. 3 The Nike Film's evil non-
human wearing a Jewish Star.

11.     Conor Ryan has posted a drawing he did  of religious Jews -

4

"Kikes" - in Israel, as brown tattered clothed, filthy, shabby, subhuman –

especially what appears to be a child -  in addition to hooked nosed,  with

heads on fire, which means liars. The Kikes' feet and hands are deformed,

their faces not human, one busy Jew on his cellphone is pickpocketing

another Jew, etc. This is  similar to the aspiring young artist Adolf Hitler 's

description of the Jews of Vienna in Hitler's autobiographical *Mein Kampf*

*(1925) -* Hitler, Adolf, 1889-1945. (1999). *Mein Kampf.* Boston :Houghton

Mifflin.



Ex. 4. The Nike Film's lead animator posts on his social media religious
Jews in "Palestine" as filthy Kikes not deserving human dignity. Upon
information and belief psychologists and psychiatrists will verify that the
Nike Film's lead animator manifests signs of Jew hatred.

12.     The Nike Film contains hidden hateful racial and racist messages – including Nazi messages - which become obvious when the Nike Film is carefully viewed frame by frame, a popular practice among children and young adults called searching for "Digital Easter Eggs".

13.     "A Digital Easter Egg is a hidden message or feature found in digital works, like a video game, website or movie trailer." https://sproutsocial.com/insights/digital-easter-eggs/ retrieved September 21, 2022 (*Stating that digital content creators use Easter Eggs to express themselves, in this case presumably Conor Ryan's racist Jew hatred.*)



Ex. 5. The Nike Film contains a Digital Easter Egg of the Crowned Kike – because Kikes control the world, hooked nose of course, because that is what Jews are according to Jew haters, with the word "Devil" spelled out, because to Jew haters Jews are the Devil. Notice the purple Devil's tail in the upper right corner.



Ex. 6. The Nike Film contains a Digital Easter Egg with a *picture* of the "Devil", evincing the duality of letters forming both a word and a picture, both "d e v i l", and the devil.



Ex. 7. The word "KIKE", as a Digital Easter Egg is flashed with a Devil's tail".



Ex. 8. Another Nike Film's Digital Easter Eggs for children: Nazi SS lightning bolts; Nazi Hungarian Arrow Cross – Murderers and Torturers of 600,000 Jewish unarmed civilians when the war was already lost for Germany, and Devil Jew pitchfork.

14.    The Nike Film ensures that the viewers, especially children because the Nike Film is animated[1], are exposed to the message that Jews murdered Jesus by *constantly* juxtaposing a Jewish Star next to one of the Christian heroes of soccer in the crucified position. This crucified position is repeated throughout the Nike Film. Jesus is also flashed too quickly to be seen at normal speeds, followed by another visible image of Jesus – Christ The Redeemer Statue.

15.    Jesus is constantly associated with the Gentile "good guys" heroes of soccer in the Nike Film.

---

[1] See Appendix B, children's comments.

8



Ex. 9. The Nike Film *constantly* promotes the message
that the Jews  Murdered Jesus with the "good guy" gentile
soccer players in the crucified position next to Stars of David.
This is just one of many examples.


16.    The Nike Film also contains many hidden sexual images including a

dual perception  of an erect child's penis with cynical planned deniability that it is a

knee, in addition to other children with exposed penises, and images of

masturbation. A few of these deceptive Digital Easter Eggs, are shown below.



Ex. 9. Erect penis on child deliberately drawn to be excused as a knee, but perceived as an erect penis.



Ex. 10. Digital Easter Egg of statue of soccer player masturbating. The Nike Film director Jon Saunders asked children to find his cute dog Maisie in the Ad. The faint dog's face draws children's attention to the masturbation.



Ex. 11. The Nike Film's lead animator Conor Ryan draws his signature penis on Trump while advocating Trump's murder on Ryan's social media, thereby showing probable cause as to the deliberate origin of the deceptive masturbation Digital Easter Egg for children of any age.

 

Ex. 12. Child's penis exposed.     Ex. 13.  Exposed penises on children.

17.    The Nike film also contains terrorist messages similar to the messages an illustrator placed in the Marvel comic X-Men Gold. Unlike Nike, Marvel immediately withdrew and recalled the offending comic book and apologized. Nike not only did neither but excluded Jews by their actions despite their self – serving false statements  regarding their professed zero tolerance for hate.



Ex. 14. Unlike Marvel, which withdrew the comic X-Men Gold after an Islamist illustrator put a Quranic Surah reference 5:51 admonishing Muslims about having Jews or Christians as friends, Nike ignored and has promoted such a Racist affront. See https://www.nytimes.com/2017/04/10/arts/marvel-x-men-gold-syaf.html retrieved on September 22, 2022.

C43



Ex. 15. The Nike Film promotes a racist message, that defames Islam by referencing Muhammed's birth-year 571 and Quranic Surah 40:18 **which states:** "When the doom comes, the hearts of the doomed [non-believers[2]] will choke in

___

[2] Christians, Jews, Hindus, Buddhists, e.g., non-Muslims. See

their throats, and no one will help them."



Ex. 16. The Nike Film promotes a racist message that when the Jews return to Jerusalem they will be destroyed. The frame depicts Ezekiel 20:42-49[3].

_____

http://www.alquranenglish.com/quran-surah-ghafir-18-qs-40-18-in-arabic-and-english-translation retrieved August 2, 2020 by the great Islamic Imam Ahmed Raza Khan: "(40:18) And warn them of the day of impending calamity, when hearts will rise up to the throats filled with grief; **and the disbelievers** will have neither any friend nor any intercessor who will be obeyed. (**Intercession will be accepted only for the Muslims, not for the disbelievers**)."

[3] **Ezekiel 20:42-49** [42]Then you will know that I am the LORD, when I bring you into the land of Israel, the land I had sworn with uplifted hand to give to your ancestors. [43]There you will remember your conduct and all the actions by which you have defiled yourselves, and you will loathe yourselves for all the evil you have done. [44]You will know that I am the LORD, when I deal with you for my name's sake and not according to your evil ways and your corrupt practices, you people of Israel, declares the Sovereign LORD.'" [45]The word of the LORD came to me: [46]"Son of man, set your face toward the south; preach against the south and prophesy against the forest of the southland. [47]Say to the southern forest: 'Hear the word of the LORD. This is what the **Sovereign LORD says: I am about to set fire to you,** and it will consume all your trees, both green and dry. The blazing flame will not be quenched, and every face from south to north will be scorched by it. [48]Everyone will see that I the LORD have

1ε



Ex. 17. The Nike Film's Digital Easter Egg promoting an ISIS beheading. Nonconscious ISIS with a red Axe, a terror threat because the bloody Axe is included. In late 2013 when The Nike Film was being worked on, ISIL became ISIS, a terrorist enemy of America, that murdered many innocent Americans, including American civilians  James Foley, Steven Sotloff, and Kayla Mueller. ISIS filmed many mass murders by cutting off the heads of the innocent victims, lowering them under water in a cage while the victims were alive, and filming the murders professionally, including with a waterproof camera inside the cage. Numerous pro-terrorism messages are displayed in The Nike Film.

18.     Nike has falsely stated publicly they have zero tolerance for hate (See

https://www.wweek.com/sports/2020/05/31/as-nike-released-its-new-anti-racism-

kindled it; it will not be quenched.'" [49]Then I said, "Sovereign LORD, they are saying of me, 'Isn't he just telling parables?'"[Emphasis added]

14

ad-its-ceo-sent-out-this-memo-to-employees/, retrieved September 22, 2022, See also ).

> "Let me be as clear as I can: Nike is opposed to bigotry," Donahoe wrote. "We are opposed to hatred and inequality in all its forms, indirect and overt. While Nike cannot solve injustice, I believe we have a responsibility to work toward addressing it to the best of our ability."

19.    Nike has also falsely stated that they respect all religions and falsely stated publicly that the logo in the Nike Ad is a soccer ball and not intended to be a Jewish Star ( https://www.timesofisrael.com/nike-ad-features-evil-jewish-clones/ retrieved September 22, 2022):

> "Nike said in response to the MK's [Minister of the Israeli Knesset's] remarks: "The logo shown on 'The Clones' player uniforms and on the advertising boards in 'The Last Game' film is a logo of a football. Any resemblance to any other symbol or image within the campaign is entirely coincidental and unintentional.""

> *****

> ""We respect all religions, and the image was in no way designed to cause any offense," Nike said."

20.    The Nike Film deceptively promotes, especially to children,  the incentives and reasons  to murder and commit criminal violence against Jews that virtually all obsessive Jew haters believe, including the 2022 Buffalo New York mass murderer Payton S. Gendron: Jews are the Devil, Jews are the enemies of Christianity, and that Jews control everything. See for example https://www.timesofisrael.com/manifesto-attributed-to-buffalo-shooting-suspect-pushes-antisemitic-conspiracies/ retrieved September 22, 2022.

21.    The Nike Film continues to be freely available on the Internet with well over 160 million views on one site alone.

https://www.youtube.com/watch?v=KriBQVhsgZk&ab_channel=mycoolvideos

22.    The Sixth Circuit has improperly eviscerated the MCPA by a blindsided ruling - Exhibit "A" – *Leaf v. Nike, Inc.*, **21-1045 (6th Cir. Oct. 25, 2021)**  without an opportunity for briefing an issue not passed on below, in violation of *Singleton v. Wulff*, 428 U.S. 106, 120 (1976).  The issue not passed on below was whether free transactions are covered by the MCPA.

23.    The Sixth Circuit ruled incorrectly that in order for a transaction to be covered under the MCPA it must involve a payment for the product, disregarding the fact that Michigan law does not support such an eviscerating interpretation of the MCPA for many reasons including that the last published opinion *Brownlow v McCall Enterprises, 315 Mich App 103, 122; 888 NW2d 295 (2016)* makes clear that the MCPA is derived from common law fraud, which does not require that the Plaintiff had made a payment to the Defendant.

24.    Published Michigan case law defines  transaction as a "series of actions."  *People v White*, 41 Mich.App. 370, 200 N.W.2d 326 (Mich. App. 1972). Not requiring a payment is consistent with the purpose of the MCPA – a remedy for deception. Furthermore, ordinary dictionaries define transaction without payment, etc. Federal Courts only apply Michigan Law, as the Michigan

16

Supreme Court would,  so they cannot create new Michigan precedent and

eviscerate a law passed by Michigan – unless it conflicts with an applicable

Federal law, or the US Constitution.

26.    It is common sense that  deceptive messages - like in the case of

the Nike Film - that go viral are only slowed down and not spread as widely

by requiring payment. Therefore, requiring a payment does nothing to further

the remedy for deception involving the Michigan public by businesses, as in

this case.

27.    The Sixth Circuit has also improperly eviscerated the MCPA by

wrongly ruling that internet transactions are not covered under the MCPA,

citing no cases and not allowing an opportunity for briefing on this issue not

raised below, in violation of *Singleton supra*. In fact the plain language of the

MCPA allows for internet transactions to be covered. MCL 445.904(b)

provides:

> (b) An act done by the publisher, owner, agent, or employee of a
> newspaper, periodical, directory, radio or television station, or other
> communications medium in the publication or dissemination of an
> advertisement unless the publisher, owner, agent, or employee knows or,
> under the circumstances, reasonably should know
> of the false, misleading, or deceptive character of the advertisement or has
> a direct financial interest in the sale or distribution of the advertised goods,
> property, or service.

28.    There are no exceptions to the MCPA, contrary to the claims of

the Sixth Circuit,  based on the product or service being transacted on the

17

internet. To the contrary the statute expressly provides for such liability.

29.    The above satisfies the MCL 2.605 criteria for a declaratory judgment.

30.    The above also satisfies the MCL 445.911 criteria for a declaratory judgment that Nike's acts, methods, and behavior violate MCL 445.903(s) and 903(cc).

31.    There have been no published Michigan opinions holding that the MCPA requires a payment – "protection money" – or that internet transactions are excluded from the MCPA.

32.    Children are particularly vulnerable to Nike's alleged deceptive promotion of racist hate, sexual content, and terror messages. This especially without the parent's knowledge and consent.

33.    Jews are particularly vulnerable to racist hatred, being the victims of such criminal racist acts more than all other religions combined, and much more than blacks or Muslims and it is only getting worse. See https://www.aei.org/carpe-diem/based-on-2019-fbi-data-jews-were-2-6x-more-likely-than-blacks-and-2-2x-more-likely-than-muslims-to-be-victims-of-hate-crimes/ Retrieved September 22, 2022.

34.    One of every two Jews born in the last two thousand years have been murdered by Gentiles because of messages like those that the Nike

Film deceptively promotes[4].

35.    Despite the above, incitement to harm the Jews, and criminal violence against Jews is largely ignored in America today, **including and especially by its government institutions**, and Nike and the Nike Film is an alleged example of this, especially in light of Nike being an American publicly traded corporation, its  professed and deceptive commitment to zero tolerance for bigotry and hatred - apparently not applicable to Jewish victims of its hatred -  and despite being aware of the Nike Film's promotion of such hatred for at least four years.

36.    MCL 445.903(s) provides: "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Defendant Nike violates section MCL 445.903(s) of the MCPA because Nike fails to reveal the material fact that the Nike Film promotes racist Jew hatred, contains sexual content involving children, and contains terror messages. The promotion of racist Jew hatred is  material upon information and belief and is a "fact" as alleged. Upon information and belief, the alleged deceptive promotion of sexual content involving children and terror content is also

---

[4] "[O]ne of every two Jews born in the last 2,000 years has been murdered" . *Comfort Ye My People The Church's Mandate Toward Israel and the Jewish People* . (2012). West Bow Pr. at 95 quoting David Turner, who in turn was quoting Irving Borowski.

material, and a "fact" because it is alleged to be promoted in the film. Upon information and belief none of the offensive content can be reasonably known in advance because Nike hides the content and denies it.

37.    MCL 445.903(cc)  provides: "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Defendant Nike violates section MCL 445.903(cc) of the MCPA because Nike fails to reveal the material facts that the Nike Film promotes racist Jew hatred, contains sexual content involving children, and contains terror messages. This in light of the positive representations of fact Nike makes about its intolerance of hate.

38.    Upon information and belief, the Nike Film is still being viewed in Michigan and is freely available on the internet to be viewed.

## COUNT I- DECLARATORY JUDGMENT

39.    The Plaintiff incorporates by reference the other paragraphs of this complaint.

40.    Under MCL 2.605 , in a case of actual controversy within its jurisdiction,  this Court may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted.

41.    There is an actual controversy within this Court's jurisdiction

regarding whether the MCPA exceptions of free transactions applies to the Nike film's violation of the MCPA sections 3(s) and 3(cc) .

42.    There is an actual controversy within this Court's jurisdiction regarding whether the MCPA exceptions of internet transactions applies to the Nike film's violation of the MCPA sections 3(s) and 3(cc), and whether Nike has violated MCL 445.903 .

43.    The Plaintiff seeks a declaratory judgment that the MCPA applies to the conduct described in the complaint, and that the exception for free transactions and deceptive practices involving Michigan residents on the internet are not exempt, despite the erroneous ruling by The United States Sixth Circuit and some erroneous unpublished prior Michigan opinions.

44.    The Plaintiff respectfully demands full briefing on the improper and erroneous Sixth Circuit blindsiding issues that have gutted a valid Michigan law, a *coupe de grace* for the MCPA. This was never done in violation of *Singleton* obviating fundamental fairness in light of and despite what the Sixth Circuit described as "startling allegations." *Leaf v. Nike, Inc.*, 21-1045 (6th Cir. Oct. 25, 2021) page 24.

## CONCLUSION AND RELIEF REQUESTED

Accordingly, the Plaintiff respectfully requests that this Court issue a declaratory judgment pursuant to MCR 2.605 and MCL 445.911 that the MCPA applies to the conduct described in this Complaint , and that the conduct is deceptive in accordance with MCL 445.903(s) and 903(cc).

Plaintiff also requests that all factual determinations be made by a jury, and that this matter be expedited as provided for in MCL 2.605(D) .

Furthermore, Plaintiff requests an injunction, requiring that Plaintiff issue a warning or take other measures this Court Orders to stop its deception or potential deception of the Michigan public, in violation of MCL 445.903(s) , and  445.903(cc).

Date: 09.22.22

*Martin Leaf*

Martin H. Leaf (P43202)
Counsel for Plaintiff
33228 W 12 Mile Rd Suite 345
Farmington Hills, MI 48334
248.687.9993
leafmartin@gmail.com

# EXHIBIT A
# *Leaf v. Nike, Inc.*, 21-1045 (6th Cir. Oct. 25, 2021)

21-1045

10-25-2021

MARTIN H. LEAF, Plaintiff-Appellant, v. NIKE, INC.; WIEDEN & KENNEDY, Defendants-Appellees, TWITTER, INC.; FACEBOOK, INC.; GOOGLE, LLC; YOUTUBE LLC, Defendants.

MURPHY, CIRCUIT JUDGE.

NOT RECOMMENDED FOR PUBLICATION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before: McKEAGUE, NALBANDIAN, and MURPHY, Circuit Judges.

MURPHY, CIRCUIT JUDGE.

Nike, Inc., released a short, animated film, *The Last Game*, to promote its products ahead of the 2014 World Cup. Martin Leaf alleges that this Nike ad contains hidden anti-Semitic imagery and other offensive content. He sued Nike and its advertising agency under the Michigan Consumer Protection Act. This Act protects consumers who buy or lease goods or services for their personal use from many deceptive business practices, including "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1)(cc). Here, however, Leaf does not allege that he ever even contemplated buying Nike products, let alone that he considered engaging in those "transactions" only because of Nike's positive reassurances that its ad lacked offensive  content. Rather, he treats the Nike ad itself as a "product" and his viewing of this freely available commercial as the "transaction." This reading would effectively transform the Michigan Consumer Protection Act from a narrow regulation of consumer transactions into a broad regulation of internet speech. Because the Act does not reach so far, we affirm the district court's dismissal of Leaf's complaint.

I

Leaf's first amended complaint makes startling factual allegations that we must accept as true at this stage of his suit-whether or not they are, in fact, true. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 507, 511 (6th Cir. 2020). Leaf takes issue with *The Last Game*, an animated film released in advance of the 2014 World Cup that runs for about five minutes. According to Leaf, this film was "engineered to leverage racial Jew-hatred to make more money in a sneaky subliminal way without 'getting caught.'" First Am. Compl., R.16, PageID 520.

The advertising agency Wieden + Kennedy (W+K) co-created *The Last Game* with Nike. The film tells the story of an evil villain who creates a team of soccer-playing clones. These evil clones ruin soccer (and somehow steal the beauty from the world) by winning games through a methodical (yet boring) playing style that takes no risks. A group of international soccer stars unite to come to the sport's (and the world's) rescue. Clad in Nike gear, these stars best the monotonous clones through their dazzling and

risky play during "the last game." Billions of people have watched *The Last Game*, and anyone can view it for free on the internet.

In June 2014, Leaf read an article in *The Times of Israel* describing a debate over whether *The Last Game* was anti-Semitic. Some people viewed images in the short film in this light. Others, such as the Anti-Defamation League, thought that this claim was baseless and diminished real anti-Semitism. *Id.*, PageID 527. Leaf decided to watch *The Last Game* on Nike's YouTube page. He has viewed this film many times since, including by examining the film's thousands of frames one frame at a time.

Based on these repeated viewings, Leaf concluded that the film contained subliminal anti-Semitic messages, pornography, and terroristic threats. Most of his first amended complaint goes through the alleged ways in which the film contains offensive content. Throughout the film, for example, both the uniforms and the home stadium of the evil clones display a soccer-ball logo that at times looks like a Jewish star. *Id.*, PageID 548. In addition, the film features various images (such as a skull with a Nike swoosh and a "hook-nosed figure") that Leaf claims resemble Nazi symbols and propaganda. *Id.*, PageID 534-47. Frames from the film also allegedly show "pornographic images" of animated characters, including children. *Id.*, PageID 540, 542, 544. Leaf asserts that Nike included the anti-Semitic imagery to make more money because of what he describes as the "well documented Jew hatred among European and many South American soccer fans[.]" *Id.*, PageID 576-77.

When Leaf watched the film and discovered its purportedly offensive content, he claims to have suffered mental distress. *Id.*, PageID 579-80, 582. He sued Nike and W+K, alleging that their failure to disclose the film's subliminal messages violated two provisions of the Michigan Consumer Protection Act. (Leaf sued other entities, but he voluntarily dismissed some of these defendants and failed to serve another.) Nike and W+K moved to dismiss Leaf's complaint under Federal Rule of Civil Procedure 12(b)(6).

Before the district court could rule on their motion, Leaf sought to file a second amended complaint. In the proposed new complaint, Leaf alleged that the film also contained terroristic threats, including, for example, the word ISIS with a red axe in the background of one scene. Second Am. Compl., R.38, PageID 1503-04. Leaf also alleged that at least one individual responsible for creating *The Last Game* is anti-Semitic, as evidenced by his social media. *Id.*, PageID 1402-18. Leaf further clarified that, before he watched *The Last Game*, he had read a second news article containing Nike's response to the anti-Semitism allegations. According to this article, Nike reassured its audience that the logo on the clones' uniforms was a soccer ball and that "[a]ny resemblance to any other symbol or image within the campaign is entirely coincidental and unintentional." *Id.*, PageID 1429. Nike added: "We respect all religions and the image was in no way designed to cause any offense." *Id.*

The district court held that Leaf's first amended complaint failed to state a claim under the two provisions of the Michigan Consumer Protection Act on which he relied. The first provision required Leaf to allege that Nike and W+K failed to reveal a material fact, that the omission of this fact could mislead consumers, and that consumers could not reasonably discover the omitted fact on their own. Mich. Comp. Laws § 445.903(1)(s). According to the district court, Leaf's complaint failed to assert that he could not have discovered the omitted "material fact" (that *The Last Game* contained subliminal messages) on his own. To the contrary, the complaint alleged that he learned of the film's potential anti-Semitic messages before he viewed it and that he discovered its offensive images when he did.

The second provision required Leaf to allege that Nike and W+K failed to reveal facts about a transaction that became material in light of earlier "positive" representations they had made about that transaction. *See id.* § 445.903(1)(cc). According to the court, Leaf's complaint did not allege that Nike and W+K made any positive representation (for example, that the film was not anti-Semitic) that could trigger any duty to disclose the contrary fact.

The court next denied Leaf's motion to file a second amended complaint as futile. It reasoned that the new complaint also failed to state a claim under subsection (cc) because it still did not assert that Nike made a positive statement about *The Last Game*.

Leaf appeals. We review de novo both the district court's decision to dismiss his complaint and its decision to deny as futile Leaf's request to file an amended complaint. *See Rudd*, 977 F.3d at 511; *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). To survive a motion to dismiss (or show that the filing of an amended complaint would not be futile), Leaf's first and second amended complaints needed to allege enough facts to state a "plausible" violation of the Michigan Consumer Protection Act. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596, 601 (6th Cir. 2013). In addition, Federal Rule of Civil Procedure 9(b) requires complaints to "state with particularity the circumstances constituting fraud[.]" Leaf nowhere challenges the district court's conclusion that this rule applies to his claims under the Act. We thus may assume that Leaf must meet this heightened standard. *Cf. Storey v. Attends Healthcare Prods., Inc.*, 2016 WL 3125210, at *10 (E.D. Mich. June 3, 2016).

II

The Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," Mich. Comp. Laws § 445.903(1), and allows private parties to sue for violations, *id.* § 445.911(1)-(2). Under this Act, "'[t]rade or commerce' means the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity." *Id.* § 445.902(g). For a transaction to fall within this "trade or commerce" definition, Michigan courts have long held that a customer must buy the good or service primarily for personal use, not for use in the customer's business. *See Slobin v. Henry Ford Health Care*, 666 N.W.2d 632, 634-35 (Mich. 2003) (per curiam); *Jackson Cnty. Hog Producers v. Consumers Power Co.*, 592 N.W.2d 112, 117-18 (Mich. Ct. App. 1999); *Noggles v. Battle Creek Wrecking, Inc.*, 395 N.W.2d 322, 324-25 (Mich. Ct. App. 1986). So an individual who bought a truck for his business could not rely on the Act to challenge the manufacturer's deceptive conduct. *See Zine v. Chrysler Corp.*, 600 N.W.2d 384, 392-94 (Mich. Ct. App. 1999). Nor could a patient rely on the Act to challenge a doctor's medical judgment. *See Tipton v. William Beaumont Hosp.*, 697 N.W.2d 552, 555-58 (Mich. Ct. App. 2005).

The Act contains over thirty specific prohibitions on unfair or deceptive practices for the transactions that fall within its coverage. Mich. Comp. Laws § 445.903(1)(a)-(ll). Michigan courts have recognized that these prohibitions contain language that varies greatly. Some provisions, for example, require express representations; others require factual omissions; and still others mention neither. *See Zine*, 600 N.W.2d at 397. The courts thus follow a provision-by-provision approach to resolve a dispute, paying close attention to the text of the specific subsection at issue. *See id.*; *see also Leaf v. Refn*, 742 Fed.Appx. 917, 926-27 (6th Cir. 2018); *Cormier v. PF Fitness-Midland, LLC*, 2018 WL 3594443, at *2-5 (Mich.

Ct. App. July 26, 2018) (per curiam); *DiPiero v. Better Bus. Bureau of W. Mich., Inc.*, 2014 WL 6679406, at *3-4 (Mich. Ct. App. Nov. 25, 2014) (per curiam). We thus will consider each of the subsections on which Leaf relies in turn.

A. Section 445.903(1)(cc)

Leaf relies primarily on a subsection that prohibits a business from "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1)(cc). This language requires a plaintiff to identify a "transaction." Because the Act does not define the word, Michigan courts have adhered to its ordinary meaning. *See Zine*, 600 N.W.2d at 396-97. "Transaction" means such things as "something that is transacted, esp. a business agreement" or "an act or agreement . . . in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered." *Id.* (quoting dictionaries). The word thus covers "the mutual and reciprocal acts typical of business deals that alter the legal relationships of the parties." *DiPiero*, 2014 WL 6679406, at *4. This is not a difficult requirement. Many deals-from the purchase of a vehicle to the lease of an apartment-suffice. *See Zine*, 600 N.W.2d at 396-97; *Barnes v. Arbor Circle Apartments*, 2019 WL 2063310, at *1, *5 (Mich. Ct. App. May 9, 2019) (per curiam). Still, the subsection "does not afford a right to [challenge] confusing, false or misleading" statements in the abstract without showing that the statements are connected to some potential transaction between the parties. *DiPiero*, 2014 WL 6679406, at *4. Thus, an unhappy customer of a window supplier could not sue the Better Business Bureau for airing deceptive information about the supplier because the customer did not contemplate entering into any sort of agreement with the Bureau. *Id.*

The subsection next requires that a business fail to disclose a fact about the transaction that is "material" "in light of" the business's earlier "positive" representation. What makes an omitted fact "material"? Michigan courts have looked to the common law of fraud when deciphering this legal term of art. *See Zine*, 600 N.W.2d at 398; *see also Brownlow v. McCall Enters., Inc.*, 888 N.W.2d 295, 305-06 (Mich. Ct. App. 2016) (per curiam). Relying on these common-law sources, the courts have defined "material" to cover only those facts that are "important to the transaction" or that "affect[] the consumer's decision to enter into" it. *Zine*, 600 N.W.2d at 398. To show that an omitted fact is material under subsection (cc), then, a plaintiff must show that the fact could have affected the plaintiff's contemplated transaction with the defendant in light of the defendant's earlier positive statements about the transaction. Thus, when plaintiffs have complained about a factual omission that occurred only after the parties consummated their deal, Michigan courts have repeatedly held that the omission could not have affected the parties' preexisting decision to enter into it. *See id.*; *see also Cap. One Bank USA N.A. v. Ponte*, 2013 WL 6692511, at *5 (Mich. Ct. App. Dec. 19, 2013) (per curiam); *Herbrandson v. ALC Home Inspection Servs., Inc.*, 2004 WL 316275, at *3 (Mich. Ct. App. Feb. 19, 2004) (per curiam); *Wood v. Detroit Mem'l Park Ass'n, Inc.*, 2001 WL 1654940, at *3 (Mich. Ct. App. Dec. 21, 2001) (per curiam).

These transaction and materiality elements make good sense when the statutory language is read against its broader context. The Michigan Consumer Protection Act does not seek to police speech in the abstract-something that would raise First Amendment concerns. After all, outside the commercial context, the First Amendment protects even the offensive anti-Semitic speech that Leaf alleges in this case. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Collin v. Smith*, 578 F.2d 1197, 1201-07 (7th Cir. 1978). The Act instead protects consumers by regulating the speech that a business uses to convince them to buy or lease its goods or services. *See Cap. One Bank*, 2013 WL 6692511, at *4; *Noggles*, 395 N.W.2d at 324.

27

Here, Leaf's first and second amended complaints both allege that Nike and W+K violated subsection (cc) by failing to reveal that *The Last Game* contained subliminal offensive content. Yet neither complaint adequately alleges that Nike and W+K failed to disclose a fact that was "material" to a "transaction" between these parties-as that subsection requires.

Leaf's view of the relevant "transaction" is a moving target. At times, his complaints treat *The Last Game* as an ad that promotes the sale of Nike "gear" (its shoes and athletic apparel). Second Am. Compl., R.38, PageID 1396. The second amended complaint, for example, alleges that *The Last Game* sends the "clear message" that "buying Nike gear" will help consumers "save the world" because the soccer stars are wearing that gear. *Id.*, PageID 1534. It elsewhere claims that Nike included the anti-Semitic content to "increase sales of Nike products[.]" *Id.*, PageID 1424-25. Just like the sales of cars, the sales of Nike products would qualify as "transactions" under subsection (cc). *See Zine*, 600 N.W.2d at 397. And if a plaintiff contemplated purchasing, say, Nike shoes based on Nike's representations that *The Last Game* did not contain anti-Semitic content, the failure to reveal the film's allegedly offensive imagery might be material to such a transaction. *See id.* at 398. But Leaf's complaints do not allege that *The Last Game* affected his decision to do *any* "business" with Nike. *DiPiero*, 2014 WL 6679406, at *4. Indeed, the complaints do not identify a single Nike product that Leaf has ever even considered buying-let alone a product that he considered buying based on Nike's positive statements about *The Last Game*. Because Leaf fails to identify any actual or contemplated Nike purchases, he fails to allege that the short film was material to this sort of traditional "transaction." *See Zine*, 600 N.W.2d at 397.

At other times, however, Leaf's complaints seem to treat *The Last Game* itself-not the athletic gear that the company sells-as Nike's "product." Both of his complaints, for example, conclusorily describe the "commercial" as a "product" that Nike disseminated. First Am. Compl., R.16, PageID 581; Second Am. Compl., R.38, PageID 1428. The proposed second amended complaint alleges further that Leaf watched this so-called product only after Nike made "positive" reassurances to the media that the soccer logo on the evil clones' uniforms was not a Jewish star and that the company respects all religions. Mich. Comp. Laws § 445.903(1)(cc); *see* Second Am. Compl., R.38, PageID 1429. This second amended complaint also asserts that Leaf would not have viewed *The Last Game* "in the ordinary manner" or "at all" if Nike had disclosed the allegedly offensive subliminal messages. Second Am. Compl., R.38, PageID 1538.

But Leaf's viewing of *The Last Game*, by itself, is not a "transaction" within the meaning of subsection (cc). Although it involves two or more persons (Nike and Leaf), this ad did not alter their legal relationship. *See Zine*, 600 N.W.2d at 396. Neither Nike nor Leaf undertook any legal obligation or gained any legal right. *See id.* When Leaf watched the video, there was also no transfer of value. The parties "forged no agreement and exchanged no promises." *DiPiero*, 2014 WL 6679406, at *4. Leaf simply went onto Nike's YouTube page and watched an ad. Second Am. Compl., R.38, PageID 1429. Any other person could have done the same thing because Nike made the ad available free of charge. If every viewer of freely available "speech" could treat that speech as a "business deal," it would greatly expand the Michigan Consumer Protection Act beyond its narrow domain of protecting consumers who buy goods or services for personal use. *See Cap. One Bank*, 2013 WL 6692511, at *4. Because, however, "website representations" alone do not generally qualify as "transactions," subsection (cc) does not give everyone who views a representation a right to challenge it as deceptive-irrespective of whether a viewer has any intent to buy any associated products or services. *See DiPiero*, 2014 WL 6679406, at *4.

Regardless, even if Leaf's viewing of this ad could be considered a "transaction," Leaf has failed to plead with particularity the materiality of Nike's alleged omitted fact. *Cf. Universal Health Servs., Inc. v. U.S.*

*ex rel. Escobar*, 136 S.Ct. 1989, 2004 n.6 (2016); *Minzer v. Keegan*, 218 F.3d 144, 151 (2d Cir. 2000). His second amended complaint simply concludes that he would not have watched *The Last Game* if he had known of the alleged anti-Semitism within it. Second Am. Compl., R.38, PageID 1538. Yet the rest of his complaint contradicts this bare allegation- one resembling a legal conclusion that merely parrots the materiality requirement. *Cf. Iqbal*, 556 U.S. at 678-79. Leaf did not plead that he was an unsuspecting soccer fan who came across the short film in anticipation of the World Cup. Rather, he pleaded that he watched the film only after  viewing articles debating whether it was anti-Semitic. Second Am. Compl., R.38, PageID 1427- 29. These allegations show that Leaf knew of the film's potential offensive content before he watched it. Yet he went ahead and did so, frame by frame. If anything, the complaint's specifically alleged facts (in contrast to its legal conclusions) suggest that the film's potential anti-Semitism was an "important" reason why Leaf *watched* the film. Those facts do not suggest that he would have *avoided* the film if he had known of its content. *See Zine*, 600 N.W.2d at 398. Because Leaf failed to plead facts plausibly suggesting that he might not have watched the film had he known of its content, he has not pleaded this materiality element with particularity. *See Collins v. A1 Motors, LLC*, 2017 WL 1190932, at *7 (Mich. Ct. App. Mar. 28, 2017) (per curiam); *Vandermale v. Harvey Auto.*, 2005 WL 1459610, at *2 (Mich. Ct. App. June 21, 2005) (per curiam).

In response, Leaf argues that the district court mistakenly concluded that Nike and W+K made no "positive" representations about *The Last Game*-as subsection (cc)'s language requires to trigger any duty to disclose omitted facts. *See* Mich. Comp. Laws § 445.903(1)(cc). According to Leaf, Nike's reassurances in the media that the soccer logo on the clones' uniforms was not a Jewish star and that the company respected all religions sufficed to allege this positive-representation requirement and trigger a duty to disclose the film's offensive content. We need not consider this point. Even if the allegations in the second amended complaint would have sufficed to allege a "positive" representation, Leaf's claim would still fail because he has identified no omitted fact that was "material" to a "transaction."

Leaf also relies on the Michigan court's decision in *Brownlow*. There, the defendant was hired to clean the plaintiffs' home following a small fire. 888 N.W.2d at 297. The defendant used an ozone generator to remove the smell of smoke, and this generator allegedly damaged the home. *Id.* The court held that there was a dispute of fact over whether the defendant had made a "positive"  representation that the generator would remove the smoke odor so as to trigger a duty to disclose that it might also damage the home. *Id.* at 308. In that case, then, a transaction existed (for cleanup services) and the omitted fact (that the ozone generator might damage the home) was material to whether plaintiffs would go through with it. These elements are missing here.

B. Section 445.903(1)(s)

Leaf thus falls back on a second provision of the Michigan Consumer Protection Act that prohibits a business from "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. Laws § 445.903(1)(s). Unlike subsection (cc), subsection (s) does not include the term "transaction." Like subsection (cc), however, subsection (s) does require a "material fact." And because Michigan courts have defined a "material" fact as one "important" to a transaction, they have repeatedly held that subsection (s) impliedly requires a plaintiff to identify the underlying transaction that the alleged factual omission could affect. *See Zine*, 600 N.W.2d at 398; *see also DiPiero*, 2014 WL 6679406, at *4; *Cap. One Bank*, 2013 WL 6692511, at *5; *Herbrandson*, 2004 WL 316275, at *4. Leaf's claim under subsection (s) thus fails for the same reasons that his claim under subsection (cc) fails: He did not

establish that the alleged failure to disclose the hidden offensive content in the Nike ad was "material" to any underlying "transaction."

This claim also fails for an additional reason. Subsection (s) requires that the omitted fact "could not reasonably be known by the consumer." Mich. Comp. Laws § 445.903(1)(s). This element incorporates a form of the "reasonable reliance" requirement from the common law of fraud. *See, e.g., Fox v. Sherwin Williams Co.*, 2010 WL 46905, at *2 (Mich. Ct. App. Jan. 7, 2010) (per curiam); *Evans v. Ameriquest Mortg. Co.*, 2003 WL 734169, at *3 (Mich. Ct. App. Mar. 4, 2003) (per curiam). Leaf must adequately allege that he relied on Nike's failure to disclose the allegedly offensive content because he could not have reasonably discovered this content on his own. Yet, as the district court noted, his complaints pleaded that he watched the film only after reading a news article in which individuals alleged that it was anti-Semitic. He thus "could reasonably be expected to discover the omission at issue." *Zine*, 600 N.W.2d at 398.

\* \* \*

Leaf ends with a trio of procedural objections to the district court's dismissal of his suit. He suggests that we and the district court should not rely on unpublished Michigan decisions because they lack precedential effect and do not bind Michigan's courts. Yet we routinely rely on these unpublished decisions for their "persuasive" power concerning the substance of Michigan law. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1095-96 (6th Cir. 2010); *see, e.g., Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*, 790 Fed.Appx. 775, 779 (6th Cir. 2019). They persuasively show why Leaf's claims fail here.

Leaf next suggests that the district court improperly considered extrinsic evidence. He correctly notes that if a court relies on outside-the-complaint evidence when ruling on a motion to dismiss, the court must treat the motion as one for summary judgment and give the parties a chance to present relevant evidence. Fed.R.Civ.P. 12(d); *see Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483-85 (6th Cir. 2020). But Leaf wrongly claims that the district court relied on outside-the-complaint materials from one of his other cases when dismissing his complaint in this one. The district court considered the materials in this related case only when unsealing certain exhibits, not when ruling on the merits of the motion to dismiss. Op., R.58, PageID 1805-06. The outside-the-complaint evidence thus did not affect its ruling on the merits.

Leaf lastly argues that the district court showed improper bias against him. That is so, he claims, because the court described his conduct across four similar cases as "sloppy." *Id.*, PageID 1806-07. The court noted, among other things, that Leaf had failed to serve some defendants, had voluntarily dismissed other defendants "at an alarming rate," and had filed many irrelevant exhibits. *Id*. It warned him that further wasteful litigation "may well lead to future sanctions." *Id.*, PageID 1807. Like Leaf's prior claims of bias against a state judge, this "accusation is wholly without basis[.]" *Deming v. CH Novi, L.L.C.*, 2013 WL 5629814, at *1 (Mich. Ct. App. Oct. 15, 2013) (per curiam). Just because a court looks unfavorably on a party's litigation tactics does not make the court improperly biased against that party. *Liteky v. United States*, 510 U.S. 540, 550- 51 (1994); *United States v. Parker*, 837 Fed.Appx. 341, 346 (6th Cir. 2020). For this type of criticism to reveal improper bias, the criticism must stem from something that can be described as wrongful (for example, a court's use of some outside-the-lawsuit source that it should not have considered). *Parker*, 837 Fed.Appx. at 346. We see nothing of the sort in the district court's "ordinary efforts at courtroom administration" in this case. *Liteky*, 510 U.S. at 556. Its statements about Leaf's litigation conduct had firm evidentiary support.

At day's end, Leaf claims to have been "outraged" that *The Last Game* contains offensive content that will inflame hatred and violence. Second Am. Compl., R.38, PageID 1531. Even accepting as true his allegations about this offensive content (as we must at this pleading stage), these allegations do not plead the types of commercial harms that the Michigan Consumer Protection Act seeks to remedy. We affirm.

# APPENDIX B
# SAMPLE CHILDREN'S COMMENTS



# THE LAST GAME

1:15 / 7:02

## Nike Football: The Last Game full edition

163,733,927 views • Dec 8, 2015

👍 1.8M    👎 DISLIKE    ↗ SHARE    ⬇ DOWNLOAD    ✂ CLIP    ☰+ SAVE    •••

**mycoolvideos**
613K subscribers

SUBSCRIBE

My social media:
Instagram:https://www.instagram.com/mycoolvideo...
Facebook:https://www.facebook.com/Mycoolvideos...

# COMMENTS FROM KIDS

 **Joel Ririassa** 1 month ago

OMG i watched this so many times when i was 8

 **Apolo Jimenez** 1 year ago

I remember watching this as a little kid.But it was only 3 years ago. 

 **HubOfBoredom** 8 months ago

Nostalgic anyone?
its been 5 years since this ad first launch, back then i was 9 years old, man thats so damn nostalgic!

 **Illucka.** 5 months ago (edited)

Seeing this as a kid was so mf inspiring

 **LeonPlays** 2 months ago

I remember watching this as a kid it would get me so hyped to go outside and play football

 27 👎 REPLY

 **Zak_MM** 3 months ago

I remember watching this when I was a kid 

 **S0L0BiT Gaming** 1 month ago

Cant belive that I am still watch this video.I watched this since I was 7

 **Aqil Nazmi** 2 months ago

the internet is suuuuppppeeeerrrr slow when i watch this as a kid

  REPLY



**Napoleon Bonaparte** 5 days ago

LoL i watch this video junior high school and now i was 20 years old



**Mohau Mokhethi** 1 year ago (edited)

My favorite weekly videos from back in my primary school days 😭 
Every Wednesday funny enough we played games the same day 😭
Damn back in those days
Risk Everything ⚽



**Shinobi X** 1 month ago

Yo this was the hypest thing when I was eleven



**TheGaMinG HuB** 2 weeks ago

Cant belive that I am still watch this video.I watched this since I was 7

    REPLY



**LorD** 1 month ago

Cant belive that I am still watch this video.I watched this since I was 7



**Just a Mexican** 2 months ago

As a kid I loved watching this



**Richard Smj** 3 weeks ago

Back in the days, i watched this
It was fun



**Kostas Skoulidas** 1 week ago (edited)

this ad is so nostalgic. 2014... Elementary school. Those where my role models



**Ящ RoЯ** 1 month ago (edited)

Remembering the days when I watched this for the first time. I was15 but now I'm 21.... Time flies.



**Real Ninja** 3 weeks ago

I watched this when i was little and i still watch it



**Jamesjhsn07** 2 months ago

this was the peak of my childhood



**Jereyyy** 3 months ago

When I was 9, I was like, yo where is messi



**Felix Tobias** 1 month ago

childhood! ❤️ ⚽



**HeadCanon** 1 month ago

I remember watching this over and over again when I was 8 or 9



Pablo Martinez 2 months ago (edited)

I remember watching this when I was 7 with my cousin in his iPad in his house because he had internet and with this im sure I had the best childhood ever!



**Sinfu 2.0** 2 months ago

The first time i swa this video I was 12 and i was happy   Now im 16 and depressed



**Yeah Whatever** 2 months ago

I watched that when I was 4 .—.



**meerkatenator** 2 weeks ago

I remember watching this ad as a kid



**Helena Popikova** 1 month ago

Fun fact: when you watched this you were 11 or less

👍 17   👎   REPLY



**Schandorf Oppong** 1 week ago

Legendary video tho 😂😂 still remember discussing it with my friends in fifth grade

    REPLY



**Yousef Alfares** 1 month ago

I've been watching this since I was 6 😭

👍 1   👎   REPLY



**Pubg Lover** 2 months ago

i watched it when i was a kid and i will never left : )



TBP_360 4 months ago

i remebr i watched this wehn i was 5yrs old, man i miss this so much.



**Rahab Jericho** 3 months ago

as a kid in 2014, i always wondered why they didn t include messi. Now i have the answer: hes not a nike ambassador lol :)

👍 21 👎   REPLY



**TuanTran04** 1 year ago

Nostalgic anyone?
its been 5 years since this ad first launch, back then i was 9 years old, man thats so damn nostalgic!



**Suprav Karmacharya** 1 month ago

this feels so nostalgic now damn, i watched this video when i was 9/10 yo

👍 👎   REPLY



**Feyenoord Rotterdam** 2 months ago

Old memories when i was 9 and 10 i always watches this wow goed memories in thin bad lockdown (Netherlands) not a real lockdown but corona



**Jina Lopez** 1 month ago

I remember being like 10 & re watching this all day cuz it's just so amazing

👍 👎   REPLY

**EXHIBIT 11**

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OTTAWA**

---

**HP BENSON ASSOCIATION INC.,**

                             Plaintiff,                      **Order**

v                                                    **File No. 22-7011-NO**

**NIKE, INC.,**

                                                  Hon. Jon Hulsing

                              Defendants,

---

        Defendant has filed a motion to dismiss prior to the filing of its answer.  This motion is scheduled to be heard in December.  In reviewing both the complaint and defendant's motion, it appears that this complaint may be based on a questionable legal theory; and, plaintiff counsel may have a history of filing frivolous claims against defendant.  It is also interesting that plaintiff filed this action in Ottawa County when both plaintiff and defense counsel are based in the southeast area of Michigan.  Therefore, the court requires and orders that plaintiff counsel personally appear before the court to argue this motion.  Defense counsel may appear by remote technology.

*IT IS SO ORDERED,*

October 24, 2022

                                        Hon. Jon Hulsing

OCT 2 4 2022

# EXHIBIT 12

STATE OF MICHIGAN
IN THE OTTAWA COUNTY CIRCUIT COURT


HP BENSON ASSOCIATION INC.

      Plaintiff,


-V-                           Case: No. 22-7011-NO
                                  Hon:  Jon H. Hulsing

NIKE, INC.

      Defendant.                Motion For Disqualification
                                   Of Trial Judge

---

Martin H. Leaf (P43202)
Counsel for Plaintiff
33228 W 12 Mile Rd Suite 345
Farmington Hills, MI 48334
248.687.9993
leafmartin@gmail.com

Thomas M. Schehr (P54391)
Nasseem S. Ramin (P73513)
Dykema Gossett PLLC
*Attorneys for Defendant NIKE, Inc.*

400 Renaissance Center, 37th Floor
Detroit, MI 48243
(313) 568-6800
tschehr@ddykema.com
nramin@ddvkcrna.com

---

## MOTION FOR DISQUALIFICATION OF TRIAL JUDGE

Plaintiff, HP BENSON ASSOCIATION INC., through Attorney  Martin

Leaf  moves for the disqualification of the trial judge for the reasons in the attached brief.


Date: November 11, 2022


Respectfully submitted,

*Martin Leaf*

Martin H. Leaf, Esq (P43202)
Attorney for Plaintiff

<u>**BRIEF IN SUPPORT OF MOTION FOR DISQUALIFICATION IN BOTH**</u>
<u>**THE HP BENSON V NIKE CASE AND THE HP BENSON V AMAZON CASE**</u>

**I.      SUMMARY**

This motion asserts the unfortunate requisite *appearance* of  bias including anti-Semitic

bias by the trial court  in violation of Judicial Cannon II, that requires disqualification. Nothing

herein is intended to be an assertion that the trial court is psychologically biased against Jews,

parties, or attorneys, even  if the word *appearance* is not explicitly stated next to *bias* somewhere

in this pleading and brief.  Nor does it mean that the survey of judges herein evincing strong

implicit bias against Jews means this trial court is so automatically implicitly or explicitly biased.

The trial court must be disqualified because it issued an apparent  biased unjustified

Order that harms and sanctions  Plaintiff and their counsel by falsely and without justification, or

due process, accusing or implicating Plaintiff's counsel – *inter alia* - of filing frivolous lawsuits,

using questionable legal theories,  and "curious" venue. The order also physically discriminates

against Plaintiff and counsel by forcing only Plaintiff to drive to Grand Haven from Detroit,

expending time and money, while giving Nike the option and convenience of appearing by

Zoom. Ex. 1.

In addition, the Order, like the Nike Film,  appears to be an attack on Jewish human

dignity because Jews – only one percent of the Michigan population – historically were

discriminated for being Jews, including having to enter Government buildings in just about every

country, "using a different door" than the Gentiles. So, this Order by the government is

symbolically and actually a painful reminder and slap in the face for Jews, and inspiring and

invigorating  for Jew haters. It has the requisite  appearance of bias for disqualification.

All of this without the most basic due process and fundamental fairness of waiting for a response of right from Plaintiff. The trial court has, by its Order, made this case about Plaintiff's counsel which is just as irrelevant at this point in the proceedings as making this case about Nike's prior and current misdeeds: Using slavery; Having been found to engage in deceptive commercial speech (*Kasky v Nike* 119 Cal.Rptr.2d 296 (2002) ; Dividing America; Defaming Islam; and in this case allegedly violating a Michigan statute by deceiving the Michigan public with deceptive messages of hate, sexuality, and terror, by using a deceptive method.

Although helpful to Plaintiff's case, Plaintiff does not want to make this case about those Nike misdeeds because that is not what is or should be before the Court right now. By the same token the false allegations by the trial Court against Plaintiff's counsel are not *properly* before this court either. *The fact that Nike [primarily and deceptively] focuses on Plaintiff's counsel is a red flag about the real strength of Nike's case.*

What *is* properly before this court is whether HP BENSON ASSOCIATION INC is precluded from asking a Michigan court if Nike is engaging in a deceptive method  as defined in the Michigan consumer protection act, MCL 445.903 (MCPA). The overwhelming authority from the United States Supreme Court  is that it is virtually impossible for Nike to meet its burden to preclude issues or claims at this point for the reasons explained herein. See *Taylor v Sturgell*  553 U.S. 880 (2008). Does Nike properly represent that law to the Court ?

Another issue properly before this Court is whether prior Federal rulings on a Michigan statute – the MCPA -  are valid Michigan law. There is not sufficient  Michigan authority that internet transactions are immune from the declaratory relief in the MCPA as the Federal court erroneously ruled. Likewise, there is no proper authority that free transactions are immune from the declaratory relief Plaintiff seeks for many of the reasons herein, including that the purpose of

the MCPA is to provide a remedy for deception and must be construed liberally. "The MCPA is a remedial statute designed to prohibit unfair practices in trade or commerce and must be liberally construed to achieve its intended goals." *Forton v Laszar*, 239 Mich App 711, 715; 609 NW2d 850 (2000), citing *Price v Long Realty, Inc*, 199 Mich App 461,470-471; 502 NW2d 337 (1993).

The great lengths Nike and the courts are going, resulting in the public being  prevented from knowing whether they are being deceived by the primarily subliminal but also supraliminal deceptive content in the Nike Film goes against the MCPA's protection of the public. A jury has the right to determine if the method Nike uses, Digital Easter Eggs, deceives the Michigan public. The obstacle the federal courts have placed on the MCPA regarding "transactions" are ridiculous barriers on the public's right to know. A simple example will show this.

A father helps his young daughter download an app from Company X. Unbeknownst to the father , the app steals everything on the daughter's phone and transmits the data it to Company X to sell. According to Nike and most likely this trial court, a declaration by the court – as a result of a complaint for declaratory relief -   regarding such deceptive conduct by the business could not be done because the business transaction of downloading the software was "free." That makes no sense whatsoever, and is contrary to the reason for the MCPA, *Forton* 239 Mich App at 715 (1993) .

A declaration regarding a deceptive method should have the broadest reach possible to protect as many Michigan residents as possible – in this case anyone being deceived by the Nike Film.

Nike's continued false denial that  the Nike Film is not deceptive is a continuing violation of the MCPA because it means – if and when a court is willing to apply the MCPA – that Nike is failing to reveal the material fact regarding  deception, in light of Nike's ongoing denial of any deception. In other words, Nike is continuing to violate the MCPA by it representations of facts made in a positive way in this proceeding.

Plaintiff and its counsel should *not* stand equally before this court compared to Nike. The Michigan public's right to know about Nike's alleged deception versus Nike's right to promote the Nike Film are the "parties" that should stand equally before this court.

Unfortunately, any reasonable person cognizant of the relevant facts and applying common sense would conclude that the trial court's ability to be fair in this public protection issue is impaired for all the above reasons. Especially the fact that the trial court's apparent bias is getting in the way of protecting the Michigan consumer by properly applying the Michigan consumer *protection* act's provision for declaratory relief.

Obviously, the trial court has improperly bought into Nike's deceptive legal strategy and will not or cannot focus on the issues affecting the Michigan public. There is no rule of evidence such as "prior bad acts" by a party's counsel – even if true , which it is not - that justifies the trial court's apparent abandonment of the serious issues involving protection of the public that is before the Court *at this time*. That abandonment is another  appearance of the requisite bias for disqualification.

## II.     INTRODUCTION

This case involves an action filed by Plaintiff HP BENSON ASSOCIATION INC., a non-profit Michigan watchdog formed in May of 2022, whose purpose as stated in the articles of incorporation is:

> To educate the public regarding media that contains, and entities and individuals that promote, *deceptive:* Hateful content; Inappropriate sexual content; Terrorist messages; and other deceptive offensive content. To engage in legal opposition, including lawsuits opposing the *deception* and *deceptive* content described above. [emphasis added]

The complaint asks for the Court to issue a declaratory judgment that the *method* used by Nike in the Nike Film *The Last Game* (2014) is deceptive. This is allowed under MCL 445.*911* of the Michigan consumer protection act.

That method at issue, referred to as "Digital Easter Eggs" is where individual frames of a film contain hidden messages - flashed quickly - in this case Jew hatred, sexual content, and terror messages. It must be stressed that the alleged deceptive messages in *The Nike Film* is not the method at issue but rather an instance of the method. The method is using Digital Easter Eggs to convey material content.

It is painfully obvious that Material Digital Easter Eggs are deceptive *per se*. In fact, because they are subliminal the FCC has already ruled they are deceptive and against the public interest (FCC 74-78, BROADCAST OF INFORMATION BY MEANS OF 'SUBLIMINAL PERCEPTION' TECHNIQUES, issued January 24, 1974):

> " We believe that the use of subliminal perception is inconsistent with the obligations of a licensee, and therefore we take this occasion to make clear that broadcasts employing such techniques are contrary to the public interest. Whether effective or not, **such broadcasts clearly are intended to be deceptive.**" [Emphasis added]

This means that a government agency – The FCC – has already concluded that Nike's or anyone's alleged use of Digital Easter Eggs is deceptive, so the finder of fact finding that Nike is deceptive,  should be a no brainer.

One example of a material  Digital Easter Egg in the Nike Film – one of many -  is the Jew hating image of a hooked nose Jew with a crown on its head and the Devil on its neck quickly flashed after the word "Kike," all the while under the penumbra of the bad guys wearing a Jewish Star. (Ex.3, Ex. 4).

Another set of Digital Easter Eggs are the Nazi symbols including the SS lightning bolts, Genocidal Nazi Hungarian Arrow Cross, and the Devil's pitchfork. (Ex. 5). Not really material to Jews or Americans because those deceptive symbols only promote six million murders. Maybe Nike promoting and mocking 6.25 million murders might get someone's attention.

The fact that Digital Easter Eggs can so easily be used for political purposes like the Nike Film has already been proven by the Marvel Islamist illustrator  Syaf, admitting he put Digital Easter Eggs containing Quranic Surahs warning Muslims not to take Jews and Christians as their friends. (Ex. 6). Syaf also admitted to placing Kitty Pride – who is Jewish in the comic – next to a sign that said 'JEWELRY' with only the "JEW" showing. (Ex. 7).

Marvel, unlike Nike took immediate action to remedy the situation by firing the illustrator and recalling every comic with the Digital Easter Eggs. https://www.nytimes.com/2017/04/10/arts/marvel-x-men-gold-syaf.html retrieved on September 22, 2022.

Young adults and minors go frame by frame looking for Digital Easter eggs, so they are not just subliminal but supraliminal. https://www.domestika.org/en/blog/10409-10-of-the-best-movie-easter-eggs-hidden-in-classic-films retrieved November 11, 2022.

The Sixth Circuit Court of Appeals in a previous lawsuit ruled that free transactions and internet transactions are not covered under the MCPA and therefore deceptive methods involving the internet or that are free are not covered under the MCPA. However, those Federal rulings regarding Michigan law are meritless and are not precedent. See *Ryder Truck Rental, Inc v Auto-Owners Ins Co, Inc*, 235 Mich App 411, 416; 597 NW2d 560 (1999); *Van Buren Twp v Garter Belt, Inc,* 258 Mich App 594, 604; 673 NW2d 111 (2003). (Holding federal rulings on Michigan law are not precedent).

For the trial court to come to the correct conclusion regarding Michigan Law would require the trial court to be fair, apply due process, and correctly apply Michigan law – something plaintiff's counsel maintains the trial court has an appearance of not being able to do, based on the record and common sense and the arguments herein.

The court also seems incapable of due process and fundamental fairness should Nike raise the issue of the First Amendment, among other issues. Deceptive commercial speech is not subject to first amendment protection. See *In re R.M.J.*, 102 S.Ct. 929, 937 (1982).

The authority to bring an action for declaratory judgment or equitable relief is found at MCL 445.911:

> **"(1) *Whether or not a person seeks damages or has an adequate remedy at law,* a person may bring an action to do either or both of the following:**
>   **(a) Obtain a declaratory judgment that a method, act, or practice is unlawful under section 3.**
>   **(b) Enjoin in accordance with the principles of equity a person who is engaging or is about to engage in a method, act, or practice that is unlawful under section 3.**

Because this case involves allegations of the illegal deceptive promotion of hate by Nike – including Jew Hatred - the Order by the trial court has an appearance of *anti-Semitic* bias for

the reasons contained herein. Such bias is causing potential harm to Michigan residents that should be protected, informed, and potentially remedied from hateful, sexual and terror deception. Instead, the apparent bias causes the trial court to improperly focus at this point on trial counsel.

Imagine a civil rights case, as this case substantially is for Jews, and the trial court gives the Defendant white attorneys representing those accused of illegal hate speech, the option of appearing by Zoom but the black Plaintiff and black attorney has to appear in person and the black plaintiff and counsel are not given the opportunity to address the white Defendant's motion prior to issuing a discriminatory Order based on the white side's motion only and not considering a response.

There is absolutely no valid – non-biased - reason besides an appearance of the requisite "bias for disqualification" that the trial court would not wait for Plaintiff's response and then oral argument before sanctioning Plaintiff's counsel.

**LAW REGARDING THE APPEARANCE OF BIAS**

Judicial Cannon 2 provides ( Michigan Judicial Institute, *Judicial Disqualification*, p. 5, 8 (2022)):

> Judicial disqualification is warranted under MCR 2.003(C)(1)(b) where "[t]he judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in [*Caperton v Massey*, 556 US 868 (2009)], or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct."

> ******

> "Under MCR 2.003(C)(1)(b), the test for determining whether there is an appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Kern v Kern-Koskela*, 320 Mich App 212, 232 (2017)

(quotation marks and citations omitted). The appearance of impropriety standard "cannot be equated with any person's perception of impropriety, lest a judge find himself or herself subject to a barrage of recusal motions on the part of any person who apprehends an impropriety, however unreasonable this apprehension. Rather, this standard must be assessed in light of what can be gleaned from existing court rules and canons, historical practices and expectations, and common sense."*Adair v Michigan,* 474 Mich 1027, 1039 (2006). The standard requires an objective inquiry "made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances*." Id*. (quotation marks and citation omitted).

### III.  THE TRIAL COURT'S ACCUSATIONS REGARDING VENUE ARE IRRELEVANT AND APPEARS TO BE PREJUDICIAL

"[V]enue is controlled by statute [(MCL 600.1621)] in Michigan." *Omne Fin, Inc v Shacks, Inc*, 460 Mich 305, 309 (1999). In most cases, venue is proper where the defendant (1) resides, (2) has a place of business or conducts business, or (3) if the defendant is a corporation, where the registered office is located. MCL 600.1621(a). If no defendant meets any of these criteria, venue may be proper where the plaintiff (1) resides, (2) has a place of business or conducts business, or (3) has a registered office if the plaintiff is a corporation. MCL 600.1621(b).

Nike conducts business in Ottawa County. Nike is not inconvenienced by Ottawa County. Nike is located in Beaverton Oregon, so appearing here or anywhere else in Michigan is the same inconvenience. Interestingly, Nike has not raised the issue of venue.

The trial court *appears* to be sending a message to Jews throughout Michigan: Challenge illegal deceptive anti-Semitism through the courts and you will be punished by the government. In this case the very early but ominous punishment by the trial court is the usual rush to judgement, and public unwarranted humiliation: The Jew has to drive from Detroit to Grand Haven and the Gentile gets to use Zoom. An appearance of bias to anyone using common sense, and a sanction without due process or fundamental fairness.

I.      **PLAINTIFF'S COUNSEL HAS NEVER BEEN FOUND TO HAVE FILED A
        FRIVILOUS LAWSUIT .**

There has never been a hearing held that Plaintiff's counsel has filed a frivolous lawsuit,

nor did Nike ever request costs or sanctions in  a prior Nike lawsuit by counsel, which speaks

volumes.  The trial court raising that false accusation and sanctioning counsel prior to any

response allowed is an appearance of anti-Semitic bias to the public because this case alleges:

"[I]ncitement to harm the Jews, and criminal violence against Jews is largely ignored in America

today, *including and especially by its government institutions"(Ex. 2, Complaint, para 35).*

Obviously,   Nike's deceptive shift of focus to the Court is working to the detriment of the

Michigan public.


II.     **QUESTIONABLE LEGAL THEORIES.**

All of Plaintiff's legal theories have met the Michigan standard of having  "arguable legal

merit."  MCR 600.259(3)(iii). The trial court needs to be more specific in this accusation in order

for counsel to be given a fair chance to respond to this at a fair proper time.

> **A.      NIKE CANNOT SUSTAIN ITS BURDEN AT THIS TIME OR ANY
> TIME THAT PRECLUSION IS JUSTIFIED.**

The preclusive effect of a Federal judgement for a Michigan court is governed by

Federal common law which of course is subject to Federal due process considerations.

See *Pierson Sand & Gravel, Inc v Keeler Brass Co*, 460 Mich 372, 380-381 (1999): "The state

courts must apply federal claim-preclusion law in determining the preclusive effect of a prior

federal judgment. [18 Moore, Federal Practice, § 131.21[3][d], p. 131-50.]" See also *Taylor v

Sturgell* 553 US 891 (2008):  "The preclusive effect of a federal-court judgment is determined

by federal common law. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–

508, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). … The federal common law of preclusion is, of

course, subject to due process limitations. See *Richards v. Jefferson County*, 517 U.S. 793, 797, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996)."

In Michigan, preclusion is an affirmative defense that the party asserting such preclusion bears the [not easy] burden of *proving. Baraga Co v State Tax Comm*, 466 Mich 264, 269 (2002). See also *Taylor*  at 906 (2008):

> "We reject Fairchild's suggestion. Claim preclusion, like issue preclusion, is an affirmative defense. See Fed. Rule Civ. Proc. 8(c); Blonder–Tongue, 402 U.S., at 350, 91 S.Ct. 1434. Ordinarily, it is incumbent on the defendant to plead and prove such a defense, see *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), and we have never recognized claim preclusion as an exception to that general rule, see 18 *Wright & Miller* § 4405, p. 83 ("[A] party asserting preclusion must carry the burden of establishing all necessary elements."). We acknowledge that direct evidence justifying nonparty preclusion is often in the hands of plaintiffs rather than defendants. See, e.g., *Montana*, 440 U.S., at 155, 99 S.Ct. 970 (listing evidence of control over a prior suit). But "[v]ery often one must plead and prove matters as to which his adversary has superior access to the proof." 2 K. Broun, *McCormick on Evidence* § 337, p. 475 (6th ed.2006). In these situations, targeted interrogatories or deposition questions can reduce the information disparity. We see no greater cause here than in other matters of affirmative defense to disturb the traditional allocation of the proof burden.

The United States Supreme Court is clear, there are only two ways Plaintiff is precluded in the instant case: If the Plaintiff is a proxy for present counsel, and the Supreme Court is equally clear what constitutes a proxy- a legal representative such as a personal representative of an estate. This is because in a federal diversity case, which the previous federal case was, preclusion is determined by federal common law ( federal questions involve a statutory/congressional scheme).

> "Fifth, a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy. Preclusion is thus in order when a person who did not participate in a litigation later brings suit as the **designated representative of a person who was a party to the prior adjudication.** See *Chicago, R.I. & P.R. Co. v. Schendel*, 270 U.S. 611, 620, 623, 46 S.Ct. 420, 70 L.Ed. 757 (1926); 18A Wright & Miller § 4454, pp. 433–434." *Id* at 881. [Emphasis added]

The other way Plaintiff is precluded is if Plaintiff was an agent of counsel and the U.S. Supreme Court defines that to be "the *legal* agent," meaning the plaintiff is legally bound by what counsel wants. "And although our decisions have not addressed the issue directly, it also seems clear that preclusion is appropriate when a nonparty later brings suit as an agent for a party who is bound by a judgment. See *id.*[ 18A Wright & Miller], § 4449, p. 335." *Taylor* 553 *U.S.* at 895.

The Supreme Court admonishes a trial court not to succumb to a "witch hunt" for preclusion, as Nike will try to deceptively do, and the trial court appears to already buy hook line and sinker, as a "questionable legal theory". *Taylor v. Sturgell,* 553 U.S. 906:

> We have never defined the showing required to establish that a nonparty to a prior adjudication has become a litigating agent for a party to the earlier case. Because the issue has not been briefed in any detail, we do not discuss the matter elaborately here. We note, however, that courts should be cautious about finding preclusion on this basis. **A mere whiff of " tactical maneuvering" will not suffice; instead, principles of agency law are suggestive. They indicate that preclusion is appropriate only if the putative agent's conduct of the suit is subject to the control of the party who is bound by the prior adjudication. See 1 Restatement (Second) of Agency § 14, p. 60 (1957) ("A principal has the right to control the conduct of the agent with respect to matters entrusted to him.").**

The difficult burden of proof is on Defendant through discovery or interrogatories meaning dismissal because of preclusion is improper at this stage, as the Supreme Court makes clear.  Preclusion based on Plaintiff's attorney having "controlled" the prior litigation is not applicable because it would only be relevant if HP BENSON – the non-party to the prior litigation - had controlled the prior litigation and they were not. HP BENSON ASSOCIATION was not even in existence.

Just so this court does not understand this new case to be an unfair legal loophole Plaintiff and Plaintiff's counsel are exploiting, the bedrock of our legal system is that everyone

should have their day in court subject to the very narrow exceptions discussed herein (*Taylor* 553

U.S. 892):

> A person who was not a party to a suit generally has not had a "full and fair opportunity to litigate" the claims and issues settled in that suit. The application of claim and issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have his own day in court." *Richards,* 517 U.S., at 798, 116 S.Ct. 1761 (internal quotation marks omitted). Indicating the strength of that tradition, we have often repeated the general rule that "one is not bound by a judgment in *personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry*, 311 U.S., at 40, 61 S.Ct. 115. See also, e.g., Richards, 517 U.S., at 798, 116 S.Ct. 1761; *Martin v. Wilks*, 490 U.S. 755, 761, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); [128 S.Ct. 2172],*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 110, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

The Supreme court shuts down conclusory terms that Nike has and will be wont to use

that only serve to obfuscate, such as *privy*, *privity, res judicata, collateral estoppel* in favor of

the simple English term "preclusion." Those antiquated and obfuscating terms Nike deceives the

court with are just as counterproductive to the issues as "Mutatis Mutandis" is. See *Taylor* , 553

U.S. 880 fn , 8.

> "The substantive legal relationships justifying preclusion are sometimes collectively referred to as "privity." See, e.g*., Richards v. Jefferson County*, 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996); 2 Restatement § 62, Comment a. **The term "privity," however, has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground. See 18A Wright & Miller § 4449, pp. 351–353, and n. 33 (collecting cases). To ward off confusion, we avoid using the term "privity" in this opinion."**

The same very limited narrow exceptions apply to both issue preclusion and claim

preclusion. *Taylor* 553 U.S. at 892 (Treating issue Preclusion and Claim preclusion as subject to

the same exceptions) . Neither form of preclusion will be able to be shown sufficiently by Nike

in this case for the reasons herein and in the reply to Nike's motion to dismiss, and are barred by

Taylor 553 U.S. 880, from being a sufficient basis in a motion to dismiss.

Finally, to underscore the strength of the right of any person to have their own day in

Court, the U.S. Supreme Court indicates how to solve a "problem" like Plaintiff's counsel. It is

not to force them to enter the courthouse through an anti-Semitic  "different door," before even

reading its response. It is to use *Stare Decisis* if possible, i.e. free transactions are exempt and so

are internet transaction from the MCPA, by a published [precedential] opinion, and if that is not

possible (which in this case it is not for the reasons set forth herein), rely on human nature to

eventually give up a costly losing cause (*Taylor* 553 U.S. at  903).

> But we are not convinced that this risk [vexatious litigation] justifies departure from
> the usual rules governing nonparty preclusion. First, *stare decisis* will allow courts
> swiftly to dispose of repetitive suits brought in the same circuit. Second, even when
> stare decisis is not dispositive, "the human tendency not to waste money will deter
> the bringing of suits based on claims or issues that have already been adversely
> determined against others." Shapiro 97. This intuition seems to be borne out by
> experience: The FAA has not called our attention to any instances of abusive FOIA
> suits in the Circuits that reject the virtual representation theory respondents
> advocate here.

### B.     THE NIKE FILM'S BROAD DECEPTIVE METHODS  NIKE IS AWARE OF IS APPROPRIATE FOR THE MCPA'S DECLARATORY RELIEF.

The courts so far have ignored the blatantly deceptive hateful, sexual and terror content

forced on the Michigan public because Nike has so far succeeded in convincing the courts to do

so.  There is no doubt that the Nike Film is anti-Semitic and rabidly so. The lead animator, Connor

Ryan, besides Jew hatred (Ex. 8) is also obsessed with Swastikas (Ex. 10).

The  sophisticated  deceptive  primarily  Jew  hatred,  is  delivered  using  two  deceptive

methods, each method synergistic to the other: The first is subtlety manifest by the Jewish star

logo on the bad guys (Ex.11). That subtlety is extended by the bad guys being Kikes and doing

everything  Kikes do:  Ruin everything for everyone Exhibit 12, control everything – even the

weather (Exhibit 13 ) -  cheat (Exhibit 14), not human (Ex. 15), Christ murderers (Exhibit 16) ,

Kikes (Ex. 17) therefore enemies of Christianity, and of course because of all the preceding, must

be destroyed.  These things are more than obvious to an honest, intelligent observer of the Nike Film's content. In any event it is for the finder of fact and must be accepted as true at this stage. "[A]ll well-pleaded allegations are accepted as true, and construed most favorably to the non-moving party." *Wade v Dep't of Corrections*, 439 Mich 158, 162-163 (1992).

The second deceptive method utilizes digital Easter Eggs. This method has already been determined to be deceptive whether or not it is effective. The Jewish Star logo constantly reminds the viewer that the Digital Easter Eggs are about the Jews.

The recent mass murderer in Buffalo, Payton Gendron, used all the points the Nike Film promotes,  to justify the murder of primarily innocent Black people in his manifesto: Jews are the enemies of Christianity, Jews control everything, Jews ruin everything and Jews must be destroyed. The Nike film is the perfect Jew hatred because it adheres to what Nazi Joseph Goebbels recommended: Entertaining, directed to children, subtle and subliminal - which is what the Nike Film does. Lee, Stephen J. (2000). *European dictatorships, 1918–1945*. London: Psychology Press. p. 182. ISBN 978-0-415-23046-9. Retrieved 29 October 2011.

Even the lies promoted by the Black Hebrews in the other HP BENSON case, *Hebrews to Negroes*, are promoted by Nike: Black people are puppets of Jews.  Nike shows "Perfect LeBron" wearing a Jewish star in a very depressing grey environment. (Ex. 19)  He only reverts to the real LeBron after the Jews are defeated. This, in a supposed Nike soccer film.

But because Jews are less than one percent of the Michigan population they can and should be ignored for purposes of this pleading. The criminal violence they disproportionately are the recipients of can also be ignored for the time being. This, because Nike's method is bad for the rest of the presumably more equal Michigan residents.

It is easy to apply Nike's method to other groups that are in disfavor or can become in disfavor if enough of the next generation are so indoctrinated. Take the police for example. Many people hate the "pigs." Nike's darling Colin Kaepernick is one of them. He has been seen wearing police pig socks .

It is not hard to imagine a Nike Film targeted to children and adolescents as the Nike Film at issue is, where an evil group that is abusing the neighborhood, shooting, murdering, and beating up people for no good reason, plays a football game (American football – not soccer) for the fate of the city. The evil group has a police pig like logo, like Kaepernick's socks, instead of a Star of David as in the Nike Film, and all kinds of hateful anti-police messages are quickly flashed on the screen as Digital Easter eggs. "Slaughter pigs", "Pigs stink", "No Pigs = Freedom", "Jesus Hates Pigs", etc. Maybe also typography of the Devil on the neck of the pig as Nike does with the hooked nose crowned figure after "Kike" is flashed in the Nike Film.

Obviously that is not OK, and parents and everyone else have every right to be outraged that such grooming, indoctrination, and sophisticated deception is being forced on the [usually young] viewer.

The same thing with another recent "out group." Judges. Same scenario. Maybe the logo on the bad guys in a prospective Nike  Film using this method would be a scale. The media has whipped up a frenzy against the [Supreme Court] Judiciary and some crazed individuals have tried to unlawfully harm and intimidate Judges.

When, not if,  core institutions - like the judiciary and the police – which form a thin line separating America from anarchy are *illegally* trampled on our society has collapsed. Forget about the one percent Jews, they don't count, it is the method. To complete this troika, Nike

exploits and attacks our very liberal laws regarding free speech with their high-tech stealthy deception, thus potentially implicating all three branches of our government with their method.

This is not just about or primarily about the Jews. The illegal method starts with Jews, because it is easier to get away with as the instant case demonstrates. Of course , Nike's illegal method is more serious than even these examples suggest. Deceptively combining the subtle with the subliminal and the supraliminal as is clearly the case with the Nike Film, all in a deceptive way, all capable of influencing behavior and beliefs, is a deceptive dangerous harmful practice by Nike regardless of who is responsible for putting this deceptive depravity in the Nike Film. The Nike Film's lead animator Connor Ryan had a substantial part of that responsibility.

The deceptive sexual content in the Nike film is equally wrong. So is the terror content and so is using Jesus to promote hatred as the Nike Film deceptively does by using Jesus deceptively as a prop for hatred, as well as using Islam's prophet Muhammad as a prop for hatred (Complaint, Ex2. P.12, Ex.15). Regardless of how an individual or a parent wants to raise their young children about Jesus, that should not be done in a deceptive manner as the Nike Film and its attendant method does. It is also deceptive under the MCPA.

Given our powerful robust First Amendment, Nike resorts to cheating by deceptively stealing the goodwill capital of the viewer without getting caught. It is perfectly legal to promote hatred without deception subject to very few exceptions.  Nike does not have the courage or integrity to espouse legally – without deception - what they are promoting illegally. After all, Nike knows about the hatred of its soccer fans they are pitching to in the Nike Film. https://henryjacksonsociety.org/event/antisemitism-in-football/ retrieved November 14, 2022.

It is clear that Nike knows exactly how wrong they are in showing the Nike Film to the Michigan public. Connor Ryan has virtually "disappeared" – from his constant hateful social

media postings and his high profile work in animation,  since the day a prior lawsuit was filed on

behalf of current  Plaintiff's counsel in Federal Court.

Ryan literally went from living large in his expensive London flat, to moving back to his

native Ireland now doing cover art for local Irish bands. Furthermore, with a federal district

judge that appears to have improperly had a laser focus on only one side of the dispute, Nike

could have obtained ANY monetary sanctions it wished against Plaintiff's counsel. The fact they

did not ask for such [unjustified] sanctions speaks volumes about the justification of that federal

lawsuit.

III.     ***THE UNFORTUNATE STRONG POSSIBLE ANTI-SEMTIC BIAS IN THE COURT
         ROOM***.

Sadly, given the fact that a substantial percentage of Christian judges tested -  virtually all

– especially males, hold strong anti-Semitic biases based on the peer reviewed Implicit

Association Test given to a  sample of federal and state court judges, even an appearance of an

anti-Semitic bias by the trial court judge at this stage is deeply concerning, especially given the

fact  that the trial judge is Christian and chairman of the judicial tenure commission, so it would

appear that these actions are intentional. See Justin D. Levinson, Mark W. Bennett, and Koichi

Hioki, *Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev.

63 (2017)

A chart, Ex. 20, shows the strong implicit anti-Semitism of the 239 federal and state

judges tested.   These Judges tested, hold the usual [implicit] biases that Jews are "greedy"

"dishonest," and "controlling"  and associate Whites and Christians with moral traits, such as

"trustworthy," "honest," and "giving." *Id* at 63.

Virtually all these stereotypes are either in the Nike Film or implicated in this case by the trial judge's unfortunate apparent anti-Semitic bias against plaintiff and counsel and Nike appears to be playing up these anti-Semitic biases to the trial court like a fiddle.

This scientifically demonstrated implicit anti-Semitic bias by the Christian judiciary is especially concerning because the relief Plaintiff and Plaintiff's attorney is seeking is not for Plaintiff or Plaintiff's attorney or even for Jews, but rather for the People of the State of Michigan, including for its Judges (so they too are not *deceived* and *tricked* into being haters of any group or worse haters if they already are). The strong implicit bias against Jews in favor of Christians by judges is manifest in the light grey bars in Ex. 20.

The "Jew penalty" meted out by the Judiciary Ex. 21, averages 6.3 months of additional suffering and brutalization for each criminal sentence for each Jew sentenced by Christian judges, compared to Christians identically situated. (160.12 months for Jews v 153.9 for non-Jews). Most likely Jews that should not be prosecuted are prosecuted based on this sentencing bias, and cases involving Jewish Plaintiffs are equally biased and improperly thrown out – such as cases alleging deceptive anti-Semitism like this one - based on the sentencing bias tested, and the trial courts premature unanswered allegations, and apparent anti-Semitic sanctions.

Jews are less than one percent of the population of Michigan. *Deceiving* the vast majority of non-Jewish citizens of the state of Michigan to hate, including Nike *deceiving* Michigan residents that Jesus and Islam promotes hate violates the MCPA. (Complaint, Ex2. p.12, Ex.15)

That makes a trial judge's alleged anti-Semitic implicit and explicit bias much more dangerous when it affects a decision such as the Nike Film, that allows for the exponential spread of [Jew] hatred based on its viewership - already more than four billion views - and therefore should not be ignored this time, as it always has been.

# EXHIBIT 13

STATE OF MICHIGAN

IN THE 20th CIRCUIT COURT FOR THE COUNTY OF OTTAWA

414 Washington Street
Grand Haven, MI 49417
616-846-8230

* * * * * * *

**HP BENSON ASSOCIATION, INC.**

Plaintiff,

v

**NIKE, INC.**

Defendant.

OPINION AND ORDER ON
MOTION FOR SUMMARY
DISPOSITION

File No. 2022-7011-NO

---

In dismissing a similar complaint on summary disposition, the United States District Court wrote the following regarding plaintiff's counsel:

> Since 2016, Plaintiff [current plaintiff's counsel] has either been the plaintiff or attorney in four Eastern District of Michigan cases that alleged MCPA violations. . . Plaintiff has also voluntarily dismissed defendants at an alarming rate. . . .

> In three of the cases, Plaintiff sought to amend several complaints before the Court could rule on motions to dismiss. . . . Plaintiff also attached large numbers of irrelevant exhibits to his complaints. . . . Judge Roberts even said that she would strike future complaints that attach too many exhibits or have excessive factual content that "goes beyond the requirements of [Federal Rule of Civil Procedure 8(a)(2).]"

> Simply put, Plaintiff's conduct before the Eastern District of Michigan has been sloppy. Depleting judicial resources by continued careless conduct in federal litigation may well lead to future sanctions.[1]

This Court GRANTS defendant's motion for summary disposition under MCR 2.116(C)(8). The Court further finds that this complaint violates MCR 1.109(E)(5). Therefore, the Court sanctions plaintiff and its counsel pursuant to MCR 1.109(E)(6). Defendant shall schedule a hearing consistent with *Pirgu*[2] within 90 days. Defendant shall disclose any proposed

---

[1] *Leaf v Nike Inc, et al*, opinion of the United States District Court for the Eastern District of Michigan, issued November 23, 2020 (Case No 2:20-cv-11491) p 5. 2020 WL 12230315.

[2] *Pirgu v United Services Auto Ass'n*, 499 Mich 269; 884 NW2d 257 (2016).

1

exhibits with plaintiff at least 21 days prior to that hearing.  Plaintiff shall disclose any exhibits with defendant at least 7 days prior to that hearing.  Because this matter is emotionally charged, the hearing regarding the amount of attorney fees to be awarded shall be in-person.

## The Complaint

On September 23, 2022, plaintiff filed a one-count complaint for declaratory judgment in which it seeks a determination that Nike engaged in deceptive conduct in violation of the Michigan Consumer's Protection Act (MCPA).  Plaintiff seeks injunctive relief.

The complaint consists of 44 paragraphs, along with a request for relief.  Paragraph 6 describes the focus of plaintiff's scorn as the animated Nike film, *The Last Game* that was apparently released in 2014.  Paragraphs 7 and 8 describe the theme of the film—the heroes of soccer playing a team of corporate created clones.  In paragraphs 9 and 11, plaintiff describes Nike's lead animator of the film as a racist "Irish National."[3]  According to plaintiff, the film surreptitiously equates the evil clones with Jews.

The heart of the complaint is contained in paragraphs 12, 13, 16 and 20 in which it is alleged that the film contains "hidden, hateful and racist messages," along with images of child pornography, when the film is slowed down and viewed frame by frame.[4]  According to plaintiff, these images promote hatred against Jews.  Paragraphs 33 to 37 describe how Jews have been the victim of historical hate and that this film contributes to that hatred.  Paragraphs 22, 23, 25, and 27 gratuitously criticize the 6th Circuit for decisions that it has made in which that court dismissed similar actions in suits brough by plaintiff's counsel individually, or in which plaintiff's counsel represented a plaintiff.

Ironically, only the first paragraph of the complaint references plaintiff.  That paragraph simply notes that plaintiff is a non-profit corporation.  It is not alleged anywhere that plaintiff or any of its agents have ever viewed *The Last Game* or had any dealings whatsoever with Nike.

---

[3] It is unknown why plaintiff chose to reference this animator's perceived ethnicity.

[4] Apparently, this is called searching for "Digital Easter Eggs."

**Standard of Review**

"A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint."[5]  "When deciding a motion brought under this section, a court considers only the pleadings."[6]  "All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant."[7]  All reasonable inferences or conclusions that may be drawn from the factual allegations must be accepted by the court as true.[8] A (C)(8) motion may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery.[9]

**The MCPA**

Plaintiff seeks relief under two provisions of the MCPA, specifically MCL 445.903(1)(s) and 903(1)(cc).[10]  The court will review these in reverse order.  The first provision of the MCPA for which plaintiff seeks relief is §903(1)(cc) and reads in context:

> (1) Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows:  (cc) Failing to reveal facts that are material to the *transaction* in light of representations of fact made in a positive manner.[11]

As used in this section, "trade or commerce" is defined and means in relevant part:

> "Trade or commerce" means the conduct of a business providing goods, property, or service primarily for *personal, family, or household purposes* and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, . . .[12]

---

[5] *Maiden* v *Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999).

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] Plaintiff referenced MCL 445.903(s) and 903(cc). However, these provisions do not exist.

[11] MCL 445.903(1)(cc).  Emphasis added.

[12] MCL 445.902(1)(g). Emphasis added.

3

In *Zine,* the court analyzed the "personal, family or household purposes" language of §902(1)(g) and held that where an item is "purchased primarily for business or commercial rather that personal purposes, the MCPA does not supply protection."[13]

This subsection specifically requires a "transaction." However, the MCPA does not define what constitutes a "transaction." *Zine* addressed this issue and referred to dictionary definitions of "transaction" before clarifying this term:

> Black's Law Dictionary, [. . . ] defines it as: Act of transacting or conducting any business; negotiation; management; proceeding; that which is done; an affair. It may involve selling, leasing, borrowing, mortgaging or lending. Something which has taken place, whereby a cause of action has arisen. It must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, *in which more than one person is concerned*, and by which the legal relations of such persons between themselves are altered. (Black's Law Dictionary (5th ed.).)

> Random House Webster's College Dictionary (1997) provides these definitions [for transaction]:

> 1. the act or process of transacting; the fact of being transacted. 2. something that is transacted, esp. a business agreement.

> Webster's defines "transact" as follows:

> 1. to carry on or conduct (business, negotiations, etc.) to a conclusion or settlement. 2. to carry on or conduct business, negotiations, etc. (*Id.*)

> Thus, a "transaction" is the business conducted between the parties, which in this case would be the negotiations that concluded in Zine's agreement to buy the truck.[14]

In *DiPiero,* the court further explained that "transaction" "connotes the mutual and reciprocal acts typical of business deals that alter the legal relationships of the parties."[15]

---

[13] *Zine v Chrysler,* 236, Mich App 261, 273; 236 NW2d 261 (1999). See also *Jackson Cty Hog Producers v Consumers Power Co,* 234 Mich App 72, 84; 592 NW2d 112 (1999), and *Watkins & Son Pet Supplies v Iams Co,* 107 F Supp 2d SD Ohio (1999).

[14] *Zine,* 236 Mich App at 280. Emphasis added.

[15] *DiPiero v Better Business Bureau,* unpublished per curiam opinion of the Court of Appeals dated November 24, 2014, (Docket No 316308) p 4; 2014 WL 6679406.

4

The second statute upon which plaintiff relies is §903(1)(s) and reads in context:

> (1)Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows: (s) *Failing to reveal a material fact,* the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.[16]

Unlike the prior subsection, §903(1)(s) does not use the term "transaction" in the prohibited practices. However, *Zine* also addressed the element of failing to reveal a "material fact" required by §903(1)(s). *Zine* referenced *Mayhall*[17] and noted that "it is proper to construe the provisions of the MCPA 'with reference to the common-law tort of fraud.'[18]" Thus, a material representation "need not 'relate to the sole or major reason for the *transaction,* but . . . it [must] relate to a material or important fact.'"[19] *Zine* then held:

> . . . [A] material fact for purposes of the MCPA would likewise be one that is *important to the transaction or affects the consumer's decision to enter into the transaction.* This interpretation is supported by the dictionary definition, which defines "material" as a "[r]epresentation relating to a matter which is so substantial and important as to influence [the] party to whom [it is] made...." Black's Law Dictionary, . . .[20]

In other words, to be protected by the two statutes of the MCPA relied upon by plaintiff, there must be a transaction involving goods or services used primarily for non-business family or household purposes.

### Analysis

The complaint lists no transaction between plaintiff and defendant. Nothing in the complaint alleges "mutual and reciprocal acts typical of business deals that alter the legal relationships of [plaintiff and defendant]"[21] No facts are pled that plaintiff or any of its agents purchased, rented, viewed or otherwise entered into a transaction with defendant regarding *The*

---

[16] MCL 445.903(1)(s). Emphasis added.

[17] *Mayhall v A H Pond,* 129 Mich App 178; 341 NW2d 268 (1983).

[18] *Zine,* 236 Mich App at 283, citation omitted.

[19] *Id.,* citing *Papin v Demski,* 17 Mich App 151, 155; 169 NW2d 351 (1969), *aff'd* 383 Mich 561; 177 NW2d 166 (1970). Emphasis added.

[20] *Id.* Emphasis added.

[21] *DiPiero,* unpub op at 4.

5

*Last Game;* rather, plaintiff simply asserts what the film contains without any reference to how plaintiff came to that conclusion. In fact, plaintiff boldly admits the same when it writes:

> There is no requirement that the Plaintiff asking for declaratory judgment has even seen the film, and it is Nike's burden to prove when HP BENSON saw the film if that is even relevant, and Nike has not shown it is.[22]

There is simply no intersection between the parties. As shown above, a transaction is basic to establish a cause of action under both §903(1)(s) and §903(1)(cc). In addition, plaintiff fails to allege any facts to support a claim that it engaged in any transaction for personal, family, or household purposes with defendant. Aside from a corporate entity which files a MCPA complaint against its competitor based on false advertising directly affecting the entity, it would seem unusual for a corporation, to engage in a transaction with another corporation for personal, family or household purposes. Nevertheless, nothing in the complaint gives any hint of that circumstance. Perhaps these omissions are because there was no transaction, or even interaction, between the parties of any kind.

Plaintiff also fails to plead facts showing that third parties who happen to view a free animated film have engaged in the conduct of trade or commerce with defendant such as to raise MCPA protection. Simply seeing something is not a transaction as it does involve mutual and reciprocal acts typical of business deals that alter the legal relationships of the parties. The failure to plead any facts showing a transaction of any type is simply fatal to plaintiff's cause of action and requires this court to grant summary disposition in favor of defendant under MCL 2.116(C)(8).

To decide otherwise would lead to absurd results. For instance, the offering of free cookies could result in a MCPA violation because upon chemical analysis it would be revealed that cookies contain fats and sugars which could lead to obesity, early death and additional health care costs to society, the hazards of which were "not disclosed" to the unsuspecting victim of an urge to munch down cookies.

We must now determine if plaintiff should be allowed to file an amended complaint. In other words, can the pleading defects be remedied? This question need not be answered in a vacuum. Rather, the court will look beyond the pleadings and notes that Exhibit D to defendant's motion for summary disposition are the Articles of Incorporation of plaintiff. Plaintiff did not dispute the accuracy of these Articles in its response brief or at oral argument. Importantly, Article II addresses the purpose for which plaintiff was incorporated in May, 2022, and states:

> To educate the public regarding media that contains, and entities and individuals that promote, deceptive: Hateful content; Inappropriate sexual content; Terrorist messages; and other deceptive offensive content.

---

[22] Plaintiff's brief in opposition to motion to dismiss, p 9.

6

To engage in legal opposition, including lawsuits opposing the deception and deceptive content described above.[23]

The purpose for which plaintiff was incorporated are not for personal, family, or household purposes. Rather, HP Benson was formed for the business of "investigating" perceived affronts to certain people groups and filing lawsuits, such as this, to protect those groups.[24]  In other words, there is no amount of wordsmithing that can be performed that would give plaintiff relief under the MCPA given plaintiff's purpose to exist.

More importantly, for plaintiff to obtain injunctive relief under MCL 445.911, it must first establish that there has been a violation of, in this case, §903(1)(s) or §903(1)(cc). As shown above, where there is no transaction, there can be no violation of the MCPA and injunctive relief is precluded.[25]  In reality, plaintiff seeks to act as the Attorney General who has the exclusive authority under MCL 445.905 to bring an action for injunctive relief where the Attorney General has probable cause to believe that there has been, or will be, a violation of the MCPA. However, anyone seeking to act as the Attorney General must first be elected Attorney General. Under MCR 2.116(I)(5), the evidence before the court shows that any amendment would be futile and not justified under law.

Defendant's motion under MCR 2.116(C)(7), *res judicata* and statute of limitations, is denied. While these theories may have merit, plaintiff aptly points out that summary disposition cannot be granted on this basis as factual development is necessary. Therefore, a (C)(7) motion is premature. Given the Court's decision, it is unnecessary to address defendant's theory that *The Last Game* is protected by the First Amendment.

---

[23] Exhibit D to defendant's motion for summary disposition.  These Articles are from LARA and are dated May 10, 2022.  Plaintiff counsel is the incorporator.  In its motion for disqualification, plaintiff also referenced the Articles of Incorporation.  In other words, there is no dispute as to their accuracy.

[24] See the above quote from p 9 of plaintiff's brief in which it states that it does not matter if it viewed *The Last Game*. Rather, plaintiff wants to enjoin or regulate other viewers or potential viewers of this film.

[25] MCL 445.911(9) states: "An action under this section must not be brought more than 6 years after the occurrence of the method, act, or practice that is the subject of the action or more than 1 year after the last payment in a *transaction* involving the method, act, or practice that is the subject of the action, whichever period of time ends at a later date. However, if a person commences an action against another person, the defendant may assert, as a defense or counterclaim, any claim under this act arising out of the *transaction* on which the action is brought." Emphasis added.

Again stated, there must be a transaction upon which the request for injunctive relief is based, at least as it pertains to the theories raised in this case.

**Sanctions**

MCR 1.109(E) states in part:

(5) Effect of Signature. The signature of a person filing a document, whether or not represented by an attorney, constitutes a certification by the signer that:

    (a) he or she has read the document;

    (b) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and

    (c) the document is *not interposed for any improper purpose, such as to harass* or to cause unnecessary delay *or needless increase in the cost of litigation.*

(6) Sanctions for Violation. If a document is signed in violation of this rule, *the court,* on the motion of a party or *on its own initiative*, *shall impose upon the person who signed it, a represented party, or both,* an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages.[26]

The Court specifically finds that plaintiff counsel signed the complaint with an improper purpose in order to harass defendant and to force defendant to incur needless expenses to defend itself from a meretricious and frivolous action. Therefore, plaintiff counsel by signing the complaint makes himself personally liable for monetary sanctions. Plaintiff counsel knew that this complaint was baseless; and, as the incorporator of plaintiff, plaintiff is likewise deemed responsible for monetary sanctions.

At the outset of this opinion, the Court quoted the United States District Court in which that court warned plaintiff counsel that further frivolous actions, such as the case at bar, may warrant sanctions. Apparently, plaintiff counsel heeded that advice and avoided filing this meritless complaint in federal court. Unfortunately, plaintiff counsel has signed a complaint for an improper purpose in state court. As was shown above in the "analysis" section of this opinion, there is simply no legal basis to support plaintiff's claim for relief under the MCPA. This conclusion is consistent with the conclusions of courts in several similar prior cases filed by

---

[26] MCR 1.109(E). Emphasis added. The plain language indicates that the Court may act *sua sponte* and award sanctions. See also *Maldonado v Ford Motor Co,* 476 Mich 372, 375; 719 NW2d 809 (2006). "We reiterate that trial courts possess the inherent authority to sanction litigants and their counsel, . . . " Defendant did not move for relief under MCR 2.625 which describes the process for obtaining relief under MCL 600.2591. Defendant may request relief under MCR 2.625 and MCL 600.2591.

plaintiff counsel in his personal capacity or as an attorney on behalf of a party. The Court will briefly summarize those cases.[27]

In 2013, plaintiff counsel represented plaintiff in *Deming*[28] in which a suit was brought against certain defendants because of an "offensive" anti-Semitic film called *Drive*. The court affirmed the trial court's dismissal of the case, and said the following which is relevant to the current analysis:

> Plaintiff was offended by the movie Drive. It is not surprising that some moviegoers would find the film offensive; it is filled with disturbingly violent scenes and brutal characters. However, being offended by a film is not, in and of itself, grounds for a lawsuit. Plaintiff attempts to make it actionable by asserting that defendants violated the MCPA by advertising the film with a preview that is so inconsistent with the actual film to which it is intended to draw an audience that it is "[u]nfair, unconscionable, or deceptive." MCL 445.903(1). We are unaware of, and plaintiff does not refer us to, any such prior application of the MCPA.

> * * *

> . . . the true gravamen of her complaint, that the movie Drive "used extreme gratuitous defamatory dehumanizing racism to depict members of the Jewish faith, and thereby promoted criminal violence against members of the Jewish faith" and that the trailer was misleading as it excluded any reference to the film's anti-Semitic nature. However, plaintiff does not provide factual support for her assessment of the film as anti-Semitic other than that two of the many "bad guys" are Jewish. . . Moreover, plaintiff, contrary to her hyperbole, does not refer us to any actual violence against, or even criticism of, Jews that has resulted from the film being shown. Thus, plaintiff has not presented any evidence that the movie Drive does, in fact, express or promote anti-Semitism and, thus, has not shown that the film's trailer failed to reveal a material fact, as required under MCL 445.903(1)(s). Finally, plaintiff concedes that no film critics were able to discern the anti-Semitic nature of the film and so admits that her subjective interpretation that the film is anti-Semitic was not shared by others. Consequently, plaintiff cannot show that defendants failed to reveal a material fact. See MCL 445.903(1)(s).[29]

In *Deming,* like the case at bar, plaintiff falsely accused the trial court of being anti-Semitic. Plaintiff also sought to recuse the appellate panel that rendered the decision![30]

---

[27] The cases listed below are not a complete list of the actions filed in the United States District Court. The District Court referred to 4 cases which were meritless. The District Court did not refer to *Deming,* cited immediately below, as that case was not filed in federal court.

[28] *Deming v CH Novi LLC, et al,* unpublished per curiam opinion of the Court of Appeals issued October 15, 2013 (Docket No 309989). *lv den* 495 Mich 996; 845 NW2d 507 (2014), 2013 WL 5629814

[29] *Id.,* p 1-2.

[30] The members of that appellate panel were Judges Beckering, O'Connell and Shapiro.

9

Plaintiff counsel then filed his own suit in the United States District Court, naming one of the defendants in *Deming,* along with several other defendants, and again claimed that *Drive* was anti-Semitic and violated the MCPA under §903(1)(s) and 903(1)(cc).  In upholding the District Court's dismissal of the action, although on different grounds, the court held that plaintiff was not entitled to relief under the MCPA.  The court said:

> . . . Leaf asserts that defendants violated subsection (1)(s) because the film itself contains anti-Semitic messaging, which defendants concealed from the casual viewer using a variety of tactics within the film. . . .

> Accepting Leaf's allegations as true, we find defendants' second argument persuasive. Leaf concedes that the allegedly anti-Semitic content was immediately apparent to him "upon first viewing." . . . He alleges that "the anti-Semitic messages would not be understood to be anti-Semitic by the vast majority of viewers," but this assertion is unsupported by factual allegations. [] Even if Leaf adequately alleged that other viewers might not notice the alleged anti-Semitism, Leaf himself must experience an injury caused by the film, but he admits that he was not misled.

> \* \* \*

> Even assuming that the film contained anti-Semitic messaging, Leaf makes no allegation that the trailer made affirmative representations suggesting that the opposite was true. *Deming,* 2013 WL 5629814, at \*2 ("[T]he trailer certainly does not affirmatively suggest that all the 'bad guys' are non-Jews or that the movie puts Jews in a favorable or even neutral light."). Rather, he alleges only that "[t]here were no indications in the trailer that Drive was anti-Semitic, and/or promoted anti-Semitism." . . . This type of allegation is insufficient to state a claim under Mich. Comp. Laws § 445.903(1)(cc).[31]

Undeterred by the reasoning of the Michigan Court of Appeals and the Sixth Circuit, plaintiff counsel, as plaintiff, filed an action against Nike complaining that their film, *The Last Game,* violated the §903(1)(s) and §903(1)(cc) of the MCPA.  In affirming the District Court's dismissal of the case, the Sixth Circuit first reviewed in detail the facts alleged in the complaint:

> . . . Leaf takes issue with *The Last Game,* an animated film released in advance of the 2014 World Cup that runs for about five minutes. According to Leaf, this film was "engineered to leverage racial Jew-hatred to make more money in a sneaky subliminal way without 'getting caught.' "

> \* \* \*

> In June 2014, Leaf read an article in *The Times of Israel* describing a debate over whether *The Last Game* was anti-Semitic. Some people viewed images in the short film in this light. Others, such as the Anti-Defamation League, thought that this

---

[31] *Leaf v Refn, et al,* 742 Fed Appx 917 (CA 6, 2018) pp 926-927.

claim was baseless and diminished real anti-Semitism. . . Leaf decided to watch *The Last Game* on Nike's YouTube page. He has viewed this film many times since, including by examining the film's thousands of frames one frame at a time.

Based on these repeated viewings, Leaf concluded that the film contained subliminal anti-Semitic messages, pornography, and terroristic threats. Most of his first amended complaint goes through the alleged ways in which the film contains offensive content.

When Leaf watched the film and discovered its purportedly offensive content, he claims to have suffered mental distress. . . He sued Nike and W+K, alleging that their failure to disclose the film's subliminal messages violated two provisions of the Michigan Consumer Protection Act.[32]

After reviewing Michigan law which requires a transaction to occur in order for the MCPA to be applicable, the court held:

> . . . Leaf's complaints do not allege that The Last Game affected his decision to do *any* "business" with Nike. Indeed, the complaints do not identify a single Nike product that Leaf has ever even considered buying—let alone a product that he considered buying based on Nike's positive statements about *The Last Game*. Because Leaf fails to identify any actual or contemplated Nike purchases, he fails to allege that the short film was material to this sort of traditional "transaction."

> \* \* \*

> . . . Leaf's viewing of *The Last Game*, by itself, is not a "transaction" within the meaning of subsection [§903(1)](cc). Although it involves two or more persons (Nike and Leaf), this ad did not alter their legal relationship. Neither Nike nor Leaf undertook any legal obligation or gained any legal right. When Leaf watched the video, there was also no transfer of value. The parties "forged no agreement and exchanged no promises." Leaf simply went onto Nike's YouTube page and watched an ad. Any other person could have done the same thing because Nike made the ad available free of charge. If every viewer of freely available "speech" could treat that speech as a "business deal," it would greatly expand the Michigan Consumer Protection Act beyond its narrow domain of protecting consumers who buy goods or services for personal use. . .

> Regardless, even if Leaf's viewing of this ad could be considered a "transaction," Leaf has failed to plead with particularity the materiality of Nike's alleged omitted fact. His second amended complaint simply concludes that he would not have watched *The Last Game* if he had known of the alleged anti-Semitism within it. Yet the rest of his complaint contradicts this bare allegation—one resembling a legal conclusion that merely parrots the materiality requirement. Leaf did not plead that he was an unsuspecting soccer fan who came across the short film in anticipation

---

[32] *Leaf v Nike et al*, unpublished opinion of the United States Court of Appeals for the Sixth Circuit, issued October 25, 2021 (Case no. 21-1045, p 1-2; 2021 WL 4950383.

of the World Cup. Rather, he pleaded that he watched the film only after viewing articles debating whether it was anti-Semitic. These allegations show that Leaf knew of the film's potential offensive content before he watched it. Yet he went ahead and did so, frame by frame. If anything, the complaint's specifically alleged facts (in contrast to its legal conclusions) suggest that the film's potential anti-Semitism was an "important" reason why Leaf *watched* the film.[33]

Like the case at bar, and the *Deming* case, plaintiff, or plaintiff counsel, once again accused the trial court judge of being anti-Semitic.

In the present case, plaintiff filed a motion to disqualify this judge and demanded that the motion be heard before defendant's motion for summary disposition. While this court heard the summary disposition motion first, the court first decided the disqualification motion. Plaintiff then appealed this Court's denial of the motion to disqualify and *while that decision was pending*, moved and scheduled a hearing for sanctions against defendant before this Court. Because the disqualification motion was pending before the chief judge, this Court adjourned the sanctions hearing. The case history reveals that plaintiff then supplemented his motion for disqualification before the chief judge because it claimed that this court's adjournment of the hearing for sanctions further demonstrated bias. This is nonsensical and confirms the United States District Court's comments that plaintiff counsel is sloppy and wastes judicial resources.[34]

### Conclusion

The court GRANTS defendant's motion for summary disposition under MCR 2.116(C)(8) because no transaction for personal, family or household purposes occurred between the parties or anyone else. In fact, no transaction of any kind occurred. Rather, plaintiff attempts to act as the Attorney General to police defendant's practices. There is no authority for plaintiff to so act.

Defendant's motion for summary disposition under MCR 2.116(C)(7), *res judicata* and statutes of limitations, is denied as factual development is required. The court need not reach defendant's motion for summary disposition based on First Amendment issues because relief under other grounds is given.

The court further finds that both plaintiff and plaintiff counsel are liable for sanctions under MCR 1.109(E)(5) and (6) because this complaint was filed for an improper purpose. The federal courts (plural) have repeatedly ruled against plaintiff counsel in both his individual capacity and as an attorney in which similar bogus theories of MCPA violations were alleged. In fact, the United States District Court has warned plaintiff counsel that further similar baseless claims may result in sanctions. Instead of heading that advice, plaintiff and its incorporator, plaintiff counsel,

---

[33] *Id,* pp 4-5 cleaned up. Emphasis supplied.

[34] The 6th Circuit noted that the District Court Judge's observations about "Leaf's litigation conduct had firm evidentiary support." *Id.,* at 7.

have chosen to waste state judicial resources and cause defendant to incur unnecessary legal fees. This is plaintiff's last game.

Should defendant wish to pursue sanctions against plaintiff and its counsel, a *Pirgu* hearing must be scheduled as stated in the introductory paragraphs to this opinion.  If defendant chooses not to pursue that hearing, then this will be a final order and the case will be closed.

*IT IS SO ORDERED,*

February ___3___, 2023

Hon. Jon Hulsing

# EXHIBIT 14

**COMMISSIONERS**

HON. JON H. HULSING
**CHAIRPERSON**
JAMES W. BURDICK, ESQ.
**VICE CHAIRPERSON**
HON. BRIAN R. SULLIVAN
**SECRETARY**



LYNN HELLAND, ESQ.
**EXECUTIVE DIRECTOR**

GLENN J. PAGE, ESQ.
**DEPUTY EXECUTIVE DIRECTOR**

HON. MONTE J. BURMEISTER
DANIELLE CHANEY
HON. PABLO CORTES
SIHAM AWADA JAAFAR
HON. AMY RONAYNE KRAUSE
THOMAS J. RYAN, ESQ.

*State of Michigan*

3034 WEST GRAND BLVD., SUITE 8-450
CADILLAC PLACE BUILDING
DETROIT, MICHIGAN 48202
TELEPHONE: (313) 875-5110
FAX: (313) 875-5154
WEBSITE: jtc.courts.mi.gov

# Judicial Tenure Commission

## July 5, 2022

## PERSONAL AND CONFIDENTIAL

Hon. Alexis G. Krot
c/o Kenneth M. Mogill, Esq.
27 E. Flint St., Second Floor
Lake Orion, MI 48362

**Re: Request for Investigation 2022-24657**

Dear Judge Krot:

The Judicial Tenure Commission has completed its review of the above request for investigation. For the reasons stated below, we dismiss it with a caution, pursuant to MCR 9.223(A)(2).

On January 10, 2022, you presided over the code enforcement docket. One of the matters before you involved Burhan Chowdhury, who had been issued a ticket in August 2021 for failing to keep his property free of weeds, trees or other nuisance vegetation. Mr. Chowdhury and his son, Shibbir, appeared before you by Zoom.

The facts are not in dispute, and you have candidly acknowledged them to the Commission. During the hearing, Mr. Chowdhury informed you that he was a cancer patient, was very old and weak, and could not look after "these things." A

picture shown by screen share reflected overgrown vegetation around a garage in an alley.

You responded to Mr. Chowdhury's statement that he was sick and weak by telling him that he should be ashamed of himself and that if you could give him jail time, you would. After you fined him $100, you told him to get the area cleaned up, as its appearance was "totally inappropriate."

When Mr. Chowdhury's son then asked if the fine was forgivable and stated that his father had been ill with cancer and that the area had been cleaned prior to the hearing, you only asked whether he had seen the photo of the area, then stated in a raised voice that it was shameful and that the neighbors should not have to view it, adding that "if you come back here -- with your yard looking like that, you're going to jail." That threat was particularly inappropriate, as a jail sentence is not an option for a civil infraction.

Though not required to do so, you self-reported your conduct, and that self-report candidly acknowledged that your tone and words with the Chowdhurys were neither dignified nor courteous and were completely inappropriate. We agree. You deprived Mr. Chowdhury of his right to provide his explanation for the overgrown vegetation; whether intended by you or not, your interaction caused him humiliation; and you reacted with excessive anger toward an individual appearing before you for the first time, and doing so for a minor infraction.

We commend you for acknowledging your error proactively, and for appropriately taking full responsibility for your conduct and not attempting to excuse it. You have publicly apologized for your actions. We accept that your treatment of the Chowdhurys was not racist or otherwise biased. We understand that your reaction to them may have been due in part to your unusually heavy docket that day, your disappointment that Mr. Chowdhury was one of too many homeowners in your jurisdiction who have neglected their property, and your frustration that the city's lag in using screen share was slowing the day's proceedings. We further acknowledge that you became aware of a significant health issue shortly before the hearing. We also appreciate that you have an unblemished discipline history.

All that said, Canon 3(A)(3) requires a judge at all times to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in an official capacity. Canon 3(A)(14) requires a judge to treat every person fairly, with courtesy and respect. Your conduct on this occasion violated Canons 3(A)(3) and 3(A)(14). A judge cannot allow circumstances, such as

those you faced when the Chowdhurys were before you, unduly to influence the way they treat litigants. We caution you to adhere to the letter and spirit of these canons in the future, and we are confident that you share this aspiration.

You have been a judge since 2016 and as noted above, you have an excellent discipline record. We are confident this hearing was an aberration and there is no risk of repetition. Nonetheless, we are obligated to inform you that, in the event of future misconduct, we may consider this incident in our resolution of that matter.

Very truly yours,

Jon H. Hulsing
Chairperson

Cc:     All Commissioners
        Lynn Helland, Esq.
        Executive Director

**COMMISSIONERS**

HON. JON H. HULSING
**CHAIRPERSON**
JAMES W. BURDICK, ESQ.
**VICE CHAIRPERSON**
HON. BRIAN R. SULLIVAN
**SECRETARY**

HON. MONTE J. BURMEISTER
HON. THOMAS C. CAMERON
DANIELLE CHANEY
HON. PABLO CORTES
SIHAM AWADA JAAFAR
THOMAS J. RYAN, ESQ.



State of Michigan

LYNN HELLAND, ESQ.
**EXECUTIVE DIRECTOR**

3034 W. GRAND BLVD.
SUITE 8-350
CADILLAC PLACE BUILDING
DETROIT, MICHIGAN 48202
TELEPHONE: (313) 875-5110
FAX: (313) 875-5154
WEBSITE: jtc.courts.mi.gov

## Judicial Tenure Commission

December 12, 2023

Hon. Charles T. LaSata
c/o Theresa Asoklis, Esq.
Collins Einhorn Farrell PC
4000 Town Center, 9th Floor
Southfield, MI 48075-1473

RE:   **Request for Investigation No. 2020-23919**

Dear Judge LaSata,

We have completed our review of the above request for investigation. As you know, we investigated three types of misconduct: impatience and discourtesy toward criminal defendants and defense lawyers, repeated disregard for governing law, and violations of Canon 7 in connection with your wife's political campaigns.

We found "a tale of two judges." That is, we found serious and ongoing problems with several aspects of your actions and attitude as a judge for a decade that ended when we brought our concerns to your attention in September 2020, after which you became a very different judge. After considering both the severity of the problems we found and, critically, the complete turnaround in your judicial persona after we contacted you, we dismiss the request for investigation with an admonition, pursuant to MCR 9.223(A)(4).

Demeanor issues were the most frequent complaints we received about you, and we found concerns about your demeanor substantiated. You attributed your demeanor issues to trauma you experienced due to a 2016 shooting just outside your courtroom. While we have no doubt that your trauma from the shooting was real and contributed to the problems with your demeanor, and we applaud you for recognizing

and addressing that trauma, our investigation showed that valid concerns about your demeanor preceded the shooting as well.

Our investigation focused on particulars that occurred after the shooting. We found that at times you disparaged criminal defendants in personal terms, which violated Canon 3(A)(3)'s requirement that you be "patient, dignified and courteous" and Canon 3(A)(14)'s requirement that you treat every person fairly, with courtesy and respect. The canons allow a judge to criticize defendants' actions, but not to denigrate or humiliate them. Your public expression of your negative opinions of these defendants also called your evenhandedness into question in violation of Canon 2(B), which requires you to preserve the public's faith in your impartiality. Even when the facts of a case justify a harsh sentence, you must maintain judicial neutrality and impose a sentence based on the defendant's crimes rather than your personal anger.

In addition, we found that you violated Canons 2(B), 3(A)(3), and 3(A)(14) on two occasions when you ignored the concerns of defendants who were appearing before you that their lawyers were absent. You did not pause to determine whether the defendants' concerns were justified; and they were. You explained your oversight by pointing to your heavy docket, but the fact that you had a heavy docket did not give you license to ignore the defendants' protests that they were unrepresented by lawyers.

We also found that your treatment of criminal defense attorneys violated Canon 2(A)'s requirement that you avoid all impropriety and appearance of impropriety, Canons 2(B) and 3(A)(14)'s requirement that you treat every person fairly, with courtesy and respect, Canon 3(A)(3)'s requirement that you treat anyone with whom you deal in an official capacity with patience, dignity, and courtesy, and Canon 3(A)(1)'s requirement that you be faithful to the law and maintain professional competence in it.

Thus, we found that on one occasion you were inattentive to a defense attorney's attempt to make a record. We found that on several occasions you opined, without good reason, that motions filed by criminal defense attorneys were frivolous or were only filed to delay the proceedings. On some occasions you threatened attorneys with sanctions or with the filing of a grievance with the Attorney Grievance Commission for filing what you believed to be frivolous motions. We note that on one occasion when you did that, another judge granted the motion you had dismissed as "frivolous."

We found that on another occasion you relied inappropriately on MCR 1.109(E)(5) and (6) as authority for imposing a "sanction" in the form of a fine on a criminal defense attorney. Even when an attorney does file a frivolous motion, the rule does not authorize a fine. MCR 1.109(E)(7) ("The court may not assess punitive damages"). Since there is no precedent for requiring a defendant to pay the

2

prosecution's costs of defending pretrial motions, and since in any case you made no effort to compute the prosecution's costs, it follows that a monetary sanction would be an improper fine that disregarded the law, in violation of Canon 3(A)(1).

Your definition of "frivolous" seemed broad enough to encompass any motion you thought would be unsuccessful. But even a weak motion filed by a criminal defense lawyer is seldom frivolous. As the Supreme Court reminded you when reversing and remanding in *People v Krestel*, before finding that a position is frivolous you must consider "the wide latitude given to the judgment of criminal defense counsel . . . and a criminal defendant's right to present a defense." 505 Mich 1139 (2020) (unpublished).

Even when lawyers are irritating, "the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary." Canon 2(B). Many times, when you made threats of any kind, your doing that seemed to be an expression of your impatience or anger more than the result of careful consideration whether the threatened action was justified or appropriate.

We found that on other occasions you stated that you were considering fines against public defenders who were not present in your courtroom when their cases were called. The reality of your courthouse is that public defenders were expected to be ready to proceed in multiple courts at the same time. Under these circumstances, threatening fines against public defenders who were not present when your court called their cases showed a lack of concern not only for the difficult positions of the defenders, but also for how your demands to have them present in your court would affect your judicial colleagues who also required their presence.

You represented to us in 2020 that you will no longer make unjustified threats to file grievances or impose sanctions, and our sources confirm that you have kept that resolution for the last three years. Again, we very much appreciate your recognition that your actions were inappropriate. You must continue to avoid the appearance that you prejudge motions filed by criminal defendants to be frivolous or filed merely to cause delay.

On another occasion you told a criminal defendant that they could file a malpractice suit based on their attorney's "poor lawyering." That was a serious infringement on the attorney-client relationship.

We also found that you were not faithful to the law in some circumstances. You acknowledged that you did not comply with MCR 6.106 regarding pretrial release until after our September 2020 letter requesting your comments. Even though the 2016 amendment to the rule was discussed in many judges' meetings and memos, you continued to require cash bonds in most cases. We understand and appreciate that you are now making a point of complying with those rules by releasing defendants on

personal recognizance when it is appropriate and by stating your reasons on the record if you deny pretrial release or impose conditional release after considering the factors in MCR 6.106(F).

You sometimes took actions against defendants that appear to have been motivated by anger. Thus, you once *sua sponte* increased a defendant's bond after they moved to withdraw their guilty plea without providing any justification, suggesting you were punishing them for deciding to go to trial. That created the appearance of impropriety in violation of Canon 2(B) and disregarded the law of due process in violation of Canon 3(A)(1).

Our investigation also revealed that you did not apply the factors set out in MCR 6.425, so found defendants "able" to pay costs, fines, and fees with little support in the record. In other cases you required costs and fines to be paid at sentencing— and ordered the defendants incarcerated immediately when they said they did not have sufficient funds on their person to pay fines and costs at once.

The clear language of MCR 6.425 required you to make a record of the factors supporting a finding of ability to pay "without manifest hardship" and to find that the defendant had not made a good faith effort to pay. It was your responsibility to make this determination before ordering incarceration for failure to pay. It appears to us that you allowed your belief that MCR 6.425 was bad public policy to override the rule's clear language. In doing so, you violated Canon 3(A)(1), which requires a judge to be faithful to the law. We understand that this is another practice you abandoned upon learning that we were investigating you and we applaud you for that.

Finally, we investigated whether you violated Canon 7(A)(1)(b), which prohibits a judge from "publicly endorsing a candidate for non-judicial office." Our evidence showed that: 1) A picture of you with your wife and others under a campaign banner supporting your wife's candidacy appeared on your public Facebook page; 2) you drove a car with a bumper sticker supporting your wife's candidacy; and 3) you publicly displayed a campaign sign for your wife on election day "at least briefly." You dispute our evidence by asserting: 1) the post on Facebook was not made by you, 2) you did not knowingly drive a car with this bumper sticker on it, and 3) the sign you held on election day was only for a brief moment. We recognize that the campaign was your wife's and that the circumstances put you in an awkward position, but the canons contain no exception for spouse's campaigns. We caution you to use care in the future regarding any campaign activities for non-judicial offices.

The reason we are only admonishing you despite the findings outlined above is because our obligation is not to punish but to protect the public, and it appears that you have taken this process, and our concerns, to heart and have made significant changes to the way you fulfill your responsibilities. Attorneys who practice before you told us that the atmosphere in your courtroom has improved markedly. When you

4

met with our staff you communicated in a heartfelt way that you were dismayed that your actions in dealing with criminal defendants had caused them harm and were also dismayed to realize your poor treatment of criminal defense attorneys, and you truly desire to be a judge of whom your community can be proud. In light of the three years of evidence that you have been sincere about this, we believe the public is now protected. We encourage you to continue to monitor your emotions in court, especially when dealing with criminal defendants and criminal defense attorneys. We encourage you to display the courtesy, empathy and respect you said you aspire to when you met with our staff.

You have been a judge since 2005. Though the problems our investigation disclosed were extensive and longstanding, this is the first time anyone brought meritorious complaints about you to our attention. As we have noted repeatedly, your demeanor during the past three years is a marked improvement over your demeanor for the decade prior. For these reasons, we are confident you will embrace what we have brought to your attention and continue make the necessary changes.

Very truly yours,

Jon H. Hulsing
Chairperson

Cc: All Commissioners
Lynn Helland, Esq.
Executive Director

5

# EXHIBIT 15

No. 366063

Court of Appeals of Michigan

# HP Benson Ass'n v. Nike, Inc.

Decided Nov 13, 2024

366063

11-13-2024

HP BENSON ASSOCIATION, INC., Plaintiff-Appellant, v. NIKE, INC., Defendant-Appellee.

PER CURIAM

UNPUBLISHED

Ottawa Circuit Court LC No. 22-007011-NO

Before: Boonstra, P.J., and Murray and Cameron, JJ.

PER CURIAM

Plaintiff appeals by right the trial court's order granting defendant's motion for summary disposition. Plaintiff also appeals by right the trial court's order awarding defendant $27,266.40 in attorney fees as sanctions under MCR 1.109(E)(5) and (6). We affirm.

I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff is a nonprofit corporation. Attorney Martin H. Leaf is plaintiff's incorporator and resident agent. Leaf represented plaintiff in the lower court proceedings and continues his representation of plaintiff in this appeal. Defendant is a corporation primarily known for the production and sale of sports apparel.

In 2014, defendant released a five-minute animated advertisement, entitled *The Last Game*, in anticipation of the 2014 World Cup soccer tournament in Rio de Janeiro, Brazil. The United

States Court of Appeals for the Sixth Circuit has provided the following description of *The Last Game*:

> The film tells the story of an evil villain who creates a team of soccer-playing clones. These evil clones ruin soccer (and somehow steal the beauty from the world) by winning games through a methodical (yet boring) playing style that takes no risks. A group of international soccer stars unite to come to the sport's (and the world's) rescue. Clad in Nike gear, these stars best the monotonous clones through their dazzling and risky play during "the last game." [*Leaf v Nike*, unpublished

*2

> opinion of the United States Court of Appeals for the Sixth Circuit, issued October 25, 2021 (Case No. 21-1045), p 1.]

Plaintiff filed suit in 2022, alleging that *The Last Game* contained problematic hidden images and violated the Michigan Consumer Protection Act (MCPA), MCL 445.901 *et seq.*

In lieu of filing an answer, defendant moved for summary disposition under MCR 2.116(C)(7) and MCR 2.116(C)(8). After holding a hearing, the trial court granted the motion under MCR 2.116(C)(8) after concluding that plaintiff failed to state a valid claim under the MCPA. The trial court ordered sanctions against plaintiff and Leaf,

concluding that plaintiff's complaint was baseless and noting that Leaf had unsuccessfully brought identical claims against defendant in federal court.

This appeal followed.

II. STANDARD OF REVIEW

"This Court reviews de novo a circuit court's summary disposition ruling." *Dalley v Dykema Gossett, PLLC*, 287 Mich.App. 296, 304; 788 N.W.2d 679 (2010).

3

> A court may grant summary disposition under MCR 2.116(C)(8) if [t]he opposing party has failed to state a claim on which relief can be granted. A motion brought under subrule (C)(8) tests the legal sufficiency of the complaint solely on the basis of the pleadings. When deciding a motion under (C)(8), this Court accepts all well-pleaded factual allegations as true and construes them in the light most favorable to the nonmoving party. A party may not support a motion under subrule (C)(8) with documentary evidence such as affidavits, depositions, or admissions. Summary disposition on the basis of subrule (C)(8) should be granted only when the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery. [*Id.* (quotation marks and citation omitted; alteration in original).]

We review de novo issues of statutory interpretation. *McQueer v Perfect Fence Co*, 502 Mich. 276, 285-286; 917 N.W.2d 584 (2018).

This appeal concerns the interpretation of a statute. "The primary goal of statutory interpretation is to give effect to the Legislature's intent." *Ford Motor Co v City of Woodhaven*, 475 Mich. 425, 438; 716 N.W.2d 247 (2006). "The first step is to review the statute's language[,] [a]nd if the statute is plain and unambiguous, then this Court will apply the statute as written." *Id.* at 438-439 (citation omitted). In addition,

> "All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." [*Id.* at 439, quoting MCL 8.3a.]

*3

"We review for an abuse of discretion a trial court's award of attorney fees." *Powers v Brown*, 328 Mich.App. 617, 620; 939 N.W.2d 733 (2019). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id.* (quotation marks and citation omitted).

"In reviewing a motion to disqualify a judge, this Court reviews the trial court's findings of fact for an abuse of discretion and the court's application of those facts to the relevant law de novo." *Olson v Olson*, 256 Mich.App. 619, 637; 671 N.W.2d 64 (2003).

III. SUMMARY DISPOSITION

First, plaintiff argues that the trial erred by granting summary disposition in favor of defendant as to its claim under the MCPA. We disagree.

The MCPA is a consumer protection statute that prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." MCL 445.903(1). In pertinent part, the term "trade or commerce" is defined in the MCPA as

Case 2:25-cv-10660-SDK-EAS   ECF No. 1, PageID.253   Filed 03/09/25   Page 253 of 268

HP Benson Ass'n v. Nike, Inc.     No. 366063 (Mich. Ct. App. Nov. 13, 2024)

the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity. [MCL 445.902(1)(g).]

MCL 445.903(1) contains definitions of unfair, unconscionable, or deceptive practices, stating in relevant part:

(1) Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows:

* * *

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

* * *

(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. [MCL 455.903(1)(s) and(cc).]

Although MCL 455.903(1)(cc) specifically contains the term "transaction," MCL 455.903(1)(s) does not. However, in *Zine v Chrysler Corp*, 236 Mich.App. 261, 282-283; 600 N.W.2d 284 (1999) (quotation marks and citation omitted), this Court explained that it was "proper to construe the provisions of the MCPA with reference to the common-law tort of fraud." This Court stated that "[o]ne element of fraud is that the defendant made a material misrepresentation." *Id.* at 283. This Court defined a "material" representation as a [4] "'representation relating to a matter which is so substantial and important as to influence [the]

party to whom [it is] made . . . .'" *Id.*, quoting *Black's Law Dictionary* (5th ed) (alterations in original). This Court then concluded that "a material fact for purposes of the MCPA would likewise be one that is important to the transaction or affects the consumer's decision to enter into the transaction." *Zine*, 236 Mich.App. at 283. In addition, this Court defined the term "transaction" for purposes of the MCPA to mean "the business conducted between the parties . . . ." *Id.* at 280. In support of its conclusion, this Court considered several dictionary definitions, including the following definition of "transaction" from Black's Law Dictionary:

"Act of transacting or conducting any business; negotiation; management; proceeding; that which is done; an affair. It may involve selling, leasing, borrowing, mortgaging or lending. Something which has taken place, whereby a cause of action has arisen. It must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered." [*Id.*, quoting *Black's Law Dictionary* (5th ed).]

Plaintiff alleged that defendant violated MCL 455.903(1)(s) and(cc). At the hearing on defendant's motion for summary disposition, the parties and the trial court concentrated on whether plaintiff had pleaded the existence of a "transaction" between plaintiff and defendant. The trial court concluded that plaintiff's claims under the MCPA failed because there was no allegation of any transaction between the parties. Plaintiff argues that the court erred by determining that a sale was required for there to be a "transaction." We disagree. As the trial court clarified in its opinion denying plaintiff's motion for reconsideration, the trial court held that, although a sale was unnecessary, plaintiff's MCPA claims had to be based on *some* sort of transaction, and

plaintiff had failed to plead that any such transaction occurred. The trial court correctly stated the law. See *Zine*, 236 Mich.App. at 283.

Plaintiff appears to argue that the "transaction" underlying its MCPA claims was the mere viewing of the video published by defendant as an advertisement. We disagree that this satisfied the requirements of the MCPA. In the related action that Leaf filed against defendant, the Sixth Circuit concluded that viewing *The Last Game* was not a "transaction" under the MCPA, reasoning that merely watching the advertisement did not alter the parties' legal relationship, cause the parties to undertake any legal obligation or gain a legal right, cause the transfer of value, or cause the parties to enter into an agreement. *Leaf*, unpub op at 13-14. The court further stated that "[i]f every viewer of freely available 'speech' could treat that speech as a 'business deal,' it would greatly expand the [MCPA] beyond its narrow domain of protecting consumers who buy goods or services for personal use." *Id*. at 14.

We find the Sixth Circuit's reasoning persuasive. See *Omian v Chrysler Group LLC*, 309 Mich.App. 297, 307 n 6; 869 N.W.2d 625 (2015) ("Although the decisions of lower federal courts are not binding precedents, federal decisions interpreting Michigan law are often persuasive.") (quotation marks and citation omitted). In this case, as in the Sixth Circuit case, plaintiff failed to plead that a transaction occurred. Plaintiff and defendant did not conduct any business, negotiate any agreement, exchange any promises, or make any changes to their respective legal statuses. Therefore, plaintiff never participated in a "transaction" with defendant for purposes of the MCPA. *5

Accordingly, because plaintiff failed to state a claim under MCL 445.903(1)(s) or MCL 445.903(1)(cc), the trial court properly granted summary disposition in favor of defendant under MCR 2.116(C)(8).[1] See *Dalley*, 287 Mich.App. at 304.

[1] Although defendant also raises res judicata and statute of limitations as possible alternative grounds on which to affirm the trial court's grant of the motion for summary disposition, it is unnecessary for us to consider those alternative grounds because summary disposition was properly granted under MCR 2.116(C)(8) for failure to state a claim. Likewise, because we affirm the trial court's grant of summary disposition on the basis that plaintiff failed to state a valid claim under the MCPA, it is unnecessary for us to address plaintiff's argument that the court erred by concluding that plaintiff did not have the authority to request injunctive and declaratory relief.

## IV. SANCTIONS

Next, plaintiff argues that the trial court erred by awarding defendant sanctions under MCR 1.109(E)(5) and (6). We disagree.

MCR 1.109(E)(2) requires that every filing provided to a court be signed by the party's attorney, or the party if he or she is self-represented. MCR 1.109(E)(5) provides the following with regard to the effect of a signature:

> The signature of a person filing a document, whether or not represented by an attorney, constitutes a certification by the signer that:
>
> (a) he or she has read the document;
>
> (b) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and
>
> (c) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Case 2:25-cv-10660-SDK-EAS ECF No. 1, PageID.255 Filed 03/09/25 Page 255 of 268

HP Benson Ass'n v. Nike, Inc. No. 366063 (Mich. Ct. App. Nov. 13, 2024)

If a party submits a filing that violates MCR 1.109(E)(5), that party shall be subject to sanctions:

> If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages. [MCR 1.109(E)(6).]

6    *6

Plaintiff argues that the awarding of sanctions was improper because its complaint was warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and because the trial court was biased against plaintiff. We disagree.

Leaf, either as a plaintiff or as an attorney representing another party, has brought similar actions alleging violations of the MCPA against various defendants. Those actions have been unsuccessful. See, e.g., *Leaf v Refn*, 742 Fed.Appx. 917, 920 (CA 6, 2018); *Leaf*, unpub op at 2. Indeed, Leaf, as plaintiff, earlier brought identical claims against this specific defendant in federal court. Those claims were dismissed by the federal district court, whose decision was affirmed by the Sixth Circuit on the basis that Leaf had failed to state a valid claim under the MCPA. *Leaf*, unpub op at 2. Leaf then filed this case on behalf of plaintiff, a corporation. The complaint made several allegations concerning the offensive content in the advertisement but failed to explain how the corporate plaintiff was involved; for example, there was no explanation offered as to how plaintiff had viewed the advertisement, how it was misled by defendant, or how viewing the advertisement altered the parties' legal

relationship. It is also clear that when filing this case, Leaf did not attempt to overcome the fatal flaws that had led to the dismissal of his previous cases. At a minimum, plaintiff's legal position lacked arguable legal merit. In addition, and for the reasons set forth in the next section of this opinion, plaintiff has failed to demonstrate that the trial court was biased. As a result, the trial court did not abuse its discretion by awarding sanctions in favor of defendant and against plaintiff. See *Bauer-Rowley*, 344 Mich.App. at 59; *Powers*, 328 Mich.App. at 620.[2]

> [2] Plaintiff does not challenge the reasonableness of the attorney fees awarded.

## V. JUDICIAL BIAS

Plaintiff also argues that we should remand this case to a different judge, because the trial judge who presided over this case was biased. We disagree. Because we conclude that the trial court properly granted the motion for summary disposition for failure to state a valid claim under the MCPA, remand is not required. Moreover, plaintiff has not demonstrated that the trial judge was biased against it.

"Due process requires that an unbiased and impartial decision-maker hear and decide a case." *Mitchell v Mitchell*, 296 Mich.App. 513, 523; 823 N.W.2d 153 (2012). "A trial judge is presumed unbiased, and the party asserting otherwise has the heavy burden of overcoming the presumption." *Id.* According to MCR 2.003(C)(1), disqualification of a judge is warranted for the following reasons:

> (a) The judge is biased or prejudiced for or against a party or attorney.

Case 2:25-cv-10660-SDK-EAS   ECF No. 1, PageID.256   Filed 03/09/25   Page 256 of 268

HP Benson Ass'n v. Nike, Inc.      No. 366063 (Mich. Ct. App. Nov. 13, 2024)

(b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, 556 U.S. 868; 129 S.Ct. 2252; 173 L.Ed.2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

7      *7

(c) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

(d) The judge has been consulted or employed as an attorney in the matter in controversy.

(e) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(f) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has more than a de minimis economic interest in the subject matter in controversy that could be substantially impacted by the proceeding.

(g) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(*i*) is a party to the proceeding, or an officer, director, or trustee of a party;

8

(*ii*) is acting as a lawyer in the proceeding;

(*iii*) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(*iv*) is to the judge's knowledge likely to be a material witness in the proceeding.

As discussed, we agree with the trial court's grant of summary disposition to defendant, and find no abuse of discretion in the trial court's order of sanctions. Although plaintiff argues that the court erred by not allowing it to respond to the court's determination that the complaint was baseless, plaintiff was permitted to respond to defendant's motion for summary disposition, which asserted that plaintiff failed to plead a valid claim under the MCPA. There was also a hearing concerning plaintiff's motion for reconsideration, at which plaintiff was permitted to argue that his complaint was not without basis. See *Al-Maliki v LaGrant*, 286 Mich.App. 483, 485-486; 781 N.W.2d 853 (2009) (stating in a case in which the court "considers an issue sua sponte, due process can be satisfied by affording a party an opportunity for rehearing").

To the extent that plaintiff argues that the trial court erred by denying the disqualification motion, plaintiff has not shown that the trial court was unfairly biased. Plaintiff's allegation of bias begins with the trial court's October 24, 2022 order requiring Leaf to attend the summary disposition hearing in person, while defendant's counsel was permitted to attend remotely. That order stated the following:

In reviewing both the complaint and defendant's motion, it appears that this complaint may be based on a questionable legal theory; and, plaintiff counsel may have a history of filing frivolous claims against defendant. It is also interesting that

*8



plaintiff filed this action in Ottawa County when both plaintiff and defense counsel are based in the southeast area of Michigan. Therefore, the court requires and orders that plaintiff counsel personally appear before the court to argue this motion. Defense counsel may appear by remote technology.

"Disqualification on the basis of bias or prejudice cannot be established merely by repeated rulings against a litigant, even if the rulings are erroneous." *In re MKK*, 286 Mich.App. 546, 566; 781 N.W.2d 132 (2009). In addition, "[o]pinions formed by a judge on the basis of facts introduced or events occurring during the course of the current proceedings, or of prior proceedings, do not constitute bias or partiality unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Schellenberg v Rochester Lodge No 2225*, 228 Mich.App. 20, 39; 577 N.W.2d 163 (1998). "Likewise, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id*. (quotation marks and citation omitted).

In this case, Leaf chose to file the complaint in the Ottawa Circuit Court, presumably accepting the possibility of having to appear in person before that court; yet he later argued that it was unreasonable for the trial court to require him to drive across the state and appear in person. It is unclear why he chose a venue that he believed was too inconvenient for travel purposes. In any event the trial court allowed Leaf to appear and present argument in response to the motion for summary disposition; the mere fact that only defendant was granted the option to appear remotely does not establish that the converse-a court requiring a litigant to appear in person before it-shows bias, especially in light of the trial court's stated concerns based on events that occurred during prior proceedings. *Id*. Further, plaintiff has not established that any of the court's subsequent rulings against plaintiff were the result of improper bias. See *id*. The trial court did not err by denying the motion for disqualification. See *Olson*, 256 Mich.App. at 637.

Affirmed.

casetext
Part of Thomson Reuters

# EXHIBIT 16

## STATE OF MICHIGAN

## ATTORNEY GRIEVANCE COMMISSION

## REQUEST FOR INVESTIGATION

**AGC File No: 24-2670**

TO:    Martin H. Leaf, P43202
        Martin H. Leaf, PLLC
        33228 W 12 Mile Rd Ste 345
        Farmington Hills, MI 48334-3309

**I, Michael V. Goetz (P41139)**, Grievance Administrator, State of Michigan, Attorney Grievance Commission, pursuant to Michigan Court Rule 9.109(B)(5), serve this Request for Investigation upon you.

You are required to file a signed answer to this Request for Investigation within twenty-one days from the date of this notice pursuant to Michigan Court Rule 9.113(A). Your answer must fully and fairly disclose all the facts and circumstances pertaining to the allegations contained in this Request for Investigation. You have the option of filing your answer by e-mail at rianswers@agcmi.com. However, if your answer, including all attachments, exceeds 10 pages you must submit your answer by regular mail.

Failure to submit an answer within the time required may constitute professional misconduct under Michigan Court Rules 9.104(7) and 9.113 (B)(2) and may subject you to separate, independent prosecution and discipline. A knowing misrepresentation may also constitute separate professional misconduct under Michigan Court Rule 9.104(6).

---

## STATEMENT

The Grievance Administrator, upon information and belief, states as follows:

A.    Respondent, Martin H. Leaf, is an attorney admitted to the practice of law in the State of Michigan and, as such, is fully subject to the rules and regulations of the Michigan Supreme Court governing the disciplining of attorneys for professional misconduct.

B.    In a matter titled, *HP Benson Association, Inc v Nike Inc*, Ottawa County Circuit Court Case No. 22-7011-NO, Respondent filed a lawsuit on behalf of the plaintiff, alleging violations of the Michigan Consumer Protection Act (MCPA), MCL 445.901 et seq.

C.    On or about February 23, 2023, in the above matter, the circuit court entered an opinion and order dismissing the litigation on a summary disposition basis, holding that Respondent had filed frivolous litigation and was subject to assessment of sanctions following a future hearing should those be requested by the defendant.

D.    The February 23, 2023, opinion and order first discussed the appropriateness of summary disposition:

> On September 23, 2022, plaintiff filed a one-count complaint for declaratory judgment in which it seeks a determination that Nike engaged in deceptive conduct in violation of the Michigan Consumer's Protection Act (MCPA). Plaintiff seeks injunctive relief.

> The complaint consists of 44 paragraphs, along with a request for relief. Paragraph 6 describes the focus of plaintiff's scorn as the animated Nike film, *The Last Game* that was apparently released in 2014. Paragraphs 7 and 8 describe the theme of the film-the heroes of soccer playing a team of corporate created clones. In paragraphs 9 and 11, plaintiff describes Nike's lead animator of the film as a racist "Irish National." According to plaintiff, the film surreptitiously equates the evil clones with Jews.

> The heart of the complaint is contained in paragraphs 12, 13, 16 and 20 in which it is alleged that the film contains "hidden, hateful and racist messages," along with images of child pornography, when the film is slowed down and viewed frame by frame.  According to plaintiff, these images promote hatred against Jews. Paragraphs 33 to 37 describe how Jews have been the victim of historical hate and that this film contributes to that hatred. Paragraphs 22, 23, 25, and 27 gratuitously criticize the 6th Circuit for decisions that it has made in which that court dismissed similar actions in suits brough by plaintiff's counsel individually, or in which plaintiff's counsel represented a plaintiff.

> Ironically, only the first paragraph of the complaint references plaintiff. That paragraph simply notes that plaintiff is a non-

profit corporation. It is not alleged anywhere that plaintiff or any of its agents have ever viewed *The Last Game* or had any dealings whatsoever with Nike…

The complaint lists no transaction between plaintiff and defendant. Nothing in the complaint alleges "mutual and reciprocal acts typical of business deals that alter the legal relationships of [plaintiff and defendant]" No facts are pied that plaintiff or any of its agents purchased, rented, viewed or otherwise entered into a transaction with defendant regarding *The Last Game*; rather, plaintiff simply asserts what the film contains without any reference to how plaintiff came to that conclusion. In fact, plaintiff boldly admits the same when it writes:

> There is no requirement that the Plaintiff asking for declaratory judgment has even seen the film, and it is Nike's burden to prove when HP BENSON saw the film if that is even relevant, and Nike has not shown it is.

There is simply no intersection between the parties. As shown above, a transaction is basic to establish a cause of action under both §903(l)(s) and §903(l)(cc). In addition, plaintiff fails to allege any facts to support a claim that it engaged in any transaction for personal, family, or household purposes with defendant. Aside from a corporate entity which files a MCPA complaint against its competitor based on false advertising directly affecting the entity, it would seem unusual for a corporation, to engage in a transaction with another corporation for personal, family or household purposes. Nevertheless, nothing in the complaint gives any hint of that circumstance. Perhaps these omissions are because there was no transaction, or even interaction, between the parties of any kind.

Plaintiff also fails to plead facts showing that third parties who happen to view a free animated film have engaged in the conduct of trade or commerce with defendant such as to raise MCPA protection. Simply seeing something is not a transaction as it does involve mutual and reciprocal acts typical of business deals that alter the legal relationships of the parties. The failure to plead any facts showing a transaction of any type is simply fatal to plaintiff's cause of action and requires this court to grant summary disposition in favor of defendant under MCL 2. l l 6(C)(8)…

We must now determine if plaintiff should be allowed to file an amended complaint. In other words, can the pleading defects be remedied? This question need not be answered in a vacuum. Rather, the court will look beyond the pleadings and notes that Exhibit D to defendant's motion for summary disposition are the Articles of Incorporation of plaintiff. Plaintiff did not dispute the accuracy of these Articles in its response brief or at oral argument. Importantly, Article II addresses the purpose for which plaintiff was incorporated in May, 2022, and states:

> To educate the public regarding media that contains, and entities and individuals that promote, deceptive: Hateful content; Inappropriate sexual content; Terrorist messages; and other deceptive offensive content.

The purpose for which plaintiff was incorporated are not for personal, family, or household purposes. Rather, HP Benson was formed for the business of "investigating" perceived affronts to certain people groups and filing lawsuits, such as this, to protect those groups. In other words, there is no amount of wordsmithing that can be performed that would give plaintiff relief under the MCPA given plaintiffs purpose to exist.

More importantly, for plaintiff to obtain injunctive relief under MCL 445.911, it must first establish that there has been a violation of, in this case, §903(1)(s) or §903(1)(cc). As shown above, where there is no transaction, there can be no violation of the MCPA and injunctive relief is precluded.

E.  Next, the Ottawa County Circuit Court addressed Respondent's bad faith conduct in filing the litigation:

> The Court specifically finds that plaintiff counsel signed the complaint with an improper purpose in order to harass defendant and to force defendant to incur needless expenses to defend itself from a meretricious and frivolous action. Therefore, plaintiff counsel by signing the complaint makes himself personally liable for monetary sanctions. Plaintiff counsel knew that this complaint was baseless; and, as the incorporator of plaintiff, plaintiff is likewise deemed responsible for monetary sanctions.

> At the outset of this opinion, the Court quoted the United States District Court in which that court warned plaintiff

counsel that further frivolous actions, such as the case at bar, may warrant sanctions. Apparently, plaintiff counsel heeded that advice and avoided filing this meritless complaint in federal court. Unfortunately, plaintiff counsel has signed a complaint for an improper purpose in state court. As was shown above in the "analysis" section of this opinion, there is simply no legal basis to support plaintiffs claim for relief under the MCPA. This conclusion is consistent with the conclusions of courts in several similar prior cases filed by plaintiff counsel in his personal capacity or as an attorney on behalf of a party.

[The Court then summarized the 2013 case of Deming, in which it was held that similar claims brought by Respondent were baseless]…

In *Deming*, like the case at bar, plaintiff falsely accused the trial court of being anti-Semitic. Plaintiff also sought to recuse the appellate panel that rendered the decision!...Like the case at bar, and the Deming case, plaintiff, or plaintiff counsel, once again accused the trial court judge of being anti-Semitic.

In the present case, plaintiff filed a motion to disqualify this judge and demanded that the motion be heard before defendant's motion for summary disposition. While this court heard the summary disposition motion first, the court first decided the disqualification motion. Plaintiff then appealed this Court's denial of the motion to disqualify and while that decision was pending, moved and scheduled a hearing for sanctions against defendant before this Court. Because the disqualification motion was pending before the chief judge, this Court adjourned the sanctions hearing. The case history reveals that plaintiff then supplemented his motion for disqualification before the chief judge because it claimed that this court's adjournment of the hearing for sanctions further demonstrated bias. This is nonsensical and confirms the United States District Court's comments that plaintiff counsel is sloppy and wastes judicial resources.

F.  The February 23, 2023, opinion concluded with a dismissal of the claims and holding, "The court further finds that both plaintiff and plaintiff counsel are liable for sanctions under MCR 1.109(E)(5) and (6) because this complaint was filed for an improper purpose. The federal courts (plural) have repeatedly ruled against plaintiff counsel in both his individual capacity and as an attorney in which similar

bogus theories of MCPA violations were alleged. In fact, the United States District Court has warned plaintiff counsel that further similar baseless claims may result in sanctions. Instead of heeding that advice, plaintiff and its incorporator, plaintiff counsel, have chosen to waste state judicial resources and cause defendant to incur unnecessary legal fees. This is plaintiff's last game."

G.   On or about February 24, 2023, in the above matter, plaintiff moved for reconsideration and the court allowed plaintiff to argue the motion for reconsideration on April 17, 2023, which was the same date as the hearing on sanctions.

H.   On or about April 19, 2023, in the above matter, the court entered an opinion denying Respondent's motion for reconsideration and determining sanctions against Respondent in the amount of $27,266.40. The court also dismissed Respondent's second motion for disqualification of the presiding judge as untimely and mooted by the April 19, 2023 decision.

I.   In *HP Benson Association, Inc v Nike Inc*., Ottawa County Circuit Court Case No. 22-7011-NO, Respondent engaged in a pattern of misconduct as follows:

1.   The trial court determined that Respondent had filed a frivolous lawsuit and ordered him to pay attorney fees of $27,266.40 as a sanction.

2.    After the defendant attempted to collect the court-ordered sanctions, Respondent filed for bankruptcy protection.

3.   Upon receiving adverse rulings, Respondent engaged in a pattern of labeling judges as anti-Semitic and associated the court's actions with those of Nazi Germany.

J.   An appeal was filed in *HP Benson Association, Inc v Nike Inc.,* Court of Appeals Case No. 366063 seeking to overturn the circuit court's grant of the motion for summary disposition and the award of sanctions. The Court of Appeals detailed the matter's procedural history:

Plaintiff is a nonprofit corporation. [Respondent] is plaintiff's incorporator and resident agent. [Respondent] represented plaintiff in the lower court proceedings and continues his representation of plaintiff in this appeal.   Defendant is a

corporation primarily known for representation of plaintiff in this appeal.

In 2014, defendant released a five-minute animated advertisement, entitled *The Last Game*, in anticipation of the 2014 World Cup soccer tournament in Rio de Janeiro, Brazil. The United States Court of Appeals for the Sixth Circuit has provided the following description of *The Last Game*:

> The film tells the story of an evil villain who creates a team of soccer-playing clones. These evil clones ruin soccer (and somehow steal the beauty from the world) by winning games through a methodical (yet boring) playing style that takes no risks. A group of international soccer stars unite to come to the sport's (and the world's) rescue. Clad in Nike gear, these stars best the monotonous clones through their dazzling and risky play during "the last game." [*Leaf v Nike*, unpublished opinion of the United States Court of Appeals for the Sixth Circuit, issued October 25, 2021 (Case No. 21-1045), p 1.]

Plaintiff filed suit in 2022, alleging that *The Last Game* contained problematic hidden images and violated the Michigan Consumer Protection Act (MCPA), MCL 445.901 et seq.

In lieu of filing an answer, defendant moved for summary disposition under MCR 2.116(C)(7) and MCR 2.116(C)(8). After holding a hearing, the trial court granted the motion under MCR 2.116(C)(8) after concluding that plaintiff failed to state a valid claim under the MCPA. The trial court ordered sanctions against plaintiff and [Respondent], concluding that plaintiff's complaint was baseless and noting that [Respondent] had unsuccessfully brought identical claims against defendant in federal court.

This appeal followed.

K.   In its opinion of November 13, 2024, the Court of Appeals, it found that because plaintiff failed to state a claim under MCL 445.903(1)(s) or MCL 445.903(1)(cc), the trial court properly granted summary disposition in favor of defendant under MCR 2.116(C)(8).

L.   The Court of Appeals then addressed the issue of sanctions entered against Respondent by the circuit court, first addressing his claim that the action was brought in good faith:

Plaintiff argues that the awarding of sanctions was improper because its complaint was warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and because the trial court was biased against plaintiff. We disagree.

[Respondent], either as a plaintiff or as an attorney representing another party, has brought similar actions alleging violations of the MCPA against various defendants. Those actions have been unsuccessful. See, e.g., *Leaf v Refn*, 742 F Appx 917, 920 (CA 6, 2018); *Leaf*, unpub op at 2. Indeed, [Respondent], as plaintiff, earlier brought identical claims against this specific defendant in federal court. Those claims were dismissed by the federal district court, whose decision was affirmed by the Sixth Circuit on the basis that Leaf had failed to state a valid claim under the MCPA. *Leaf*, unpub op at 2. [Respondent] then filed this case on behalf of plaintiff, a corporation. The complaint made several allegations concerning the offensive content in the advertisement but failed to explain how the corporate plaintiff was involved; for example, there was no explanation offered as to how plaintiff had viewed the advertisement, how it was misled by defendant, or how viewing the advertisement altered the parties' legal relationship. It is also clear that when filing this case, [respondent] did not attempt to overcome the fatal flaws that had led to the dismissal of his previous cases. At a minimum, plaintiff's legal position lacked arguable legal merit. In addition, and for the reasons set forth in the next section of this opinion, plaintiff has failed to demonstrate that the trial court was biased. As a result, the trial court did not abuse its discretion by awarding sanctions in favor of defendant and against plaintiff. [Citations omitted].

M.    The Court of Appeals next addressed Respondent's claims that the presiding Ottawa County Circuit Court judge was biased against him, holding:

Plaintiff also argues that we should remand this case to a different judge, because the trial judge who presided over this case was biased. We disagree. Because we conclude that the trial court properly granted the motion for summary disposition for failure to state a valid claim under the MCPA, remand is not required. Moreover, plaintiff has not demonstrated that the trial judge was biased against it…

As discussed, we agree with the trial court's grant of summary disposition to defendant, and find no abuse of discretion in the trial court's order of sanctions. Although plaintiff argues that the court erred by not allowing it to respond to the court's determination that the complaint was baseless, plaintiff was permitted to respond to defendant's motion for summary disposition, which asserted that plaintiff failed to plead a valid claim under the MCPA. There was also a hearing concerning plaintiff's motion for reconsideration, at which plaintiff was permitted to argue that his complaint was not without basis. See *Al-Maliki v LaGrant*, 286 Mich App 483, 485-486; 781 NW2d 853 (2009) (stating in a case in which the court "considers an issue sua sponte, due process can be satisfied by affording a party an opportunity for rehearing"). To the extent that plaintiff argues that the trial court erred by denying the disqualification motion, plaintiff has not shown that the trial court was unfairly biased. Plaintiff's allegation of bias begins with the trial court's October 24, 2022 order requiring [Respondent] to attend the summary disposition hearing in person, while defendant's counsel was permitted to attend remotely. That order stated the following:

> In reviewing both the complaint and defendant's motion, it appears that this complaint may be based on a questionable legal theory; and, plaintiff counsel may have a history of filing frivolous claims against defendant. It is also interesting that plaintiff filed this action in Ottawa County when both plaintiff and defense counsel are based in the southeast area of Michigan. Therefore, the court requires and orders that plaintiff counsel personally appear before the court to argue this motion. Defense counsel may appear by remote technology…

In this case, [Respondent] chose to file the complaint in the Ottawa Circuit Court, presumably accepting the possibility of having to appear in person before that court; yet he later argued that it was unreasonable for the trial court to require him to drive across the state and appear in person. It is unclear why he chose a venue that he believed was too inconvenient for travel purposes. In any event the trial court allowed [Respondent] to appear and present argument in response to the motion for summary disposition; the mere fact that only defendant was granted the option to appear remotely does not establish that the converse—a court requiring a litigant to appear in person before it—shows bias, especially in light of the trial court's stated concerns based

on events that occurred during prior proceedings. *Id*. Further, plaintiff has not established that any of the court's subsequent rulings against plaintiff were the result of improper bias. See *id*. The trial court did not err by denying the motion for disqualification. [Citations omitted].

N.   On or about December 3, 2024, Respondent sought reconsideration of the Court of Appeal's opinion in the above matter, which was denied on December 26, 2024.

O.   In responding to this Request for Investigation, provide the following information:

1.   A full and fair description of the facts and circumstances surrounding the events leading to the aforementioned statements.

2.   Copies of pleadings that you filed in the trial court and on appeal in *HP Benson Association, Inc v Nike Inc*, Ottawa County Circuit Court Case No. 22-7011-NO; Court of Appeals Case No. 366063.

3.   A copy of any document Respondent intends to rely upon in this proceeding.

**MICHIGAN ATTORNEY
GRIEVANCE COMMISSION**

Dated: January 27, 2025

*Michael V. Goetz/meg*
_____
**MICHAEL V. GOETZ (P41139)
Grievance Administrator**
755 W. Big Beaver Rd., Suite 2100
Troy, Michigan 48084
(313) 961-6585