## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Marc Susselman and Martin Leaf,

     Plaintiffs,

vs.                                                             Case No.:  2:25-cv-10660

Michigan Attorney Grievance Commission,        Hon. Shalina D. Kumar
Board of Commissioners of
the Michigan Attorney Grievance Commission,    Magistrate Judge
in their official capacities,                              Elizabeth Staffor
and Michael Goetz,
Administrator of the Michigan Attorney
Grievance Commission, in his official capacity,

     Defendants.

_____/

Marc M. Susselman (P29481)
Attorney for Plaintiffs
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

Martin Leaf (P43202)
Attorney for Plaintiffs
33228 W 12 Mile Rd., #345
Farmington Hills, MI 48335
(248) 687-9993
leafmartin@gmail.com

_____/

## In Memory of
## The Six Million Jews Who Perished In The Holocaust,
## And For Those Who Survived, And Their Children,
## Who Lived, And Continue To Live, With Its Lifelong Trauma

## Never Again!  Never Forget!

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Now Come Plaintiffs Marc Susselman and Martin Leaf, pursuant to Fed. R. Civ. P. 15(a)(1)(B), and file their First Amended Complaint by right within 21 days of the Defendants filing their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Plaintiffs allege violations of their rights under the First and Fourteenth Amendments of the Constitution, and state as their First Amended Complaint against the Defendants as follows:

## PRELIMINARY STATEMENT

The Plaintiffs are licensed attorneys in the State of Michigan. They are both Jewish. Within the last year, the Michigan Attorney Grievance Commission ("Commission") has issued Requests For Investigation to both attorneys requiring that they file written Answers to the Requests which charge each attorney with having violated the Michigan Rules of Professional Conduct. The allegations of professional misconduct are related to statements which each attorney made in legal briefs, in which they were representing different clients, statements which asserted that the presiding judge had made statements in legal opinions, and/or had engaged in conduct, which they claimed had the appearance of being anti-Semitic. The Requests for Investigation accuse Plaintiffs of having engaged in unethical conduct by virtue of their claims that a presiding judge's rulings and/or conduct had the appearance of being anti-Semitic.

Plaintiffs regard the issuance of these Requests For Investigation as a form of weaponizing the Commission, and the Rules of Professional Conduct, against Jewish attorneys who assert that a presiding judge has made biased statements, or expressed biased conduct and opinions, which have the appearance of being anti-Semitic. Plaintiffs do not take this action lightly, and they appreciate the gravity, seriousness and provocative nature of what they are doing.  But continued silence is not an option. Plaintiffs recognize that improper accusations of anti-Semitism can constitute playing "the Jew card" and can be unfairly used, for example, to purge good-faith criticisms of Israel as part of a cancel culture.  At the same time, criticizing and retaliating against an attorney's claim that a judge's actions and rulings have the distinct appearance of being anti-Semitic, supported by evidence, can be used to purge legitimate criticism of unlawful judicial bias as part of a cancel culture.  Plaintiffs maintain that this lawsuit is about the latter, not the former.

Plaintiffs maintain that the issuance of these Requests For Investigation constitutes an effort to muzzle and penalize Plaintiffs, and thereby make an example of them, and represents a dangerous, and unconstitutional, violation of their right of free speech under the First Amendment, and of Equal Protection under the Fourteenth Amendment.  They are requesting equitable relief in the form of a declaratory judgment and an injunction.

The opposite of love is not hate, it's indifference.  The opposite of art is not ugliness, it's indifference.  The opposite of faith is not heresy, it's indifference.  And the opposite of life is not death, it's indifference.

There may be times when we are powerless to prevent injustice, but there must never be a time when we fail to protest.

Wherever men and women are persecuted because of their race, religion, or political views, that place must-at that moment-become the center of the universe.

For in the end, it is all about memory, it's sources and its magnitude, and, of course, its consequences.

For the dead and the living, we must bear witness.

Elie Wiesel

Silence is complicity with the status quo.

Albert Einstein

The past is never dead. It's not even past.

William Faulkner

## **JURISDICTION AND VENUE**

1.     This action arises under the First and Fourteenth Amendments of the United States Constitution.

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(3).

3.     Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the Eastern

District of Michigan.

## **PARTIES**

4.     Marc Susselman is an attorney licensed to practice law by the State of Michigan.  He resides in Wayne County, Michigan.  Mr. Susselman is Jewish.

5.     Martin Leaf is an attorney licensed to practice law by the State of Michigan.  He resides in Oakland County, Michigan.  Mr. Leaf is Jewish.

6.     The Michigan Attorney Grievance Commission is the governmental agency responsible for overseeing and monitoring the conduct of attorneys in Michigan and their adherence to the Michigan Rules of Professional Conduct issued by the Michigan Supreme Court.  Its office is located in Oakland County, Michigan.

7.     The Board of Commissioners of the Michigan Attorney Grievance Commission is the governing body of the Attorney Grievance Commission.  It has nine members, who are currently Layota M. Willis, Chairperson; J. Paul Janes, Vice Chairperson; Kathleen Hickey, Secretary; Kendrah Robinson, attorney member; Dr. Samy Wassef, lay person member; Amani El-Edlebi, lay person member; Kathryn Swedlow, attorney member; James Moritz, lay person member; and Alexander Pahany, attorney member.

8.     Michael Goetz is the Administrator of the Michigan Attorney Grievance Commission.

## STATEMENT OF RELEVANT FACTS RELATING TO
## MARC SUSSELMAN'S CLAIMS

9.     On July 3, 2024, Mr. Susselman received an email from the Michigan Attorney Grievance Commission. The email indicated that a Request For Investigation ("Request") had been filed against him and directed that he had 21 days to file an Answer to the Request. The Request was attached to the email. It had been filed with the Commission two months earlier, on April 30, 2024, by an individual named Michelle Kinnucan. Mr. Susselman had never heard of Ms. Kinnucan, who lived in Washington state, and he had no idea who she was. He had never met her; never spoken to her; never communicated with her in any way; and he had never represented her in any legal proceeding. In the Request, Ms. Kinnucan accused Mr. Susselman of having unethically violated the Michigan Rules of Professional Conduct ("MRPC") by virtue of statements he had made in various legal briefs he had filed in a lawsuit in the United States District Court in Detroit against protesters in front of the Beth Israel synagogue in Ann Arbor, Michigan. The facts of the lawsuit are set forth below.

10.     In 2019, Marc Susselman was informed that a group of protesters were picketing in front of Beth Israel synagogue in Ann Arbor, Michigan. He went to Ann Arbor to see the picketing for himself. It turned out that the picketers had been protesting in front of the synagogue every Saturday morning, since 2003, using blatantly anti-Semitic signs, bearing such messages as "Jewish Power Corrupts";

"Resist Jewish Power"; "No More Holocaust Movies."  Commingled with the anti-Semitic signs were signs protesting Israel's role in the Israeli-Palestinian conflict, offering cover for the anti-Semitic signs.

11.    The signs numbered some twenty signs in all, with half directly in front of the synagogue, and the other half across Washtenaw Ave. facing the synagogue. (Photographs of the sign are attached as Exhibits 1 and 2.) The signs were placed on both sides of the street in the public right-of way.   They also displayed the Israeli flag in front of the synagogue, with the Jewish Star of David, the recognized symbol of the Jewish people, defaced with a red circle and a red slash across the circle – the international symbol meaning "Prohibited," reviving the Nazi propaganda that Jews were expendable. (Photograph of the defaced Israeli flag is attached as Exhibit 3.)  Several of the protesters were avowed Holocaust deniers, and had publicly said so.[1]

---

[1] Although the ringleader of the protesters, Henry Herskovitz, was born Jewish, he is an avowed Holocaust denier.  On April 26, 2014, Herskovitz posted an article about a vigil which was held at the Holocaust Memorial Center in Farmington Hills, Michigan. https://blog.deiryassin.org/2014/04/30/report-on-beth-israel-vigil-04-26-14/        The article stated:  "Jewish Witnesses for Peace and Friends staged a protest at the Holocaust Memorial Center on their commemoration of 'Yom HaShoah Holocaust Day of Remembrance', Sunday April 27th.  The reason for this protest was to challenge the power these museums have for manipulating peoples' emotions to ensure that criticism of Israel relegates those who do to hateful status."  The article included a sign held by Herskovitz stating, "Free Ernst Zündel."  Zündel was the author of several books denying the Holocaust, including "The Hitler We Knew And Loved," and who was prosecuted and imprisoned in Germany for denying "the fate of destruction for the Jews planned by the National Socialist powerholders and justified this by saying that the

12.    Mr. Susselman decided to do some legal research to determine whether anything could be done to curtail the protest.  In the course of his research he learned that Ann Arbor had a sign ordinance which unambiguously prohibited placing any signs in the public right-of-way.  Because the ordinance prohibited the placement of signs in the public right-of-way, regardless their message, in legal terms the ordinance was "content and viewpoint neutral," i.e., the ordinance did not selectively allow some signs, and prohibit other signs, based on their content.  Because the ordinance was neutral, it could

---

mass destruction in Auschwitz and Treblinka, among others, were an invention of the Jews and served the repression and extortion of the German people." https://en.wikipedia.org/wiki/Ernst_Z%C3%BCndel.

In an interview of another of the protesters, Rudy List, in CounterCurrents.Org https://countercurrents.org/2016/08/obscured-american-rudy-list-the-retired-math-professor/, Mr. List offered the following choice opinions:

The Holocaust is the core element in the foundation of Jewish power, of Zionism.  Without that, the whole thing collapses.  The same with 9/11.  Once 9/11 goes, everything goes.

. . .

Jews declared economic war on Germany, and they were having an effect. The Jews controlled higher education, media and the entertainment industry in Germany in the '30's.  They controlled much of the banking sector.  Jews were fighting tooth and nail, economically, with whatever means they could, and Hitler said, "We've got to sort out this country, for the Germans," and Germany supported him.  Hitler revived the economy. He started Volkswagen and gave people jobs.  Most Germans were elated. . ....                                    . ....

On scientific and historic terms, the argument is finished.  The revisionists have won.  There were no gas chambers.

be enforced against any violators without infringing on their First Amendment protected freedom of speech. *See R.A.V. v. St. Paul*, 505 U.S. 377 (1992); *Ward v. Rock Against Racism,* 491 U.S. 781 (1989). Yet the City of Ann Arbor had never enforced the ordinance against the protesters over the 16 years that they had been protesting every Saturday morning in front of the synagogue, as members of the synagogue, many with children, entered the synagogue to engage in their Sabbath worship, even though there were Ann Arbor police stationed near the synagogue, and could see the signs illegally placed in the public right-of-way.

13.    Mr. Susselman anticipated that the protesters would claim that their use of the signs was protected by the First Amendment's freedom of speech provision.  They would rely, for example, on the case which had involved the neo-Nazi march in Skokie, Illinois, where many Holocaust survivors lived, who had attempted to prevent them from marching.  Their effort was rejected by the courts, because the survivors did not constitute what is referred to as "a captive audience" – i.e., the First Amendment does not protect speech which is forced on listeners or readers against their will.  A speaker cannot require listeners to hear or see a message they do not wish to hear or see. *Lehman v. City of Shaker Heights,* 487 U.S. 298 (1974). The courts held, however, that the survivors were not a captive audience.  The neo- Nazis intended to march in downtown Skokie, not through the residential area where the survivors lived.  The survivors could avoid seeing the neo-Nazis marching in their Nazi uniforms by simply avoiding going

9

downtown.  They therefore did not qualify as a captive audience.

14.    Likewise regarding an analogy with the Westboro Church homophobic protests at funerals for members of the U.S. military.  In the lawsuit by the father of a deceased soldier, at which the members of the Westboro Church showed up displaying their insulting homophobic signs, the Supreme Court reversed a judgment in favor of the father for intentional infliction of emotional distress on the basis that neither the father, nor any of the other funeral attendees, could see the signs during the  funeral.    The signs were too far away from the funeral to be visible. Consequently, the Court held, the father and the attendees were not a captive audience. *Snyder v. Phelps,* 562 U.S. 443 (2011).

15.    By contrast, the protesters in front of the synagogue were placing their signs in direct view of the members of the synagogue as they entered, with their children, to participate in their Sabbath worship.  They were deliberately placing their signs there so that the synagogue members would see them; the synagogue members were not going out of their way to where the signs were displayed in order to see them.  The protesters were intentionally coming to the synagogue, targeting the synagogue members every Saturday morning, going where they knew they could find Jews to harass.

16.    The Beth Israel synagogue is located in a residentially zoned area of Ann Arbor.  The Supreme Court had previously sustained state laws which restricted

residential picketing.  The Supreme Court had also sustained the constitutionality of an injunction which placed reasonable time, place and manner restrictions on anti-abortion protesters in proximity to an abortion clinic, when the right to abortion was still deemed to be a constitutionally protected right, as was the right of the synagogue members under the Freedom of Religion Clause of the First Amendment to worship without being harassed.  *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994).

17.    After he concluded his legal research, Mr. Susselman felt reasonably confident that the protesters did not have an absolute First Amendment right to picket in front of the synagogue every Saturday morning using anti-Semitic signs which insulted and vilified the congregation members, even if commingled with signs addressing the Israeli-Palestinian conflict.  He prepared a legal memorandum explaining the First Amendment law and proposing a lawsuit against the protesters in federal court seeking issuance of an injunction placing reasonable time, place and manner restrictions on their conduct, e.g., requiring that they be a certain distance from the synagogue property; that they be prohibited from protesting during the time period when the Sabbath service was being conducted; and that the number of protesters, and the number of signs they used, be limited to a reasonable number.  The legal memorandum was provided to the synagogue and was transmitted to the synagogue's Board of Directors and it was distributed among the congregation members.

18.    Mr. Susselman, who was not a member of the synagogue, began attending

services at the synagogue to try to identify members of the congregation who would be willing to be named as plaintiffs in the lawsuit. After several weeks of discussion with members of the congregation, he succeeded in identifying two members to agree to be plaintiffs in the lawsuit, Marvin Gerber and Dr. Miriam Brysk, a Holocaust survivor. Dr. Brysk worshipped at an annex connected to the synagogue. She also had concerns about retaliation. She agreed to be a plaintiff on one condition – that if there were a trial, that she would be called as a witness so that she could testify regarding her experience during the Holocaust. Mr. Susselman promised her that he would do so.

19.     Representing Mr. Gerber and Dr. Brysk on a contingency fee basis, Mr. Susselman filed a lawsuit in the United States District Court in Detroit in December, 2019, naming five of the then protesters as defendants. (Case No. 19-13726) Photographs of the signs were attached to the Compliant. He also named the City of Ann Arbor as a defendant, based on its failure to enforce its sign ordinance against the protesters, which he claimed constituted "state action" by inaction. In addition to requesting an injunction placing reasonable time, place and manner restrictions on the protesters' conduct, he included several claims based on a number of federal civil rights statutes which make it unlawful to engage in certain conduct which targets people based on their ethnicity or religion. In the Complaint, he cited federal case law supporting each of the claims that the federal civil rights statutes had been violated by

the protesters.  He requested monetary damages against the protesters for violating these statutes.

20.     The Plaintiffs alleged in the Complaint, and the First Amended Complaint, that they experienced extreme emotional distress at seeing the signs in front of their house of worship as they entered to celebrate the Jewish Sabbath.  In the Complaint, and in the legal briefs filed in the lawsuit, they acknowledged that the protesters had a First Amendment freedom of speech right to express both their views regarding the Israeli-Palestinian conflict, as well as their anti-Semitic views regarding Jews.  They had the right to express these views on any public street they wished, anywhere in Ann Arbor, or in Michigan, or in the United States. Plaintiffs maintained, however, that the protesters did not have a First Amendment right to express these views in proximity to a Jewish house of worship, whose members had a countervailing right under the Freedom of Religion Clause of the First Amendment to practice their religion without being harassed and insulted directly in front of their house of worship.  They maintained that this right was not restricted just to Jews, but that hate speech in proximity to any house of worship, of any religion, was not protected by the First Amendment.  Would signs in front of a Catholic church on a Sunday morning accusing the worshippers of supporting pedophiles be protected by the Constitution, purportedly being about an issue of public concern, expressed in a public forum?  Would signs in front of a mosque on a Friday evening referring to the worshippers as camel jockeys and supporters of

Isis be protected by the Constitution, purportedly being about an issue of public concern, expressed in a public forum?  Would signs in front of a predominantly African-American church placed by the Ku Klux Klan on a Sunday morning using the N-word, or a photograph of a burning cross, and referring to alleged Black crime be protected by the Constitution, purportedly being about an issue of public concern, expressed in a public forum?  And what if this occurred not on just one day of worship, but for multiple days of worship, year after year?  At what point does freedom of speech cross a line into unprotected religious or racial harassment, and become unprotected "fighting words"?  *Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942).  Never?

21.    After the legal complaint was filed in the federal court in Detroit, it was assigned to the Hon. Victoria Roberts.  Early in the lawsuit, Judge Roberts entered an order imposing a protocol that no motions would be allowed to be filed unless concurrence of opposing counsel was requested, and if denied, the moving party would have to submit a two-page explanation of the parties' competing positions, and the court would only allow the motion to be filed if approved based on the letter.

22.    Mr. Susselman proposed to file a motion to request a preliminary injunction imposing reasonable time, place and manner restrictions on the protesters' conduct.  The defense attorneys opposed the motion, so he submitted a letter to the court setting forth the parties' respective positions.  The ordinary procedure for such a motion is that it must be filed early in the lawsuit; the moving party must demonstrate that the

client has a likelihood of prevailing on the merits; that failure to issue the injunction would cause the party irreparable harm; and that granting the injunction would not materially injure the other party. Judge Roberts denied Mr. Susselman the right to file the motion, although the standard procedure was to allow the filing of such a motion, and then to evaluate the motion on the merits, and deny the motion if one or more of the prerequisites were not satisfied. Instead, Judge Roberts pre-judged the motion and would not allow it to be filed.

23.     Mr. Susselman next proposed to file a motion for partial summary judgment against the City of Ann Arbor based on its failure to enforce its own sign ordinance against the protesters over a period of now 17 years. The motion requested a ruling that the ordinance was content and viewpoint neutral, was unambiguous and prohibited displaying any signs in the public right-of-way, and could be enforced without violating the protesters' First Amendment Rights. He again submitted a letter to Judge Roberts setting forth the positions of the parties. Again, Judge Roberts denied the plaintiffs permission to file the motion.

24.     Thereafter, Mr. Susselman proposed filing a motion requesting leave to file a Second Amended Complaint which would add a claim against Ann Arbor alleging that it was violating the Equal Protection Clause of the 14th Amendment by enforcing its sign ordinance against some residents and businesses in Ann Arbor, while failing to enforce the ordinance against the protesters. Another letter was submitted to Judge

15

Roberts setting forth the positions of the parties, and again Judge Roberts denied the plaintiffs permission to file the motion.  These were all standard procedural motions which would routinely be granted in a federal court, yet Judge Roberts was denying the plaintiffs permission to file any of them.

25.    The defendants proceeded to file motions to dismiss the lawsuit on two grounds.  First, they claimed that the plaintiffs did not have standing to sue, on the basis that their avowed emotional distress was not sufficient to permit them to sue. The second basis was that the protesters' conduct was protected by the First Amendment, and therefore none of the claims pled in the legal complaint, or the amended complaint, stated valid legal claims.

26.    After the filing of briefs and counter-briefs, Judge Robets issued her decision.  She dismissed the lawsuit on the basis that the plaintiffs did not have standing to sue, stating that their emotional distress did not constitute a "concrete" injury.  She then proceeded to state that the claims pled in the amended complaint were also invalid, because the defendants' conduct was protected by the First Amendment, stating: "[T]he First Amendment more than protects the expressions by Defendants of what Plaintiffs describe as 'anti-Israeli, anti-Zionist, an[d] antisemitic.' Peaceful protest speech such as this – on sidewalks and streets – is entitled to the highest level of constitutional protection, even if it disturbs, is offensive, and causes emotional distress."  In making this latter ruling, Judge Roberts exceeded her jurisdictional authority, because once she

ruled that the plaintiffs did not have standing to sue, she had no authority to address the merits of the legal claims themselves. The Supreme Court had held in *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83 (1998), that if plaintiffs do not have standing to sue, there is nothing further for a federal court to rule on.  Judge Roberts in fact stated:  "Plaintiffs do not sufficiently allege Article III standing.  The Court lacks subject matter jurisdiction and must dismiss this case."  Nonetheless, Judge Roberts addressed the merits of the First Amendment issue anyway, stating that the protesters' speech was entitled to "the highest level of constitutional protection" Why did she insist on addressing an issue on the merits which she acknowledged she did not have jurisdiction to address once she ruled that the plaintiffs did not have standing to sue?

27.    Reading Judge Roberts' ruling, Mr. Susselman thought that her assertion that the plaintiffs' emotional distress at seeing anti-Semitic signs in front of their synagogue was not a "concrete" injury was absurd.  What was she saying, that she did not believe their emotional distress was genuine?  How would she know that?  And, if genuine, on what basis was it not "concrete"?  In *Bucholz v. Meyer Njus Tanick, PA,* 946 F.3d 855 (6th Cir. 2020), the Sixth Circuit recognized that the emotional distress experienced by the recipient of repeated telephonic contacts by a debt collector could qualify as a "concrete" injury affording the recipient standing to sue.  In *Losch v. Nationstar Mortg.,* 995 F.3d 937 (11th Cir. 2021), the Court ruled that the emotional distress caused by an inaccurate credit report qualifies as a "concrete" injury affording

standing to sue.  In *Clemens v. ExecuPharm Inc.,* 48 F.4th 146 (3d Cir. 2022), the Court ruled that the emotional distress caused by concerns about potential future identity theft constitutes a "concrete" injury affording standing to sue.  In *Robins v. Spokeo, Inc.,* 867 (F.3d 1168 9th Cir. 2017) (on remand from the Supreme Court), the 9th Circuit Court of Appeals ruled that the emotional distress caused by concerns of future unemployment attributable to misinformation contained in a credit report regarding marital status and income qualified as a "concrete" injury affording standing to sue. Yet, according to Judge Roberts, the emotional distress experienced by Jewish worshippers, harassed, insulted, and demeaned on a weekly basis, over a period of 16 ½ years, by visible anti-Semitic messages in front of their house of worship did not rise to the level of concrete injuries caused by repeated telephone calls by a debt collector; or inaccurate information contained in a credit report; or concerns about future identity theft.  Why was the emotional distress of two Jews seeing anti-Semitic signs in front of their synagogue less "concrete" than that of debtors harassed by debt collectors, or consumers whose identity had been stolen or whose credit report contained inaccurate information?  Why was the emotional distress of Jews deficient in the eyes of Judge Roberts? Judge Roberts' ruling struck Mr. Susselman as blatantly anti- Semitic itself – an anti-Semitic statement in a federal decision.

28.    In her decision, Judge Roberts, who is African-American, stated that the plaintiffs had failed to cite a single case in which the emotional distress of the plaintiff

was deemed sufficient in the context of a First Amendment defense to grant standing to sue.  Mr. Susselman filed a motion for reconsideration, pointing out that this statement was erroneous.  He had cited a decision from the federal court in the Southern District of Ohio, *Wells v. Rhodes,* 928 F. Supp.2d 920 (S.D. Ohio 2013), in which two Caucasian teenagers had set fire to a cross on the lawn of a house which was being rented by an African-American family.  The family sued the teenagers for violating their civil rights, citing the very same statutes Mr. Susselman had cited in the lawsuit against the protesters.  The federal judge in that case noted that none of the members of the African-American family had suffered a physical or medical injury; the property was not damaged, which the family did not own in any event, they were renting.  Their only injury was the emotional distress they suffered seeing a burning cross in front of the house.  The judge did not dismiss the lawsuit, saying that the emotional distress of the members of the African-American family did not constitute a "concrete" injury.  He did not rule that they did not have standing to sue.  Moreover, the Supreme Court had already held in *Virginia v. Black,* 538 U.S. 343 (2003), that the act of burning a cross was protected by the free speech provision of the First Amendment and could not be criminalized without evidence that the individual committing the act did so with the intention of threatening African-Americans.  The judge in the Ohio case, rather than dismissing the lawsuit, ruled in favor of the plaintiffs and granted them summary judgment in their favor, based on the same civil rights statutes, 42 U.S.C. § 1982 and §

19

1985(3). which plaintiffs were relying on. This was a case in which the plaintiffs had been granted standing to sue based on their emotional distress, in a context involving the First Amendment. For the Jewish congregants, seeing the flag of Israel with the Jewish Star of David defaced with a symbol meaning "Prohibited," with the Holocaust fresh in their memories, would be just as traumatizing for Jews as would seeing a burning cross be for African-Americans. The case had been cited in plaintiffs' brief opposing the defendants' motions to dismiss. It was recited in plaintiffs' motion for reconsideration. Yet Judge Roberts denied the motion for reconsideration without once addressing the *Wells* decision, and without explaining how that case was distinguishable from the plaintiffs' case, other than that the plaintiffs in the Ohio case were African-American, and the plaintiffs in the case before her were Jewish.

29.     In addition, included among the state law claims which Mr. Susselman had pled in the complaint was a claim under the Michigan Elliott-Larsen Civil Rights Act, which prohibits discriminating against individuals based on their race, ethnicity or religion. Judge Roberts had issued a landmark decision ruling that the statute could be used by a group of Black teenagers who were being harassed in a Michigan high-school by other students using racial epithets. *Williams v. Port Huron Area School Dist. Board of Education,* Case No. 06-14556 (E.D. Mich. 2010). She also held that this created a hostile environment for the Black students and that the school district could be held liable under the same statute for failing to take adequate measures to

20

prevent the creation of the hostile environment.  Judge Roberts did not rule in that case that the racial epithets were protected by the First Amendment, nor that the emotional distress of the Black students did not constitute a concrete injury.  Mr. Susselman pled the same claim in the complaint he had filed, applying the same statute and asserting that the failure of the City of Ann Arbor to enforce its sign ordinance against the protesters also created a hostile environment for the Jewish congregants.  Rather than apply her prior ruling to the comparable claim asserted by the Jewish plaintiffs, Judge Roberts declined to assert jurisdiction over any of the state law claims, which a federal judge has the prerogative of doing.  But why did she exercise that prerogative, in light of the fact that she had not declined jurisdiction over the same state law claim when it involved Black students?  Why didn't she assert jurisdiction and apply her ruling in the high school case to the harassment of Jews as they entered their synagogue to participate in the Sabbath service?  Why didn't the failure of the City of Ann Arbor to enforce its sign ordinance create a hostile environment, in violation of the Michigan statute, as she had held the failure of the school district to prevent the harassment of the Black students created a hostile environment?

30.    Judge Roberts' ruling that the conduct of the protesters was protected by the First Amendment had no bearing on the question of whether the plaintiffs' emotional distress constituted a concrete injury affording them standing to sue.  A litigant can suffer emotional distress affording standing to sue regardless whether the

speech causing the emotional distress is protected by the First Amendment, as did Rev. Falwell with respect to the Hustler Magazine cartoon depicting him having sexual intercourse with his mother in an outhouse. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). The Supreme Court held that the cartoon, as offensive as it was, constituted protected speech under the First Amendment. The ruling did not diminish Falwell's emotional distress, nor his standing to sue. The emotional distress of the plaintiffs caused by seeing the anti-Semitic signs in front of their house of worship every Saturday morning for 16 ½ years was no less "concrete" than Falwell's, regardless Judge Roberts' conclusion – rendered even though once she ruled that the plaintiffs did not have standing to sue, she no longer had jurisdiction to address the merits of the First Amendment issue – that the signs were "more than protected" by the First Amendment.

31. Mr. Susselman filed an appeal in the Sixth Circuit Court of Appeals, contesting Judge Roberts' ruling that the emotional distress of the plaintiffs did not constitute a "concrete" injury affording them standing to sue. In the appellate brief, he raised the issue regarding the failure of Judge Roberts to address the *Wells* decision. He asked, in failing to address the *Wells* decision, which he had cited twice, was Judge Roberts claiming that the emotional distress of Jews was not as significant as that of African- Americans? The panel of appellate judges who presided over the oral argument consisted of Chief Judge Jeffrey Sutton and judges David McKeague and Eric

22

Clay.  Mr. Susselman had barely begun his oral argument on April 27, 2021, when Judge Clay, who is African-American, interrupted him  and asked, "Mr. Susselman, where did you find the temerity to accuse a federal judge of being racist?"  Mr. Susselman was flabbergasted.  Momentarily flummoxed, he gathered his thoughts and responded that he believed Judge Clay was referring to the *Wells* decision, which Judge Roberts had failed to address, although it was a central case in the lawsuit.  Judge Clay responded that there could be a host of reasons why a judge would not discuss a particular case.  Mr. Susselman responded, stating that it was a significant case, yet Judge Roberts had not even addressed it. Judge Clay rejoindered that it did not matter whether the case was significant.  At this point, Judge Sutton intervened and said that Mr. Susselman was welcome to go down that road if he wished, but he would have a rough row to hoe with the Court.  He then suggested that Mr. Susselman apologize. Mr. Susselman was stunned, and felt like Shylock being reprimanded in a Venetian court for having had the audacity to challenge the integrity of a Christian debtor.  He was stuck between a rock and a hard place, so he abjectly apologized, stating that it was not his intention to accuse Judge Roberts of racism, but to make a point on behalf of his clients.  Judge Clay then offhandedly told him to proceed with his argument.

32.    The Court issued a 2-1 decision reversing Judge Roberts' ruling that the plaintiffs' emotional distress did not create a sufficiently concrete injury to afford them standing to sue, stating, "All in all, the congregants have standing to sue because they

have credibly pleaded an injury – extreme emotional distress – that has stamped a plaintiff's ticket into court for centuries." *Gerber v. Herskovitz,* 14 F.4th 500, 506 (1921). In his combined dissent/concurrence, Judge Clay dissented from the majority ruling on standing, agreeing with Judge Roberts that the plaintiffs' emotional distress was not sufficient to give them standing to sue. The Court proceeded to rule that although the plaintiffs had standing to sue, the protesters' signs, including the anti-Semitic signs, were addressing a matter of public concern in a public forum, and were therefore protected by the First Amendment, and were immune from even obtaining an injunction placing reasonable time, place and manner restrictions on where, when and how the signs were deployed.  The Court failed to even address the issue relating to Ann Arbor's failure to enforce its sign ordinance against the protesters. In light of Judge Sutton's recommendation that Mr. Susselman apologize, apparently a group of neo-Nazi, Holocaust denying protesters had a First Amendment right to harass Jews as they entered their house of worship to pray, but the First Amendment right of a Jewish attorney advocating for the rights of his Jewish clients in a federal court of law, having the temerity to question the motives of an African-American federal judge for ruling that the emotional distress of the Jews being harassed does not qualify as a "concrete" injury, is circumscribed by the purported dictates of propriety.

33.    Mr. Susselman decided to file a petition for *en banc* review by the entire Sixth Circuit Court of Appeals.  Before he could file the petition, Mr. Gerber terminated

Mr. Susselman as his attorney, accusing him of losing the appeal by insulting Judge Roberts and failing to apologize quickly enough. He retained a new attorney to file the petition for him. Both petitions for *en banc* review were denied by the Court, with not a single judge on the Court voting in favor of rehearing.

34.     Mr. Susselman continued the case representing only Dr. Brysk and filed a petition for *certiorari* in the Supreme Court, as did the new attorney representing Mr. Gerber. Mr. Susselman argued that anti-Semitic speech in proximity to a Jewish house of worship was not speech addressing a matter of public concern and therefore was not entitled to First Amendment protection. He contended that the same was true of hate speech in proximity to any house of worship of any religion. He thought that surely the Supreme Court would appreciate that the Sixth Circuit's decision infringed on the congregants' freedom of religion under the First Amendment. Was the freedom of religion less entitled to protection than a woman's then constitutional right to obtain an abortion, which the Court had held could be protected against anti-abortion protesters using an injunction, even when the protesters did not qualify as state actors? *Madsen v. Women's Health Center, Inc., supra.* The Supreme Court, however, in a confidential vote not available to the petitioners, denied both petitions.

35.     The fact that the Supreme Court denied the petitions for *certiorari* was not a decision on the merits and did not constitute affirmance of the Sixth Circuit's decision rejecting the plaintiffs' 1st Amendment argument. *See Young v. Fire Ins. Exchange,*

25

338 U.S. 912, 919 (1950) ("Inasmuch …as  all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should be granted, this Court has rigorously insisted that such a denial carries with it no implications whatever regarding the Court's views on the merits of a case which it has declined to review.  The Court has said this again and again; again and again the admonition has to be repeated.")

36.    Emboldened by their victory, the protesters added a new sign to their panoply of anti-Semitic signs:  "Israel attacked America 9/11/2001."  To add insult to injury, the protesters, while the petitions for *certiorari* were pending, filed a motion before Judge Roberts requesting that they be awarded attorney fees. The general law with regard to an award of attorney fees in cases involving constitutional or federal civil rights is that they are typically awarded to plaintiffs who prevail on one or more of the issues they raise.  The threshold for awarding attorney fees to prevailing defendants, however, is higher.  A prevailing defendant must argue and prove that the lawsuit was frivolous and entirely without merit in order to justify being awarded attorney fees.  The Supreme Court had held that just because a plaintiff has lost a lawsuit on the merits, it did not mean that the lawsuit was frivolous. *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,* 434 U.S. 412 (1978); *Hughes v. Rowe,* 449 U.S. 5 (1980).  It had also held that awarding attorney fees to prevailing plaintiffs' attorneys in such cases, and not awarding prevailing defendants attorney fees, is

intended to encourage attorneys to take such cases, despite the risk, in order to protect the constitutional and civil rights of American citizens. *Riverside v. Rivera,* 477 U.S. 561 (1986). Since such cases are generally taken on a contingency fee basis, attorneys representing plaintiffs seeking to vindicate their constitutional and/or civil rights will not be willing to take the risk of representing such plaintiffs if they can be penalized by awarding the defendants attorney fees, which are generally paid on an hourly basis, to the defense attorneys. Even though the plaintiffs lost on the merits regarding the scope of the First Amendment protection in this context, and had won on the issue of standing, surely a lawsuit seeking an injunction placing reasonable time, place and manner restrictions on the use of anti-Semitic signs by a bunch of neo-Nazis to harass Jews as they entered their house of worship every Saturday morning for over 17 years could not be regarded as a frivolous lawsuit. Surely even Judge Roberts would not agree that the lawsuit was frivolous. The Court of Appeals had even asserted as much in its decision, stating, "Plaintiffs' claims may be wrong and ultimately unsuccessful, but the fourteen pages that the concurrence devotes to analyzing the constitutional issues belie the conclusion that they are frivolous." 14 F.4th at 508.

37.     Judge Roberts, however, agreed with the protesters that the lawsuit was "frivolous." She awarded the neo-Nazi, anti-Semitic protesters $158,721.75, to be paid by Mr. Gerber, Dr. Brysk, and Mr. Susselman "jointly and severally." Judge Roberts was requiring that Dr. Brysk, a Holocaust survivor, pay a group of anti-Semitic, neo-

Nazis $158,721.75 for the privilege of harassing and ridiculing her as she entered her Jewish house of worship to pray. Moreover, Judge Roberts not only awarded them attorney fees for the time they expended on the First Amendment issue, on which they had prevailed; she awarded them attorney fees for the time they expended on the standing issue, an issue on which they did not prevail, an issue on which they had lost.

38.    By this point Mr. Susselman was convinced that Judge Roberts' rulings were motivated either by anti-Semitic sentiments, or by anti-Israel, pro-Palestinian sentiments, or by both.  How else to explain her multiple adverse rulings against the Jewish plaintiffs – her refusal to allow them to file standard procedural motions from the very inception of the lawsuit; her ruling that their emotional distress did not constitute a "concrete" injury so that they did not have standing to sue; and now this, an outrageous award of attorney fees to anti-Semitic, neo-Nazis.  He was reminded of the plight of Dr. Michael Siegel, a Jewish attorney who had complained to the police regarding the treatment of one of his Jewish clients, who was then forced by Hitler's Brown Shirts to march through the streets of Munich on March 10, 1933, with a sign draped around his neck, stating, "Ich bin Jude, aber ich werde mich nie mehr bei der Polizei beshweren" – "I am a Jew, but I will never again complain to the police."  (*See* copy of photograph attached as Exhibit 4.)

39.    Mr. Susselman wishes to dispel any suggestion that his claim that Judge Roberts was biased against his clients was motivated by racism against African-

Americans. He had supported the struggle for civil rights of African-Americans since he was in elementary school. He has, throughout his life, been vehemently opposed to racism of any kind, against any racial, ethnic or religious group, and has acted throughout his life in accordance with his convictions. He has been practicing law for over 45 years, in the course of which he has represented African-Americans in litigation in federal and state court, including representing an African-American female police officer employed by the Pontiac Police Dept. in a lawsuit in federal court alleging she had been discriminated against based on her race and gender, a lawsuit which resulted in a favorable monetary settlement for the plaintiff. He had represented an African-American widow of an African-American public school teacher who sued in a Michigan circuit court claiming that the school district had failed to honor a life insurance policy pursuant to which she was entitled to life insurance proceeds, which resulted in a judgment in her favor. In addition, the undersigned represented an Asian-American organization titled "Americans Citizen For Justice" seeking to obtain justice for Vincent Chin, a Chinese-American who was brutally beaten to death with a baseball bat in 1982 by two laid-off auto-workers who thought he was a Japanese-American, and who were sentenced in the Wayne County Circuit Court to probation and payment of a fine of $3,000.00.

Mr. Susselman's claim that Judge Roberts' rulings were motivated by bias was not motivated by his own racial animus towards Judge Roberts; nor by any retaliatory

motive for the adverse decision which was entered by her or the Sixth Circuit against his clients and himself.  It was motivated by his commitment to seeing that justice is done, regardless of the race, ethnicity, or religion of the litigants, and regardless of the race, ethnicity, or religion of the presiding judge.  On the lintel above the United States Supreme Court, the following message is engraved:  "Equal Justice Under Law."  This means equal justice regardless of the race, religion, or ethnicity of the litigants or their attorney, and regardless of the race, religion, or ethnicity of the presiding judge.  Equal justice if the litigants are African-American, and/or their attorney is African-American, and the judge is Caucasian and/or Jewish; equal justice which demands the abrogation of any appearance of impropriety.  And it applies with equal force to an African-American judge presiding over a legal proceeding involving litigants who are Caucasian and/or Jewish, and whose attorney is Caucasian and/or Jewish.  The fact that Judge Roberts is African-American did not insulate her from criticism that she had failed to adhere to her obligation to comply with the requirement of equal justice to all.

40.    Mr. Susselman filed an appeal in the Sixth Circuit.  In the course of the appeal, he filed a reply brief to the defendants' defense of the attorney fee award in which he argued that Judge Roberts' rulings, taken together in their entirety – including her refusal to allow the plaintiffs to file routine motions; her assertion that their emotional distress did not constitute a "concrete" injury; and her award of attorney fees in the amount of over $158,000 to a group of anti-Semitic neo-Nazis - had the distinct

appearance of being anti-Semitic.  W h i l e  under 28 U.S.C. § 352(b)(1)(A)(ii), a claim

of judicial bias may not be "directly related to the merits of a decision or procedural

ruling," there is a recognized exception to this limitation.  As the Supreme Court stated

in *Liteky v. United States,* 510 U.S. 540, 545 (1994), in the context of a motion for

recusal:

> [J]udicial remarks during the course of a trial that are critical or
> disapproving of, or even hostile to, counsel, the parties, or their cases,
> ordinarily do not support a bias or partiality challenge. They *may* do so if
> they reveal an opinion that derives from an extrajudicial source; and they
> *will* do so **if they reveal such a high degree of favoritism or antagonism
> as to make fair judgment impossible**. (Italics in the original; emphasis
> added.)

Justice Kennedy, stated in a concurrence, joined by Justices Blackmun, Stevens

and Souter, *id.* at 558:

> The statute does not refer to the source of the disqualifying partiality.  And
> placing too much emphasis upon whether the source is extrajudicial or
> intrajudicial distracts from the central inquiry.  **One of the very objects
> of law is the impartiality of its judges in fact and appearance.**  So, in
> one sense, it could be said that any disqualifying state of mind must
> originate from a source outside law itself.  That metaphysical inquiry,
> however, is beside the point.  **The relevant consideration under § 455(a)
> is the appearance of partiality … , not where it originated or how it
> was disclosed.** …  (Emphasis added; citation omitted.)

41.     In his reply brief, Mr. Susselman argued that Judge Roberts' rulings, taken

together in their entirety, came within the exception set forth in *Liteky.*  He focused on

a particular statement Judge Roberts had made in her first decision, ruling that the

plaintiffs did not have standing to sue because their emotional distress was not

"concrete" enough, after which she stated: "Indeed, the First Amendment *more than* protects the expressions by Defendants of what Plaintiffs describe as 'anti-Israeli, anti-Zionist, an[d] antisemitic.'" (Italics added.)  But why would *this particular speech* be more protected than other speech, he asked? Speech is either protected or it is not.  There is no hierarchy of protected speech. There were three possibilities.  Judge Roberts could have been referring to the anti-Semitic speech as deserving more protection; or to the anti-Israeli, anti- Zionist speech as deserving more protection; or to the combination of the two as deserving more protection.  But a federal judge should not allow her personal sentiments regarding international events – concealed sentiments which go unrebutted - to influence her decisions regarding the rights of the litigants before her.

42.     Appreciating that most people, including appellate judges, given the history of slavery, racism, and persecution of African-Americans in this country would be reluctant to conclude that an African-American judge was herself racist or anti-Semitic, Mr. Susselman offered empirical evidence that such an explanation was not beyond the realm of possibility. The evidence was offered in the brief not to prove that Judge Roberts was anti-Semitic, but to rebut the assumption that she could not possibly be anti-Semitic.  He noted in the brief that a 2016 survey by the Anti-Defamation League indicated that the rate of anti-Semitism was significantly higher in the African-American community (23%) than in the general population (14%), and attached a copy

of the survey to the brief as an exhibit.  He noted that a study published in the Social Science Journal 46 (2009), analyzing James Baldwin's 1967 essay, "Negroes Are Anti-Semitic Because They Are White," concluded:  "One analysis indicates that while some anti-Semitic attitudes are strongly associated with anti-White attitudes, African-Americans are still significantly more likely than White, Latino, and Asian groups to express anti- Semitic views when the level of anti-White sentiment is held constant (p < .05)."  https://scholar.harvard.edu/files/jsimes/files/ssj_simes_2009.pdf.  He noted that  this higher rate of anti-Semitism in the African-American community had been linked to the Israeli-Palestinian conflict and the tendency of African-Americans to identify with the Palestinians as the victims of Israeli oppression, which they equate to their oppression as the victims of slavery and segregation under the Jim Crow laws. ("We Know Occupation: The Long History of Black Americans' Solidarity with Palestinians,"    https://www.politico.com/news/magazine/2021/05/30/black-lives-matter-palestine-history-491234).  He noted that in the publication "Black Antisemitism in America: Past and Present," https://www.inss.org.il/publication/black-antisemitism/, the author wrote, at *19: "Although the [Black Lives Matter] movement has generally levelled its charges at 'Zionists,' frequently antisemitism appears undisguised. Updating the centuries-old blood libel, BLM marchers chanted, 'Israel, we know you kill children too!' and signs proclaimed, 'Defend Gaza: the New Warsaw Ghetto' – the Jews cast as the Nazis annihilating innocent people of color (Lapkin, 2020; Torok,

2021). Addressing a conference on Human Rights in 2015, Patrisse Cullors, one of the three co-founders of the movement, characterized the Palestinian cause as our generation's South Africa' and urged the audience to 'step up boldly and courageously to end the imperialist project that's called Israel,' concluding that 'we're doomed' if Israel is not brought to an 'end' (Chamberlain, 2021)." Mr. Susselman stated that the stigma of this country's reprehensible history of slavery and its continuing residual effects did not give Judge Roberts the liberty to express her own bias in her rulings, any more than the rulings of a Caucasian judge which had the distinct appearance of anti-Black bias would be tolerated. He stated that he was by no means claiming that Judge Roberts was a neo-Nazi, or that she consciously or subconsciously supported Hitler's Final Solution. He asserted, however, that if Judge Roberts' rulings, and her statement that the protesters' speech was "more than protected" by the First Amendment, were in any way the product of empathy with the Palestinian cause and/or antipathy for Israel and Zionism, those rulings were improper.

43.    The Court issued a decision, written by Chief Judge Sutton, affirming the attorney fee award, agreeing that the lawsuit was "frivolous." In the decision, Judge Sutton wrote the following:

> Lastly, Susselman, of his own accord, accuses the district court of antisemitism. The basis for this serious allegation? A "series of questionable rulings." … The only external source for the allegation is a study supposedly finding higher-than average rates of antisemitic attitudes in the African American community. From this, Susselman concludes that

the district judge – who is African American – must have been biased against the congregants.  This argument rests on offensive, essentialist stereotypes.  It involves enormous logical leaps.  And it disserves Susselman's client by distracting from the merits of the fee issue.  If this is the quality of Susselman's advocacy, the fee award hardly comes as a surprise.  Susselman's bias arguments "find no support in the record," … and are "not well received[.]"

These statements totally distorted the argument Mr. Susselman was making.

First, among the "questionable rulings" was a flagrantly anti-Semitic ruling by Judge Roberts that the emotional distress of two Jewish congregants caused by seeing anti-Semitic signs in front of their synagogue every Saturday morning for over 17 years did not qualify as a "concrete" injury.  Second, not only one study was cited reporting that there was a higher than average degree of anti-Semitism in the African-American community. Two were cited.  Third, the studies were cited not to prove that Judge Roberts "must have been biased against the congregants," but to counter the instinctive response that it was not possible that an African-American judge could be biased.  Fourth, the reference to the studies was made *in conjunction* with the reference to Judge Roberts' multiple "questionable rulings."  Fifth, while Judge Sutton denounced the studies as "offensive essentialist stereotypes," he ruled that the offensive essentialist stereotypes being used by the anti-Semitic neo-Nazis who were harassing the Jewish congregants in front of their synagogue were protected by the First Amendment. Sixth, his claim that Mr. Susselman's accusation of bias against Judge Roberts "distract[ed] from the merits of the fee issue" was specious, since he had already ruled that the fee

award was warranted because the lawsuit was "frivolous" – the contention that Judge Roberts was biased did not distract him from a decision he had already made.  He proceeded to accuse Mr. Susselman, in a federal decision, of being an unethical, unprofessional, disingenuous attorney whose advocacy is not to be trusted.

44.     Mr. Susselman filed a petition for *certiorari* in the Supreme Court seeking to overturn an attorney fee award to a group of anti-Semitic neo-Nazis as they continued to harass and vilify Beth Israel's Jewish congregants – an award which was not only outrageous, but which was contrary to numerous Supreme Court decisions which discussed the parameters of the bases for awarding attorney fees against a plaintiff in a lawsuit seeking to vindicate the constitutional and/or federal civil rights of an American citizen.  In the petition for *certiorari*, he addressed Judge Sutton's affirmance of the attorney fee award and his retaliatory comments against him for having raised the subject of Judge Roberts' bias, stating:

> Rather than dealing with the claim that Judge Roberts' rulings had the distinct appearance of being biased against plaintiffs and their attorney, the Court retaliated against Mr. Susselman, in effect accusing him of being racist for having even raised the issue. But Judge Roberts was not immune from having her rulings challenged as violating the Code of Conduct of United States Judges because she is African-American. Her race was not the issue; her conduct was.  The lintel of the Supreme Court states, "Equal Justice Under Law"–equal justice regardless the race, religion, ethnicity, gender, or age of the litigants, as well as of the judge(s) presiding over the case.  Judge Roberts' race did not give her license to allow her biases, whether conscious or subconscious, to play any role in her rulings against plaintiffs or their attorney.

On August 26, 1963, standing in front of the Lincoln Memorial, Dr. King gave his eloquently moving "I have a dream speech": "I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character." It is by the content of our character that we all should be judged, with no presumptions *for* or against us based on the color of our skin, our race, our religion, our ethnicity, our gender, or our age. None of these characteristics should be a basis for any adverse judgments; nor should they be a basis for *refraining* from judgment. Expiation for the sins of slavery and past discrimination will not be accomplished by introducing double standards. Judge Roberts' race or skin color did not vitiate the issue regarding whether her decisions showed a distinct bias against plaintiffs and their attorney based on their Jewish religion or heritage. What was at issue was the content of her character, and that content was revealed in the only available evidence - her distinctly biased rulings. J'accuse!

45.    The Supreme Court, once more, denied the petition. Mr. Susselman filed a petition for rehearing, refusing to accept that such a gross injustice against Jewish Americans could occur in the country in which he was raised, a country which prided itself on its just and fair treatment of minorities. In the petition for rehearing, he stated:

During the four years that the case was in the courts, the Supreme Court ruled that the City of Boston violated the Constitutional rights of a Christian organization by denying its request to fly a Christian flag from a flagpole in front of the Boston City Hall. *Shurtleff v. City of Boston, Mass.,* 142 S. Ct. 1583 (2022).

It ruled that a public school district violated the religious rights of a high school football coach by prohibiting him from reciting a religious prayer on the 50-yard line after every football game. *Kennedy v. Bremerton School Dist.,* 142 S. Ct. 2407 (2022).

It ruled that the religious rights of a Christian postal worker were violated by UPS because it failed to accommodate his request not to work on Sundays. *Groff v. DeJoy,* No. 22-174, 143 S. Ct. 2279 (2023).

It ruled that the State of Colorado violated the free speech rights of a Christian wedding announcement designer by ordering her to design

wedding announcements for gay couples. *303 Creative LLC v. Elenis,* No. 21-476, 143 S. Ct. 2298 (2023).

All of these American citizens have rights protected by the Constitution or federal law, the Supreme Court states.

But the right of Jews to enter their house of worship without being insulted and verbally spat upon, according to the federal courts, is not protected by the Constitution or federal law.

Their lawsuit is ruled "frivolous" and they must compensate the anti-Semitic Holocaust denying protesters their attorney fees.

The federal courts, including the Supreme Court, issue decisions expressing their concern to protect the Constitutional rights of Christians.

But to the Jews, they issue decisions which say, "You must compensate your harassers for the time their attorneys spent reviling you!"

On October 7, 2023, members of the terrorist organization Hamas invade Israel, and indiscriminately slaughter Israeli men, women and children. Perhaps they were inspired by the commitment of the U.S. government and its courts to protect Jews.

Enough is enough.

In several speeches following the Hamas massacre, President Biden stated that silence in the face of anti-Semitism constitutes complicity.

What message does the silence of the Supreme Court convey?

When will the Supreme Court stand by George Washington's pledge in 1790 to the Hebrew Congregation of Newport, Rhode Island, that, "the Government of the United States, which gives to bigotry no sanction, to persecution no assistance requires only that they who live under its protection should demean themselves as good citizens, in giving it on all occasions their effectual support."

Did the plaintiffs who sued the anti-Semitic protesters seeking protection against their anti-Semitic slurs as they sought to exercise their freedom of worship fail to "demean themselves as good citizens" as not to be deserving of the protection of the United States government, or of the

Supreme Court?

Did not the award of attorney fees give assistance to persecution by a group of anti-Semites?

The Jewish plaintiffs did the civilized thing and sought protection in the courts for their right to worship without being verbally harassed and to redress their grievance under the First Amendment.

For this they get penalized.

Would the courts prefer that next time the Jews resort to self-help?

The Supreme Court's response?  Petition for rehearing denied.

46.     In Mr. Susselman's opinion, the decisions in this case represent the most anti-Semitic rulings in the history of American jurisprudence.  Not since the lynching of Leo Frank in Georgia in 1915, and the rejection in 1939 of the M.S. St. Louis, with its cargo of Jewish refugees, forced to return to Europe to die in Hitler's death camps, have Jews been treated so shabbily and unjustly by the United States.

47.     On October 18, 2022, Mr. Susselman filed a Formal Complaint of Judicial Misconduct by Judge Roberts with the Sixth Circuit Court of Appeals, charging that by virtue of the statements in her decisions which, taken together, had the distinct appearance of being anti-Semitic and/or anti-Israel she had violated the Canons of the Code of Conduct of United States Judges.  He requested that, pursuant to Rule 26 of the Rules For Judicial-Conduct And Judicial-Disability Proceedings, that the Chief Judge submit a request to Chief Justice Roberts that the Complaint be transferred to the judicial council of another Circuit. In a footnote at the end of the Formal Complaint,

Mr. Susselman stated: "To preserve the confidentiality of this Complaint, the undersigned has not served a copy of the Complaint on any of the attorneys of record who have appeared in either appeal. If the Court believes that the undersigned has an obligation to provide opposing counsel with a copy, he requests that the Court so advise him and he will serve a copy on each of the attorneys of record." The Court did not direct Mr. Susselman to provide any of the attorneys of record with a copy of the Formal Complaint, and, to the best of his knowledge, none of the attorneys were provided a copy.

48.     On September 7, 2023, Chief Judge Sutton issued a Memorandum And Order dismissing the Formal Complaint, without honoring Mr. Susselman's request that the Complaint be referred to another Circuit Court of Appeals. On October 3, 2023, Mr. Susselman filed a petition in the Sixth Circuit Court of Appeals requesting that Judge Sutton's Memorandum and Order, and the original Formal Complaint, be reviewed by a judicial council of the Sixth Circuit. On March 26, 2024, the Court issued an Order affirming Judge Sutton's dismissal of the Formal Complaint against Judge Roberts, and informed Mr. Susselman that there was no further avenue for him to have his Formal Complaint of Judicial Misconduct reviewed.

49.     Miriam Brysk passed away on May 28, 2022. She did not live to see the worst massacre of Jews since the Holocaust on October 7, 2023, by Hamas in Israel, and the abduction of over 100 Israelis. After the Hamas massacre, Mr. Susselman

returned to Beth Israel synagogue to see what new signs the protesters may be using. They had added two new signs: "Anti- Semitism, Always Earned, Never Given"; and "Gas Chambers? REALLY?!" (Photographs of the new signs are attached as Exhibit 5.)

The protesters are still there, with their signs, every Saturday morning, protected by the Constitution.

50.    As stated above, on July 3, 2024, Mr. Susselman received an email from the Michigan Attorney Grievance Commission. Attached to the email was a Request For Investigation which had been filed against him two months earlier, on April 30, 2024, by an individual named Michelle Kinnucan, whom he did not know, had never communicated with, and had never represented in a legal proceeding. (A copy of the Request is attached as Exhibit 6.) Ms. Kinnucan lived in Washington state, several thousand miles from Michigan, where the lawsuit against the protesters had been litigated. It had been filed by Ms. Kinnucan one month after the Sixth Circuit had sent Mr. Susselman its letter, dated March 26, 2024, informing him that the Court was affirming Judge Sutton's dismissal of his Formal Complaint against Judge Roberts, and that he had no further avenue for review of the Formal Complaint or of Judge Sutton's dismissal of the Formal Complaint. As noted above, in order to preserve its confidentiality, Mr. Susselman had never provided a copy of his Formal Complaint against Judge Roberts to any of the attorneys of record. Was the temporal proximity of

Ms. Kinnucan's filing of her Request for Investigation one month after the Sixth Circuit had informed Mr. Susselman that the dismissal of the Formal Complaint against Judge Roberts was the end of the road, a mere coincidence?

51.     In the Request, Ms. Kinnucan accused Mr. Susselman of violating several of the MRPC based on some of the statements he had made in his appellate briefs related to the lawsuit against the protesters in front of Beth Israel synagogue, in which he claimed that Judge Roberts had displayed anti-Semitic bias against Mr. Susselman's clients.  Mr. Susselman did not know who Ms. Kinnucan was.  He had never spoken to her or communicated with her in any way.  He had never met her.  He had never represented her in any legal matter.  She had not been involved, to his knowledge, in any of the events related to the synagogue protests.[2]  How had she learned about the lawsuit and the appeals which followed years after she had left Michigan, and how had she obtained copies of the briefs and court decisions, referenced throughout her Request?  Mr. Susselman was flummoxed by the Request filed by a total stranger regarding a legal proceeding she had nothing to do with.

52.     Mr. Susselman requested an extension of the due date of his Answer to the Request, which was granted.  He filed his Answer to Ms. Kinnucan's Request on August

---

[2] Mr. Susselman later learned from Miriam Brysk's widowed husband, Henry Brysk, that Ms. Kinnucan had lived in Ann Arbor in 2003, when the protests in front of the synagogue had begun.  According to Mr. Brysk, Ms. Kinnucan, who at the time was Mr. Kinnucan, had administered a virulently anti-Semitic blog.  She left Ann Arbor sometime thereafter and moved to California, and then to Washington state.

19, 2024.  (Copy of the Answer is attached as Exhibit 7, minus exhibits.)  In his Answer,

Mr. Susselman provided a history of the synagogue protester litigation and the basis of

his claim that Judge Roberts had displayed anti-Semitic and/or anti-Israel sentiments in

her rulings.  He addressed in detail each of Ms. Kinnucan's accusations that he had

violated numerous provisions of the MRPC.  In the Conclusion of his Answer, Mr.

Susselman stated:

> Ms. Kinnucan's Request for Investigation of Respondent is an effort
> to engage in character assassination of an attorney whom she has never
> met, has never communicated with, and who has never represented her in
> a court of law.  Query:  How did an individual who does not reside in
> Michigan, who lives several thousand miles from Michigan, learn about
> the lawsuit and the decisions relating to the protesters in front of Beh Israel
> synagogue in Ann Arbor, Michigan? Who informed her of the decisions
> and provided her with copies of the decisions, including an unpublished
> decision which she quoted from, and may have urged her to file the
> grievance?  What motivated her to file the Request for Investigation of an
> attorney whom she has never met, never communicated with, and who
> never represented her in any legal matter?
>
> Ms. Kinnucan's allegations and charges are totally devoid of any
> legal merit.  Respondent finds it disturbing that the Michigan Attorney
> Grievance Commission has seen fit to transmit her Request for
> Investigation to Respondent without questioning her motives, and
> requiring that Respondent expend the time and energy to respond to her
> meritless charges.  The Request for Investigation should be rejected and
> be dismissed in its entirety.

53.    Mr. Susselman was required to give a sworn statement at the offices of the

Commission on October 23, 2024, regarding Ms. Kinnucan's Request, and three other

Requests which had been filed against him.[3]  He appeared at the Commission on that date and, under oath, answered questions which were directed to him by Sarah Lindsey, General Counsel of the Commission., regarding the Kinnucan Request and the three other Requests.  At the conclusion of the meeting, Ms. Lindsey requested that Mr. Susselman provide her with additional information, which Mr. Susselman did in an email dated October 24, 2024.

54.    In another email sent to Ms. Lindsey on October 24, 2024, Mr. Susselman made the following request:  "I would be curious to know how many Requests for Investigation have been filed with the Michigan Attorney Grievance Commission in the last five years by individuals who do not live in Michigan, and who have never been represented by the Michigan attorney against whom the complaint was filed; how many of those were referred to the attorney in question requiring a response, and how many of such attorneys were thereafter required to provide a sworn statement.  I would appreciate your providing me with this information, without divulging the identities of either the complainant(s) or the attorney(s) in question."  Mr. Susselman repeated the request in another email sent to Ms. Lindsey on October 25, 2024, stating:  "I would appreciate a

---

[3] Two of the three other Requests involved issues relating to how Mr. Susselman was managing his business account.  The fourth Request had been filed by Dr. Brysk's daughter accusing Mr. Susselman of having "bullied" her mother into being a plaintiff in the synagogue protest lawsuit, an accusation which Mr. Brysk, who had been present at every meeting between his wife and Mr. Susselman, whereas their daughter had not been present at any of the meetings, has vehemently denied.  None of the three other Requests are the subject of this lawsuit.

response to my request for information regarding other Requests For Investigation filed against Michigan attorneys by complainants who do not reside in Michigan and how those requests were treated by the Commission, i.e., were the attorneys required to respond to such Requests For Investigation, or to give sworn statements. I appreciate that if such requests were filed, the identities of the complainants and the attorneys against whom the grievances were filed is confidential, and would require that this information be redacted. Please respond to my request."

55.    Ms. Lindsey responded to Mr. Susselman's request with an email on October 25, 2024, stating, in relevant part:  "As to your request, we do not keep such statistics.  Further, our investigations are privileged from disclosure and confidential (see MCR 9.126).  So, I could not produce any such information to you even if we had any way to obtain it.  Moreover, before formal charges are filed, the Commission has no discovery obligations.  After formal charges are filed, discovery obligations are limited to what is provided in MCR 9.115."

56.    As of the date of this First Amended Complaint, no formal charges have been issued by the Commission against Mr. Susselman regarding any of the pending Requests.

## STATEMENT OF RELEVANT FACTS RELATING TO
## MARTIN LEAF'S CLAIMS

57.   On September 22, 2022, Mr. Leaf filed a lawsuit on behalf of the H. P. Benson Association, Inc. ("Benson"), alleging that a video advertisement on the internet sponsored by Nike, Inc., contained both overt and subliminal anti-Semitic images and references, as well as pornographic images and references.  Benson is a non-profit corporation organized under the laws of Michigan.  The Complaint requested a declaratory judgment that the Nike video advertisement violated the Michigan Consumer Protection Act, MCL 445.901, *et seq.* ("MCPA").  The lawsuit was filed in the Ottawa County Circuit Court, located in Grand Haven, Ottawa County, Michigan, where Nike does business.

58.   The video advertisement, titled "The Last Game," can be found here: https://www.youtube.com/watch?v=CJ2xU9GUPVY

59.   The video advertisement portrays a struggle for the survival of soccer between the prevailing soccer champions and their European challengers.   The prevailing champions are depicted as villains.  Their jerseys are emblazoned with the Star of David, an obvious reference to Jews.  (Photograph of the jerseys is attached as Exhibit 8.)  The stadium in which their conflict plays out also shows a billboard with the Star of David.  (Photograph attached as Exhibit 9.)  Strewn throughout the video are numerous subliminal images containing anti-Semitic messages which Mr. Leaf

itemized in the Complaint.  (*See* copy of the Complaint, attached as Exhibit 10.)  The Times Of Israel published a story about the video advertisement titled *Nike ad features evil 'Jewish' clones,* [https://www.timesofisrael.com/nike-ad-features-evil-jewish-clones/](https://www.timesofisrael.com/nike-ad-features-evil-jewish-clones/)*.*  The success of the Jewish clones in soccer was intended to be a metaphor for the age-old anti-Semitic trope that Jews are seeking world domination.  Even the title "The Last Game" evoked the message of a last stand against the Jews taking over the world.  Mr. Leaf had retained a psychological and media expert on the use of such subliminal messages to influence unknowing audiences.

60.     Mr. Leaf claimed that the video advertisement was misleading and violated the prohibition in the MCPA against deceptive advertising, i.e., the video advertisement purported to be promoting the sale of Nike products, when its primary purpose was to disseminate anti-Semitic messages.

61.     Nike filed a motion to dismiss, pursuant to MCR 2.116(C)(8), arguing that since the Nike video advertisement was available for free on the internet, watching it did not constitute a "transaction" under the MCPA.  Before Mr. Leaf even filed his response to the motion, the presiding judge, Hon. Jon Hulsing, entered an Order stating that the lawsuit "may be based on a questionable legal theory; that Leaf had a history of filing frivolous claims against Nike; and questioned why Leaf had filed the lawsuit in Ottawa County, when the parties' attorneys had offices in southeast Michigan.  (Copy of Order attached as Exhibit 11.)  Judge Hulsing ordered Leaf to appear in person in

court to argue the motion, but stated that Nike's counsel could appear "by remote technology."

62.     Mr. Leaf filed a motion to disqualify Judge Hulsing on the basis that his Order that he appear in person, while allowing Nike's attorney to appear via Zoom, raised an appearance of lack of impartiality, attributable to Leaf's being Jewish. (Copy of motion to disqualify attached as Exhibit 12.)  Judge Hulsing denied the motion, stating that Leaf had failed to cite a case "in which it was found to be erroneous for a court to require a person or party to physically appear in court."  But this was not the point.  The point was Judge Hulsing's disparate treatment of Mr. Leaf, who is Jewish, compared to his treatment of Nike's attorney, Naseem Ramin, who was evidently not Jewish.  Judge Hulsing in addition stated that because HP Benson Association, Inc., was a corporation, "a corporation cannot be of any ethnicity or religion because it is an artificial entity."  This assertion was erroneous, since the case law is replete with lawsuits filed by corporate entities and associations claiming unlawful discrimination. *See, e.g., NAACP v. Button,* 371 U.S. 415 (1963); *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.,* 745 F.3d 703 (4th Cir. 2014).  Judge Hulsing also denied that he knew of the ethnicities or religion of either counsel.  This assertion was false, since Mr. Leaf had identified himself as Jewish in his motion requesting that Judge Hulsing recuse himself.  (Exhibit 12, p. 10)  Moreover, the assertion failed to address the disparate treatment, given that ¶5 of the Complaint cited the provision of the MCPA

which allows an action to be brought in any county in which the defendant does business, and Nike did business in Ottawa County.  A review of the Complaint indicated that Benson's attorney had a thorough knowledge of historical anti-Semitic references, and therefore was likely Jewish.  Moreover, the disparate treatment applied <u>to the parties themselves</u>.  Benson was obviously opposing anti-Semitism, whereas Nike was being accused of promoting anti-Semitism.  He could have required both attorneys to appear via Zoom, rather than requiring only the attorney who was claiming the Nike video advertisement promoted anti-Semitism to appear in person, and allowing the Nike attorney to appear via Zoom.

63.    Mr. Leaf filed a response to the motion to dismiss and cited case law and language of the MCPA indicating that the statute did not require that there be a payment in order to qualify as a transaction subject to the MCPA's regulations.  He cited case law indicating that the statute is to be liberally interpreted to protect the public.  Moreover, the MCPA provided that individuals who filed lawsuits under the MCPA could do so for the purpose of acting as "private attorney generals," in order to protect the public from deceptive practices and advertising.  Venue under the MCPA applied in any county in Michigan where the defendant did business.  Nike does business in Ottawa County.

64.    In the course of the litigation, Judge Hulsing made repeated denigrating and insulting references to Mr. Leaf on the record.  Even assuming that Judge Hulsing did

not know that Mr. Leaf was Jewish, by denigrating Mr. Leaf he was also denigrating the claim that the Nike video advertisement was permeated with anti-Semitic tropes and messages, a claim that was supported by the evidence, and which, in a motion to dismiss for failure to state a claim pursuant to MCR 2.116(C)(8), was required to be assumed to be true.  In so doing, Judge Hulsing was being dismissive of legitimate concerns that a publicly available video advertisement on the internet was promoting, and thereby fortifying, anti-Semitic sentiments on the internet, particularly among young and impressionable viewers.

65.     Judge Hulsing granted Nike's motion to dismiss on the basis that since no payment was required to view the video advertisement, it did not qualify as a "transaction" under the MCPA.  He also assessed a sanction against Mr. Leaf, ruling that the lawsuit was "meretricious" and "frivolous," and required that he pay Nike its attorney fees in the amount of $27,266.40.

66.     In his decision granting Nike's motion to dismiss, Judge Hulsing compared Mr. Leaf's argument that the Nike video advertisement violated the MCPA because it was misleading and failed to warn the viewer of its hidden anti-Semitic messages to an advertisement for free cookies which failed to include a warning that the cookies contained "fats and sugars which could lead to obesity, early death and additional health costs to society, the hazards of which were 'not disclosed' to the unsuspecting victim of an urge to munch down cookies."  (Opinion and Order on

Motion for Summary Disposition, attached as Exhibit `13.)  The comparison was specious and insulting.  Judge Hulsing did not understand that the MCPA applies to broad consumer business conduct such as <u>the distribution</u> of a product, and the language of the statute does not require a monetary payment to qualify as a transaction. Distributing a product or service with deceptive content is prohibited under the MCPA, whether it is free or not.  An advertisement for cookies which failed to provide a warning regarding its potential adverse health effects was not simultaneously including a subliminal message that would indoctrinate the reader with a racist ideology.  The fact that Judge Hulsing made this totally inapt comparison, and trivialized concerns about the Nike video advertisement's anti-Semitic messages, underscored the appearance of his anti-Semitic sentiments.

67.    Judge Hulsing's rejection of Mr. Leaf's request that he recuse himself based on the appearance of hostility and a lack of impartiality was inconsistent with protocols which he himself had issued to other judges against whom judicial complaints had been filed, protocols set forth in letters he had sent to the judges in his capacity as Chairperson of the Michigan Judicial Tenure Commission.  (*See* letters attached as Exhibit 14.)

68.    Mr. Leaf appealed the decision dismissing the lawsuit, as well as the imposition of the monetary sanction, to the Michigan Court of Appeals.  The Court of Appeals affirmed both rulings in an unsigned, *per curiam* unpublished decision dated

November 11, 2024. (Copy attached as Exhibit 15.) Regarding Judge Hulsing's refusal to recuse himself, the Court made the observation that since Mr. Leaf filed the lawsuit in Ottawa County, he had no basis to complain that Judge Hulsing required that he appear in person in court to argue Nike's motion to dismiss. This, again, missed the point regarding the disparate treatment.

69.     Mr. Leaf filed a motion for reconsideration in the Court of Appeals, which has been denied. He has filed an Application For Leave To Appeal in the Michigan Supreme Court, which is currently pending.

70.     On January 27, 2025, the Commission emailed to Mr. Leaf a Request For Investigation. (A copy of the Request is attached as Exhibit 16). January 27, 2025, was, coincidentally, the 80th Anniversary of the liberation of the Auschwitz concentration camp, and Holocaust Remembrance Day.

71.     The Request is signed by Defendant Goetz. Nowhere in the Request does it identify an individual who filed the Request, other than Mr. Goetz. The Request makes clear that it is based on Mr. Leaf's filing of the lawsuit against Nike and quotes from the Michigan Court of Appeals decision affirming Judge Hulsing's grant of Nike's motion to dismiss and affirming the sanction against Mr. Leaf. The Request requires that Mr. Leaf provide, "A full and fair description of the facts and circumstances surrounding the events leading to the aforementioned statements" relating to the *Benson v. Nike* lawsuit.

72.     Nowhere in the Request does it identify the specific Michigan Rules of

Professional Conduct that Mr. Leaf purportedly violated during the Nike litigation.

73.     Mr. Leaf has filed an Answer to the Request for Investigation submitted to him.  As of the date of the First Amended Complaint, no formal charges have been issued by the Commission against Mr. Leaf.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF MARC SUSSELMAN'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

74.     All of the prior averments are incorporated herein as if fully stated herein.

75.     While a lawsuit against a State, or a subdivision of a state by a citizen of that state, is barred by the 11th Amendment, *Hans v. Louisiana,* 134 U.S. 1 (1890), a citizen may obtain equitable relief in the form of an injunction and/or a declaratory judgment by naming as a defendant a state agency and/or officer responsible for enforcing a state statute or legislative provision which the citizen claims violates the Constitution. *Ex parte Young*, 209 U.S. 123 (1908).

76.     "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.  *Plyler v. Doe,* 457 U.S. 202, 216 (1982)."  *Cleburne v. Cleburne Living Center, Inc.* 473 U.S. 432, 439 (1985).

77.     The 14th Amendment prohibits discrimination based on race. *McLaughlin v. Florida,* 379 U.S. 184 (1964).  Jews qualify as a race under 42 U.S.C. § 1983, which was enacted pursuant to Section 5 of the 14th Amendment. *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987).  Discrimination based on religion is also prohibited by the 1st and 14th Amendments. *Torcano v. Watkins,* 367 U.S. 488 (1961); *Fulton v. City of Philadelphia,* 141 S. Ct. 1868 (2021). Race and ethnic classifications also constitute suspect categories subject to strict scrutiny under the Fourteenth Amendment. *University of California Regents v. Bakke,* 438 U.S. 265, 290 (1978).  Mr. Susselman maintains that the Commission's issuance of its Request based on the allegations by Ms. Kinnucan violates the Equal Protection Clause because it unconstitutionally targets him based on his race, his religion, and his ethnicity, because he is Jewish.

78.     Under *Younger v. Harris,* 401 U.S. 37 (1971), federal courts are required to abstain from adjudicating lawsuits which would involve the federal court interfering with an ongoing state criminal proceeding. *But see Dombrowski v. Pfister,* 389 U.S. 479 (1965) (abstention not appropriate where criminal prosecution threatens a substantial loss or impairment of freedom of expression).  In *Middlesex Ethics Comm. v. Garden State Bar Assn,* 457 U.S. 423 (1982), the Supreme Court extended the application of *Younger* abstention to state disciplinary proceedings against attorneys charged with violating the state's ethical or professional regulations.

79.     The holding in *Middlesex* applies only if disciplinary charges have already

been issued by the state.  *See Fieger v. Thomas,* 74 F.3d 740 (6th Cir. 1996).  In addition, there is an exception to the application of *Middlesex* even after charges have been issued, if the state's disciplinary proceeding does not permit the attorney to raise and prove claims that the proceeding violates the attorney's constitutional rights.  "T]he federal court should not exert jurisdiction if the plaintiffs 'had an *opportunity* to present their federal claims in the state proceedings.'"  *Moore v. Sims,* 422 U.S. 415, 425 (1979) (italics in the original).  *See also Fieger, supra,* 74 F.3d at 745.

80.     In the instant case, no formal charges have been issued by the Commission against Mr. Susselman, so *Younger* abstention does not apply.

81.     In addition, as Ms. Lindsey's email indicates, any constitutional claim raised by Mr. Susselman in a prospective disciplinary proceeding would be subject to the rules of discovery under MCR 9.115.  Mr. Susselman is claiming that his right to Equal Protection is being violated by the failure of the Commission to issue Requests for Investigation in every instance where the Request is filed by an individual who does not reside in Michigan, and/or who has not been represented by the attorney against whom the Request is made, or in which a court has ruled that the attorney previously filed a frivolous pleading, and that the Request which was issued to him is distinguishable by the fact that he is Jewish, whereas comparable Requests against attorneys who are not Jewish are not pursued.

82.     MCR 9.115(F)(4) provides, in relevant part:

(4) Discovery.  Pretrial or discovery proceedings are not permitted except as follows:

(a) Within 21 days after the service of a formal complaint, a party may demand in writing that documentary evidence that is to be introduced at the hearing by the opposing party be made available for inspection or copying. …

(i)  Within 21 days after the service of a formal complaint, a party may demand in writing that the opposing party supply written notification of the name and address of any person to be called as a witness at the hearing. …

(ii)    Within 21 days following the filing of an answer, the administrator and respondent shall exchange the names and addresses of all persons having knowledge of relevant facts and comply with reasonable requests for

(1) nonprivileged information and evidence relevant to the charges against the respondent, and

(2) other material upon good cause shown to the chair of the hearing panel.

(b) A deposition may be taken of a witness who lives outside the state or is physically unable to attend the hearing.  For good cause shown, the hearing panel may allow the parties to depose other witnesses.

83.    None of the provisions in MCR 9.115(F)(4) would allow Mr. Susselman to obtain the information he needs regarding how the Commission has treated other Requests filed by individuals who do not reside in Michigan, or who have not been represented in a legal matter by the attorney against whom the Request is filed, or in which a court has ruled that a pleading filed by the attorney was frivolous, in order to show a disparity to prove that the Commission has violated his rights under the Equal Protection Clause.  This information would not be available for two reasons: (1) MCR 9.115(F)(4)(a)(ii)(1) only allows discovery of non-privileged information.  As Ms. Lindsey stated in her email, information regarding other Requests is privileged and not

subject to discovery. (2) As she further stated, the Commission has no data regarding Requests filed by individuals not living in Michigan, or by individuals filing Requests against attorneys who have not represented them.  But even if the Commission does not keep such data, the Requests themselves would still be in the Commission's possession from which such information could be extracted.  But it would not make this information available to Mr. Susselman, because it is privileged.  Without this information, it is not possible for Mr. Susselman to prove that the Commission's issuance of Ms. Kinnucan's Request against him violates the Equal Protection Clause.

84.    Consequently, Mr. Susselman does not have an opportunity to present his federal equal protection claim that the Commission's procedure violates the Equal Protection Clause in the state proceeding.  Abstention under *Middlesex* therefore does not apply to Mr. Susselman's equal protection claim.

85.    Plaintiffs recognize that under MCR 9.126(A), investigations by the Commission and its staff are "privileged from disclosure, confidential, and may not be made public."  However, given the limitations on discovery set forth in the Court Rules, as stated above, Plaintiffs have no other option than to disclose the investigations against them in order to protect their constitutional rights.

86.    Since the information regarding other Requests is solely within the possession of the Commission, by virtue of its inability or unwillingness to provide this information to Mr. Susselman, Mr. Susselman's burden of proving that the Commission

has violated the Equal Protection Clause shifts to the Commission to prove that it has *not* violated the Equal Protection Clause. *See United States v. N.Y., N.H.H.R. Co.,* 355 U.S. 253, 256, note 5 (1957) (the law does not place the burden of proof on a party when the material information is peculiarly within the knowledge of his adversary); *Shatterproof Glass Corp. v. Libbey-Owens-Ford,* 482 F.2d 317, 324 (6th Cir. 1973) (where material evidence is solely within the possession of the defendant, the burden of proof shifts to the defendant); *Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 113 (2d Cir. 2021) (same); *Cent. Of Ga. R. Co. v. Occup. S. H. R. Comm'n,* 576 F.3d 620, 624 (5th Cir. 1978) (same); *Estate of Barton v. ADT Security Services Pension Plan,* 820 F.3d 1060, 1066 (9th Cir. 2016) (same).

87.    Without the information regarding how Requests by individuals who do not live in Michigan, or against attorneys who have not represented the individual filing the Request, or against attorneys whom a court has ruled the attorney filed a frivolous pleading, the Commission cannot carry its burden of proving that *it has not* violated Mr. Susselman's rights under the Equal Protection Clause.

88.    Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Brown v. Board of Education of Topeka,* 347 U.S. 483 (1953); *Milliken v. Bradley,* 433 U.S. 267 (1977); *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski,*

*supra.*

**WHEREFORE**, Mr. Susselman requests that the Court enter a declaratory judgment that the Commission and Defendant Goetz are violating Mr. Susselman's rights under the Equal Protection Clause by requiring him to respond to Ms. Kinnucan's Request for Investigation and considering future disciplinary action against him for purportedly violating the Michigan Rules of Professional conduct, and issue an injunction precluding the Commission and/or Defendant Goetz from proceeding with disciplinary action against Mr. Susselman based on Ms. Kinnucan's Request.

## COUNT II

## VIOLATION OF MR. SUSSLEMAN'S RIGHT OF FREE SPEECH UNDER THE FIRST AMENDMENT

89.     All of the prior averments are incorporated herein as if fully stated herein.

90.     The statements which Mr. Susselman included in his legal briefs in which he claimed that Judge Roberts' rulings, taken in their entirety, displayed a distinct appearance of being anti-Semitic and/or anti-Israel were made by Mr. Susselman as an advocate for his clients.  He accordingly has third-party standing to assert the First Amendment freedom of speech rights of his clients.  *Legal Services Corp. v. Velazquez,* 531 U.S. 533 (2000).

91.     Freedom of speech under the First Amendment is a fundamental right. *Thornhill v. Alabama,* 310 U.S. 88 (1940).  The right applies to the states under the

Due Process Clause of the Fourteenth Amendment. *Young v. American Mini Theatres,* 427 U.S. 50 (1976). As such, abridgement of that right by a state government, or any of its agencies, is subject to strict scrutiny and may only be justified if the state has a compelling state interest justifying its abridgement of the right. *See Reed v. Town of Gilbert,* 576 U.S. 155 (2015); *Republican Party of Minn. v. White,* 536 U.S. 765 (2002).

92.    The Commission does not have a compelling state interest to discipline Mr. Susselman for expressing the view in his legal briefs, on behalf of his Jewish clients, that statements by Judge Roberts in her rulings, taken together in their entirety, displayed a distinct appearance of being anti-Semitic and/or anti-Israel, particularly when fortified by his right as his clients' advocate to petition the government for a redress of their grievances, also protected by the First Amendment. *See Railroad Trainmen v. Virginia Bar,* 377 U.S. 1 (1964); *Bounds v. Smith,* 470 U.S. 817 (1977).

93.    Given that under Count I the Court may not abstain from adjudicating this lawsuit, there is no basis for the Court to abstain from adjudicating Mr. Susselman's claim that the Commission's issuance of Ms. Kinnucan's Request against him also violated Mr. Susselman's freedom of speech under the First Amendment.

94.    Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Brown v. Board of Education of Topeka,* 347 U.S. 483 (1953); *Milliken v. Bradley,* 433

U.S. 267 (1977); *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Susselman requests that the Court enter a declaratory judgment that the Commission and Defendant Goetz have violated Mr. Susselman's right of freedom of speech under the First Amendment by requiring him to respond to Ms. Kinnucan's Request for Investigation and considering future disciplinary action against him for purportedly violating the Michigan Rules of Professional conduct, and issue an injunction precluding the Commission and/or Defendant Goetz from proceeding with disciplinary action against Mr. Susselman based on Ms. Kinnucan's Request.

## COUNT III

### VIOLATION OF MARTIN LEAF'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

95.    All of the prior averments are incorporated herein as if fully stated herein.

96.    Nowhere in the Request issued to Mr. Leaf does it identify what Rules of Professional Conduct he purportedly violated during the *Benson v. Nike* lawsuit.

97.    Upon information and belief, the Request was issued based on Judge Hulsing's ruling that the lawsuit was frivolous and his sanctioning Mr. Leaf by requiring that he pay the attorney fees of Nike's attorney.

98.    Mr. Leaf maintains that his right to Equal Protection is being violated by the failure of the Commission to issue Requests for Investigation in every instance where

an attorney has been sanctioned by a judge for purportedly filing a frivolous complaint or other pleading.

99.    Mr. Leaf maintains that the Commission's issuance of its Request based on Judge Hulsing's sanction of him violates the Equal Protection Clause because it has unconstitutionally targeted him based on his race, his religion, and his ethnicity because he is Jewish, whereas comparable Requests have not been issued to other attorneys who are not Jewish who have been sanctioned by a judge.

100.   Since no formal charges have been issued by the Commission against Mr. Leaf, *Younger* abstention does not apply.

101.   Upon information and belief, based on Ms. Lindsey's email to Mr. Susselman, the Commission does not have data regarding the number of Requests which are issued to attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading.

102.   None of the provisions in MCR 9.115(F)(4) would allow Mr. Leaf to obtain the information he needs regarding how the Commission has treated other Requests issued to attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading.  This information would not be available for two reasons: (1) MCR 9.115(F)(4)(a)(ii)(1) only allows discovery of non-privileged information.  As Ms. Lindsey stated in her email, information regarding other Requests is privileged and not subject to discovery. (2)  The Commission does not have data regarding how many

62

Requests are issued to attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading.  Although the Commission does not collect such data, it has in its possession the Requests from which such data could be extracted.  But it will not make that information available to Mr. Leaf, because it is privileged.  Without this information, it is not possible for Mr. Leaf to prove that the Commission's issuance of the Request to him violates the Equal Protection Clause.

103.   Consequently, Mr. Leaf does not have an opportunity to present his federal claim that the Commission's procedure violates the Equal Protection Clause in the state proceeding.  Abstention under *Middlesex* therefore does not apply to Mr. Leaf's equal protection claim.

104.   Since the information regarding other Requests is solely within the possession of the Commission, by virtue of its inability or unwillingness to provide this information to Mr. Leaf, the burden of proving that the Commission has violated the Equal Protection Clause shifts to the Commission to prove that it has *not* violated the Equal Protection Clause.  *See N.Y., N.H.H.R. supra; Shatterproof Glass Corp., supra; Sacerdote, supra; Cent. Of Ga. R. Co, supra; Estate of Barton, supra.*

105.   Without the information regarding whether Requests are issued to other attorneys who have been sanctioned for allegedly filing a frivolous complaint or other pleading, the Commission cannot carry its burden of proving that *it has not* violated Mr. Leaf's rights under the Equal Protection Clause.

106. Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Brown v. Board of Education of Topeka,* 347 U.S. 483 (1953); *Milliken v. Bradley,* 433 U.S. 267 (1977); *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Leaf requests that the Court enter a declaratory judgment that the Commission and Defendant Goetz have violated Mr. Leaf's rights under the Equal Protection Clause by requiring him to respond to its Request for Investigation and considering future disciplinary action against him for purportedly violating the Michigan Rules of Professional conduct, and issue an injunction precluding the Commission and/or Defendant Goetz from proceeding with disciplinary action against Mr. Leaf based on the Request.

## COUNT IV

## VIOLATION OF MR. LEAF'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

107. All of the prior averments are incorporated herein as if fully stated herein.

108. A fundamental requirement of due process under the Fourteenth Amendment is notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306 (1950).

109.   Where a state seeks to deprive an individual of liberty or property, notice of the charges being alleged against the individual must be articulated with sufficient clarity that the individual knows what s/he is accused of.  This applies in the case of a prison inmate accused of misconduct (*Hewitt v. Helms,* 459 U.S. 460 (1983)); a public employee facing disciplinary action (*Gilbert v. Homar,* 520 U.S. 924 (1997)); a business charged with improperly discharging an employee (*Brock v. Roadway Express, Inc.,* 481 U.S. 252 (1987)); and an attorney charged with violating the state's professional code (*Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626 (1985)).

110.   Mr. Leaf has a property interest in his profession as an attorney, and a liberty interest in protecting his professional reputation.  *Greene v. McElroy,* 360 U.S. 474 (1959) (property interest); *Board of Regents v. Roth,* 408 U.S. 564 (1972) (property and liberty interests).

111.   Nowhere in the Request issued to Mr. Leaf has Mr. Goetz identified specifically which Rule(s) of Professional Conduct Mr. Leaf purportedly violated in the course of his litigating the *Benson v. Nike* lawsuit.  By failing to provide this information, the Request fails to provide Mr. Leaf the notice he is entitled to under the Due Process Clause of the Fourteenth Amendment.

112.   Given that under Count III the Court may not abstain from adjudicating Count III, there is no basis for the Court to abstain from adjudicating Mr. Leaf's claim that the Commission's issuance of its Request to him also violated Mr. Leaf's right to

due process under the Fourteenth Amendment.

113.   Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Brown v. Board of Education of Topeka,* 347 U.S. 483 (1953); *Milliken v. Bradley,* 433 U.S. 267 (1977); *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Leaf requests that the Court enter a declaratory judgment that the Commission and Defendant Goetz have violated Mr. Leaf's right to due process under the Fourteenth Amendment by requiring him to respond to its Request for Investigation without specifying the MRPC he allegedly violated and issue an injunction precluding the Commission and/or Defendant Goetz from proceeding with disciplinary action against Mr. Leaf based on the Request.

## <u>COUNT V</u>

## <u>VIOLATION OF MR. LEAF'S RIGHT OF FREE SPEECH<br>UNDER THE FIRST AMENDMENT</u>

114.   All of the prior averments are incorporated herein as if fully stated herein.

115.   The statements which Mr. Leaf included in his legal briefs in which he claimed that Judge Hulsing's rulings and conduct displayed a distinct appearance of being anti-Semitic were made by Mr. Leaf as an advocate for his client.  He accordingly

has third-party standing to assert the First Amendment freedom of speech rights of his client. *Legal Services Corp. v. Velazquez,* 531 U.S. 533 (2000).

116.   Freedom of speech under the First Amendment is a fundamental right. *Thornhill, supra.*   The right applies to the states under the Due Process Clause of the Fourteenth Amendment. *Young, supra.*   As such, abridgement of that right by a state government, or any of its agencies, is subject to strict scrutiny and may only be justified if the state has a compelling state interest justifying its abridgement of the right. *See Reed, supra; Republican Party of Minn., supra.*

117.   The Commission does not have a compelling state interest to discipline Mr. Leaf for expressing the view in his legal briefs, on behalf of his client, that statements and conduct by Judge Hulsing displayed a distinct appearance of being anti-Semitic, fortified by his right as his client's advocate to petition the government for a redress of grievances, also protected by the First Amendment. *Railroad Trainmen, supra; Bounds, supra.*

118.   Given that under Count III the Court may not abstain from adjudicating Count III, there is no basis for the Court to abstain from adjudicating Mr. Leaf's claim that the Commission's issuance of its Request to him also violated Mr. Leaf's freedom of speech under the First Amendment.

119.   Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a

declaratory judgment holding that continuing and impending action are unconstitutional, *Brown v. Board of Education of Topeka,* 347 U.S. 483 (1953); *Milliken v. Bradley,* 433 U.S. 267 (1977); *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

**WHEREFORE**, Mr. Leaf requests that the Court enter a declaratory judgment that the Commission and Defendant Goetz have violated Mr. Leaf's right of freedom of speech under the First Amendment by requiring him to respond to its Request for Investigation and considering future disciplinary action against him for purportedly violating the Michigan Rules of Professional conduct, and issue an injunction precluding the Commission and/or Defendant Goetz from proceeding with disciplinary action against Mr. Leaf based on the Request.

<div style="margin-left:40%">

/s/  Marc M. Susselman
Marc M. Susselman (P29481)
Attorney for Plaintiffs
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

/s/ Martin H. Leaf
Martin H. Leaf (P43202)
Attorney for Plaintiffs
33228 W. 12 Mile Rd., Ste. 345
Farmington Hills, Michigan 48334
(248) 687-9993
leafmartin@gmail.com

</div>

Dated:  April 23, 2025

## <u>JURY DEMAND</u>

Plaintiffs demand a jury as to all issues of fact as to which they are entitled to a jury.

<div align="right">

/s/  Marc M. Susselman
Marc M. Susselman (P29481)
Attorney for Plaintiffs
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com


/s/ Martin H. Leaf
Martin H. Leaf (P43202)
Attorney for Plaintiffs
33228 W. 12 Mile Rd., Ste. 345
Farmington Hills, Michigan 48334
(248) 687-9993
leafmartin@gmail.com

</div>

Dated:  April 23, 2025