# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Marc Susselman and Martin Leaf,

     Plaintiffs,

vs.                                                        Case No.:  2:25-cv-10660

Michigan Attorney Grievance Commission,        Hon. Shalina D. Kumar
Board of Commissioners of
the Michigan Attorney Grievance Commission,    Magistrate Judge
in their official capacities,                  Elizabeth Staffor
and Michael Goetz,
Administrator of the Michigan Attorney
Grievance Commission, in his official capacity,

     Defendants.

_____/

| | |
|---|---|
| Marc M. Susselman (P29481) | Marla Linderman Richelew |
| Attorney for Plaintiffs | Attorney for Defendants |
| 43834 Brandywyne Rd. | Michigan Dep't of Attorney General |
| Canton, Michigan 48187 | Civil Rights & Elections Div. |
| (734) 416-5186 | 3030 West Grand Blvd., 10th Floor |
| marcsusselman@gmail.com | Detroit, MI 48202 |
| | (313) 456-0200 |
| Martin Leaf (P43202) | lindermanrichelewm@michigan.gov |
| Attorney for Plaintiffs | P55759 |
| 33228 W 12 Mile Rd., #345 | |
| Farmington Hills, MI 48335 | |
| (248) 687-9993 | |
| leafmartin@gmail.com | |

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## ORAL ARGUMENT REQUESTED

Plaintiffs, by and through their attorney, responding to Defendants' motion to dismiss Plaintiffs' First Amended Complaint, state as follows:

1.     No contest.

2.     Admit in part, but states further that the First Amended Complaint includes a request for relief in the form of a declaratory judgment that the actions of the Michigan Attorney Grievance Commission with respect to the Plaintiff are unconstitutional.

3.     Deny the averment, because it is false as to both facts and law.

4.     No contest.

5.     No contest.

6.     No contest.

7.     Deny the averment as legally erroneous under the decision of the Supreme Court in *Ex parte Young,* 209 U.S., 123 (1909).

8.     Deny the averment as false, since Plaintiffs have requested prospective relief in the form of both a declaratory judgment and an injunction.

9.     Deny the averment as legally erroneous.

10.    Deny the averment as factually and legally erroneous.

11.    Deny the averment as factually and legally erroneous.

12.    Deny the averment as legally erroneous.

13.    Deny the averment as legally erroneous.

14.    Deny the averment as factually and legally erroneous.

15.     Deny the averment as legally erroneous.

16.     Deny the averment as legally erroneous, when it is alleged that the

Commission's investigation violates the United States Constitution.

17.     Neither admit nor deny the averment, but leave Defendants to their

proofs.

18.     Deny the averment as factually and legally erroneous.

19.     Deny the averment as factually and legally erroneous.

20.     Admit.

This response is supported by the accompanying brief.

**WHEREFORE**, Defendants' motion should be denied.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

/s/  Marc M. Susselman
Attorney for Plaintiffs

Dated: May 31, 2025

3

## BRIEF IN SUPPORT OF RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... iii

QUESTIONS PRSENTED ......................................................................ix

CONTROLLING AUTHORITIES ..........................................................xi

COUNTER-INTRODUCTION ...............................................................1

COUNTER-STATEMENT OF FACTS AND PROCEEDINSGS .......................1

STANDARDS OF REVIEW ...................................................................5

ARGUMENT ........................................................................................6

I.    THE 11TH AMENDMENT DOES NOT BAR PLAINTIFFS'
      CLAIMS. ...................................................................................6

II.   PLAINTIFFS ARE PROPERLY SEEKING PROSPLECTIVE
      RELIEF. ...................................................................................10

III.  THE LAWSUIT IS NOT BARRED BY YOUNGER
      ABSTENTION. ........................................................................ 14

IV.   ROOKER-FELDMAN DOCTRINE DOES NOT BAR THE
      LAWSUIT. .............................................................................. 19

V.    NONE OF DEFENDANTS' OTHER ARGUMENTS
      HAVE MERIT. .........................................................................23

      A. Plaintiffs Have Not Failed To Seek Relief Against Goetz....................23

      B.  42 U.S.C. § 1983 Is Not Relevant To Any Of Plaintiffs' Claims.........23

      C.  Defendants' Have Pled Cognizable First Amendment Claims..........23

      D.  Plaintiffs Have Pled Cognizable Equal Protection Claims...............30

      E.  Mr. Leaf's Due Process Claim Is Cognizable. ....................................33

CONCLUSION...................................................................................34

**CERTIFICATE OF SERVICE** ..............................................................................37

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                      **Page**

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983)..................................................................................8

*Brown v. Board of Education of Topeka,*
    347 U.S. 483 (1953)................................................................................ 11

*Buckley v. American Constitutional Law Foundation, Inc.,*
    525 U.S. 182, 223 (1999) ......................................................................35

*Cent. Of Ga. R. Co. v. Occup. S. H. R. Comm'n,*
    576 F.3d 620, 624 (5th Cir. 1978)...................................................... 17

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)..................................................................................24

*Directtv, Inc. v. Tyreesh,*
    487 F.3d 471 (6th Cir. 2007)................................................................5

*Dombrowski v. Pfister,*
    380 U.S. 479 (1965)..........................................................................7, 11, 14

*Edelman v. Jordan,*
    415 U.S. 651 (1974)................................................................................9

*Estate of Barton v. ADT Security Services Pension Plan,*
    820 F.3d 1060, 1066 (9th Cir. 2016)..................................................18

*Ex parte Young,*
    209 U.S. 123 (1908)......................................................................7, 11, 12, 14

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,*
    544 U.S. 280 (2005)................................................................................21

*Fears v. Kasich, In Re: Ohio Execution Protocol Litigation,*
    845 F.3d 231 (6th Cir. 2016)...............................................................32

*Fieger v. Thomas,*
     74 F.3d 740, 745 (6th Cr. 1996) .......................................................15, 18, 19

*Hans v. Louisiana,*
     134 U.S. 1 (1890) ...........................................................................................7

*Jenkins v. McKeithen,*
     395 U.S. 411 (1969) ...................................................................................8, 12

*Larson v. Valente,*
     456 U.S. 228 (1982) ........................................................................................8

*Legal Services Corporation v. Velazquez,*
     531 U.S. 533 (2001) ......................................................................................26

*Mezibov v. Allen,*
     411 F.3d 712 (6th Cir. 2005) ........................................................................25

*Middlesex Ethics Comm. v. Garden State Bar Assn,*
     457 U.S. 423 (1982) ..........................................................................14, 15, 18

*Mikel v. Quinn,*
     81 F.4th 252 (6th Cir. 2023) .........................................................................10

*Milliken v. Bradley,*
     433 U.S. 267 (1977) ..................................................................................... 11

*Monat v. State Farm Ins. Co.,*
     469 Mich. 679 (Mich. 2004) .........................................................................22

*Monell v. Dept. of Social Services,*
     436 U.S. 658 (1978) ......................................................................................10

*Moore v. Oglivie,*
     394 U.S. 814 (1969) ........................................................................................9

*Moore v. Sims,*
     422 U.S. 415, 425 (1979) ...............................................................................7

*Mullane v. Central Hanover Bank & Trust*,
    339 U.S. 306 (1950) ................................................................................ 34

*Musson Theatrical, Inc. v. Federal Exp. Corp.*,
    89 F.3d 1244 (6th Cir. 1998) ...................................................................5

*National Association for the Advancement of Colored People v. Button*,
    371 U.S. 415 (1963) ................................................................................25

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ...........................................................................8, 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ..................................................................................9

*Puerto Rico Aqueduct and Sewer Authority v. Metcalf Eddy, Inc.*,
    506 U.S. 139 (1992) ...............................................................................13

*Quern v. Jordan*,
    540 U.S. 332 (1979) .................................................................................9

*RMI Titanium Co. v. Westinghouse Elec. Corp.*,
    78 F.3d 1125 (6th Cir. 1996) ...................................................................5

*Sacerdote v. N.Y. Univ.*,
    9 F.4th 95 (2d Cir. 2021) ....................................................................... 17

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) ...................................................................................9

*Shaare Tefila Congregation v. Cobb*,
    481 U.S. 615 (1987) .................................................................................6

*Shatterproof Glass Corp. v. Libbey-Owens-Ford*,
    482 F.2d 317, 324 (6th Cir. 1973) ........................................................ 17

*Singleton v. Wulff*,
    428 U.S. 106 (1976) ...............................................................................28

*Squire v. Coughlan,*
    469 F.3d 551, 555 (6th Cir. 2006) .......................................................... 15

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ..................................................................... 11, 23

*Todd v. Weltman, Weinberg Reis Co., L.P.A.*
    434 F.3d 432 (6th Cir. 2006) ............................................................... 22

*Transcontinental Leasing, Inc. v. Michigan National Bank of Detroit,*
    738 F.2d 163 (6th Cir.1984) ................................................................. 5

*United States v. N.Y., N.H.H.R. Co.,*
    355 U.S. 253 (1957) ..................................................................... 17, 31

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) ...................................................................... 8, 12

*Whitfield v. State,*
    639 F.3d 253 (6th Cir. 2011) ............................................................... 13

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989) ........................................................................ 10

*Younger v. Harris,*
    401 U.S. 37 (1971) ........................................................................ 14

*Zal v. Steppe,*
    968 F.2d 924 (9th Cir. 1992) ............................................................... 25

## Constitution

U.S. Const. amend. I ...........................................................*passim*

U.S. Const. amend XI ....................................................6, 7, 9, 13

U.S. Const. amend. XIV ......................................................*passim*

**Statutes**

**Federal**

Indian Gaming Regulatory Act, 25 U.S.C. 2710(d)(1)I ...........................................9

28 U.S.C. § 2201 ........................................................................................................6

42 U.S.C. § 1983 ................................................................................................*passim*

**Michigan**

Michigan Consumer Protection Act, MCL 445.901, *et seq.* ("MCPA") ...................4

MCL 450.2911 ........................................................................................................30

**Other**

Louisiana Subversive Activities and Communist Control Law and the
    Communist Propaganda Control Law ..............................................................7

Minnesota charitable solicitations Act ....................................................................8

**Rules**

**Federal**

Fed. R. Civ. P. 12(b)(1) ............................................................................................5

Fed. R. Civ. P. 12(b)(6) ............................................................................................5

Fed. R. Civ. P. 15(a)(1)(B) .......................................................................................4

Fed. R. Civ. P. 15(2) ...............................................................................................12

**Michigan**

MCR 9.115(F)(4) .....................................................................................13, 15, 16, 19

MRPC 1.0...............................................................................................................23

MRPC 3.1..................................................................................................24

**Miscellaneous**

Justin D. Levinson, Mark W. Bennett, and Koichi Hioki, *Judging Implicit Bias:*
    *A National Empirical Study Of Judicial Stereotypes,*
    Florida Law Review, Vol. 69, Issue 1 (January 2017)...................................28

Vida B. Johnson, *White Supremacy From The Bench,*
    Lewis & Clark Law Review, Vol. 27, No. 39 (2023) ...................................29

## QUESTIONS PRESENTED

I.    Whether Plaintiffs' claims are barred by the 11th Amendment.

Plaintiffs answer, "No."

II.   Whether Plaintiffs are properly seeking prospective relief.

Plaintiffs answer, "Yes."

III.  Whether Plaintiffs' lawsuit is barred by the *Younger* abstention doctrine.

Plaintiffs answer, "No."

IV.   Whether Plaintiffs' lawsuit is barred by the *Rooker-Feldman* doctrine or collateral estoppel.

Plaintiffs answer, "No."

V.    Whether Plaintiffs have sought proper prospective relief against Defendant Goetz.

Plaintiffs answer, "Yes."

VI.   Whether Plaintiffs have pled any claims pursuant to 42 U.S.C. § 1983.

Plaintiffs answer, "No."

VII.  Whether Plaintiffs have pled cognizable claims that their freedom of speech under the First Amendment is being violated.

Plaintiffs answer, "Yes."

VIII. Whether Plaintiffs have pled cognizable claims under the Equal Protection Clause.

Plaintiffs answer, "Yes."

IX.    Whether Plaintiff Leaf has pled a cognizable claim of violation of his right to due process.

Plaintiffs answer, "Yes."

## <u>CONTROLLING AUTHORITY</u>

*Ex parte Young,* 209 U.S. 123 (1908)

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280 (2005)

*Legal Services Corporation v. Velazquez,* 531 U.S. 533 (2001)

*Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306 (1950)

*Steffel v. Thompson,* 415 U.S. 452 (1974)

*Dombrowski v. Pfister,* 380 U.S. 479 (1965)

## COUNTER-INTRODUCTION

The Defendants' Introduction mischaracterizes what this lawsuit is about. This lawsuit is not an effort by Plaintiffs to reverse prior decisions made by the Sixth Circuit Court of Appeals, or by the Ottawa County Circuit Court and the Michigan Court of Appeals. Such an effort would be barred by the *Rooker-Feldman* doctrine. Nowhere in their First Amended Complaint do Plaintiffs request that this Court reverse, otherwise nullify, the decisions by those courts. Rather, this lawsuit challenges actions taken by the Michigan Attorney Grievance Commission ("Commission") and its Administrator against Plaintiffs seeking to discipline them for statements and legal positions which Plaintiffs advanced in those lawsuits, statements and legal positions which Plaintiffs had a constitutional right to make on behalf of their clients in those lawsuits, based on the evidence. Plaintiffs maintain that the Commission's actions in an effort to discipline them for having made statements, and advanced legal positions they had a constitutional right to make as advocates for their clients, violate the Plaintiffs' rights under the First and Fourteenth Amendments, an issue which is separate and apart from the rulings rendered by the courts in the cases in question. None of the arguments which Defendants offer as a basis to dismiss Plaintiffs' First Amended Complaint have legal merit.

## COUNTER-STATEMENT OF FACTS AND PROCEEDINGS

On July 3, 2024, Mr. Susselman received an email from the Michigan Attorney

Grievance Commission.  The email indicated that a Request For Investigation ("Request") had been filed against him and directed that he had 21 days to file an Answer to the Request.  The Request was attached to the email.  It had been filed with the Commission on April 30, 2024, by an individual named Michelle Kinnucan.  Mr. Susselman had never heard of Ms. Kinnucan, who lived in Washington state, and he had no idea who she was.  He had never met her; never spoken to her; never communicated with her in any way; and he had never represented her in any legal proceeding. In the Request, Ms. Kinnucan accused Mr. Susselman of having violated the Michigan Rules of Professional Conduct ("MRPC") by virtue of statements he had made in various legal briefs he had filed in a lawsuit in the United States District Court in Detroit against protesters in front of the Beth Israel synagogue in Ann Arbor, Michigan.  Ms. Kinnucan's allegations against Mr. Susselman were unsubstantiated and without merit.  (*See* ¶s 10-55 of Plaintiffs' First Amended Complaint.)

Mr. Susselman was required to give a sworn statement at the offices of the Commission on October 23, 2024, regarding Ms. Kinnucan's Request, and three other Requests which had been filed against him.  He appeared at the Commission on that date and, under oath, answered questions which were directed to him by Sarah Lindsey, General Counsel of the Commission., regarding the Kinnucan Request and the three other Requests.  At the conclusion of the meeting, Ms. Lindsey requested that Mr. Susselman provide her with additional information, which Mr. Susselman did in

an email dated October 24, 2024. In another email sent to Ms. Lindsey on October 24,

2024, Mr. Susselman made the following request:

> I would be curious to know how many Requests for Investigation
> have been filed with the Michigan Attorney Grievance Commission in
> the last five years by individuals who do not live in Michigan, and who
> have never been represented by the Michigan attorney against whom the
> complaint was filed; how many of those were referred to the attorney in
> question requiring a response, and how many of such attorneys were
> thereafter required to provide a sworn statement.  I would appreciate
> your providing me with this information, without divulging the identities
> of either the complainant(s) or the attorney(s) in question.

Mr. Susselman repeated the request in another email sent to Ms. Lindsey on

October 25, 2024.

Ms. Lindsey responded to Mr. Susselman's request with an email on October

25, 2024, stating, in relevant part:

> As to your request, we do not keep such statistics.  Further, our
> investigations are privileged from disclosure and confidential (see MCR
> 9.126).  So, I could not produce any such information to you even if we
> had any way to obtain it.  Moreover, before formal charges are filed, the
> Commission has no discovery obligations. After formal charges are
> filed, discovery obligations are limited to what is provided in MCR
> 9.115.

On September 22, 2022, Martin Leaf filed a lawsuit on behalf of the H. P.

Benson Association, Inc. ("Benson"), alleging that a video advertisement on the in-

ternet sponsored by Nike, Inc., contained both overt and subliminal anti-Semitic im-

ages and references, as well as pornographic images and references.  The Complaint

requested a declaratory judgment that the Nike video advertisement violated the

Michigan Consumer Protection Act, MCL 445.901, *et seq*. ("MCPA").  The lawsuit was filed in the Ottawa County Circuit Court, located in Grand Haven, Ottawa County, Michigan, where Nike does business. In the course of the lawsuit, Ottawa County Circuit Court Judge Jon Hulsing made statements and engaged in conduct which Mr. Leaf regarded as having the appearance of being anti-Semitic, as set forth in ¶¶ 61-67 of the FAC.  Judge Hulsing dismissed the lawsuit, held that it was frivolous, and sanctioned Mr. Leaf.

On January 27, 2025, the Commission emailed a Request For Investigation. to Mr. Leaf.  The Request was signed by Defendant Goetz.  The Request made clear that it was based on Mr. Leaf's filing of the lawsuit against Nike and quoted from the Michigan Court of Appeals decision affirming Judge Hulsing's grant of Nike's motion to dismiss and affirming the sanction against Mr. Leaf.  The Request required that Mr. Leaf provide, "A full and fair description of the facts and circumstances surrounding the events leading to the aforementioned statements" relating to the *Benson v. Nike* lawsuit. Nowhere in the Request did it identify the specific Michigan Rules of Professional Conduct that Mr. Leaf purportedly violated during the Nike litigation.

Plaintiffs filed the current lawsuit on March 8, 2025, in which they assert that the filing of the Requests for Investigation against them violate the First and Fourteenth Amendments.  Defendants filed a motion to dismiss the Complaint on April 22, 2025.  Plaintiffs filed their First Amended Complaint by right pursuant to Fed. R. Civ.

P. 15(a)(1)(B).  Defendants have filed a subsequent motion to dismiss the FAC, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

**STANDARDS OF REVIEW**[1]

The Sixth Circuit Court of Appeals set forth the standard of review for a 12(b)(1) motion in *Musson Theatrical, Inc. v. Federal Exp. Corp.,* 89 F.3d 1244, 1248 (6th Cir. 1998), as follows:

> When a 12(b)(1) motion attacks the face of a complaint, the plaintiff's burden to prove federal question subject matter jurisdiction is not onerous. *RMI Titanium Co. v. Westinghouse Elec. Corp.,* (6th Cir. 1996) (discussing 12(b)(1) motions that attack jurisdictional facts, the standard of review of such motions, and when they should be converted to motions for summary judgment). The plaintiff must show only that the complaint alleges a claim under federal law, and that the claim is "substantial." A federal claim is substantial unless "prior decisions inescapably render[it] frivolous."' *Transcontinental Leasing, Inc. v. Michigan National Bank of Detroit*, 738 F.2d 163, 165 (6th Cir.1984). In short, when faced with a 12(b)(1) challenge to the face of a complaint, the plaintiff can survive the motion by showing any arguable basis in law for the claim made.

The standard of review for a motion brought pursuant to Fed. R. Civ. P. 12(b)(6) was set forth in *Directv, Inc. v. Tyreesh,* 487 F.3d 471 (6th Cir. 2007), as follows, *id.* at 476:

> "[A] Rule 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." … <u>In reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable</u>

---

[1] Defendants have failed to include a discussion of the standards of review which apply to their motion brought pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

5

inferences in favor of the plaintiff. … The defendant has the burden of showing that the plaintiff has failed to state a claim for relief. … While all the factual allegations of the complaint are accepted as true, "we need not accept as true legal conclusions or unwarranted factual inferences." … (Emphasis added; citations omitted.)

## ARGUMENT

## I.   THE 11ᵀᴴ AMENDMENT DOES NOT BAR PLAINTIFFS' CLAIMS.

Defendants state on p. 8, "Plaintiffs have brought suit pursuant to 42 U.S.C. § 1983 invoking their First and Fourteenth Amendments rights." This assertion is false. None of Plaintiffs' claims plead 42 U.S.C. § 1983 as the basis for the claim. Each claim cites a constitutional amendment directly as the basis for the claim: Mr. Susselman's Count I is based exclusively on the Equal Protection Clause of the 14ᵗʰ Amendment; his Count II is based exclusively on the Freedom of Speech Clause of the 1ˢᵗ Amendment; Mr. Leaf's Count III is based exclusively on the Equal Protection Clause of the 14ᵗʰ Amendment; his Count IV is based exclusively on the Dur Process Clause of the 14ᵗʰ Amendment; his Count V is based exclusively on the Freedom of Speech Clause of the 1ˢᵗ Amendment. 42 U.S.C. § 1983 is neither cited, nor or incorporated, in any of these counts. The statute is cited only once in the FAC, in ¶77, regarding the holding in *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987), that Jews qualify as a race under the 14ᵗʰ Amendment and the statute.

28 U.S.C. § 2201 states, in relevant part:

(a) In a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may

6

declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

In the case of a state citizen seeking a declaratory judgment that action taken by the state is unconstitutional, the 11th Amendment precludes suing the state in federal court. *Hans v. Louisiana,* 134 U.S. 1 (1890). In *Ex parte Young,* 209 U.S. 123 (1908), the Supreme Court held that under such circumstances, a litigant who wishes to challenge the constitutionality of a state's action by any arm of the state may name an officer of the state who has responsibility for taking the action in question as a defendant, thereby avoiding the proscription of the 11th Amendment.

In subsequent years, numerous Supreme Court decisions have affirmed the validity of lawsuits in federal court in which citizens of a state have sued officers of the state contesting the constitutionality of a state law, and requesting equitable relief in the form of an injunction and/or a declaratory judgment. *See, e.g., Dombrowski v. Pfister,* 380 U.S. 479 (1965) (sustaining validity of a lawsuit in federal court by Louisiana citizens against the governor and the Chairman of the Legislative Joint Committee on Un-American Activities in Louisiana seeking declaratory relief and an injunction under the 14th Amendment against enforcement of the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law); *Moore v. Oglivie,* 394 U.S. 814 (1969) (sustaining the validity of a lawsuit by residents of Illinois against the Illinois Electoral Board seeking

7

declaratory relief and an injunction under the Equal Protection Clause against the operation of an Illinois statute designating the number of voter signatures required for an individual to qualify as an independent candidate); *Jenkins v. McKeithen,* 395 U.S. 411 (1969) (sustaining validity of a lawsuit in federal court by a citizen of Louisiana against the Governor of Louisiana, and Commission members, contesting the constitutionality of Act 2, which created a Commission to investigate alleged violations in the field of labor-management relations, and seeking injunctive and declaratory judgment relief under the 14th Amendment); *Larson v. Valente,* 456 U.S. 228 (1982) (sustaining validity of a lawsuit in federal court by citizens of Minnesota against the Attorney General and Commissioner of Securities of Minnesota challenging the constitutionality of the Minnesota charitable solicitations Act under the Establishment Clause and requesting equitable relief).[2]  None of these cases were

---

[2] *See also Anderson v. Celebrezze,* 460 U.S. 780 (1983) (sustaining validity of a lawsuit in federal court by citizens of Ohio against the Ohio Secretary of State challenging the constitutionality of the state's election law under the First Amendment and Equal Protection Clause and requesting equitable relief); *Wallace v. Jaffree,* 472 U.S. 38 (1985) (sustaining validity of a lawsuit in federal court by Alabama citizens against the Governor of Alabama and state officials challenging the constitutionality under the Establishment Clause of several Alabama statutes requiring one minute of silence in all public schools for meditation or voluntary prayer and permitting teacher led prayer, requesting equitable relief); *Obergefell v. Hodges,* 576 U.S. 644 (2015) (sustaining validity of a lawsuit in federal court by citizens of Michigan, Tennessee and Kentucky against the respective governors of these states contesting the constitutionality under 14th Amendment substantive due process of the respective state marital laws precluding marriage between same-gender couples and requesting equitable relief against the enforcement of these laws).

based on 42 U.S.C. § 1983.  They were all exclusively based on a provision of the Constitution, and were held to be cognizable.  This is precisely how Plaintiffs have pled each of their claims against the Defendants.

The cases cited by Defendants on p. 9 are distinguishable. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984), raised the question whether a federal court had jurisdiction over <u>a pendent state claim</u> alleging that a state hospital was violating a Pennsylvania statute. The Supreme Court held the 11th Amendment barred such a claim in federal court. Here, Plaintiffs are not claiming Defendants are violating Michigan law. They are claiming, rather, that Defendants are violating provisions of the Constitution, a claim which is not barred by the 11th Amendment. In *Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996), the Seminole tribe was suing Florida for violating a federal statute, the Indian Gaming Regulatory Act, 25 U.S.C. 2710(d)(1)(C). The Court held the Indian Commerce Clause of the Constitution, Art. 1, 10, cl. 3, did not authorize Congress to abrogate state sovereignty under the 11th Amendment, and Florida had not consented to be sued in federal court to enforce the statute. Plaintiffs are not suing under a federal statute; rather, they are suing directly under the 1st and 14th Amendments of the Constitution, for which no consent by Michigan is required. In *Quern v. Jordan,* 540 U.S. 332 (1979), the issue was whether a requirement that Illinois send notices to its citizens informing them of their potential entitlement to welfare benefits under *Edelman v. Jordan,* 415 U.S.

651 (1974), involved retroactive relief requiring expenditures from the Illinois treasury, and thereby violated the 11th Amendment. The Court held that the notices were ancillary to prospective relief, and therefore the requirement to send the notices did not violate the 11th Amendment. Plaintiffs are requesting prospective <u>equitable relief</u>, i.e., cancellation of future disciplinary action, which would not require any expenditures from the Michigan treasury. In *Will v. Mich. Dep't of State Police,* 491 U.S. 58 (1989), the plaintiff had sued the Michigan State police in a Michigan state court, and had pled a claim pursuant to 42 U.S.C. § 1983. The Court reaffirmed the holding in *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978), that states, and state employees named in their official capacities, do not qualify as "persons" under the statute. To reiterate, none of Plaintiffs' claims involve 42 U.S.C. § 1983. Likewise, in *Mikel v. Quinn,* 581 F.4[th] 252 (6th Cir. 2023), the plaintiff filed suit in federal court against the Tennessee Attorney General, claiming that the Tennessee Department of Children's Services had violated her rights under 42 U.S.C. § 1983. The decision is inapplicable, since Plaintiffs are not suing pursuant to 42 U.S.C. § 1983. As Defendant acknowledge, all of the Michigan cases cited at the bottom of p. 9 involved claims pled under 42 U.S.C. § 1983. They have no bearing on this lawsuit. In sum, Plaintiffs' claims pled in the FAC are not barred by the 11th Amendment.

## II. PLAINTIFFS ARE PROPERLY SEEKING PROSPLECTIVE RELIEF.

Defendants assert in Argument I(B) that Plaintiffs' claims against Goetz fail

to request prospective relief, and therefore do not qualify as avoiding 11th Amendment immunity under *Ex parte Young.* A review of the prayers for relief demonstrate that this assertion is false.  The prayer for relief at the end of Count I states:

> **WHEREFORE**, Mr. Susselman requests that the Court enter a declaratory judgment that the Commission and Defendant Goetz <u>are violating</u> Mr. Susselman's rights under the Equal Protection Clause by requiring him to respond to Ms. Kinnucan's Request for Investigation and <u>considering future disciplinary action against him</u> for purportedly violating the Michigan Rules of Professional conduct, and <u>issue an injunction precluding the Commission and/or Defendant Goetz from proceeding with disciplinary action against Mr. Susselman</u> based on Ms. Kinnucan's Request.  (Emphasis added.)

The use of the present tense makes clear that the alleged constitutional violation is ongoing and occurring in the present, and requests prospective future relief in "precluding … Defendant Goetz from proceeding with disciplinary action against Mr. Susselman."  Preceding the prayer for relief, Plaintiffs state:

> 88.    Equitable relief against impending future unconstitutional action by a state in the form of an injunction is appropriate, *Ex parte Young, supra*, as well issuance of a declaratory judgment holding that continuing and impending action are unconstitutional, *Brown v. Board of Education of Topeka,* 347 U.S. 483 (1953); *Milliken v. Bradley,* 433 U.S. 267 (1977); *Steffel v. Thompson,* 415 U.S. 452 (1974), or both, *Steffel; Dombrowski, supra.*

The same prayer for relief and preliminary paragraph appear at the end of each of the subsequent counts, Count II through V.  Plaintiffs have specified ongoing present conduct by Mr. Goetz, and request equitable relief precluding <u>future</u> conduct.  This is sufficient to satisfy the requirements of *Ex parte Young.*

11

The Defendants proceed to object that Mr. Goetz is not an appropriate defendant because he does not make the final decision whether to discipline Plaintiffs. This objection is refuted by the Defendants' own assertion in ¶5 of their motion that, "Mr. Goetz is the Grievance Administrator appointed by the Michigan Supreme Court and is charged with investigating alleged misconduct of attorneys." Moreover, the objection is further refuted by several of the decisions cited above. In *Dombrowki, supra,* the Governor of Louisiana was deemed a proper defendant, although the governor played no direct role in enforcing the Louisiana statute intended to combat subversive activities and Communism. In *Jenkins, supra,* the Governor of Louisiana played no role in the operation of the Commission the constitutionality of which was challenged in the lawsuit. In *Wallace, supra,* the Governor of Alabama played no direct role in enforcing the requirement that public schools provide for a minute of silence and meditation. In *Obergefell, supra,* none of the governors of Michigan, Tennessee or Kentucky played any direct role in enforcing the state' matrimony laws or prohibiting the marriage of same-sex couples. Yet, in none of these decisions did the Supreme Court hold that the indirect role played by the respective defendants failed to satisfy the requirements under *Ex parte Young*.[3]

---

[3] Even if Mr. Goetz does not qualify as the proper defendant, by the Defendants' own admission, naming the nine individual members of the Commission themselves as defendants would obviate this issue. Under Fed. R. Civ. P. 15(2), should the Court agree that Mr. Goetz is not the appropriate defendant, leave to amend the FAC to add

On p. 13, Defendants claim that Plaintiffs have admitted "that they lack proof of antisemitic animus by the AGC," citing ECF No. 13, PageID.643, 649.  Plaintiffs have made no such admission on the cited pages.  Rather, Plaintiff assert on the pages in question that, as Ms. Lindsey acknowledged in her response to Mr. Susselman's inquiry, because the Commission does not generate data on how many Requests For Admission it requires attorneys to respond to where the request has been  made by an individual who either does not reside in Michigan, or who was not provided legal services by the attorney in question, or where a judge has ruled that the attorney had filed a frivolous pleading, Plaintiffs cannot prove their violation of the Equal Pro-tection Clause by pursuing their claim before the Commission, because under MCR 9.115(F)(4) discovery of such data would not be permitted.  Consequently, in order to obtain such information, Plaintiffs had to file their Equal Protection claims in federal court.  Via discovery in this Court, the Commission will be required to provide such data to Plaintiffs, substantiating that the Commission and Mr. Goetz are violating

---

each of the Commissioners as defendants would have to be freely given "when jus-tice so requires."

The cases cited by the Defendants in support of their contention that the Commis-sion, named as a body, is not a proper defendant are not apposite.  In *Puerto Rico Aqueduct and Sewer Authority v. Metcalf Eddy, Inc.,* 506 U.S. 139 (1992), the plain-tiff was suing the Puerto Rico Aqueduct and Sewer Authority, an arm of Puerto Rico, not for equitable relief, but for damages for an alleged breach of contract.  Similarly, in *Whitfield v. State,* 639 F.3d 253 (6th Cir. 2011), the plaintiff was seeking monetary damages from the Tennessee Department of Mental Health. Here, Plaintiffs are seek-ing only prospective equitable relief.

equal protection by having issued the Requests for Investigation to Plaintiffs. In sum, Defendants contention that the equitable relief Plaintiffs have requested does not comport with the requirements under *Ex parte Young,* and that Mr. Goetz is not the proper defendant, is without merit.

## III.   THE LAWSUIT IS NOT BARRED BY *YOUNGER* ABSTENTION.

Defendants' contention that the lawsuit is barred by the abstention doctrine under *Younger v. Harris,* 401 U.S. 37 (1971), lacks merit. In *Younger,* the Supreme Court held that federal courts are required to abstain from adjudicating lawsuits which would involve the federal court interfering with an ongoing state criminal proceeding.[4]   In *Middlesex Ethics Comm. v. Garden State Bar Assn,* 457 U.S. 423 (1982), the Supreme Court extended the application of *Younger* abstention to state disciplinary proceedings against attorneys charged with violating the state's ethical or professional regulations. There is an exception to the application of *Middlesex* if the state's disciplinary proceeding does not permit the attorney to raise and prove claims that the proceeding violates the attorney's constitutional rights. "[T]he federal court should not exert jurisdiction if the plaintiffs 'had an *opportunity* to present their federal claims in the state proceedings.'"  *Moore v. Sims,* 422 U.S. 415, 425 (1979)

---

[4] *But see Dombrowski v. Pfister,* 389 U.S. 479 (1965) (abstention not appropriate where criminal prosecution threatens a substantial loss or impairment of freedom of expression). Here, the Commission's actions against the Plaintiffs for having made certain arguments in their legal briefs does threaten "a substantial loss or impairment of their freedom of expression on behalf of their clients."

(italics in the original).  In *Middlesex,* the Court likewise stated that *Younger* absten-

tion applies to state disciplinary proceedings, "So long as the constitutional claims

of respondents can be determined in the state proceedings … ."  457 U.S. at 435.

*See also Squire v. Coughlan,* 469 F.3d 551, 555 (6th Cir. 2006); *Fieger v. Thomas,*

74 F.3d 740, 745 (6th Cr. 1996).

Here, Plaintiffs are not able to pursue their constitutional claims before the

Commission.  As Ms. Lindsey admitted in her email to Mr. Susselman, any constitu-

tional claim raised by him in a prospective disciplinary proceeding would be subject

to the rules of discovery under MCR 9.115.  Mr. Susselman is claiming that his right

to Equal Protection is being violated by the failure of the Commission to issue Re-

quests for Investigation in every instance where the Request is filed by an individual

who does not reside in Michigan, and/or who has not been represented by the attorney

against whom the Request is made, or in which a court has ruled that the attorney

previously filed a frivolous pleading, and that the Request which was issued to him is

distinguishable by the fact that he is Jewish, whereas comparable Requests against

attorneys who are not Jewish are not pursued.

MCR 9.115(F)(4) provides, in relevant part:

> (4) Discovery.  Pretrial or discovery proceedings are not permitted
> except as follows:
>                              . . .
> (ii)  Within 21 days following the filing of an answer, the admin-
> istrator and respondent shall exchange the names and addresses of
> all persons having knowledge of relevant facts and comply with

        reasonable requests for

(1) <u>nonprivileged information</u> and evidence relevant to the charges against the respondent, and

(2) other material upon good cause shown to the chair of the hearing panel.

(Emphasis added.)

None of the provisions in MCR 9.115(F)(4) would allow Mr. Susselman to obtain the information he needs regarding how the Commission has treated other Requests filed by individuals who do not reside in Michigan, or who have not been represented in a legal matter by the attorney against whom the Request is filed, or in which a court has ruled that a pleading filed by the attorney was frivolous, in order to show a disparity to prove that the Commission has violated his rights under the Equal Protection Clause.  This information would not be available for two reasons: (1) MCR 9.115(F)(4)(a)(ii)(1) only allows discovery of non-privileged information.  As Ms. Lindsey stated in her email, information regarding other Requests is privileged and not subject to discovery. (2) As she further stated, the Commission has no data regarding Requests filed by individuals not living in Michigan, or by individuals filing Requests against attorneys who have not represented them.  But even if the Commission does not keep such data, the Requests themselves would still be in the Commission's possession, from which such information could be extracted.  But it would not make this information available to Mr. Susselman, because it is privileged.  Without this information, it is not possible for Mr. Susselman to prove <u>in the disciplinary proceeding</u> that the Commission's issuance of Ms. Kinnucan's Request against him violates

the Equal Protection Clause.  The same limitations would apply to Mr. Leaf's efforts to obtain information regarding how many attorneys whom a judge has ruled filed a frivolous pleading have been required to respond to a Request For Investigation.  If the percentage is less than 100%, the question remains why Mr. Leaf was required to respond to such a Request, while others were not.

Consequently, neither Mr. Susselman nor Mr. Leaf have an opportunity to present his federal equal protection claim that the Commission's procedure violates the Equal Protection Clause in the state proceeding.  Abstention under *Middlesex* therefore does not apply to either Mr. Susselman's or Mr. Leaf's equal protection claim. Since the information regarding other Requests is solely within the possession of the Commission, by virtue of its inability or unwillingness to provide this information to Mr. Susselman or Mr. Leaf, their burden of proving that the Commission has violated the Equal Protection Clause shifts to the Commission to prove that it has *not* violated the Equal Protection Clause.  *See United States v. N.Y., N.H.H.R. Co.,* 355 U.S. 253, 256, note 5 (1957) (the law does not place the burden of proof on a party when the material information is peculiarly within the knowledge of his adversary); *Shatterproof Glass Corp. v. Libbey-Owens-Ford,* 482 F.2d 317, 324 (6th Cir. 1973) (where material evidence is solely within the possession of the defendant, the burden of proof shifts to the defendant); *Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 113 (2d Cir. 2021) (same); *Cent. Of Ga. R. Co. v. Occup. S. H. R. Comm'n,* 576 F.3d 620, 624 (5th Cir. 1978)

17

(same); *Estate of Barton v. ADT Security Services Pension Plan,* 820 F.3d 1060, 1066 (9th Cir. 2016) (same).  Without the information regarding how Requests by individuals who do not live in Michigan, or against attorneys who have not represented the individual filing the Request, or against attorneys whom a court has ruled the attorney filed a frivolous pleading, the Commission cannot carry its burden of proving that *it has not* violated their rights under the Equal Protection Clause.

Defendants' contention on pp. 16-17 that the three factors which apply to abstention under *Middlesex* are satisfied here is irrelevant where, as here, the exception to such abstention applies where the attorney is precluded from advocating his constitutional defenses in the state proceeding.  Their reliance on the assertion in *Fieger, supra,* 74 F.3d at 745-746 that, "the Michigan lawyer discipline proceedings afford an adequate opportunity to raise constitutional challenges" is misplaced.  In support of this assertion, the Court noted that an attorney defending against a charge by the Commission of unprofessional conduct "may be represented by a lawyer, can conduct discovery, may depose unavailable witnesses, and may, for good cause shown, depose other witnesses."  These constitutional due process protections, however, do not address Plaintiffs' constitutional claims in this lawsuit, which relate to the scope of discovery which would be available to them to prove their equal protection violation claim.  The Court stated, *id.* at 746, "The Michigan Court Rules specify that '[e]xcept as otherwise provided in these rules, the rules governing practice and procedure in a

nonjury civil action apply to a proceeding before a hearing panel.'  M.C.R. 9.115(A)."

However, as stated in MCR 9.115(F)(4), attorneys are only entitled to discovery of

"nonprivileged" information.  Ms. Lindsey stated in her email that information re-

garding other Requests is privileged and not subject to discovery.

Therefore, even under the decision in *Fieger,* Plaintiffs would not be allowed

to obtain information regarding Requests for Investigation against attorneys filed by

individuals from other states, or who were never represented by the attorney, or who

were held by a court to have filed a frivolous pleading, <u>even though the Commission</u>

<u>has copies of every Request for Investigation ever filed against an attorney</u>.  Without

this information, Plaintiffs would not be able show that the Equal Protection Clause

was being violated.  <u>This information would only be available pursuant to discovery</u>

<u>in a federal court.</u>  Consequently, *Younger* abstention does not preclude the Plaintiffs

from pursuing their lawsuit in this Court.

## IV.    *ROOKER-FELDMAN* DOCTRINE DOES NOT BAR THE LAWSUIT.

The *Rooker-Feldman* doctrine precludes a litigant who has lost a case in state

court from filing a lawsuit in federal court to reverse the state court decision.  How-

ever, by filing the instant lawsuit in this Court, neither Plaintiff is seeking to reverse

a prior decision of another court. Mr. Susselman is not seeking in this lawsuit to

reverse either decision by the Sixth Circuit Court of Appeals relating to the lawsuit

he filed against the protesters in front of the Ann Arbor synagogue. Mr. Leaf is not

seeking in this lawsuit to reverse the decision of the Michigan Court of Appeals related to his lawsuit against Nike regarding their video advertisement which includes anti-Semitic messages. Rather, in this lawsuit Plaintiffs are contending that the Commission's issuance of Requests for Investigation relating to statements which Plaintiffs made in briefs which they filed in the prior lawsuits violates their rights under the First and Fourteenth Amendments. This is an independent claim from the claims which were asserted in the prior lawsuits, and therefore is not barred by the *Rooker-Feldman* doctrine. Nowhere in the FAC does either Plaintiff request that this Court reverse, vacate, or nullify any decision rendered in either of the prior lawsuits.

Defendants assert on p. 20 that, "At the core of their amended complaint, Plaintiffs' fundamental claim is that they had a right to assert that antisemitism motivated the courts to find their filings frivolous when representing their clients." This assertion is false and a distortion of what this lawsuit is about. This lawsuit is <u>not</u> about asking this Court to overturn the rulings in either of the prior lawsuits. This lawsuit asserts, rather, that the Commission's decision <u>to seek to discipline Plaintiffs for the arguments they made in the prior lawsuits,</u> separately and independently of the decisions in those prior lawsuits, violates their rights under the Equal Protection Clause of the 14th Amendment and the Freedom of Speech Clause of the 1st Amendment. They assert that the Commission's actions are causing them <u>a separate injury</u> by violating their constitutional rights. The Court does not have to reverse either of

20

the prior decisions in order to determine whether the Commission's conduct does in fact violate Plaintiffs' constitutional rights.

The Supreme Court emphasized this distinction in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280 (2005), in which the Court held that the lower courts were improperly applying the *Rooker-Feldman* doctrine to dismiss cases on the purported basis of lack of jurisdiction.  The Court stated, *id.* at 284, 293:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name:  cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.  *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.
>
> * * *
>
> Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law.  The Full Faith and Credit Act, 28 U.S.C §1738 … requires the federal court to "give the same preclusive effect to a state-court judgment as another court of that State would give." …  Preclusion, of course, is not a jurisdictional matter. …
>
> Nor does §1257 stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court.  <u>If a federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party … then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.</u>" … (Emphasis added; citations omitted.)

21

*See also Todd v. Weltman, Weinberg Reis Co., L.P.A.,* 434 F.3d 432 (6th Cir. 2006) (rejecting the defendant's claim that the plaintiffs' federal lawsuit was barred by the *Rooker-Feldman* doctrine).

While Defendants refer, in addition, to the "collateral bar" rule, they offer no analysis of the bar or how it applies here.  It does not apply.  Defendants are presumably referring to collateral estoppel.  The Michigan Supreme Court explained the doctrine of collateral estoppel in *Monat v. State Farm Ins. Co.,* 469 Mich. 679 (Mich. 2004), as follows, *id.* at 683:

> Generally, for collateral estoppel to apply three elements must be satisfied: (1) "a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment"; (2) "the same parties must have had a full [and fair] opportunity to litigate the issue"; and (3) "there must be mutuality of estoppel." … (Citations omitted.)

In *Monat,* the Court held mutuality of estoppel was no longer required if the claim of estoppel was being asserted defensively.  Neither of the remaining factors is satisfied.  The questions of fact and constitutional issues raised in the current lawsuit against the Commission were not addressed in either of the prior cases. Plaintiffs are not requesting, for example, that this Court rule that anti-Semitism played a role in either of the prior cases.  They are making a totally different argument – that the Commission's action to discipline Plaintiffs for making the claims of anti-Semitism in the prior cases, and the manner in which the Requests for Investigation were filed,

violate their constitutional rights. Neither of these questions were raised in the prior lawsuits; Plaintiffs are not estopped from raising them here.

## V.  NONE OF DEFENDANTS' OTHER ARGUMENTS HAVE MERIT.

### A.  Plaintiffs Have Not Failed To Seek Relief Against Goetz.

On p. 21, Defendants erroneously assert that Plaintiffs seek relief only from the Commission, and fail to assert that they seek relief from Mr. Goetz.  This assertion is false, as a review of each of the prayers for relief demonstrates.

### B.  42 U.S.C. § 1983 Is Not Relevant To Any Of Plaintiffs' Claims.

In their Argument II(B), Defendants assert that Plaintiffs have failed to satisfy the elements of a claim under 42 U.S.C. § 1983.  This argument is specious, as demonstrated in Argument I, *supra.*

### C.  Defendants' Have Pled Cognizable First Amendment Claims.

The Michigan Rules of Professional Conduct provide, in relevant part:

Comment to MRPC 1.0:

As a public citizen, a lawyer should seek improvement of the law, the administration of justice and the quality of service rendered by the legal profession. As a member of a learned profession, a lawyer should cultivate knowledge of the law beyond its use for clients, employ that knowledge in reform of the law and work to strengthen legal education. A lawyer should be mindful of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons who are not poor, cannot afford adequate legal assistance, and should therefore devote professional time and civic influence in their behalf. A lawyer should aid the legal profession in pursuing these objectives and should help the bar regulate itself in the public interest.

MRPC 3.1 states, in relevant part:

Rule 3.1. Meritorious Claims and Contentions. A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous. A lawyer may offer a good-faith argument for an extension, modification, or reversal of existing law. …

In their Argument II(C), Defendants contend that Plaintiffs did not themselves have a First Amendment right, nor a First Amendment right on behalf of their clients, to make the statements in their legal briefs asserting that certain statements by the presiding judge made in their decisions, and in the case of Judge Hulsing, certain conduct, had the appearance of being anti-Semitic.  In support of their contention, Defendants state on p. 23 that, "Courts are authorized to discipline attorneys when they violated court decorum rules and make baseless statements[,]" citing *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991).  In *Chambers,* the attorney was sanctioned because he had "(1) attempted to deprive the court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of the court, (2) filed false and frivolous pleadings, and (3) "attempted by other tactics of delay, oppression, harassment and massive expense to reduce [NASCO] to exhausted compliance." Plaintiffs' statements in their legal briefs that the statements and conduct of the presiding judges appeared to be motivated by anti-Semitism were far from the conduct alleged in *Chambers.*  Moreover, the anti-Semitism claims were justified in light of the evidence set forth in ¶¶ 21-38, 57-67 of the FAC.

24

Defendants also cite *Mezibov v. Allen,* 411 F.3d 712 (6th Cir. 2005), in support of their position.  In *Mezibov,* the plaintiff was a criminal defense attorney who filed three motions in a criminal case seeking to dismiss the indictment and to disqualify the prosecutor for allegedly engaging in improper conduct.  The motions were denied, and the defendant was convicted by a jury.  Thereafter, the prosecutor made public statements accusing the attorney of incompetence and filing frivolous motions which actually adversely affected his client's interests.  The attorney sued the prosecutor under 42 U.S.C. § 1983, claiming that when the prosecutor made the disparaging comments about him, the prosecutor was acting under color of law and defamed him.  The attorney contended that the disparaging comments constituted retaliation against him for "exercising his First Amendment right to protect his client's Sixth Amendment and other constitutional rights."  411 F.3d at 716.  The trial court dismissed the lawsuit for failure to state a claim.  The case is immediately distinguishable on the basis that it was based on 42 U.S.C. § 1983, whereas, as demonstrated above, none of Plaintiffs' claims are based on 42 U.S.C. § 1983.  They are all based directly on Amendments I and XIV.

More significantly, regarding the attorney's contention that the trial court's decision failed to recognize his First Amendment rights, the Court stated, *id.,* at 718:

> [A]ny such challenge is almost always grounded in the rights of the client, rather than any independent rights of the attorney.  *See Zal* [*v. Steppe,* 968 F.2d 924 (9th Cir. 1992)], F.2d at 931 (Trott, J. concurring) ("In the courtroom, during a judicial proceeding, an attorney's First

25

Amendment' rights depend exclusively on his client's trial rights.") *see also Legal Services Corporation v. Velazquez,* 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (upholding the First Amendment challenge by indigent clients to government funding regime that prevented their attorneys from presenting to a court on the clients' behalf certain otherwise-reasonable arguments against the validity of welfare laws).

Here, both Plaintiffs cited *Legal Services Corporation v. Velazquez,* 531 U.S. 533 (2001), in their First Amendment claims, asserting that when they made the assertions regarding anti-Semitism on the part of the respective presiding judge, they were making the arguments on behalf of their clients.  (*See* ¶¶ 90 and 115 of the FAC.)  This argument was directly relevant to their clients' interests.  In the case of Mr. Susselman, his clients were seeking equitable relief against anti-Semitic, neo-Nazi protesters in front of their synagogue and they asserted standing on the basis of the severe emotional distress the protesters' anti-Semitic signs caused them as they entered their house of worship to exercise their First Amendment right of freedom of religion. The trial court judge had dismissed the lawsuit on the basis that their emotional distress under the circumstances did not constitute a "concrete" injury, and then proceeded to rule that the lawsuit was "frivolous," and awarded monetary sanctions against the plaintiffs and their attorney requiring that they pay the protesters' attorney fees in the amount of $158,000, to be paid jointly and severally.  An argument that the judge's outrageous rulings were motivated by anti-Semitic sentiments constituted "a good-faith argument for an extension, modification, or reversal of existing law" seeking "improvement of the law, the administration of justice and

26

the quality of service rendered by the legal profession."[5]

In Mr. Leaf's lawsuit, he was seeking equitable relief under the Michigan Consumer Protection Act to protect against a misleading and deceptive video advertisement by Nike, which purported to be about soccer and athletic equipment, but which transmitted both ostensible and subliminal anti-Semitic messages.  Judge Hulsing, rather than addressing the serious and sinister aspect of the anti-Semitic messages, instead compared Mr. Leaf's argument to challenging an advertisement for cookies which failed to disclose the unhealthy ingredients of the cookies.  In addition to trivializing the argument, Judge Hulsing applied disparate treatment by requiring that Mr. Leaf appear in his court in person to argue Nike's motion to dismiss, while Nike's attorney could appear via Zoom.  Mr. Leaf's claim that the judge's rulings had the appearance of being motivated by anti-Semitism, rather than by the

---

[5] While Miriam Brysk is deceased, and therefore is not available to testify regarding how she interpreted the trial judge's decisions, her husband, Henry Brysk, in an affidavit provided to the Commission in relation to another grievance filed against Mr. Susselman by Dr. Brysk's, daughter, accusing him of bullying her mother to be a plaintiff, has attested to how he interpreted the trial court's rulings. (*See* Affidavit, attached as Exhibit 1.)  Mr. Brysk attested as follows:

> 18.    After I read the first decision by the trial judge asserting that the emotional distress which Miriam stated she experienced by seeing the anti-Semitic signs in front of the synagogue was not a concrete injury, I concluded that the judge was anti-Semitic.  That conclusion was reinforced when I read her decision asserting that the lawsuit was frivolous, and required that Miriam, Mr. Gerber, and Mr. Susselman had to pay the attorney fees of the protesters.

27

merits of his argument, was a legitimate argument on behalf of his client, and con-

stituted "a good-faith argument for an extension, modification, or reversal of existing

law" seeking "improvement of the law, the administration of justice and the quality

of service rendered by the legal profession."

Defendants assert on p. 24 that, "[A]n AGC process is solely about attorneys-

not their clients.  There is no risk to Plaintiffs' clients, nor do Plaintiffs' request relief

on their behalf."  This assertion is false.  To the extent that attorneys, particularly

attorneys who represent members of ethnic, racial, or religious minorities, are sub-

ject to disciplinary action for stating in legal briefs that a presiding judge's state-

ments and/or conduct, based on the evidence, have had the appearance of bias against

a particular ethnic, racial, or religious minority, taking disciplinary action against the

attorney stifles such expression by attorneys representing those minorities, and has

an adverse effect on the administration of justice, generally.  Under *Velazques,* attor-

neys have third-party standing to defend the freedom of speech rights of their clients,

just as physicians have third-party standing to protect the constitutional rights of

their patients.  *See Singleton v. Wulff,* 428 U.S. 106 (1976); *see also National Asso-

ciation for the Advancement of Colored People v. Button,* 371 U.S. 415 (1963).

In this regard, empirical studies have demonstrated there is extensive implicit

racial and religious bias among jurists.  In *Judging Implicit Bias:  A National Em-

pirical Study Of Judicial Stereotypes,* Florida Law Review, Vol. 69, Issue 1 (January

2017) (copy attached as Exhibit 2), the authors document that extensive anti-Semitic

sentiments exist in the judiciary, stating, *id.,* at 63:

> This Article proposes, and then empirically tests, the proposition that even today negative implicit biases may manifest in federal and state judges against even so-called privileged minorities, such as Asian-Americans and Jews.  We present the results of an original empirical study we concluded on 239 sitting federal and state judges (including 100 federal district judges representing all Circuits) and consider the ways in which these judicial implicit biases may manifest.  The study found the judges harbored strong to moderate negative implicit stereotypes against Asian-Americans and Jews, while holding favorable implicit stereotypes towards Whites and Christians.  These negative stereotypes associate Asians and Jews with immoral traits, such as "greedy," "dishonest," and "controlling," and associate Whites and Christians with moral traits, such as "trustworthy," "honest," and "giving." … This Article suggests, and the empirical study supports the claim, that automatic biases and cognitions influence a much broader range of judicial decisions than has previously been considered.

*See also White Supremacy From The Bench,* Lewis & Clark Law Review, Vol. 27,

No. 39 (2023), (copy attached as Exhibit 3). The studies demonstrate that Plaintiffs'

claims that the presiding judges expressed sentiments which had the appearance of

being anti-Semitic are supported by empirical evidence, and are not frivolous.

On p. 24, Defendants assert that the Plaintiffs' "interests and their clients' interests could be in conflict in an AGC process," because "their clients must pay the

sanctions, not Plaintiffs."  This assertion is irrelevant to the freedom of speech issue,

and, in addition, is false.  In the case of the attorney fees sanction which Judge Roberts awarded the protesters, the attorney fee sanction was assessed against Mr.

Susselman and his clients, jointly and severally.  Consequently, all three, including

Mr. Susselman, were each individually liable for the entire $158,000 attorney fee award. Moreover, if the attorney fee award was motivated in any respect by anti-Semitic sentiments on the part of Judge Roberts, requiring payment of the award by any of the three individuals cannot be justified, and therefore repayment could not be justified. In Mr. Leaf's case, he paid the entire sanction himself.[6]

### D.    Plaintiffs Have Pled Cognizable Equal Protection Claims.

Defendants argue that Plaintiffs' Equal Protection Claim is not cognizable because they have admitted in the FAC that they do not have evidence of disparate treatment by the Commission of Requests for Investigation filed, in Mr. Susselman's case, of Requests filed by individuals not living in Michigan, or who were not

---

[6] Defendants proceed to claim that neither Mr. Susselman nor Mr. Leaf have clients whose interests they represent, because Dr. Brysk has passed away, and H. P. Benson has been dissolved, because Mr. Leaf allegedly failed to file its annual reports. Both claims are false. Dr. Brysk passed away <u>after</u> the appeal for the attorney fee award was filed in the Court of Appeals. Therefore, when Mr. Susselman made the statements in his appellate briefs that Judge Roberts' rulings had the appearance of being anti-Semitic, sentiments which motivated her attorney fee award requiring that Dr. Brysk, a Holocaust survivor, pay the anti-Semitic, neo-Nazi protesters $158,000, he was in fact protecting Dr. Brysk's right to freedom of religion against the apparent anti-Semitic motives of a federal judge. Moreover, after Dr. Brysk passed away, while the appeal was still pending, Henry Brysk, who was the executor of her estate, authorized Mr. Susselman to continue to represent Dr. Brysk's estate. With regard to Mr. Leaf, Defendants' assertion on p. 25 that under Mich. Ct. R. 450.2911 (*sic*), the alleged failure to file annual corporate reports resulted in the dissolution of H. P. Benson, is also false. Defendants are presumably referring to MCL 450.2911. Nowhere in MCL 450.2911 does it state that failure to file an annual report results in the automatic dissolution of the corporation. Moreover, Mr. Leaf has retroactively filed the reports. Plaintiffs' First Amendment claims are cognizable.

represented in any legal matter by the attorney against him the Request is filed, and in Mr. Leaf's case of Requests filed against attorneys whom a court has ruled filed a frivolous pleading. This, Defendants claim, is an admission that the Plaintiffs cannot prove their denial of equal protection claim. This contention is false, and constitutes a distortion of what Plaintiffs have alleged in their respective Equal Protection claims. Plaintiffs do not assert that there is no evidence to support their disparate treatment claim. Rather, they assert that such evidence is not available <u>in the disciplinary process under the Michigan Court Rules which apply to the disciplinary process</u>, and therefore *Younger* abstention does not apply under *Middlesex, supra.* Every Request for Investigation which has ever been filed with the Commission is still in the possession of the Commission. The evidence to prove Plaintiffs' equal protection claim exists in those documents, but the procedures which apply under the Michigan Court Rules will not allow Plaintiffs to have access to that information. This is not an admission that the evidence does not exist; it is an assertion that the Commission will not allow them to have access to the information in the State's disciplinary process, which is the reason that abstention under *Middlesex* does not apply. The law does not place the burden of proof on a party when the material information is peculiarly within the knowledge of his adversary. *United States v. N.Y., N.H.H.R. Co., supra.* 355 U.S. at 256, note 5 (1957).

Defendants' contention that Plaintiffs are seeking to conduct "a fishing

expedition" to obtain this information is also specious.  Defendants cite *Fears v. Kasich, In Re: Ohio Execution Protocol Litigation,* 845 F.3d 231 (6th Cir. 2016), in support of their position.  In *Fears,* the trial court imposed a protective order precluding the plaintiffs, death-row inmates, from obtaining the identities of manufacturers of Ohio's legal-injection drugs, as well as the identities of individuals who performed the executions.  The trial court expressed a concern that revealing the identities of the suppliers and manufacture, as well as the executioners, would subject them to the risk of harm, violence and harassment, and interfere with the execution protocol.  The appellate Court held that the protective order was justified and did not prevent the plaintiffs from prosecuting their claims.  Plaintiffs here are not seeking the identities of individuals who have filed Requests for Investigation, although they do not live in Michigan or have never been represented by the attorney against whom they have filed the Request.  In his email exchange with Ms. Lindsey, Mr. Susselman in fact acknowledged that the identities of the individuals who filed the Requests, and of the attorneys regarding whom the Requests were made, would have to be redacted.  Nor are Plaintiffs seeking the identities of attorneys who have been sanctioned for filing a frivolous pleading.  The only information Plaintiffs are seeking are the numbers of such Requests which have been filed, and which the Commission proceeded to require the respective attorney to file a response to.  The identities of the attorneys, and of the individuals who filed the Requests are

irrelevant.  No individuals would be put in any danger or risk of harm by requiring the Commission to provide this numerical information, since no identities would be disclosed.  Obtaining such numerical information does not constitute a "fishing expedition."  The information is obtainable, since the Commission possesses every Request for Investigation which has ever been filed.  The Equal Protection claim is thus cognizable.

### E.    Mr. Leaf's Due Process Claim Is Cognizable.

The Defendants' position that Mr. Leaf's due process claim is not viable because he has not yet actually been charged with violating the MRPC contradicts their own position on p. 11 that the Plaintiffs' claims fail because they have purportedly failed to request prospective relief.  But a request for prospective relief is predicated on the circumstance that the actual injury has not yet occurred, but is threatened.  That is precisely what the Commission's Request for Investigation portends – a future actual injury.  A litigant does not have to wait until the threatened injury is actualized.  S/he is entitled to seek a declaratory judgment to prevent the potential future actual injury, before it occurs.  *See Steffel v. Thompson,* 415 U.S. 452 (1974) (petitioner entitled to declaratory relief to prevent a threatened prosecution, "when a state prosecution has been threatened, but is not pending, and a showing of bad-faith enforcement or other special circumstances has not been made").

Mr. Leaf's due process claim is based on the failure of the Defendants to

identify specifically which provision(s) in the Michigan Rules of Professional Con-duct the Commission is claiming that he allegedly violated.  This failure deprives him of an essential element of due process – notice.  *See Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306 (1950). Defendants respond on p. 28:  "As a licensed attorney knowledgeable in Michigan's Code of Professional Responsibility, Leaf has received sufficient notice of the rules and how they <u>might</u> be violated."  (Emphasis added.)  So, Mr. Leaf is supposed to scour through the several hundred provisions of the MRPC and guess which ones he is being charged with having violated.  This does not constitute adequate notice under the 14th Amendment.

## <u>CONCLUSION</u>

Anti-Semitism is on the rise around the world and in the United States.  On May 21, 2025, two members of the Israeli delegation to the United States were mur-dered in front of the Capital Jewish Museum in Washington, D.C., by a domestic terrorist shouting, "Free, Free Palestine!"  He had been radicalized by the anti-Se-mitic content which is proliferating on the internet, the kind of anti-Semitic content which is being promoted by the Nike video advertisement which Mr. Leaf demon-strated violates the Michigan Consumer Protection Act, but which Judge Hulsing trivialized by comparing it to an advertisement for cookies. This inapt comparison constitutes evidence that anti-Semitic sentiments are seeping into the judiciary.  De-fendants, rather than taking the claim of the proliferation of anti-Semitism seriously,

seek to suppress the Plaintiffs' exposure of this anti-Semitism which is infiltrating the judiciary, seeking to have the attorneys disciplined for alleged unethical conduct. As Justice Brandeis noted, however, "sunlight is said to be the best of disinfectants," quoted in *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 223 (1999) (O'Connor, J., concurring).

Plaintiffs acknowledge in the Introduction of their FAC that the claims they are making, that judicial statements made by two judges appear to be motivated by anti-Semitic sentiments, are very serious, and not to be made lightly.  Because they are very serious, they should be taken seriously.  Instead, Defendants seek to stifle Plaintiffs' claims by charging that their claims violate the Michigan Rules of Professional Conduct, for which they need to be subjected to professional discipline.  The Defendants, rather than taking Plaintiffs' claims seriously, seek to trivialize them, by making specious and meritless arguments, as did Judge Hulsing in making his inapt cookie comparison.  In their effort to stifle Plaintiffs' claims, Defendants contend, falsely, that Plaintiffs have failed to plead cognizable claims; that Plaintiffs have failed to satisfy the elements of a claim under 42 U.S.C. § 1983, when none of the claims are pled under § 1983; that Plaintiffs are asking this Court to reverse decisions previously made in other courts, and are thereby barred by the *Rooker-Feldman* doctrine, when no such request appears anywhere in the FAC.  None of Defendants' arguments have legal merit. Their motion to dismiss should accordingly be denied.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

/s/  Marc M. Susselman
Attorney for Plaintiffs

Dated: May 31, 2025

## CERTIFICATE OF SERVICE

The undersigned certifies that he served a copy of the preceding document on

each of the attorneys of record via the ECF system of the United States Court for

the Eastern District of Michigan on May 31, 2025

> Marc M. Susselman At-
> torney at Law
> 43834 Brandywyne Rd.
> Canton, Michigan 48187
> (734) 416-5186
> marcsusselman@gmail.com

By:                                    /s/  Marc M. Susselman
                                       Attorney for Plaintiffs

# EXHIBIT 1

## MICHIGAN ATTORNEY GRIEVANCE COMMISSION
### AFFIDAVIT OF HENRY BRYSK

State of Michigan        )
                          ) s
County of Washtenaw)

Henry Brysk, being first duly sworn, deposes and states as follows:

1.     If called upon to testify, I could testify to the following based on my personal knowledge.

2.     Dr. Miriam Brysk was my wife. She was a Holocaust survivor, as I am. We met after World War II.

3.     Miriam had a Ph.D. in Biological and Medical Sciences. I have a Ph.D. in theoretical physics.

4.     Miriam attended Jewish services at the Pardes Hannah congregation, which was located in an annex next to the Beth Israel synagogue in Ann Arbor, Michigan.

5.     Starting in 2003, protesters began picketing in front of Beth Israel synagogue and the Pardes Hannah annex on Saturday mornings, using numerous anti-Semitic signs. I know that several of the protesters were Holocaust deniers.

6.     The signs angered Miriam, and caused her extreme emotional distress.

7.     I met Marc Susselman in 2019. He indicated that he was in the process of preparing a lawsuit against the protesters in order to obtain an injunction against them which placed restrictions on their conduct. He asked if I would be willing to

be a plaintiff in the lawsuit. I declined, because I did not attend services at the Beth Israel synagogue, but indicated to Mr. Susselman that my wife attended services at the annex next to the synagogue and might be interested in participating in the lawsuit.

8.      Mr. Susselman thereafter met with Miriam and myself at our home in Ann Arbor to discuss the lawsuit. We had several meetings at our house for that purpose. The only people present at these meetings were Miriam, myself and Mr. Susselman. My daughter, Dr. Judith Bysk, was never present at any of these meetings.

9.      Miriam considered whether she wanted to be a party in the lawsuit against the synagogue protesters. She expressed some concerns whether there would be any adverse consequences if they lost the lawsuit. Mr. Susselman indicated that, based on his legal research, he thought it was highly unlikely that the court would award attorney fees to the protesters if we lost the lawsuit, although he could not guarantee that this would not occur.

10.     Miriam decided that she wanted to be a plaintiff in the lawsuit. She did so on her own volition. Mr. Susselman did not in any way pressure her to do so. Miriam had toured and delivered well-received lectures regarding her experiences during the Holocaust. She viewed her participation in the lawsuit as an opportunity

2

to educate the jury regarding the Holocaust in the event she testified. Mr. Susselman promised her that if there was a trial, he would call her to testify.

11.    After the oral argument in the Court of Appeals, Miriam's co-plaintiff, Marvin Gerber, contacted me by phone and told me that he was firing Mr. Susselman as his attorney, and recommended that Mirima do the same. I told Mr. Gerber that I did not think that it was a good idea to change attorneys mid-stream.

12.    After my conversation with Mr. Gerber, he and his wife came to our home in order to try to persuade Miriam to fire Mr. Susselman as her attorney. At the time, Miriam was suffering extreme back pain and was lying on a couch. Mr. and Mrs. Geber proceeded to bully Miriam into firing Mr. Susselman. Under pressure from them, she signed a statement terminating Mr. Susselman as her attorney. I observed what was occurring, and tried to intervene to prevent what was happening. Based on my observation, Miriam signed that statement against her will.

13.    After Mr. and Mrs. Gerber left our house, I sent an email to Mr. Susselman telling him what had occurred. Mr. Susselman came to our home and asked Miriam if she wanted to fire him as her attorney. Miriam answered, "I don't want to fire anyone." I agreed to sign a statement, prepared by Mr. Susselman, reporting what had occurred when Mr. and Mrs. Gerber visited us and bullied Miriam into signing a statement firing Mr. Susselman.

3

14.     That was the last time Miriam saw Mr. Susselman. After that meeting, Miriam began to experience a gradual decline in her cognitive ability. This occurred without Mr. Susselman's knowledge, and only after her last meeting with Mr. Susselman.

15.     I have read my daughter Judith Brysk's grievance that she filed against Mr. Susselman, asserting that he bullied Miriam into being a party in the lawsuit against the protesters, against her will, and claiming that Mr. Susselman took advantage of Miriam's cognitive disorientation in order to have her participate in the lawsuit. I was not aware that Judy had filed this grievance against Mr. Susselman, and would not have agreed with her filing it if she had consulted me before-hand. My daughter has no basis for making this claim against Mr. Susselman. She was never present when Mr. Susselman visited us or when he spoke to Miriam. Her claim that he bullied Miriam into being a party in the lawsuit, and took advantage of her mental decline, is false.

16.     The lawsuit dragged on for several years. During that time, Miriam deteriorated cognitively to a significant degree. I believe that my daughter is excessively projecting this deterioration backwards. Her perception of the lawsuit was second-hand, mostly from talking with her mother. Miriam had fantasies of playing a heroic role in the trial. As the dementia progressed, these fantasies grew. Thus, Judy protested that Miriam was no longer fit to participate in the lawsuit. But,

4

in reality, Miriam had no role in its pursuit other than her willingness to testify, and Mr. Sussleman, contrary to Judy's accusation, did not coerce Miriam into participating.

17.    Mr. Susselman kept Miriam and me informed regarding the lawsuit at every stage, and emailed copies of the various briefs that he filed throughout the lawsuit and the appeal. He also emailed copies of every decision that was made by the courts in this matter. Neither I nor Miriam had any complaints regarding how he represented Miriam.

18.    After I read the first decision by the trial judge asserting that the emotional distress which Miriam stated she experienced by seeing the anti-Semitic signs in front of the synagogue was not a concrete injury, I concluded that the judge was anti-Semitic. That conclusion was reinforced when I read her decision asserting that the lawsuit was frivolous, and required that Miriam, Mr. Gerber, and Mr. Susselman had to pay the attorney fees of the protesters.

19.    Mr. Susselman has informed me that an individual named Michelle Kinnucan has also filed an attorney grievance against him related to statements he made in legal briefs related to the synagogue protester litigation. During the protests in front of Beth Israel synagogue, Michelle Kinnucan was the author of a local blog which expressed fervid anti-Semitic sentiments. At the time, Ms. Kinnucan was in

5

the process of trans-gendering, and changed her name.  At some point, Ms. Kinnucan discontinued her blog, left Ann Arbor and moved to the West Coast.

20.    Miriam passed away in May, 2022, at the age of 87.  Mr. Susselman attended the funeral.  After the funeral, Mr. Susselman and I have remained in communication.  He informed me that Mr. Gerber had paid the attorney fee award, and that Miriam's estate would not be responsible for paying it.  We went to see the movie "Oppenheimer" together, given my background in physics, and went to dinner afterwards.

21.    I believe that Mr. Sussleman provided excellent legal representation, under very trying circumstances, and that he, himself, has been the victim of anti-Semitism in the way he was treated by the courts.

Further, affiant sayeth not.

Henry Brysk

SUBSCRIBED AND SWORN TO
BEFORE ME, on the
12th day of November, 2024

NOTARY PUBLIC

My commission expires    3/31/2030

6

GRACE WALKER HACKETT
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires March 31, 2030
Acting in the County of Washtenaw

# EXHIBIT 2

## Florida Law Review

Volume 69
Issue 1 *Volume 69, Issue 1 (January 2017)*

Article 2

January 2017

# Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes

Justin D. Levinson

Mark W. Bennett

Koichi Hioki

Follow this and additional works at: https://scholarship.law.ufl.edu/flr

 Part of the Judges Commons

## Recommended Citation

Justin D. Levinson, Mark W. Bennett, and Koichi Hioki, *Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev. 63 (2017).
Available at: https://scholarship.law.ufl.edu/flr/vol69/iss1/2

This Article is brought to you for free and open access by UF Law Scholarship Repository. It has been accepted for inclusion in Florida Law Review by an authorized editor of UF Law Scholarship Repository. For more information, please contact kaleita@law.ufl.edu.

# JUDGING IMPLICIT BIAS: A NATIONAL EMPIRICAL STUDY OF JUDICIAL STEREOTYPES

*Justin D. Levinson[*], Mark W. Bennett[**] & Koichi Hioki[*** ****]*

## Abstract

American judges, and especially lifetime-appointed federal judges, are often revered as the pinnacle of objectivity, possessing a deep commitment to fairness, and driven to seek justice as they interpret federal laws and the U.S. Constitution. As these judges struggle with some of the great challenges of the modern legal world, empirical scholars must seek to fully understand the role of implicit bias in judicial decision-making. Research from the field of implicit social cognition has long documented negative implicit biases towards a wide range of group members, some of whom may well be harmed in various ways across the legal system. Unfortunately, legal scholarship, and particularly empirical legal scholarship, has lagged behind in terms of investigating how implicit biases, beyond Black and White, may lead to unfair outcomes in a range of legal areas, including those relevant to judges' potentially landmark legal decisions.

This Article proposes, and then empirically tests, the proposition that even today negative implicit biases may manifest in federal and state judges against even so-called privileged minorities, such as Asian-Americans and Jews. We present the results of an original empirical study we conducted on 239 sitting federal and state judges (including 100 federal district judges representing all Circuits) and consider the ways in which these judicial implicit biases may manifest. The study found that the judges harbored strong to moderate negative implicit stereotypes against Asian-Americans and Jews, while holding favorable implicit stereotypes towards Whites and Christians. These negative stereotypes associate Asians and Jews with immoral traits, such as "greedy," "dishonest," and "controlling," and associate Whites and Christians with moral traits, such as "trustworthy," "honest," and "giving." The study further found that federal district court judges sentenced Jewish defendants to marginally longer prison terms than identical Christian defendants and that implicit bias was likely the cause of the disparity.

---

[*] Professor of Law & Director, Culture and Jury Project, Carlsmith Ball Faculty Scholar, University of Hawai'i at Manoa, William S. Richardson School of Law. The researchers would like to thank Dean Aviam Soifer for providing generous summer support. Patrick Forscher provided thoughtful input as a collaborator during early stages of this project. Finally, thank you to Krysti Uranaka for superb research assistance. U.S. District Judge D. Brock Hornby and Professor Jeff Rachlinski provided thoughtful feedback and advice.

[**] Mark W. Bennett is in his 23rd year as a U.S. District Judge in the Northern District of Iowa.

[***] Assistant Professor, Kobe University, Graduate School of Business Administration.

[****] Copyright © 2017 by Justin D. Levinson, Mark Bennett, and Koichi Hioki.

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

This Article suggests, and the empirical study supports the claim, that automatic biases and cognitions indeed influence a much broader range of judicial decisions than has previously been considered.

INTRODUCTION ...................................................................................65

I.    IMPLICIT BIAS, JUDGES, AND LEGAL SCHOLARSHIP:
      EXPANDING BEYOND BLACK AND WHITE ...............................70
      A.  *Judges' Implicit Bias: A Little-Studied Domain*...............72
      B.  *Implicit Bias in the Law: Empirical Studies,*
          *Black and White*................................................................75
      C.  *Beyond Black and White: Social Science and*
          *the Big Picture of Implicit Bias* .......................................79

II.   BIASES BEYOND BLACK AND WHITE:
      ASIANS AND JEWS IN AMERICA ..............................................82
      A.  *Anti-Asian Explicit Attitudes and Stereotypes:*
          *From Yellow Peril to the "Model Minority"*...................86
      B.  *Anti-Asian Attitudes and Stereotypes: Implicit*
          *Biases*................................................................................89
      C.  *Anti-Jewish Explicit Attitudes and Stereotypes:*
          *From Peddler to Wall Street* ...........................................92
      D.  *Anti-Jewish Attitudes and Stereotypes:*
          *Implicit Biases* .................................................................95

III.  THE EMPIRICAL STUDY ........................................................97
      A.  *Participants* .....................................................................97
      B.  *Materials* .........................................................................98
      C.  *Hypotheses*......................................................................102
      D.  *Results: Implicit Bias, Federal Judges,*
          *and Sentencing* ...............................................................103
          1.  Judges Implicitly Biased Against Asians...............104
          2.  Judges Implicitly Biased Against Jews ..................104
          3.  Federal District Court Judges
              (Marginal Significance) Gave
              Longer Sentences to Jewish
              (vs. Christian) Defendants; State
              Court Judges Gave Longer Sentences
              to White (vs. Asian) Defendants ............................104
          4.  All Judge Cohorts Possessed Similarly
              Strong Implicit Biases............................................105
          5.  Male Judges Showed Stronger
              Anti-Jewish Implicit Bias.......................................106

6.   Political Party of Appointing President Did
     Not Predict Different IAT Scores ...........................106
7.   Protestant and Catholic Judges Had
     Higher Pro-Christian/Anti-Jewish IAT
     Biases Compared to Judges Who
     Reported No Religion ..............................................107
8.   Catholic and Protestant Judges Self-Reported
     More Agreement with Asian and Jewish
     Stereotypes, as Compared to "No Religion"
     Judges (for both Positive Stereotypes and
     Negative Stereotypes) .............................................107
9.   State Judges Were More Anti-Asian in
     Their Self Reports ....................................................108
10.  Judges' Self-Reported Agreement with Asian
     Stereotypes Were Correlated with Their
     Agreement with Jewish Stereotypes .......................108
11.  Federal District Judges' Support for
     Retribution Predicted Higher Anti-Asian
     Implicit Bias............................................................109
12.  Anti-Jewish, Pro-Christian Implicit Biases
     Predicted the Sentence Length of Christian
     Defendant: the Higher the Bias,
     the Shorter the Sentence .........................................109

IV.  DISCUSSION: ANTI-ASIAN AND ANTI-JEWISH IMPLICIT
     BIASES .................................................................................110

CONCLUSION.......................................................................................113

## INTRODUCTION

American judges, and lifetime-appointed federal judges in particular, are often revered as the pinnacle of objectivity, possessing a deep commitment to fairness, and driven to seek justice as they interpret federal laws and the United States Constitution.[1] Curiously, despite the growing interest in the concept of implicit bias among judges and legal

---

1.  *E.g.*, 28 U.S.C. § 453 (2012) (requiring that all justices and judges of the United States take an oath or affirmation in which they affirm that they "will administer justice without respect to persons, and do equal right to the poor and to the rich, and . . . will faithfully and impartially discharge and perform all the duties incumbent upon [them]"); Michael B. Hyman, *Implicit Bias in the Courts*, ILL. B.J., Jan. 2014, at 40, 43 ("Judges must be impartial, as a matter of ethical principle, professional identity, and oath.").

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

commentators,[2] only one empirical study has measured judges' individual implicit biases, and that study only measured a single implicit bias among a sample of state trial judges.[3] Implicit bias research has been compelling for a range of reasons—perhaps chiefly among them that individual implicit biases often diverge from people's egalitarian self-concepts.[4] This disconnect between a person's commitment to fairness, on the one hand, and their possession of justice-obscuring automatic biases on the other, highlights the question of whether American judges can actually fairly perpetuate the justice they hold so dear.

As federal judges, in particular, struggle with some of the great challenges of the modern legal world—the role of the government in health care,[5] the boundaries of affirmative action,[6] the legal status of executive orders over immigration,[7] the role of the judge in sentencing,[8]

---

2. *See, e.g.*, Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson, *and Proposed Solutions*, 4 HARV. L. & POL'Y REV. 149, 158, 168 (2010) (discussing judge-dominated voir dire and the *Batson* challenges and how these processes exacerbate problems of implicit bias in jury selection and jury determinations, and proposing two possible solutions—increasing lawyer participation in voir dire and eliminating peremptory challenges—to address the implicit biases of jurors and lawyers throughout these processes). As a gauge of the interest in implicit bias among judges and attorneys more generally, it is notable that the authors of this Article, alone, have given hundreds of trainings to judges and lawyers on implicit bias-related topics.

3. *See* Jeffrey J. Rachlinski et al., *Does Unconscious Racial Bias Affect Trial Judges?*, 84 NOTRE DAME L. REV. 1195, 1197 (2009) (finding that state court judges harbor White–Black implicit racial biases and that these biases can influence their judgment). The authors of that study indicate that they also included a gender Implicit Association Test (IAT) as part of their study, but they do not report the results. *Id.* at 1208 n.68.

4. *See* Mahzarin R. Banaji & Anthony G. Greenwald, *Implicit Gender Stereotyping in Judgments of Fame*, 68 J. PERSONALITY & SOC. PSYCHOL. 181, 190 (1995) (finding that explicit expressions of sexism or stereotypes were not correlated with the observed implicit gender bias in fame judgments); *see also* Alexander R. Green et al., *Implicit Bias Among Physicians and Its Prediction of Thrombolysis Decisions for Black and White Patients*, 22 J. GEN. INTERNAL MED. 1231, 1235 (2007) (finding that physicians held implicit racial biases against African-Americans that affected treatment recommendation, but no similar predictive validity was found by asking doctors about their explicit racial preferences); Laurie A. Rudman et al., *Measuring the Automatic Components of Prejudice: Flexibility and Generality of the Implicit Association Test*, 17 SOC. COGNITION 437, 460 (1999) (finding that the average effect size for implicit prejudice based on ethnicity (Jewish vs. Christian), age (young vs. old), and nationality (American vs. Soviet) was large (d = 1.32) as compared to moderate (d = 0.49) for self-reported measures of prejudice).

5. *See, e.g.*, Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2577 (2012).

6. *See, e.g.*, Fisher v. Univ. of Texas, 133 S. Ct. 2411, 2421 (2013), *aff'd*, 136 S. Ct. 2198 (2016).

7. *See, e.g.*, Texas v. United States, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by an equally divided court*, United States v. Texas, 136 S. Ct. 2271 (2016) (per curiam).

8. Mark W. Bennett, Justin D. Levinson & Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 IOWA L. REV. (forthcoming 2017).

and the status of the death penalty[9]—it is indeed worth pursuing a vibrant research agenda that seeks to fully understand the role of implicit bias in judicial decision-making. As studies of the harmful effects of implicit bias against African-Americans in law and society continue to make an impact in scholarship and in practice, scholars must also expand the consideration of implicit bias in the law with special regard for judicial biases beyond the Black–White paradigm.[10] Research from the field of implicit social cognition has long documented negative implicit biases towards a wide range of group members, some of whom may well be harmed in various ways across the legal system.[11] Unfortunately, legal

---

9.  Hurst v. Florida, 136 S. Ct. 616, 621 (2016).

10.  *See, e.g.*, Melody S. Sadler et al., *The World Is Not Black and White: Racial Bias in the Decision to Shoot in a Multiethnic Context*, 68 J. SOC. ISSUES 286, 306 (2012) (finding that college-age participants and police officers were quicker to correctly shoot armed Black targets and to indicate "don't shoot" for unarmed Latino, Asian, and White targets but noting that police officers showed additional racial biases in reaction times towards Latinos compared to Asians and Whites); *see also* John Pyun, *When Neurogenetics Hurts: Examining the Use of Neuroscience and Genetic Evidence in Sentencing Decisions Through Implicit Bias*, 103 CALIF. L. REV. 1019, 1032, 1037 (2015) (arguing that given the strong implicit bias against disability and mental illness, the admission of neuro-genetic evidence of mental illness may hurt, rather than help, a defendant claiming mental illness as the cause of their actions).

This Article does not mean to suggest that work focusing on implicit bias within the Black–White paradigm is anywhere near complete. There still remain a wide range of areas within the legal system in which the role of implicit bias, specifically with respect to automatic discrimination towards African-Americans, has yet to be conducted. Some of our own work, in particular, continues to focus on the unaddressed problems related to racial disparities that most harm African-Americans. *See, e.g.*, Robert J. Smith, Justin D. Levinson & Koichi Hioki, Race and Retribution: An Empirical Study of Racialized Punishment and Implicit Bias in America 43 (Feb. 29, 2016) (unpublished manuscript) (on file with authors) (finding that jury-eligible citizens associate Black with Payback and White with Mercy and that these racial associations are correlated with overall support for retributive theories of punishments); Justin D. Levinson & Robert J. Smith, *Systemic Implicit Bias*, 126 YALE L.J. F. 406 (2017), http://www.yalelawjournal.org /forum/systemic-implicit-bias.

11.  *See, e.g.*, Becca R. Levy & Mahzarin R. Banaji, *Implicit Ageism*, *in* AGEISM: STEREOTYPING AND PREJUDICE AGAINST OLDER PERSONS 49, 54–55 (Todd D. Nelson ed., 2002) (finding that there is a negative implicit bias toward the elderly); Dan-Olof Rooth, *Automatic Associations and Discrimination in Hiring: Real World Evidence*, 17 LABOUR ECON. 523, 529 (2010) (finding that a negative implicit association toward Arab-Muslim men can affect human resource officers' choice of job candidates); Marlene B. Schwartz et al., *Weight Bias Among Health Professionals Specializing in Obesity*, 11 OBESITY RES. 1033, 1037 (2003) (finding that health professionals exhibited a significant pro-thin and anti-fat implicit bias); *see also* Laurie A. Rudman & Stephanie A. Goodwin, *Gender Differences in Automatic In-Group Bias: Why Do Women Like Women More Than Men Like Men?*, 87 J. PERSONALITY & SOC. PSYCHOL. 494, 497, 506 (2004) (finding that both genders implicitly prefer their own group but that women have a much stronger implicit bias favoring their own group than men do and that men were implicitly associated with violence and aggression more readily than women); *cf.* Christopher L. Aberson et al., *Implicit Bias and Contact: The Role of Interethnic Friendships*, 144 J. SOC. PSYCHOL. 335, 344 (2004) (finding that participants with close friends who were Latino or African-American

scholarship, and particularly empirical legal scholarship, has lagged behind in terms of investigating how implicit biases, beyond Black and White, may lead to unfair outcomes in a range of legal areas.[12] Because of these implicit biases, judges and other well-intentioned actors in the criminal justice system and beyond may also harm stereotyped groups, such as Latinos, Native Americans, the disabled, the mentally ill, the overweight, immigrants, the LGBT community, the elderly, women, Asians, Arab-Muslims, Jews, and many others.[13]

This Article proposes, and then empirically tests, the proposition that even today negative implicit biases may manifest in federal and state judges against even so-called privileged minorities, such as Asian-Americans and Jews. This Article presents the results of an original empirical study we conducted on 239 sitting federal district judges, federal magistrate judges, and state judges, and considers the ways in which judicial implicit biases may manifest. This Article aims to broaden the scholarly discourse around implicit bias by presenting this study, in which we measured judges' levels of implicit bias towards Asians and Jews (as compared to Whites and Christians, respectively) and asked judges to sentence a hypothetical white-collar criminal defendant.

This study found that federal district court judges, federal magistrate judges, and state court judges harbored strong to moderate negative implicit stereotypes against Asians and Jews, while holding favorable

---

exhibited less implicit bias toward those groups than participants without close friends in those particular groups).

12.  *But see* Susan K. Serrano & Breann Swann Nu'uhiwa, *Federal Indian Law: Implicit Bias Against Native Peoples as Sovereigns*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW 209, 210–11 (Justin D. Levinson & Robert J. Smith eds., 2012) (discussing implicit biases toward Native Peoples as foreign and less American, violent and aggressive, and nonacademic and in need of benevolent assistance); Eric K. Yamamoto & Michele Park Sonen, *Reparations Law: Redress Bias?*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra*, at 244, 246 (discussing implicit gender bias in redress); Jerry Kang et al., *Are Ideal Litigators White? Measuring the Myth of Colorblindness*, 7 J. EMPIRICAL LEGAL STUD. 886, 887–88 (2010) (studying implicit attitudes related to Asian and White litigators); *see also* Sara R. Benson, *Reviving the Disparate Impact Doctrine to Combat Unconscious Discrimination: A Study of* Chin v. Runnels, 31 T. MARSHALL L. REV. 43, 44 (2005) (analyzing a court's ruling "regarding the exclusion of Hispanic-Americans, Chinese-Americans, and Filipino-Americans from serving as grand jury forepersons"); Justin D. Levinson, Koichi Hioki & Syugo Hotta, *Implicit Bias in Hawai'i: An Empirical Study*, 37 U. HAW. L. REV. 429, 433 (2015) (studying implicit stereotypes and attitudes related to Japanese-Americans, Whites, Native Hawaiians, and Micronesians in Hawai'i as compared to other states in the United States); Justin D. Levinson & Danielle Young, *Implicit Gender Bias in the Legal Profession: An Empirical Study*, 18 DUKE J. GENDER L. & POL'Y 1, 4 (2010) (studying implicit gender biases related to women in the legal profession); Darren Seiji Teshima, *A "Hardy Handshake Sort of Guy": The Model Minority and Implicit Bias About Asian Americans in* Chin v. Runnels, 11 ASIAN PAC. AM. L.J. 122, 132 (2006) (finding "a stronger implicit association between white and American than between Asian and American").

13.  *See supra* notes 10–12.

implicit stereotypes towards Whites and Christians.[14] These negative stereotypes associate Asians and Jews with immoral traits, such as "greedy," "dishonest," and "controlling," and associate Whites and Christians with moral traits, such as "trustworthy," "honest," and "giving." The study further found that federal district court judges were marginally more likely to sentence a Jewish defendant to longer terms than a Christian defendant, and state court judges were more likely to sentence a White defendant to longer terms than an Asian defendant.[15] A regression analysis also revealed that judges' anti-Jewish (pro-Christian) implicit stereotypes predicted shorter sentences for Christian defendants.[16] Finally, the study revealed various judicial differences in explicit (self-reported) negative attitudes towards Asians and Jews in America, and in particular among state judges (as compared to federal judges) and among judges that self-identified as either Catholic or Protestant (as compared to judges who reported no religious affiliation).[17]

Part I of this Article considers the current landscape of knowledge regarding implicit bias in the legal system, highlighting the fact that very little is known about judges' implicit biases and fairly little is known beyond the well-documented concerns relating to implicit biases towards African-Americans. Part II contextualizes this project within both social science and legal scholarship related to two groups: Asians and Jews in America. We tested judges' implicit biases toward these groups for two main reasons: first, both of these groups have been perceived as having overcome many of the historical barriers that hindered their progress; and second, if judges indeed harbor negative implicit biases against even the most favored minority groups, one could predict that further research would uncover a massive range of judicial implicit biases against a wide range of less privileged groups. This Part therefore presents the evolving historical role of both positive and negative stereotypes of Asians and Jews in America and concludes with a summary of modern social science findings that connect negative stereotypes—specifically those related to trustworthiness—with members of both groups. Part III presents the methods and results of the empirical study we conducted. We studied 239 federal and state judges, including 100 federal district court judges from all Circuits; provided them with a realistic white-collar criminal case (in which they read about an Asian, White, Jewish, or Christian defendant);

---

14. *See* discussion *infra* Subsections III.D.1, III.D.2.

15. Bennett, Levinson & Hioki, *supra* note 8 (manuscript at 28–29). When data was combined across all conditions, 75% of federal trial judges and a lesser percentage of other judges gave the exact minimum possible sentence. *Id.* (manuscript at 27). This result likely reflects a larger issue related to the Federal Sentencing Guidelines and judges' perceptions of sentencing severity for white collar crime. We examine these particular study results in the context of the Federal Sentencing Commission, in a separate article. *Id.*

16. *See infra* Subsection III.D.

17. *See infra* Subsection III.D.10.

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

asked them to sentence the defendant in accordance with an agreed upon plea-bargain range (consistent with the Federal Sentencing Guidelines); and then tested both their implicit and explicit bias levels.

Part III then discusses the results of the study, which found that: (1) judges displayed strong to moderate negative implicit biases towards Asians and Jews, (2) state judges self-reported stronger anti-Asian attitudes than federal judges, (3) Catholic and Protestant judges held stronger pro-Christian, anti-Jewish biases than "no religion" judges, (4) Protestant judges self-reported some stronger anti-Asian biases than "no religion" judges, and (5) participants' pro-Christian, anti-Jewish implicit bias levels predicted shorter sentencing of a Christian defendant. The study further found that federal district court judges sentenced (of marginal statistical significance) Jewish defendants to longer sentences than Christian defendants, and that state court judges sentenced Asian defendants to shorter sentences than White defendants.[18] Part IV offers suggestions about the next stage of implicit bias scholarship and concludes by calling for a robust expansion of research.

## I. IMPLICIT BIAS, JUDGES, AND LEGAL SCHOLARSHIP: EXPANDING BEYOND BLACK AND WHITE

Scholarship on implicit bias[19] has altered society's way of understanding ethnic and racial disparities in the legal system.[20] That work, and in particular empirical studies conducted on the role of race and implicit bias, has made a profound contribution to law and policy literature, both in the criminal justice realm and beyond.[21] Because of the continuing and

---

18. For an extensive detailing of this sentencing result, see Bennett, Levinson & Hioki, *supra* note 8 (manuscript at 28–29).

19. Simply stated, the concept of implicit bias describes "the process whereby the human mind automatically and unintentionally reacts to different groups in divergent ways, a process that can have unfortunate consequences." Justin D. Levinson et al., *Implicit Racial Bias: A Social Science Overview*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra* note 12, at 9, 10.

20. *See id.* at 9–10; *see also* Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. REV. 1124, 1186 (2012).

21. *See, e.g.*, Kang et al., *supra* note 12, at 888 (finding that explicit and implicit biases in favor of Whites and against Asian-Americans altered the evaluation of a litigator's deposition); Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 DUKE L.J. 345, 350 (2007) (finding that "the race of a civil plaintiff or a criminal defendant can act implicitly to cause people to misremember a case's facts in racially biased ways"); Justin D. Levinson et al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 N.Y.U. L. REV. 513, 521 (2014) [hereinafter Levinson et al., *Devaluing Death*] (finding that death-qualified jurors harbored stronger implicit and self-reported explicit racial biases than excluded jurors); Justin D. Levinson et al., *Guilty by Implicit Racial Bias: The Guilty/Not Guilty Implicit Association Test*, 8 OHIO ST. J. CRIM. LAW 187, 190 (2010) [hereinafter Levinson et al., *Guilty by Implicit Racial Bias*] (finding that people implicitly associate Black and Guilty compared to White and Guilty); Justin D. Levinson & Danielle Young, *Different Shades of Bias: Skin Tone, Implicit Racial Bias, and Judgments of Ambiguous Evidence*, 112 W. VA. L. REV. 307, 309 (2010) (finding that "jurors automatically and unintentionally evaluate[d] ambiguous trial evidence in racially biased ways");

overwhelming racial disparities in America, especially those related to employment,[22] education,[23] home ownership,[24] and criminal justice,[25]

Rachlinski et al., *supra* note 3, at 1197 (finding that judges harbor the same kinds of implicit biases as others and that these biases can influence their judgment).

22. Between 1972 and 2013, the ratio of unemployment rates among Blacks versus that among Whites were between 2 and 2.5. Neil Irwin et al., *America's Racial Divide, Charted*, N.Y. TIMES (Aug. 19, 2014), http://www.nytimes.com/2014/08/20/upshot/americas-racial-divide-charted.html?_r=2. Even among people with similar levels of education, the Black unemployment rate is higher. *Id.* For example, in 2013, among people with a Bachelor's degree or higher, the unemployment rate for Blacks was 5.7%, compared with 3.5% for Whites. *Id.* Additionally, in 2013, the median weekly earnings of full-time wage and salary workers was 21.6% higher for Whites, and an analysis of Federal Reserve data by the Urban Institute suggests that White families were 6.1 times as wealthy as Black families in 2010. *Id.*

23. The disparities are apparent both at the level of high-school graduation as well as in advanced degree attainment. *Table 1: Educational Attainment in the United States: 2014—Detailed Tables*, U.S. CENSUS BUREAU (2014), http://www.census.gov/hhes/socdemo/education/data/cps/2014 /tables.html (under Table 1, click on hyperlinks for "Black alone" and "Non-Hispanic White alone" for statistics) (including data from 24,864 Blacks and 140,124 non-Hispanic Whites). For example, in 2014, 32.5% of Blacks had attained a Bachelor's or Associate's degree or higher, compared to 46.1% of Whites. *Id.* In 2008, 44% of White 18- to 24-year-olds were enrolled in colleges and universities, compared to 32% of Black 18- to 24-year-olds. SUSAN AUD ET AL., U.S. DEP'T OF EDUC., NAT'L CTR. FOR EDUC. STATISTICS, STATUS AND TRENDS IN THE EDUCATION OF RACIAL AND ETHNIC GROUPS 117 (2010), http://nces.ed.gov/pubs2010/2010015.pdf. In 2008, 17% of Black children had a mother with at least a Bachelor's degree, compared with 36% of White children. *Id.* at 20. Black K-12 students are nearly three times more likely to be held back as their White peers. Lindsey Cook, *U.S. Education: Still Separate and Unequal*, U.S. NEWS & WORLD REP. (Jan. 28, 2015, 12:01 AM), http://www.usnews.com/news/blogs/data-mine/2015/01/28/us-educat ion-still-separate-and-unequal (citing the U.S. Department of Education's Civil Rights Data Collection). On the SAT, black students had a mean score of 428 for critical reading and 428 for math, compared with mean scores for white students of 527 for critical reading and 536 for math. *Id.* (same).

24. Access to homeownership may be the most important factor driving the wealth gap between Blacks and Whites. *See* Laura Shin, *The Racial Wealth Gap: Why a Typical White Household Has 16 Times the Wealth of a Black One*, FORBES (Mar. 26, 2015, 8:00 AM), http://www. forbes.com/sites/laurashin/2015/03/26/the-racial-wealth-gap-why-a-typical-white-household-has-16-times-the-wealth-of-a-black-one/#13799aab6c5b; *see also* THOMAS SHAPIRO ET AL., INST. ON ASSETS & SOC. POLICY, THE ROOTS OF THE WIDENING RACIAL WEALTH GAP: EXPLAINING THE BLACK-WHITE ECONOMIC DIVIDE 2–3 (2013), http://iasp.brandeis.edu/pdfs/Author/shapiro-thomas-m/racialwealthgapbrief.pdf (finding that in a study of 1,700 families over a period of twenty-five years, the number of years families owned their homes was the largest predictor of the gap in wealth growth by race in families with positive wealth growth, accounting for 27% of the difference in relative wealth growth between White and African-American families); U.S. CENSUS BUREAU NEWS, RESIDENTIAL VACANCIES AND HOMEOWNERSHIP IN THE SECOND QUARTER 2016, at 9 (2016), http://www.census.gov/housing/hvs/files/currenthvspress.pdf (finding that between 2012 and 2016, the homeownership rate for Blacks was 41–44%, compared to 71–73% for Whites).

25. Sonja B. Starr & M. Marit Rehavi, *Mandatory Sentencing and Racial Disparity: Assessing the Role of Prosecutors and the Effects of* Booker, 123 YALE L.J. 2, 4 (2013) (explaining that one in nine Black men between the ages of twenty and thirty-four is behind bars, and Black males are incarcerated at nearly seven times the rate of White males); Sonja B. Starr & M. Marit Rehavi, *Racial Disparity in Federal Criminal Charging and Its Sentencing Consequences* 3

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

much of the legal scholarship has rightfully focused on the Black–White paradigm of racial injustice.[26] This work has established the need for a comprehensive examination and systemic response to implicit racial bias that spans the entire legal system, perhaps beginning with, but certainly not limited to, judges. This section examines what is known and not known about judges' implicit biases, considers the successes and limitations of existing empirical work on implicit bias in the law, and outlines how social scientists studying implicit bias have outpaced legal scholars in understanding how implicit biases operate outside of the Black–White paradigm. It thus sets the stage for this Article's empirical study of judges' implicit biases beyond Black and White, specifically regarding judicial implicit biases related to Asian-Americans and Jews.

## A. *Judges' Implicit Bias: A Little-Studied Domain*

When looking at the powerful range of ways that implicit bias can lead to harm for stereotyped group members in the legal system, perhaps one of the most interesting places to look is at the role of the judge. Judges possess tremendous discretion in a vast range of legal areas. In criminal law, for example, discretion spans the entire trial process, beginning with

---

(Univ. of Mich., Law & Econ. Working Paper Series, Working Paper No. 12-002, 2012), http://ssrn.com/abstract=1985377 (explaining how federal criminal charging and sentencing found that, on average, Blacks receive almost 10% longer sentences than comparable Whites arrested for the same crimes and that prosecutors are more likely to file charges carrying the mandatory minimum sentences against Blacks); *Arrest Data Analysis Tool*, BUREAU JUST. STAT., http://www.bjs.gov/index.cfm?ty=datool&surl=/arrests/index.cfm# (last visited Jan. 4, 2017) (showcasing that in 2012, the arrest rate for Blacks was 7,920.1 people per 100,000, compared to just 3,392.3 people per 100,000 for Whites); *see also* Mark W. Bennett, *A Slow Motion Lynching? The War on Drugs, Mass Incarceration, Doing* Kimbrough *Justice, and a Response to Two Third Circuit Judges*, 66 RUTGERS L. REV. 873, 880–81 (2014) (quoting MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS 7 (2010)) (stating that in 2012, over 72% of the defendants in federal court sentenced for drug trafficking offenses were Black or Hispanic and in some states Black men have been admitted to prison on drug charges at rates twenty to fifty times greater than those of white men).

26. *See, e.g.*, Levinson et al., *Guilty by Implicit Racial Bias*, *supra* note 21, at 190; *see also* Charles Ogletree et al., *Criminal Law: Coloring Punishment: Implicit Social Cognition and Criminal Justice*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra* note 12, at 45, 46; Jennifer L. Eberhardt et al., *Looking Deathworthy: Perceived Stereotypicality of Black Defendants Predicts Capital-Sentencing Outcomes*, 17 PSYCHOL. SCI. 383, 383 (2006); Theodore Eisenberg & Sheri Lynn Johnson, *Implicit Racial Attitudes of Death Penalty Lawyers*, 53 DEPAUL L. REV. 1539, 1554 (2004) (questioning whether implicit racial bias influences trial judge decision-making); Levinson, *supra* note 21, at 398–99; Justin D. Levinson, *Race, Death, and the Complicitous Mind*, 58 DEPAUL L. REV. 599, 599–600 (2009); L. Song Richardson & Philip Atiba Goff, *Implicit Racial Bias in Public Defender Triage*, 122 YALE L.J. 2626, 2628, 2630 (2013) (examining implicit racial bias in the context of the public defender's office); Robert J. Smith & Justin D. Levinson, *The Impact of Implicit Racial Bias on the Exercise of Prosecutorial Discretion*, 35 SEATTLE U. L. REV. 795, 795 (2012).

bail decisions and culminating in sentencing.[27] Similarly, judges are always present: unlike individual jurors (who are not present in many legal proceedings, are not present during important legal decisions even during jury trials, and may never sit on another jury), the cumulative courtroom impact of an individual judge's implicit bias, as well as the potential impact of a "de-biased" judge, is considerable.[28] However, only one empirical study has examined the role of the judge with regard to implicit bias.[29] No studies have tested the implicit bias levels of U.S. district court or magistrate judges, and no studies have examined judges' implicit biases towards stereotyped groups beyond Black and White.

Considering the tremendous discretion judges possess throughout the American legal system, it is surprising that the role of implicit bias in American judges has largely been unexamined empirically. Although a range of scholars may frequently allude to potential biases in judicial decisions,[30] only one study has in fact measured whether judges hold similar types of implicit bias as the rest of the population, and that study only investigated one type of implicit bias.[31] In this study, Professor Jeffrey Rachlinski and his colleagues conducted a study of 133 state or local trial judges at three different judicial conferences.[32] Judges were tested both using an Implicit Association Test (IAT) and a separate priming measure.[33] In the IAT portion of the study, judges completed what is known as the Black–White attitude IAT.[34] In this variation of the

---

27.  *See* Richard B. Spindle, *Judicial Discretion in Common Law Courts*, 4 WASH. & LEE L. REV. 143, 145, 147–48, 152 (1947) (discussing the wide range of a judge's discretion, including a judge's discretion to grant or refuse a continuance, apply the rules of evidence, and decide probation, bail, and matters of procedure such as change of venue, setting aside order of dismissal, setting aside motion for default, setting aside default judgment, extension of time, separation of defendants on joint trial, consolidating several tort actions, amendment of pleadings, pretrial examination of state's evidence in a criminal case, changing plea, compelling election, order of putting on evidence, and declaring a mistrial); *see also* Mark Osler & Mark W. Bennett, *A "Holocaust in Slow Motion?" America's Mass Incarceration and the Role of Discretion*, 7 DEPAUL J. SOC. JUST. 117, 153, 155 (2014) (stating that prior to the U.S. Sentencing Guidelines established in 1987, judges had virtually unlimited discretion, and even now, after the Guidelines have been deemed advisory, judges, in their discretion, remain committed to the Guidelines).

28.  *See* Rachlinski et al., *supra* note 3, at 1221.

29.  *See id.* at 1208 (finding that judges harbor the same kinds of implicit biases as others and that these biases can influence their judgment).

30.  *See, e.g.*, Bennett, *supra* note 2, at 150; Hyman, *supra* note 1, at 41–42.

31.  Rachlinski et al., *supra* note 3, at 1197 ("In this Article, we report the results of the first study of implicit racial bias among judges.").

32.  *See id.* at 1205–06, 1208, 1209 n.59 (finding that in two of these three judicial trainings, judges presumably were unaware of the topic of the study and in the third training, judges had voluntary chosen to attend a session that referenced the "unconscious bias" topic in conference materials).

33.  *Id.* at 1208.

34.  *Id.* at 1209, 1238.

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

IAT, judges categorized photos of White and Black faces with positive attitude words (e.g., peace, pleasure, friend) or negative attitude words (e.g., nasty, evil, awful) as quickly as possible.[35] The researchers hypothesized that judges would display the same implicit biases as have been found in the rest of the population—judges would associate Black with bad and White with good.[36]

The second part of the study involved a nonconscious priming task, in which the experimenters rapidly flashed coded words (e.g., dreadlocks, hood, rap, for the Black prime; summer, stress, trust, for the control group prime) on the judge participants' computer screens at high speeds.[37] Following this racial (or non-racial, in the case of the control group) priming, the researchers asked the judges to complete simulated trial decision tasks related to two juvenile defendants, one involving a shoplifting case and the other involving a robbery case.[38] The researchers were interested first in whether judges who had been nonconsciously primed with Black-related words would respond to the trial decision tasks in harsher ways as compared to judges who were in the control group;[39] and second, whether judges' IAT scores predicted biased decisions on the decision-making task.[40]

The results of the study showed that, on the IAT, judges indeed harbored the anti-Black implicit biases that the rest of the population has been repeatedly shown to possess—judges more readily associated Black with bad and White with good.[41] On the priming task, however, the judges did not display the predicted results—judge participants who were exposed to the subliminal priming that presumably cognitively triggered the racial category of "Black" were not harsher in their judgments as compared to the control group.[42] IAT scores, however, were shown to be related to the judges' ultimate decisions.[43] Judges with higher implicit bias scores indeed rendered harsher judgments when the judges had been primed with the racial category of "Black."[44]

Other than this one study, however, there have been no empirical examinations of judges' implicit biases, and no studies have examined

---

35. *Id.* at 1238–39.

36. *Id.* at 1210–11.

37. *Id.* at 1212, 1213 & nn.86–87.

38. *Id.* at 1214–15, 1217 (explaining that the researchers also presented the judges with one trial decision task in which the researchers explicitly identified the race of the defendant).

39. *Id.* at 1214.

40. *Id.*

41. *Id.* at 1210 (finding "a strong white preference among white judges" but "[t]he black judges, by contrast, demonstrated no clear preference overall").

42. *Id.* at 1215.

43. *Id.* at 1214.

44. *Id.* at 1217.  This finding was reported as being "marginally significant." *Id.*

judges' implicit biases other than with regard to Black and White. A significant number of scholars, however, have empirically examined the ways in which implicit bias, and mostly Black–White bias, manifests in the legal system, and particularly in the criminal justice system.[45]

### B. *Implicit Bias in the Law: Empirical Studies, Black and White*

This Subsection briefly reviews empirical studies that demonstrate what is known about implicit bias in the legal system. Our review demonstrates that, despite major progress in the understanding of how implicit bias functions in the law, most of the work has focused on the Black–White paradigm in the field of criminal law. No studies have been conducted on federal judges or have compared different types of judges to each other. Little work has assessed how implicit bias may operate in the context of other minority groups, such as Asians and Jews.[46] The empirical study we designed and describe in Part III seeks to begin to fill this gap.

Before describing the contributions of modern studies on implicit bias, which have disproportionately focused on discrimination against African-Americans in the criminal justice system, we wish to contextualize the discussion with the story behind one of social psychology's earlier and most interesting studies, which raises a range of interesting legal questions not only about the role of race in perceptions of behavior and criminality but also about the role of stereotyped groups in the law more generally. This study, conducted by Professors Gordon W. Allport and Leo Postman, who originally designed it to test the psychology underlying rumors, almost accidentally began an era of study that focused on the power of negative racial stereotypes.[47] In Professors Allport and Postman's study, participants viewed a picture of passengers on a streetcar (one of whom was Black).[48] In the picture, a White passenger holds a razor blade and a Black passenger is empty-handed.[49] After viewing the picture, participants were asked to describe the picture to other participants who had not seen the picture, much like the traditional "telephone game" in which stories tend to transform as a story is told and retold.[50] As participants told and retold the story to others, the story changed, and it did so in a racialized context.[51] After participants had retold the story several times, some participants reported that the

---

45. *See supra* notes 25–26.

46. *See* Sadler et al., *supra* note 10, at 287.

47. *See* GORDON W. ALLPORT & LEO POSTMAN, THE PSYCHOLOGY OF RUMOR 63–64 (1947).

48. For a description of the Allport and Postman study, see Levinson, *supra* note 21, at 381.

49. *Id.*

50. *Id.*

51. *Id.*

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

Black passenger—not the White passenger—held a razor blade.[52] In psychological terms, the results of the study (which had originally focused on retelling accuracy) demonstrated a source-attribution error— the razor blade possession shifted from one memory source (the White passenger) to another (the Black passenger).[53]

If, through storytelling, a knife can somehow migrate from the hand of a White perpetrator to the hand of his innocent Black neighbor, how does one deconstruct and analyze any law-related story that depends on facts, stories, and memories (e.g., employment,[54] health care,[55] rights of native peoples,[56] tax,[57] property[58])? And how can one analyze the places within each law-related story that are susceptible to possible distortions triggered by racial or other group-based stereotypes? Modern empirical studies have done a fairly good job in beginning this dialogue but have left much undone. These studies have focused upon the cognitive elements of error that negative implicit attitudes and stereotypes can introduce into law and society, ranging from private action, to legislative progress, to jury decision-making. Why are voting citizens, for example, more likely to sign a petition to end so-called "three strikes" laws when

---

52.  *Id.*

53.  *Id.*

54.  *See* Nancy Gertner & Melissa Hart, *Employment Law: Implicit Bias in Employment Litigation*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra* note 12, at 80, 81–82 (discussing the role implicit bias plays in employment discrimination law in the courtroom).

55.  *See* Michele Goodwin & Naomi Duke, *Health Law: Cognitive Bias in Medical Decision-Making,* *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra* note 12, at 95, 96–97 (discussing the threat of implicit bias to medical decision-making, the physician–patient relationship, and quality of care, and the challenges of combatting racial discrimination in the health care system given that implicit bias is outside the scope of Title VI of the Civil Rights Act).

56.  *See* Serrano & Nu'uhiwa, *supra* note 12, at 210–11 (discussing how implicit biases toward Native Peoples as foreign, violent, and nonacademic undergird modern barriers to Native self-governance, such as legislation, case law, and administrative action limiting Native peoples' governing power).

57.  *See* Dorothy A. Brown, *Tax Law: Implicit Bias and the Earned Income Tax Credit*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra* note 12, at 164, 165–66 (discussing how implicit bias toward Blacks and welfare in the earned income tax credit context has harmed hard-working White taxpayers, led to the failure to monitor noncompliance and large instances of tax fraud, and led to little reduction of the error rate, which would help lift more hard-working Americans out of poverty).

58.  *See* Michelle Wilde Anderson & Victoria C. Plant, *Property Law: Implicit Bias and the Resilience of Spatial Colorlines*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra* note 12, at 25, 26, 39–40 (discussing implicit bias in the context of racially ordered housing, neighborhoods, and mortgage markets, and the challenges of combatting racial discrimination in the housing and land context given that implicit bias is outside the scope of the Fair Housing Act and other antidiscrimination laws).

prison is depicted as *less* Black?[59] Why are resumes with White-sounding names more likely to elicit a phone call for a job interview than resumes with Black-sounding names?[60] Why are guns, for example, more quickly identified and categorized when they are associated with Black faces?[61] Why is a "for sale" home evaluated as being more desirable when there is a photo with a White family (as opposed to a Black family) on the mantle?[62] And how is it that mock jurors evaluate the same ambiguous evidence differently based on the perpetrator's skin color? [63] These questions are likely best resolved by understanding the automatic and uncontrolled nature of group-based bias in the broader context of the legal system.

A summary of implicit-bias related legal studies may help begin to signal just how broad the discussion of implicit bias in the law can and should be, when one considers the impact of gender, disability, race, ethnicity, sexuality, religion, body shape, national origin, and more. Notably, however, a large proportion of existing implicit bias studies focus on African-Americans in the criminal justice system. These studies prove to be a great example of what can come next as researchers begin

---

59.  *See* Rebecca C. Hetey & Jennifer L. Eberhardt, *Racial Disparities in Incarceration Increase Acceptance of Punitive Policies*, 25 PSYCHOL. SCI. 1949, 1950–51 (2014) (finding that "[w]hen a penal institution was represented as 'more Black,' people were more concerned about crime and expressed greater acceptance of punitive policies than when the penal institution was represented as 'less Black'").

60.  *See* Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 AM. ECON. REV. 991, 992 (2004) (finding that submitting resumes with White-sounding names as opposed to African-American-sounding names resulted in 50% more callbacks for interviews, and finding that callbacks are also more responsive to resume quality for White names than for African-American names).

61.  *See* B. Keith Payne, *Prejudice and Perception: The Role of Automatic and Controlled Processes in Misperceiving a Weapon*, 81 J. PERSONALITY & SOC. PSYCHOL. 181, 185 (2001) (finding that participants identified guns faster when primed with Black faces than with White faces and that participants misidentified tools as guns more often when primed with a Black face than with a White face); *see also* Joshua Correll et al., *The Influence of Stereotypes on Decisions to Shoot*, 37 EUR. J. SOC. PSYCHOL. 1102, 1102, 1107 (2007) (finding that using a video game simulation, participants who read stories about Black (vs. White) criminals had increased bias in the decision to shoot Black targets and that an increased number of armed Blacks in the simulation led participants to shoot armed Blacks more quickly than armed Whites).

62.  *See* Anderson & Plant, *supra* note 58, at 35; *see also* Courtney Marie Bonam, *Devaluing Black Space: Black Locations as Targets of Housing and Environmental Discrimination* (Aug. 2010) (unpublished Ph.D. dissertation, Stanford University) (on file with the Stanford University Libraries) (arguing that people discriminate against Black, relative to White, space, evaluating and treating a Black space more poorly, and that people devalue Black space relative to White space).

63.  *See* Levinson & Young, *supra* note 21, at 309–10 (proposing and confirming the Biased Evidence Hypothesis, which "posits that when racial stereotypes are activated, jurors automatically and unintentionally evaluate ambiguous trial evidence in racially biased ways").

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

to think about implicit bias in broader contexts. In the criminal justice system, for example, implicit racial cues can even influence something as fundamental as societal support for law reform. A study by psychologists Rebecca C. Hetey and Jennifer L. Eberhardt found that, when they showed Californians photographs depicting over-incarceration in the wake of the state's highly criticized "three strikes law," a significantly larger percentage of citizens were willing to sign a real petition urging the repeal of the law when the prison population was depicted in the photographs as *less* Black.[64] Racial cues can affect juries, too. For instance, one of the authors of this Article, Professor Justin D. Levinson, studied how mock-jurors remembered "trial" information presented to them. His study found that mock-jurors who read about an African-American perpetrator had better memories of the aggressive case facts than those who read the same case but with a White perpetrator, a process thereby likely to skew their subsequent judgments.[65]

In other jury-focused studies, Professor Levinson and his colleagues examined race in the context of the presumption of innocence and found that mock-jurors automatically associated Black with Guilty and White with Not Guilty on an IAT.[66] In addition, they found that mock-jurors were more likely to evaluate ambiguous evidence as guilt-prone after having briefly seen a security camera image of a dark-skinned perpetrator (as compared to a lighter-skinned perpetrator in the same image).[67] Even criminal defense lawyers, a group that is presumably motivated to avoid racial bias, can be susceptible to these biases. Professors Theodore Eisenberg and Sheri Lynn Johnson found that even capital defense lawyers implicitly associated Black with bad and White with good on an IAT that they conducted.[68] Researchers later found that jurors eligible to sit on a death penalty trial actually harbored stronger Black-Worthless and White-Worth implicit associations than jurors who would not be allowed to sit on such juries.[69] Finally, researchers have noted that even rationales for punishment may be infused with implicit racial bias. In a 2016 study, Professor Robert J. Smith and his colleagues found that, in a national study, jury-eligible citizens (on an IAT) actually associate Black with Payback and White with Mercy—core punishment concepts that are supposedly devoid of racial content and underlie fair criminal punishment.[70]

---

64. Hetey & Eberhardt, *supra* note 59, at 1950–51.
65. Levinson, *supra* note 21, at 350.
66. Levinson et al., *Guilty by Implicit Racial Bias*, *supra* note 21, at 190.
67. Levinson & Young, *supra* note 21, at 309–10.
68. Eisenberg & Johnson, *supra* note 26, at 1545.
69. Levinson et al., *Devaluing Death*, *supra* note 21, at 521, 564.
70. *See* Smith et al., *supra* note 10, at 43.

We need not recount all such implicit bias in criminal law studies here. There are quite a range, and most of them lead to the same conclusion: implicit racial bias can influence legal decision-making at every single stage of the criminal justice system, from law making, to policing, to the courtroom, to sentencing, and finally, to parole.[71] Yet, outside of the Black–White paradigm, and outside of criminal law, a key theme that emerges from this research review is that empirical study of implicit biases in other legal domains lags behind social science findings, particularly outside the context of Black and White.

## C. *Beyond Black and White: Social Science and the Big Picture of Implicit Bias*

Current legal scholarship has largely failed to reflect fully the extraordinary breadth of social science work on implicit bias. Specifically, few scholars have conducted implicit bias legal scholarship outside the Black–White paradigm,[72] and few empirical studies have examined any legal domain outside of criminal law.[73] One may begin to understand these shortcomings of legal scholarship by looking first to the field of implicit social cognition, where hundreds of studies have documented a wide range of implicit biases beyond Black and White.

Social scientists have published hundreds of articles dedicated to exploring implicit bias, its rationales, and its effects.[74] Although the

---

71. *See* Joshua Correll et al., *The Police Officer's Dilemma: Using Ethnicity to Disambiguate Potentially Threatening Individuals*, 83 J. PERSONALITY & SOC. PSYCHOL. 1314, 1325 (2002); Eberhardt et al., *supra* note 26, at 384; Jennifer L. Eberhardt et al., *Seeing Black: Race, Crime, and Visual Processing*, 87 J. PERSONALITY & SOC. PSYCHOL. 876, 876, 881, 883, 885–87 (2004); Phillip Atiba Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences*, 94 J. PERSONALITY & SOC. PSYCHOL. 292, 302, 304 (2008); Anna Roberts, *Asymmetry as Fairness: Reversing a Peremptory Trend*, 92 WASH. U. L. REV. 1503, 1527 (2015). *But see supra* note 12.

72. *But see supra* note 12.

73. *But see, e.g.*, Rachlinski et al., *supra* note 3, at 1197 (finding that judges harbor the same kinds of implicit biases as others and that these biases can influence their judgment).

74. *See, e.g.*, Correll et al., *supra* note 61, at 1103 ("The current studies examine whether experimental manipulations designed to increase the accessibility of the Black-danger stereotype exacerbate bias in the decision to shoot. This research borrows from work on the malleability of implicit associations."); *see also* Correll et al., *supra* note 71, at 1320 (finding that in a video game simulation, participants were able to make the decision to shoot an armed target more quickly and more accurately if the target was Black); Patricia G. Devine, *Stereotypes and Prejudice: Their Automatic and Controlled Components*, 56 J. PERSONALITY & SOC. PSYCHOL. 5, 12 (1989) (showing that the consequence of subconscious activation of negative black racial stereotypes is evaluating ambiguous behavior as aggressive); Eberhardt et al., *supra* note 71, at 881–83, 885–87 (finding that individuals, including police officers, who saw split-second images typically associated with crime prior to completing a study, were more likely to focus their attention on an image of a Black man as opposed to the White man on the same screen, even though they did not realize where they were looking); Goff et al., *supra* note 71, at 296, 302 (showing that individuals

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

research is too numerous to recount fully here, and there is indeed a wealth of research demonstrating the presence and societal effects of anti-Black implicit bias, it is helpful for the purposes of this Article to recognize the breadth of this research beyond Black and White. Researchers using implicit social cognition methods, such as the now well-known IAT,[75] have found that a majority of Americans consistently hold a varied range of implicit biases. Because of the flexibility of the measures, the IAT has allowed researchers to test, and statistically confirm the presence of, a huge range of implicit associations and stereotypes, including demonstrating that Americans implicitly associate: Asian-American or Native American with foreign (White as American),[76] Arab-Muslim with bad (White as Good),[77] women with family (male with the workplace),[78] gay as bad (straight as good),[79] disabled as bad

---

subconsciously associate Black faces with apes and that the association, once triggered, can change the way an individual views violence against a Black person); John T. Jost et al., *A Decade of System Justification Theory: Accumulated Evidence of Conscious and Unconscious Bolstering of the Status Quo*, 25 POL. PSYCHOL. 881, 893, 912 (2004) (arguing that, psychologically, there is an unconscious ideological motive that supports the status quo and that this motive explains why members of minority groups sometimes express preferences toward the majority group); Brian A. Nosek et al., *Pervasiveness and Correlates of Implicit Attitudes and Stereotypes*, 18 EUR. REV. SOC. PSYCHOL. 36, 38 (2007) (summarizing the results of more than 2.5 million IAT results that studied various implicit biases); Payne, *supra* note 61, at 190 (discovering that individuals who saw split-second images of Black men prior to beginning a study were more likely to misidentify tools as guns in a timed experiment); Laurie A. Rudman & Richard D. Ashmore, *Discrimination and the Implicit Association Test*, 10 GROUP PROCESSES & INTERGROUP REL. 359, 368 (2007) (showing that an IAT that focuses on racial stereotypes can sometimes predict the likelihood that someone has participated in overt acts of racial discrimination in the past).

75. *See* Anthony G. Greenwald et al., *Measuring Individual Differences in Implicit Cognition: The Implicit Association Test*, 74 J. PERSONALITY & SOC. PSYCHOL. 1464, 1464 (1998).

76. *E.g.*, Nosek et al., *supra* note 74, at 20 (summarizing data from IATs and self-reports and finding, among other things, that participants more easily associated Asian or Native American faces with "Foreign" and European American faces with "American"); *see also* Thierry Devos & Mahzarin R. Banaji, *American = White?*, 88 J. PERSONALITY & SOC. PSYCHOL. 447, 452 (2005) (finding that Asian-Americans as groups are less associated with the "American" culture than are White Americans; Nosek et al., *supra* note 74, at 20 (finding that Native Americans are implicitly viewed as less American than White Americans).

77. *E.g.*, Kristin A. Lane et al., *Understanding and Using the Implicit Association Test: IV: What We Know (So Far) About the Method*, *in* IMPLICIT MEASURES OF ATTITUDES 59, 66 (Bernd Wittenbrink & Norbert Schwarz eds., 2007) (finding that based on over 2.5 million online tests of seventeen different IATs, "participants demonstrated, on average, greater positivity for White over Black [and] Other Peoples (non-Arab Muslims) over Arab Muslims"); *see also* Jaihyun Park et al., *Implicit Attitudes Toward Arab-Muslims and the Moderating Effects of Social Information*, 29 BASIC & APPLIED SOC. PSYCHOL. 35, 38 (2007) (finding that participants exhibited a strong implicit preference for White over Arab-Muslim names).

78. *E.g.*, Lane et al., *supra* note 77, at 64, 68.

79. *E.g.*, *id.* at 66–67.

(abled as good),[80] obese as bad (thin as good),[81] old as bad (young as good),[82] and so many others.[83] In many of these domains, Americans' self-reported attitudes and stereotypes often vary widely from, or even conflict with, their documented implicit biases. For example, most Americans will self-report that they consider Native Americans to be the most American of all groups, but these self-reports contrast deeply with their implicit associations revealed by scientific testing.[84] Researchers estimate that the vast majority of Americans possess the implicit biases listed above, and many others, too.[85] Thus, research has consistently shown that the practice of simply asking people about their group-related attitudes or stereotypes captures only a limited amount of relevant information.[86]

Social scientists have also employed a variety of methods other than the IAT to test how implicit biases affect cognitive processing and behavior across a wide range of groups. Of the many articles chronicling implicit bias outside of the Black–White paradigm, consider one that demonstrates how certain actions can simply and easily activate implicit bias in people's minds. In an empirical study, researchers showed study participants a video of a research assistant holding cue cards that contained unfinished word fragments.[87] One-half of the participants saw an Asian research assistant in the video, and the other half saw a White research assistant.[88] The cue cards that the research assistant held contained incomplete words, several of which conformed to Asian

---

80. *E.g., id.*

81. *E.g., id.* at 67.

82. *E.g., id.* at 66–67.

83. *E.g., id.* at 66–68 (finding that people implicitly associate males with science (females with the liberal arts), light skin with good skin (dark skin with bad skin), and White with harmless objects (Black with weapons)).

84. *See* Nosek et al., *supra* note 74, at 20 (finding that participants' self-reported responses reflected the view that Native Americans were more "American" than whites).

85. *See, e.g.*, Anthony Greenwald, *Race in America: The Invisible Hand of the Implicit Mind*, PSYCHOL. TODAY (Aug. 12, 2015), https://www.psychologytoday.com/blog/the-violent-mind/201508/race-in-america-the-invisible-hand-the-implicit-mind; Dennis Junius, *AP Poll: U.S. Majority Have Prejudice Against Blacks*, USA TODAY (Oct 27, 2012, 8:37 AM), http://www.usatoday.com/story/news/politics/2012/10/27/poll-black-prejudice-america/1662067/.

86. This Article does not suggest, however, that asking people about their self-reported biases is a waste of time. Indeed, there are times in which people will indeed admit such biases or preferences, and researchers should scrutinize these admissions. For example, Levinson and collaborators found that participants who self-reported more explicit bias displayed more sentencing bias in a death-penalty task. *See* Levinson et al., *Devaluing Death*, *supra* note 21, at 562.

87. Daniel T. Gilbert & J. Gregory Hixon, *The Trouble of Thinking: Activation and Application of Stereotypic Beliefs*, 60 J. PERSONALITY & SOC. PSYCHOL. 509, 510 (1991).

88. *Id.*

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

stereotypes, such as "POLI_E," "RI_E," "S_ORT," and "S_Y."[89] The researchers challenged participants to formulate as many word completions as they could during a limited time.[90] The researchers found that participants who saw the Asian research assistant completed more Asian-stereotyped words (POLITE, RICE, SHORT, AND SHY) as compared to participants who saw a White assistant.[91]

Such a simple study can have more complex implications. Recognizing the ease with which an entire network of stereotypes became activated and readily available in cognition in the study, one might consider how easily group membership can function to prime stereotypes in the legal system. Particularly in the context of judging, one could predict that a judge could pick up on a huge range of cues (appearance of a person or categorization of a last name, as the simplest examples) and that those cues could potentially work to rapidly activate one or more networks of stereotypes.

The next Part builds upon this discussion of implicit bias beyond Black and White and sets the stage for this Article's empirical study by considering why it might be important to empirically investigate judicial implicit biases related to Asian-Americans and Jews.

## II. BIASES BEYOND BLACK AND WHITE: ASIANS AND JEWS IN AMERICA

Although the vast majority of legal scholarship on implicit bias has dealt with African-Americans and the harmful stereotypes that can influence a range of areas across the law (namely, aggressive stereotypes such as violence[92]),[93] there is detailed empirical research from the social sciences that documents the history of discrimination, both explicit and implicit, against both Asian-Americans[94] and Jews in America.[95] Within

---

89. *Id.*

90. *Id.*

91. *Id.* at 513.

92. *See* sources cited *supra* note 26.

93. Justin D. Levinson, Understanding the Full Impact of Implicit Bias in the Criminal Justice System: From Lawmaking to Parole, and Back Again, Presentation at the University of Hawai'i Law Review Conference (Jan. 16, 2015) (on file with author).

94. *See supra* note 75 and accompanying text. This Article uses the term "Asian-American" in full recognition of the multiple meanings of the term and the risks of grouping together all American people of Asian descent. As a Harvard Law Review note discusses, this descriptor "obscures not only the differences among Asian-American individuals qua individuals but also the historic disputes that have separated Asian peoples. Moreover, it helps conceive individuals as components of monolithic blocs defined primarily by common physical traits." Note, *Racial Violence Against Asian Americans*, 106 HARV. L. REV. 1926, 1932 (1993); *see also* Masako Iino, *Asian Americans Under the Influence of "Japan Bashing,"* 32 AM. STUD. INT'L 17, 17 (1994) ("Asian Americans are diverse. They are people who are, or whose ancestors are, from such countries in Asia as China, Japan, Korea, the Philippines, India, Vietnam, Laos, and Cambodia.").

95. BRUCE E. BLAINE, UNDERSTANDING THE PSYCHOLOGY OF DIVERSITY 87 (2007) (stating that "[s]tereotypes of Jews have long included a mix of positive and negative attributes," such as

legal discourse, there has been a deep and engaged discourse focusing on various elements of injustice within American law and society, primarily focusing on the Asian-American experience[96] but also on the Jewish experience.[97] Because many perceive both of these groups as "model

---

intelligence, shrewdness, ambition, success, loyalty to family, dishonesty, money loving, and ruthlessness); BARRY A. KOSMIN & ARIELA KEYSAR, BRANDEIS CTR. & TRINITY COLL., NATIONAL DEMOGRAPHIC SURVEY OF AMERICAN JEWISH COLLEGE STUDENTS 2014: ANTI-SEMITISM REPORT 2–3 (2015), http://www.brandeiscenter.com/images/uploads/articleuploads/trinity-Anti-Semitism.pdf (finding that in a survey of 1,157 self-identified Jewish students at fifty-five university and four-year college campuses, 54% of Jewish students "reported having been subject to or witnessing anti-Semitism on their campus"); Daniel Katz & Kenneth Braly, *Racial Stereotypes of One Hundred College Students*, 28 J. ABNORMAL & SOC. PSYCHOL. 280, 282, 285 (1933) (finding that in 1933, when researchers asked one hundred Princeton students to select traits from a list of eighty-four adjectives that matched Jews, the top twelve chosen traits for Jews were: shrewd (79%), mercenary (49%), industrious (48%), grasping (34%), intelligent (29%), ambitious (21%), sly (20%), loyal to family ties (15%), persistent (13%), talkative (13%), aggressive (12%), and very religious (12%)); Rudman & Ashmore, *supra* note 74, at 364, 365 (finding that results of a Jewish/Christian negative/positive traits IAT predicted recommended budget cuts (economic discrimination) for Jewish organizations); Edwards S. Shapiro, *Jews with Money*, 36 JUDAISM 7, 8 (1987) ("The association of Jews with money was a staple of American, as well as of British, literature of the nineteenth and early twentieth century."); Stacey Burling, *Jews, Money and Image*, PHILA. INQUIRER (Jan. 11, 2009) ("Jews gravitated toward finance and trade centuries ago, when more highly valued roles in agrarian societies—land owner and warrior—were denied to them. Early Christians were banned from loaning money at interest to fellow Christians, but they needed loans and Jews took on that role.").

96.  *E.g.*, Ming W. Chin, *Keynote Address: "Fairness or Bias?: A Symposium on Racial and Ethnic Composition and Attitudes in the Judiciary*," 4 ASIAN L.J. 181, 181–82 (1997); Harvey Gee, *Asian Americans and Criminal Law and Criminal Procedure: A Missing Chapter from the Race Jurisprudence Anthology*, 2 GEO. J.L. & MOD. CRITICAL RACE PERSP. 185, 185 (2010); Jou-Chi Ho, *The Call for and Role of Asian Lawyers in the Deep South*, 12 SEATTLE J. SOC. JUST. 843, 868 (2014); Darren Lenard Hutchinson, *Ignoring the Sexualization of Race: Heteronormativity, Critical Race Theory and Anti-Racist Politics*, 47 BUFF. L. REV. 1, 26–27, 89–90 (1999); Nary Kim, *Too Smart for His Own Good? The Devolution of a "Model" Asian American Student*, 20 ASIAN AM. L.J. 83, 84–85 (2013); Mari J. Matsuda, *Voices of America: Accent, Antidiscrimination Law, and a Jurisprudence for the Last Reconstruction*, 100 YALE L.J. 1329, 1353–54 (1991); Setsuko Matsunaga Nishi, *Perceptions and Deceptions: Contemporary Views of Asian Americans*, *in* A LOOK BEYOND THE MODEL MINORITY IMAGE 3, 3–5 (Grace Yun ed., 1989); Note, *supra* note 94, at 1932; Rhoda J. Yen, *Racial Stereotyping of Asians and Asian Americans and Its Effect on Criminal Justice: A Reflection on the Wayne Lo Case*, 7 ASIAN L.J. 1, 2 (2000).

97.  *E.g.*, Kenneth L. Marcus, *Jurisprudence of the New Anti-Semitism*, 44 WAKE FOREST L. REV. 371, 391 (2009) (noting that the view of Jews in America only as a religious group and not as a religious, ethnic, or racial group is problematic in claims of discrimination based on race or national origin); *see also* VICTORIA SAKER WOESTE, HENRY FORD'S WAR ON JEWS AND THE LEGAL BATTLE AGAINST HATE SPEECH 3 (2012) (detailing the discrimination against Jews in the 1920s in the context of *Sapiro v. Ford*); Daniel M. Hinkle, *Peremptory Challenges Based on Religious Affiliation: Are They Constitutional?*, 9 BUFF. CRIM. L. REV. 139, 178 (2005) (proposing that removing Jewish jurors based on the assumption that Jews are intelligent may lead to feelings of exclusion by Jewish jurors); Julie D. Arp, Note, *The* Batson *Analysis and Religious Discrimination*, 74 OR. L. REV. 721, 730–32 (1995) (noting discrimination against Jews as a

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

minorities" or "success stories," largely due to perceived academic and socio-economic measures as well as stereotypes related to these groups— for example, Asian academic achievement[98] or Jewish business savvy[99]— it may initially seem somewhat counterintuitive for those unfamiliar with the literature to focus on how they may be unintentional targets of discrimination in the legal system.

However, research from the cognitive sciences consistently shows the continuing prevailing stereotypes about these groups.[100] Some of the stereotypes are indeed positive, but there are also strong negative associations between both of these groups and morality-related stereotypes, such as slyness, financial fraud, and an overall lack of trustworthiness.[101] These stereotypes have deep historical roots, but they are not a relic of history; social scientists have demonstrated that they

---

religious group in peremptory challenges because the U.S. Supreme Court did not explicitly protect religious groups, as opposed to ethnic groups).

    98.  In 2013, 65% of Asian-Americans between the ages of 35 and 39 had a four-year college degree, compared with 42% of Whites of the same age. Cass R. Sunstein, *Asians Make It Big in America*, BLOOMBERG VIEW (Mar. 2, 2015), http://www.bloombergview.com/articles/2015-03-02/why-asian-americans-will-soon-be-the-wealthiest-americans; *see also* Susan T. Fiske, *Stereotyping, Prejudice, and Discrimination, in* 2 HANDBOOK OF SOCIAL PSYCHOLOGY 357, 379 (Daniel T. Gilbert, Susan T. Fiske & Gardener Lindzey eds., 1998) ("Asians in the United States are subsumed in the second half of the twentieth century as the Model Minorities: quiet, law-abiding, hardworking, and intelligent." (citation omitted)).

    99.  HASIA R. DINER, THE JEWS OF THE UNITED STATES 320 (2004).

    100.  One study found that on average, Jews are viewed as wealthier, more intelligent, harder working, more self-supporting, and less violent than Whites in general. Thomas C. Wilson, *Compliments Will Get You Nowhere: Benign Stereotypes, Prejudice and Anti-Semitism*, 37 SOC. Q. 465, 465, 467 (1996) ("Research . . . has identified two sorts of Jewish stereotypes. The first is overly malevolent and clearly anti-Semitic, portraying Jews as pushy, covetous, clannish, ill-mannered, ruthless, dishonest, mercenary, grasping, overbearing, sloppy, loud, money-loving, and uncouth. The second kind of stereotype is ostensibly benign, characterizing Jews as financially successful, ambitious, hardworking, intelligent, loyal to family and other Jews, industrious, energetic, and able to get ahead."). Stereotypes for Jewish people include perceived disloyalty, power, intelligence, and dishonesty, all of which are also stereotypes of Asian-Americans. *See* Fiske, *supra* note 98, at 379–80. In addition, Jews are also seen as "clannish, greedy, ambitious, and pushy," and Asians are also seen as "quiet, law-abiding, hardworking, and intelligent." *Id.* In a study involving over 860 college students associating groups with each of 120 characteristics, Asian-Americans were perceived as more self-disciplined (more self-disciplined, reserved, shy, and quiet, but less noisy), less popular (less sociable, athletic, good looking, and competent), and more traditional (more family committed, tradition-loving, and old-fashioned) than White Americans. *See* Linda A. Jackson et al., *Cognition, Affect, and Behavior in the Prediction of Group Attitudes*, 22 PERSONALITY & SOC. PSYCHOL. BULL. 306, 308, 311 (1996). In a 2001 telephone survey of 1,216 Americans, the poll found that 23% of Americans said they were uncomfortable with the idea of voting for an Asian-American candidate for president (11% for a Jew and 15% for an African American). K. Connie Kang, *Study Finds Persistent Negative Perceptions of Chinese Americans*, L.A. TIMES (Apr. 25, 2001), http://articles.latimes.com/2001/apr/25/news/mn-55180.

    101.  *See supra* note 100 and accompanying text.

continue today.[102] Within the law, the existence of negative moral stereotypes can play a dangerous role in a host of domains where moral judgments can become legally relevant, ranging, for example, from legislative and administrative decision-making in criminal law (e.g., implementing stricter sentencing guidelines for white-collar crimes),[103] corporate law (duty of loyalty violations),[104] tort law (punitive damage judgments), securities law (insider trading or disclosure violations), contract law (breach and damages), employment law (trustworthiness of employees and their perceived loyalty to a corporation), and immigration law (moral thresholds). Non-doctrinal but still important legal consequences could additionally flow from the impact of stereotypes on the hiring and promotion of these groups in legal jobs, including law firm positions, judicial clerkships, and academic posts.[105]

We chose to focus on stereotypes of Asians and Jews in America for multiple reasons. First, we wanted to investigate the breadth of implicit bias in federal and state judges beyond Black and White. As discussed in Part I, the concept of implicit bias against African-Americans in the legal system is well-researched and now regularly debated by the media and the public,[106] perhaps because it is supported by so many objective measures of inequality that it is nearly impossible to deny.[107] Second, there is a rich history of discrimination against Asians and Jews in America, both inside and outside the legal context, but a significant amount of public discourse about these groups highlights recent successes and overshadows this history. Testing empirically the current state of bias against these groups (among a group as honored as federal and state judges, who presumably would be among the most motivated to avoid bias) would therefore be illuminating in the context of that history of discrimination.

Third, both of these groups are perceived largely as American success stories, yet somewhat contradictory data complicates these narratives, such as objective indicators of wealth and achievement, as compared to social-science data demonstrating the continued propagation of negative stereotypes.[108] Studying implicit and explicit biases toward these groups

---

102. Rudman & Ashmore, *supra* note 74, at 368.

103. Bennett, Levinson & Hioki, *supra* note 8 (manuscript at 18).

104. Judgments relating to the seizing of corporate opportunities for personal gain may well involve moral judgments.

105. Kang et al., *supra* note 12, at 886–87 (finding that explicit and implicit biases in favor of Whites and against Asian-Americans altered the evaluation of a litigator's deposition).

106. MICHELLE ALEXANDER, THE NEW JIM CROW 232–33 (2010).

107. In fact, the only empirical study to examine implicit bias in judges was conducted on Black and White implicit attitudes. Rachlinski et al., *supra* note 3, at 1208, 1210.

108. The median wealth of White families in 2013 was $134,008 compared to $94,440 for Asian-American families and $11,184 for African-American families. Sunstein, *supra* note 98. In

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

allows us to harness scientific methods to potentially help resolve ambiguity about the state of these biases in the legal system. And finally, we believed that studying groups that are largely considered favored minority groups is important: if strong implicit biases against Asians and Jews (that may be considered counterintuitive by some) were documented among federal and state judges, it would help illuminate the true breadth of implicit bias in the law and all of its attendant dangers.[109]

### A. *Anti-Asian Explicit Attitudes and Stereotypes: From Yellow Peril to the "Model Minority"*

There is a long history of anti-Asian sentiment in the United States. Although this history is complex and well-documented, this Article summarizes briefly the evolution of anti-Asian attitudes and stereotypes to set the stage for our report on modern research on implicit and explicit anti-Asian attitudes and stereotypes.[110] According to some scholars, significant anti-Asian sentiment initially grew out of the immigration of large numbers of Chinese and Japanese to the United States, largely beginning

---

2013, 65% of Asian-Americans between the ages of thirty-five and thirty-nine had a four-year college degree, compared with 42% of Whites of the same age. *Id.*

In 2013, 25% of Jews had a household income exceeding $150,000, compared with 8% of the general public, and 58% of Jews were college graduates, compared with 29% of the general public. *A Portrait of Jewish Americans*, PEW RES. CTR. (Oct. 1, 2013), http://www.pewforum.org/2013/10/01/jewish-american-beliefs-attitudes-culture-survey/.

109. Additional empirical work on other groups in the American legal system is still sorely needed. For example, the incarceration numbers for certain group members, such as Latinos, demonstrate serious concerns that should be investigated in the implicit bias context. Similarly, Muslims in America report overt discrimination in law enforcement. *See* Geneive Abdo, *Muslims Say Fellow Americans Are Lashing Out*, CHI. TRIB. (July 15, 2014), http://articles.chicagotribune.com/2004-07-15/news/0407150256_1_american-muslims-muslim-activist-non-muslim. Future empirical work must examine these biases, as well as others. Unfortunately, due to the voluntary nature of our study and the need to prevent a large drop-out rate, we were limited in what group stereotypes we could investigate empirically.

110. This summary is not meant to be comprehensive. There are a wide number of sources that can provide a meaningful context to anti-Asian sentiment in the United States. *See generally, e.g.*, ANGELO N. ANCHETA, RACE, RIGHTS, AND THE ASIAN AMERICAN EXPERIENCE (2d ed. 2006) (comparing Asian-Americans' experiences with those of African-Americans in the United States, specifically that they have been the targets of racially based violence); DAVID PALUMBO-LIU, ASIAN/AMERICAN (1999) (arguing that the United States' identity has been strongly attached to the Pacific and various Asian-American identities had been formed as a result); Yuko Kawai, *Stereotyping Asian Americans: The Dialectic of the Model Minority and the Yellow Peril*, 16 HOWARD J. COMM. 109 (2005) (noting that Asian-American's stereotype of the model minority is inseparable from the negative stereotype of "yellow peril"); Natsu Taylor Saito, *Model Minority, Yellow Peril: Functions of "Foreignness" in the Construction of Asian American Legal Identity*, 4 ASIAN L.J. 71 (1997) (finding that those of Asian descent have been labeled the "model minority," but also "foreign," which reinforces their inferiority to White Americans).

in the 1850s.[111] In California, for example, 17% of the male workforce in the 1870s was composed of Chinese workers.[112] According to the Asian-American Almanac, "once the new immigrants arrived they faced a growing tide of bigotry fueled by white workers' fears of economic competition."[113] These fears manifested as "widespread public rhetoric excoriating Asian immigrants"[114] and "culminat[ed] in a series of restrictive policies."[115] These policies included the Sidewalk Ordinance of 1870,[116] the Chinese Exclusion Act of 1882,[117] and later the Immigration Acts of 1917 and 1924, which essentially shut down Asian immigration for two decades.[118] Although many of these efforts consisted of legally sanctioned discrimination related to negative perceptions and fears of Chinese-Americans in particular, these discriminatory efforts were by no means limited. The Japanese-American experience similarly tells a story of discrimination and fearful legal responses to stereotypes. This fear was at its height just ten weeks after the Pearl Harbor attack, when President Franklin D. Roosevelt signed Executive Order 9066, which codified a policy of "exclusion, removal, and detention" that affected 120,000 people without review.[119] This policy, considered by some to be among the most embarrassing chapters in recent American history,[120] was fueled by fears and stereotypes of Japanese-Americans, known by some as the

---

111.  THE ASIAN AMERICAN ALMANAC 265 (Susan B. Gall & Irene Natividad eds., 1995).

112.  *See id.*

113.  *Id.*

114.  *Id.* at 337.

115.  *Id.* at 265.

116.  This law "prohibited persons from walking on the streets while using poles to carry goods, a practice used only by Chinese Americans at the time." *Id.* at 337.

117.  *Id.* at 206 (suspending "the immigration of Chinese laborers to the United States for ten years" (emphasis omitted)).

118.  *Id.* at 266.

119.  Don T. Nakanishi, *Surviving Democracy's "Mistake": Japanese Americans & the Enduring Legacy of Executive Order 9066*, 19 AMERASIA J. 7, 7 (1993) (quoting COMM'N ON WARTIME RELOCATION & INTERNMENT OF CIVILIANS, PERSONAL JUSTICE DENIED 2 (1982), https://www.archives.gov/files/research/japanese-americans/justice-denied/summary.pdf).

120.  *See, e.g.*, Saito, *supra* note 110, at 74.

> "[T]he broad historical causes which shaped these decisions were race prejudice, war hysteria and a failure of political leadership." Based on this report, the president issued an official apology and Congress passed legislation providing for at least symbolic redress. These, too, imply that the experience was an unfortunate detour in an otherwise honorable history of respect for the rights of citizens.

*Id.* (footnotes omitted) (quoting COMM'N ON WARTIME RELOCATION & INTERNMENT OF CIVILIANS, *supra* note 119, at 18).

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

"yellow peril" era.[121] During this era, "Japanese were depicted as degenerate mongrels and the voters [in California] were urged to save 'California-the White Man's Paradise' from the 'yellow peril.'"[122]

Social science research began to document negative explicit (self-reported) attitudes and stereotypes against Asian-Americans as early as the 1930s. A 1933 study of Princeton students sought to document their racial and ethnic stereotypes, including stereotypes of Chinese- and Japanese-Americans.[123] Researchers asked study participants to choose traits from a list of adjectives and match those traits to groups.[124] For Japanese, participants selected "Intelligent," "Industrious," "Progressive," "Shrewd," and "Sly."[125] For Chinese, the participants' top six choices were "Superstitious," "Sly," "Conservative," "Tradition-loving," "Loyal to family ties," and "Industrious."[126]

Although one can see the beginnings of mixed negative with positive stereotyping in the Princeton survey, researchers report a stronger shift toward positive stereotyping that occurred primarily in the second half of the twentieth century, perhaps beginning in earnest across the American population around the 1960s.[127] Self-reported attitudes toward Asian-Americans in the United States appear to evolve as the "Model Minority" stereotype began to emerge clearly; Asians began to be seen as "quiet, law-abiding, hardworking, and intelligent,"[128] as well as "self-disciplined," attributes that are believed to go along with educational and career success.[129] These "model" stereotypes, however, were not always positive and failed to entirely evade the negative moral stereotypes that were clear in the early 1900s.

The "model minority" and other stereotypes about Asian-Americans did not disappear in the aftermath of the Civil Rights Movement. Modern researchers have been sensitive to the multi-directionality of stereotypes and have investigated the way seemingly positive stereotypes can actually activate a threat response, whereby White Americans became concerned about the overrepresentation of Asian-Americans in desirable

---

121. Kawai, *supra* note 110, at 113 ("[T]he 1941 Pearl Harbor bombing by Japan during World War II inflated the yellow peril stereotype and led to the detention of Japanese Americans in concentration camps.").

122. Saito, *supra* note 110, at 72 n.3 (quoting Oyama v. California, 332 U.S. 633, 658–59 (1948)).

123. Katz & Braly, *supra* note 95, at 285.

124. *Id.* at 282.

125. *Id.* at 285.

126. *Id.*

127. Nakanishi, *supra* note 119, at 11.

128. Fiske, *supra* note 98, at 379.

129. Colin Ho & Jay W. Jackson, *Attitudes Toward Asian Americans: Theory and Measurement*, 31 J. APPLIED SOC. PSYCHOL. 1553, 1553–54 (2001).

academic and professional positions. In a 2001 study of American attitudes towards Asian-Americans, for example, Professors Colin Ho and Jay Jackson presented survey participants with a series of questions that make up what they call the "Attitude Toward Asians (ATA) Scale."[130] The ATA is an explicit measure that asks participants how much they agree or disagree with statements like, "Asian Americans tend to be hardworking and diligent," "Asian Americans should think in more American ways," and "Asian Americans are gradually taking over the United States."[131] The researchers hypothesized that "[b]eing perceived as intelligent, industrious, and successful may elicit admiration and respect, but may also elicit threat, resentment, envy, and hostility."[132]

The results of their study confirmed these expectations and found that "[f]our stereotype factors were found to underlie the stereotype of Asian Americans: a negative stereotype, a model-minority stereotype, an artistic stereotype, and a quiet stereotype."[133] One can expect this kind of multi-directionality and complexity of explicit self-reported measures to be found in continuing empirical studies. With the implicit social cognition revolution, however, researchers have not been limited to using explicit measures to investigate Asian-American stereotypes. The next Section summarizes this research endeavor and sets the stage for this Article's empirical study of Asian-American implicit stereotypes held by federal and state judges.

## B. *Anti-Asian Attitudes and Stereotypes: Implicit Biases*

Modern studies of implicit bias have occasionally, though not frequently, examined implicit biases that Americans hold towards Asians. These studies have shown that people implicitly classify Asian-Americans as foreigners, ineffective litigators, and inhibited, among other negative categorizations. A 2007 study by Professors Laurie A. Rudman and Richard D. Ashmore, for example, found that college student participants associated Asians (on an IAT) with negative traits (reserved, stiff, inhibited) and Whites with positive traits (warm, friendly, outgoing).[134] When combined with an economic discrimination measure, in which researchers asked students to employ budget cuts to various student organizations at their university, the researchers found that the implicit bias levels predicted students' discrimination against an Asian student group (the "Japanese Cultural Association").[135]

---

130. *Id.* at 1556.

131. *Id.* at 1563.

132. *Id.* at 1555.

133. *Id.* at 1570.

134. Rudman & Ashmore, *supra* note 74, at 364.

135. *Id.* at 367 (finding that explicit self-reported attitudes towards Asians also predicted discrimination in the budget cut task).

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

Research has also found Asian-Americans to be less associated as "American" compared to White Americans.[136] In that study, researchers Thierry Devos and Mahzarin R. Banaji created an IAT in which they asked participants to pair photos of Whites or Asians with symbols that were easily identifiable as "American" (such as the American flag, Mt. Rushmore, Capitol building) or "Foreign" (UN Building in Geneva, Ukrainian bill, Green and White flag).[137] Results of the study showed that participants implicitly associated White with American and Asian with Foreign, relative to one another.[138]

In the legal context, one study has measured how implicit bias may affect Asian-Americans. In that study, Professor Jerry Kang and his colleagues investigated whether the stereotype of the successful litigator was indeed a White stereotype.[139] The researchers in that study employed two different IATs designed to measure how implicit associations of Asians and Whites may be related to stereotypes of successful litigators.[140] In one IAT, Kang and his colleagues instructed participants to group together photos of male Asian faces and White faces with attribute words typically associated with successful scientists (e.g., analytical, methodical, mathematical) or litigators (e.g., eloquent, charismatic, verbal).[141] In the second, participants grouped together the photos with positive or negative attitudes (often called the good/bad IAT), including, for example, "beauty, gift, happy," for the category "Good," and "filth, pain, hurt," for the category "Bad."[142] In both IATs, the researchers found the predicted implicit bias—participants not only associated White with good and Asian with bad, but they also associated White with successful litigator traits and Asian with successful scientist traits.[143] Furthermore, the researchers found that when participants were asked to rate the performance of a litigator (whom they heard by audio and was labelled as either White or Asian), their implicit biases predicted their ratings of the litigator when he was labelled as White.[144] The more implicit bias they held associating White with successful litigator attributes (as opposed to successful scientist attributes), the more likely they were to judge a White litigator as being competent, the more likely

---

136. Devos & Banaji, *supra* note 76, at 453.
137. *Id.* at 454, 456, 457 (using identifiable Asian and White names instead of photos for the IAT, a second study found similar results).
138. *Id.* at 463.
139. *See* Kang et al., *supra* note 12, at 887.
140. *Id.* at 892, 895.
141. *Id.* at 893–94.
142. *Id.* at 895.
143. *Id.* at 900.
144. *Id.* at 896, 901–02.

they were to like him, and the more likely they were to hire or refer him to others.[145]

In light of the historical evidence regarding anti-Asian discrimination, as well as the more modern implicit stereotypes of Asians in America described in this Subsection, it is not surprising that scholars have considered the ways in which Asian-Americans might face automatic discrimination in the legal setting.[146] These scholarly accounts have included a range of claims that posit, for example: "The yellow peril stereotype tends to increase the likelihood of acquittal in cases involving Asian American victims;"[147] "Asian American and other non-white victims tend to receive less attention from law enforcement officers at all stages of the criminal arrest, investigation, and pre-trial processes;"[148] law enforcement officers, due to stereotypes of Asians as morally inferior, may "apply tactics of harassment or brutality to dominate Asian suspects;"[149] Asian intellectual and "masterminding" stereotypes may make it less likely for a jury to agree with an insanity defense;[150] and

---

145. *See id.* at 900–01. For the Asian-litigator condition, however, it was the participants' explicit bias, not their implicit bias, that predicted their evaluations of his performance. *See id.*

146. *See* Gee, *supra* note 96, at 195, 197 (arguing that the model minority myth prevents Asian-Americans from becoming jury forepersons where Asian-Americans are not parties to the litigation; can help Asian defendants secure more lenient sentences than they deserve; and combined with the characterization of Asian-Americans as foreign, often create obstacles for Asian-Americans to establish *prima facie* claims of racial discrimination due to a belief that they are less protected under the Fourteenth Amendment than are African-Americans); Yen, *supra* note 96, at 15, 19–20 (arguing that the "yellow peril" stereotype devalues Asian lives because the perception of Asian-Americans as foreign or non-American is a significant hurdle for prosecutors in convincing a non-Asian jury to identify with an Asian victim, and that police who perceive Asian-Americans as foreign may attempt to take advantage of Asian suspects by failing to comply with criminal procedures).

147. Yen, *supra* note 96, at 13–15 (arguing that the image of Asian men as dangerous foreigners or martial artists has influenced jurors' views of "reasonableness" in self-defense contexts, such as in *Hattori v. Peairs*, 662 So. 2d 509 (La. Ct. App. 1995), and *Kansas v. Simon*, 646 P.2d 1119 (Kan. 1982)).

148. *Id.* at 16 ("Police often assume that Asian and Asian American victims are unable to speak coherent English and instead speak to white witnesses. Asian victims also may distrust police and fail to assert their grievances. As a result, police likely make fewer arrests for Asian and Asian American victims as compared to white victims." (footnote omitted)).

149. *Id.* at 19 (noting that a New York court convicted a police officer of attempted assault of a Korean storeowner after the officer called the storeowner and his brother "f—ing Orientals" and "animals" as he beat them).

150. *See* Kim, *supra* note 96, at 93–94 ("The model minority stereotype, which disproportionately attributes intelligence and wiles to Asian Americans, packs the potential to influence trials for Asian American defendants . . . . [T]he prosecution can insist that Asian Americans are capable of 'masterminding' crimes and outsmarting non-Asians, even when the crimes lack clear design. . . . In the end, it may be too paradoxical for jurors to find that a scholarly and well-educated defendant has a mental defect that clouds his ability to discern right from

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

Asians are less likely to be selected to be jury forepersons, among others.[151]

## C. *Anti-Jewish Explicit Attitudes and Stereotypes: From Peddler to Wall Street*

Although Asians and Jews took quite different paths in terms of their settlement in America, there are some historical similarities, both in chronology and in stereotypes that have led to the development of a mix of negative and positive group-based stereotypes. As psychologist Susan Fiske summarizes, "Stereotypes for Jewish people . . . share some of the content for Asians: perceived disloyalty, power, intelligence, and dishonesty overlap."[152] Here, this Article briefly traces the historical development of Americans' attitudes and stereotypes toward Jews.

The largest Jewish immigration occurred from Europe between the years of 1820–1924.[153] During these years, over 2.5 million Jews immigrated to the United States, both as a response to intolerable anti-Semitism and harsh economic conditions in Europe and to the economic opportunities available in America.[154] Jews settled into a new life in the United States, often becoming peddlers to make a living.[155] This new life did not come without discrimination, however. Jews in the nineteenth century were often stigmatized "for what many considered essential racial traits—greed, depravity, crudeness, and clannishness."[156] Prior to the 1880s, however, most Americans also perceived Jews to be "white," which made legally-sanctioned discrimination more difficult.[157] After the 1880s, however, a more racialized view of Jews emerged in America. A large swath of private enterprises formalizing policies to exclude Jews (e.g., law firms, universities, hotels, clubs) accompanied this racialization,[158] but this

---

wrong—though subsequent events continue to point to a correlation between a high level of intelligence and mental illness.").

151. *See, e.g.*, Chin v. Runnels, 343 F. Supp. 2d 891, 895, 906 (N.D. Cal. 2004); *see also* Teshima, *supra* note 12, at 122–24 (citing *Chin*, 343 F. Supp. 2d at 895, 906); Benson, *supra* note 12, at 43–44 (citing *Chin*, 343 F. Supp. 2d at 895, 906).

152. Fiske, *supra* note 98, at 379–80.

153. DINER, *supra* note 99, at 88, 112.

154. *Id.* at 88–89, 92 (describing the pogroms of Eastern Europe, in which Jewish civilians and communities were attacked indiscriminately).

155. *Id.* at 99–100.

156. *Id.* at 164.

157. *Id.*; *see also* ERIC L. GOLDSTEIN, THE PRICE OF WHITENESS 6–7 (2006) (describing the development and complexity of Jewish identity in the United States from the early 1820s to present day).

158. DINER, *supra* note 99, at 209–10 ("From the early 1920s through the mid-1940s, most American colleges and universities, particularly those on the East Coast, imposed quotas on Jewish students. Schools like Harvard worried that if academic merit alone became the standard in the admissions process, they would become 'too Jewish.'"). Similar worries have been publicly

discrimination was not embodied in specific anti-Jewish legislation. Rather, unlike the more explicit Congressionally sanctioned discrimination against Asians of this era, governmental inaction and the decision not to enforce anti-discrimination laws seemed to be the prevailing response to this form of private discrimination.[159]

The twentieth century "did not spell the end of anti-Jewish behavior and rhetoric," but rather, the 1920s and 1930s served as the "peak" of anti-Semitism in the United States.[160] Part of this height of anti-Jewish attitudes was attributable to the continuation of racialized stereotypes that derived from European cultural trends and then-current political rhetoric, which attempted to connect the notions of a Jewish race to varying forms of human immorality.[161] Another part of it emerged from a combination of economic pressures leading up to the Depression, when "Americans facing unemployment and the loss of economic status blamed the Jews for their problems,"[162] a phenomenon that was exacerbated by "a stream of anti-Semitic organizations, publications, and speakers who competed in viciously vilifying the Jews."[163] Indeed, some Americans of this era believed that "Jews, whom they assumed were controlling Wall Street[164] . . . [and] Hollywood, conspired to destroy American rural life"[165] and control the government.[166] Even at this height of anti-Semitism in America, however, explicit negativity towards Jews was not universal. Jewish politicians and cultural figures were finding some level of success in local elections and in the entertainment world, and some non-Jewish intellectuals and cultural leaders openly fought to call out automobile manufacturer Henry Ford and others for their anti-Semitism.[167]

---

addressed regarding Asian-Americans in modern college admissions. *See* Don T. Nakanishi, *A Quota on Excellence? The Asian American Admissions Debate*, *in* THE ASIAN AMERICAN EDUCATIONAL EXPERIENCE 273 (Don T. Nakanishi & Tina Yamano Nishida eds., 1995).

159. *See* DINER, *supra* note 99, at 164–65.

160. *Id.* at 207–08, 210.

161. *Id.* at 208.

162. *Id.* at 210.

163. *Id.* at 211.

164. *Id.* at 209 (footnote added). For more on the association between Jews and money, see Shapiro, *supra* note 95, at 8 ("The association of Jews with money was a staple of American, as well as of British, literature of the nineteenth and early twentieth century.").

165. DINER, *supra* note 99, at 209. Around the same time, Henry Ford waged his well-known assault on Jews, largely beginning with his 1920 publication, "The International Jew: The World's Foremost Problem," and continuing with his purchasing a newspaper that regularly told of the "international Jewish conspiracy," making these ideas known "to anyone who came to buy an automobile." *Id.*

166. *Id.* at 212. For an interesting parallel discussion regarding Jewish stereotypes in Europe, see Werner Bergmann, *Anti-Semitic Attitudes in Europe: A Comparative Perspective*, 64 J. SOC. ISSUES 343, 346 (2008).

167. GOLDSTEIN, *supra* note 157, at 123.

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

Empirical study of attitudes and stereotypes of Jews in America began largely in the 1950s, but interestingly, some of the first telling self-report data that emerged for Jews came in the same 1933 Princeton study that examined students' attitudes toward Japanese and Chinese.[168] Participants' five most selected traits for Jews were "Shrewd," "Mercenary," "Industrious," "Grasping," and "Intelligent"[169]—multi-directional (both positive and negative) traits that one could indeed trace to the propagation of stereotypes surrounding Jewish control of Wall Street. This type of stereotype multi-directionality has persisted through more modern research. A 1950 study by Professor Gregory Razran, for example, asked 150 male American participants to rate photos of college-aged women based on a variety of characteristics.[170] Professor Razran randomly gave the photos either Jewish, "Old American," Irish, or Italian names.[171] He found that participants disliked photos labeled with Jewish names the most, and participants more harshly judged the photographed women's character, as compared to the same photos labeled with non-Jewish names.[172] However, he also found that participants were more likely to judge the women labelled with Jewish names as ambitious and intelligent, as compared to the other groups.[173]

Modern measures of self-reported attitudes toward Jews display some of the same multi-directionality revealed in the historical account. According to Professor Bruce Evan Blaine, "On the one hand, Jews are regarded as intelligent, shrewd, ambitious, successful, industrious, and loyal to family. On the other hand, Jews are associated with traits such as dishonesty, money loving, pushy, and ruthlessness."[174] As previously discussed, Susan Fiske summarizes modern stereotypes as sharing some of the same stereotypes as Asians, such as "perceived disloyalty, power, intelligence, and dishonesty overlap. In addition, Jews are seen as clannish, greedy, ambitious, and pushy."[175]

Over time, explicit self-reports of negative attitudes and stereotypes have shown that openly expressed anti-Semitic attitudes and stereotypes have declined, much as have openly expressed stereotypes toward many

---

168. Katz & Braly, *supra* note 95, at 282, 285.

169. *Id.* at 285.

170. Gregory Razran, *Ethnic Dislikes and Stereotypes: A Laboratory Study*, 45 J. ABNORMAL PSYCHOL. 7, 7 (1950).

171. *Id.* at 8.

172. *Id.* at 15, 22.

173. *Id.* at 15. It was during this era that Jewish law firms began to prosper in New York City, which Eli Wald has argued is due to a unique combination of anti-Jewish hiring discrimination and positive stereotyping. *See* Eli Wald, *The Jewish Law Firm: Past and Present*, *in* JEWS AND THE LAW 65, 65–66 (Ari Mermelstein et al. eds., 2014).

174. BLAINE, *supra* note 95, at 98.

175. Fiske, *supra* note 98, at 379–80.

other groups. In this context, research using implicit methods has allowed researchers to introduce a more dynamic way to measure attitudes and stereotypes.

### D. *Anti-Jewish Attitudes and Stereotypes: Implicit Biases*

Modern studies of implicit bias confirm that negative stereotyping of Jews persists on an automatic level. In one such study, Professor Laurie Rudman and her colleagues asked participants to complete IATs that required them to group together Christian and Jewish names with negative and positive attitude words (e.g., positive: rainbow, paradise; and negative: vomit, murder), and then to answer explicit attitude questions about how warmly they feel towards Christians and Jews.[176] The researchers hypothesized that while out-group implicit biases would emerge, they did not expect non-Jewish participants to self-report similar negative attitudes toward Jews as would be revealed using the IAT.[177] Indeed, confirming their predictions, the researchers found that non-Jewish participants showed significant anti-Jewish (pro-Christian) implicit bias on IAT but only showed small self-reported attitude preferences for Christian over Jewish when completing the feeling thermometer.[178] The results, the researchers indicate, underscore the need to investigate intergroup biases not only by asking people about their attitudes but also by employing implicit methods.[179]

In another study of implicit bias related to negative Jewish stereotypes, Professors Rudman and Ashmore also tested implicit biases of participants towards Jews and measured the effect of those biases on economic decision-making.[180] They found, on an IAT, that participants displayed significant associations between Jewish and immoral traits (e.g., cheap, controlling, dominating) and Christian and moral traits (e.g., generous, charitable, friendly) and that these negative stereotype levels predicted their budget cuts to a Jewish university campus organization.[181] Put simply, the stronger the participants' anti-Jewish implicit bias, the more likely they were to cut the budget of a Jewish student organization.

In addition to these two studies showing negative out-group biases against Jews, other studies indicate that implicit attitudes related to

---

176. Rudman et al., *supra* note 4, at 441–43. This measure is called a "feeling thermometer." *Id.* at 443.

177. *Id.* at 441.

178. *Id.* at 460–61.

179. *See id.* at 460.

180. *See* Rudman & Ashmore, *supra* note 74, at 363–68. This is the same study, described previously, that measured participants' implicit biases toward Asian-Americans and then asked them to make budget cuts to university groups.

181. *Id.* at 363–64, 365–68.

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

Judaism, at least, may not be as negative as implicit attitudes toward other religions. For example, researchers who have studied IAT results gathered by Harvard University's Project Implicit demonstration website[182] report that Americans' implicit attitudes towards Judaism (rather than specifically regarding Jewish people) are actually favorable. In those studies, researchers measured implicit attitudes towards religions by using symbols to represent Judaism (rather than using last names, for example, to represent Jewish people) and a mix of other religions.[183] In these studies, about 50% of participants show positive implicit attitudes toward Judaism, with approximately 26% showing negative attitudes.[184] This study, in the context of the studies presented above, thus echoes the historical multi-directionality of attitudes and stereotypes regarding Jews. On the one hand, Judaism and Jews may well be favored as compared to other minority groups, but on the other hand, negative morality-based stereotypes still persist.

Considering the vast history of anti-Semitism in the United States and the continuing multi-directional stereotypes of Jews in modern America, it is somewhat surprising that the legal literature has not fully considered the ways in which Jews may face intentional or unintentional discrimination in the legal system. Two scholars, for example, have concluded that Jews may be discriminated against in jury selection due both to stereotypes regarding intellectual ability (Jews may be difficult to convince) or based on other perceived biases.[185] Yet other legally focused scholarship has not deeply considered the ways in which the negative moral stereotypes of Jews may manifest in other areas of the law, for example, in white-collar fraud cases, medical malpractice, products liability tort cases, and other legal claims that could be related to morality.

It is based upon these similar explicit and implicit attitudes and stereotype profiles that we decided to craft identical measures of both explicit and implicit bias and apply them both to Asian-Americans and Jewish Americans.

---

182. *See* Nosek et al., *supra* note 74, at 18.

183. *Id.* at 52.

184. *Id*. at 18. The other participants showed no significant preference for Judaism or other religions. *Id.*

185. *See* Hinkle, *supra* note 97, at 178 ("[A] lawyer may use his peremptories to strike all the Jews from the jury on the assumption that Jews are intelligent because the lawyer is hoping for the dumbest jurors he can find."); *see also* Benjamin Hoorn Barton, *Religion-Based Peremptory Challenges After* Batson v. Kentucky *and* J.E.B. v. Alabama*: An Equal Protection and First Amendment Analysis*, 94 MICH. L. REV. 191, 210 n.89 (1995) ("For a particularly bizarre example of religious stereotyping in the use of the peremptory challenge, consider the Marcos-Khashoggi trial. Imelda Marcos, wife of the ex-President of the Philippines, and Adnan Khashoggi, an Arab businessman and arms-dealer, were on the same side at trial, yet Khashoggi's lawyers wanted to eliminate Jewish potential jurors because of supposed anti-Arab bias, while Marcos's lawyers thought Jewish jurors would be ideal because Jews are 'sensitive to persecution and suspicious of government power.'").

## III. The Empirical Study

Building upon prior research testing implicit biases in the legal system as well as on stereotype research relating to Asians and Jews in America, we designed a study to measure implicit and explicit stereotypes of Asians and Jews among a group of federal district court judges, federal magistrate judges, and state trial judges, and to test the effects of group membership on white-collar sentencing. We conducted the study using three types of judges not only to get a broad judicial sample but also to compare the responses of the different types of judges.

### A. *Participants*

Two hundred thirty-nine judges participated in the study, all of whom participated voluntarily on their own time and on their own computers.[186] One hundred eighty federal judges participated in the study, 100 of whom were district court judges (representing all federal judicial circuits)[187] and 80 of whom were magistrate judges (also representing all federal judicial circuits).[188] Fifty-nine state judges from eight states participated in the study.[189] 71% of the judges were male, and 29% were female. The vast majority of judges, 91.6%, identified themselves as White. 3% identified themselves as African-American. 2% identified themselves as Asian, and 2% identified themselves as "more than one race."[190] Judges were asked to indicate their age within the span of a decade (to preserve anonymity), with judges' ages ranging from 21–30 to 80-plus. The majority of judges, 71%, were between the ages of 51 and 70.[191] We asked participants their religious affiliation in part due to historical studies that indicate a relationship between religiosity and prejudice (including anti-Semitism).[192] In response to this question, 31% identified themselves as

---

186. State judges were typically invited to participate by a judicial training office in their state after Judge Mark W. Bennett obtained permission from the Chief Justice of that state. Federal judges were invited by email to participate by Judge Mark W. Bennett. They were not provided compensation for their participation.

187. District court judges from the Ninth (19), Eighth (15), Seventh (10), Fourth (12), and Fifth Circuits (9) were the most heavily represented among district court judge participants.

188. District court judges from the Ninth (19), Eleventh (11), and Sixth (10) were the most heavily represented among magistrate court judge participants.

189. State court judges from Missouri (14), Washington (11), Kentucky (10), and Arizona (9) were the most heavily represented among state court judge participants.

190. We separately asked if judges identified as Hispanic or Latino, and 5% of judges indicated that they identified as Hispanic or Latino.

191. Specifically, 37% reported being between the ages of 51–60 and 34% between the ages of 61–70.

192. Gordon W. Allport & J. Michael Ross, *Personal Religious Orientation and Prejudice*, 5 J. Personality & Soc. Psychol. 432, 432 (1967) (finding that religious participants displayed higher levels of out-group bias).

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

Protestant, 30% identified as Catholic, 21% identified as "none," and 11% identified as Jewish. The remaining judges identified religious affiliations including Baptist, Latter Day Saints, and others.

## B. *Materials*

Because of the nuanced and multi-directional stereotypes relating to Asians and Jews in America, we were interested in measuring both implicit and explicit attitudes and stereotypes regarding these groups. To investigate this potential link, this study employed both implicit methods and explicit (self-report) methods. The primary implicit method employed was the IAT.[193] Explicit (self-report) questions were employed using scaled survey-style questions.

The IAT measures implicit cognitions in an easy and compelling manner. It instructs participants to rapidly classify information, "and then calculates a participant's reaction time (in milliseconds) and accuracy in completing the categorization task.[194] The wisdom behind the IAT holds that statistically significant speed and accuracy-based differences in a person's ability to categorize different types of information reflect something meaningful in that person's automatic cognitive processes.

What follows is an in-depth description of how researchers typically conduct the IAT: While using computers, study participants rapidly press two pre-designated keyboard keys after viewing particular words or images on their computer screens. The words and images that participants view are classified into meaningful categories, which require participants to "pair an attitude object (for example, Black or White . . .) with either an evaluative dimension (for example, good or bad) or an attribute dimension (for example, home or career, science or arts)."[195] Participants finish several trials of the matching activities so researchers can measure how participants perform in pairing each object with each dimension. For instance, "in one trial of the most well-known IATs, participants pair the concepts Good-White together by pressing a designated response key and the concepts Bad-Black together with a different response key." After finishing the trial, participants then match the opposite concepts with

---

193. The following few paragraphs briefly describe the scientific principles underlying the IAT. An almost identical version of this Subsection appeared in Levinson et al., *Guilty by Implicit Racial Bias*, *supra* note 21, at 191–93.

194. As psychologists Nilanjana Dasgupta and Anthony Greenwald summarize, "When highly associated targets and attributes share the same response key, participants tend to classify them quickly and easily, whereas when weakly associated targets and attributes share the same response key, participants tend to classify them more slowly and with greater difficulty." Nilanjana Dasgupta & Anthony G. Greenwald, *On the Malleability of Automatic Attitudes: Combating Automatic Prejudice with Images of Admired and Disliked Individuals*, 81 J. PERSONALITY & SOC. PSYCHOL. 800, 803 (2001).

195. Levinson, *supra* note 21, at 355.

each other: in this example, Good-Black and Bad-White.[196] Computer software gathers the data[197] and "measures the number of milliseconds it takes for participants to respond to each task. Scientists can then analyze (by comparing reaction times and error rates using a statistic called "D-prime")[198] whether participants hold implicit associations between the attitude object and dimension tested." Race IAT results consistently demonstrate that "white Americans express a strong 'white preference' on the IAT."[199]

The IAT is a flexible measure. Researchers have developed several types of IATs. Some examples of IATs include: "Gender-Science IAT, Gay-Straight IAT, and the Fat-Thin IAT, among many others."[200] For instance, the Gender-Science IAT requires participants to pair Male and Female images with Science and Liberal Arts words.[201] One should note "the flexibility of the IAT to test either evaluative dimension words (such as grouping Male-Female with Good-Bad), or attribute dimension words (such as grouping Male-Female with Career-Family)." The two IATs we created for the present study, the Caucasian-Asian stereotype IAT, and the Christian-Jewish stereotype IAT, require participants to group together words associated with the group category (easily identifiable last names of members of the four groups, such as Chang, Goldberg, and Baker)[202] and either positive or negative stereotype words (such as honest and generous versus controlling and greedy).[203]

---

196. Because participants may naturally be quicker at responding with one of their hands, participants complete these tasks twice, once for each response key, to eliminate differences based on hand preference. The order of the IAT tasks is also usually randomized to reduce order effects.

197. In our empirical study, we used the software Inquisit, produced by Millisecond Software.

198. *See* Anthony G. Greenwald et al., *Understanding and Using the Implicit Association Test: I. An Improved Scoring Algorithm*, 85 J. PERSONALITY & SOC. PSYCHOL. 197, 201 (2003).

199. Rachlinski et al., *supra* note 3, at 1199; Levinson, *supra* note 26, at 612 (noting that "a majority of test takers exhibit implicit racial bias" and referencing one IAT which found that "sixty-eight percent of participants demonstrated an implicit preference for 'White people' versus 'Black people'").

200. *See, e.g.*, PROJECT IMPLICIT, https://implicit.harvard.edu/implicit (last visited Oct. 23, 2016).

201. *Id.*

202. The names selected for the IAT stimuli were, for Asian: Chang, Wu, Lee, Kwan, Choi, Tanaka, and Yamada; for Caucasian and Christian: Miller, Taylor, Johnson, Baker, Smith, Andrews, and Higgins; and for Jewish: Shapiro, Cohen, Friedman, Weinstein, Eisenberg, Siegel, and Zucker. It should be noted that we attempted to at least somewhat balance the Asian names by including recognizable names that are Chinese, Japanese, or Korean in origin, but these names are by no means a perfect representative of Asian-American names. For a brief discussion of the limitations of categorizing a diverse group of Americans into one category, see sources cited *supra* note 94.

203. *See* Greenwald et al., *supra* note 75, at 1466. The words we used for positive moral stereotypes were moral, generous, giving, charitable, trustworthy, friendly, and honest. The words

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

In addition to measuring implicit stereotypes with IATs, we also asked judges to self-report their stereotypes towards Asians and Jews. To do this, we used composite scale measures that we developed from existing, validated, scales.[204] These measures ask participants, for example, how much they agree with the statements "Asians are taking more than their fair share of jobs in America," and "Jews are trying to control America." The purpose of these measures is to quantify self-reported attitudes towards each group. These questions were each completed on 1–7 scales, and the scores were compiled into scales.[205]

After giving informed consent and completing demographic information, participants began the online study by completing the sentencing task. In this task, judges read about either a White defendant, an Asian-American defendant, a Christian defendant, or a Jewish defendant. We initially designed the study to compare two defendants of different religions—Jewish or Christian—and two defendants of different ethnicities—Asian or White.[206] Using different defendant names varied the defendant's group membership. The White and Christian defendants were named Nathaniel Kinnear. The Asian defendant was named Michael Zhang.[207] The Jewish defendant was identified as Nathanial Goldberg.[208] For the Jewish and Christian defendants, the religion of the defendant was identified by stating that the defendant and his wife were active in either the Christian or Jewish community and that the defendant's brother served as a member of the clergy of either a Christian church or Jewish synagogue. All other information about the defendant was identical, including age (47), marital status (married), citizenship (U.S.), birth place (Chicago, IL), and education (Master's degree). Other names in the presentence report (e.g., names of defendant's parents) were made to be consistent with the group membership condition.

---

we used for negative moral stereotypes were dishonest, liar, scheming, controlling, dominating, competitive, and greedy.

204. To create these scales, we blended measures from previously validated scales. The purpose of the blending was to simplify and shorten the length of the study, as well as to narrow the stereotypes examined to those that would be most relevant in a legal context.

205. The full list of items was as follows: "Asian Americans are trying to control America; Asian Americans cannot be trusted; Asian Americans are taking more than their share of good jobs; Asian Americans are honest people; Asian Americans possess good moral values; Asian Americans are cunning." The same items were also asked relating to Jews.

206. We therefore conducted statistical analysis separately, comparing the results for Asian as compared to White, and Jewish as compared to Christian.

207. It should be noted that the surname Zhang is a traditionally Chinese name and therefore does not represent all Asian-American names. If participants identified the name as Chinese, and hold specific stereotypes of Chinese-Americans that are different from other Asian-American stereotypes, the results of the study could have been affected by this difference.

208. Spouse names also conformed with the defendant names.

Levinson et al.: Judging Implicit Bias: A National Empirical Study of Judicial Ste

The sentencing task asked judges to read a federal-style presentence report for a fraud case. To create a more manageable presentence report, we chose to conduct the sentencing for an 11(c)(1)(c) plea bargain, for which the stipulated sentencing range was 151–235 months. The presentence report described a fraud crime in which the alleged perpetrator had agreed to plead guilty to federal securities fraud in violation of 18 U.S.C. § 1348. Judges read that "the defendant abused his position of trust within the company by persuading [a company for which he was the director] to give him money and stock under the guise that he was going to take the company private through a stock buyback." The amount involved in the fraud was estimated to be between $6,800,000 and $7,200,000. Under the Federal Sentencing Guidelines, a conviction for such a crime results in a sentence between 151–235 months in prison.[209] Judge participants were instructed to sentence the defendant within this range.[210] Although it would only be typical for federal district court judges to deliver the sentence in a crime such as the one presented, we nonetheless provided the same sentencing measure to all judges. Because federal magistrate judges are familiar with federal presentence reports and the sentencing guidelines, we expected that the task would not be difficult for them to follow. State judges were presumably less familiar with the sentencing rules and presentence report that were used in this study. However, we gave the same sentencing task to state and federal judges because we did not want to have different stimuli for different groups.

After the judges completed the sentencing task, they were asked questions relating to their personal sentencing philosophy. This scale included four questions: two designed to measure support for retributive punishment ("A person who commits the harshest crime deserves the harshest punishment" and "Those who hurt others deserve to be hurt in return"), and two to measure mercy or rehabilitation-based punishment ("People who commit serious crimes often should receive treatment instead of punishment" and "People who commit serious crimes sometimes deserve leniency"). They then completed an IAT: either a stereotype IAT for the groups Asian and Caucasian or a stereotype IAT for the groups Christian and Jewish. Judges who were randomly assigned to the Asian or White defendant condition received an Asian-Caucasian IAT, and judges who were randomly assigned to the Christian or Jewish defendant condition received a Christian-Jewish IAT.

After completing the IAT, participants next completed the self-report stereotype measure for both Asians and Jews. These measures consisted

---

209. U.S. SENTENCING GUIDELINES MANUAL § 3E1.1, at 82 (U.S. SENTENCING COMM'N 2015).

210. If a judge attempted to enter a number not within the range, the study was programmed to reject the response and request a response between the 151–235 month guidelines.

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

of six questions each and were identical except for the target of the question (Asians or Jews). For example, participants were asked how much they agreed or disagreed with the following statements: "Asian Americans are taking more than their fair share of jobs," and "Jews are trying to control America." For each such question, participants responded based on a range of strongly agree to strongly disagree (1–7 scale). These questions were also presented in counterbalanced order, so that different participants answered these questions in different orders (to eliminate order effects). After completing these explicit stereotype measures, the survey concluded and participants were thanked for their participation.

## C. *Hypotheses*

Based upon previous scholarship related to implicit bias in the criminal justice system, as well as knowledge gained through previous empirical research on stereotypes of Asians and Jews in America, we made the following hypotheses[211]:

*Hypothesis 1*: Judges will harbor implicit biases associating Asians with negative economic and moral stereotypes and Whites with positive economic and moral stereotypes.

*Hypothesis 2*: Judges will harbor implicit biases associating Jews with negative economic and moral stereotypes and Christians with positive economic and moral stereotypes.

*Hypothesis 3*: Judges will sentence Jewish defendants more harshly than Christian defendants and will sentence Asian defendants more harshly than White defendants.

*Hypothesis 4*: Judges' implicit bias scores (on the IATs) will predict the length of their hypothetical defendant's sentence. For example, judges with higher levels of implicit bias towards Asians will give longer sentences to Asian defendants.

*Hypothesis 5*: Judges' self-reported agreement with Asian and Jewish stereotypes will be less likely than the IAT scores to predict discrimination in sentencing, but it may still somewhat predict group-based sentences.

*Hypothesis 6*: Judges will use judicial philosophy to justify higher punishment of Asians and Jews. Phrased another way, judges who respond to a case with an Asian or Jewish defendant will embrace more retributive or punitive philosophies, and less rehabilitative philosophies, compared to judges who see a case with a White or Christian defendant.

---

211. We documented these hypotheses before conducting the study, in conformity with best empirical practices.

In calculating the IAT results, we used the updated scoring algorithms suggested by Professor Anthony Greenwald and his colleagues.[212] These updated algorithms addressed challenges that were raised regarding the original IAT scoring algorithm.[213]

## D.  Results: Implicit Bias, Federal Judges, and Sentencing

To test our hypotheses, we conducted several statistical analyses. For hypotheses one and two, we examined whether judges held implicit biases by using one-sample T-tests.[214] For hypothesis three, we compared whether judges gave different sentences based on defendant ethnicity or religion using analysis of variance (ANOVA) tests.[215] This statistical analysis also was employed to determine whether different types of judges reported different levels of self-reported bias or harbored different levels of implicit bias. For the remaining hypotheses, we employed regression analyses. IAT D scores were regressed upon judicial retributive and mercy philosophies. Sentencing decisions were regressed upon ethnicity or religion of defendant, implicit and explicit biases, sentencing philosophies, and the two-way interactions between these variables.

---

212.  *See* Greenwald et al., *supra* note 198, at 213–15.

213.  As Levinson et al., summarized:

> Greenwald, Nosek and Banaji's suggested improved scoring measure for the IAT, called a *D* score, has improved test-response detection (for instance, it throws out indiscriminate responses or responses that indicate a lack of attention) and incorporates an inclusive standard deviation for all congruent trials (for instance, both the practice and test block of white-guilty and black-not guilty). Mean latencies are computed for each block, and complimentary blocks are subtracted from each other (e.g., practice white-not guilty and black-guilty would be subtracted from practice white-guilty and black-not guilty). These two difference scores are divided by their inclusive standard deviation score, and the average of these two scores is called *D*.

Levinson et al., *Guilty by Implicit Racial Bias*, *supra* note 21, at 203 n.80 (citations omitted). For more on Greenwald and his colleagues' scoring algorithm, see Rachlinski et al., *supra* note 3, at 1245–46.

214.  A one-sample T-test tests whether a single population differs from a hypothesized value. *See* RONALD CHRISTENSEN, ANALYSIS OF VARIANCE, DESIGN AND REGRESSION 37–42 (1996) (explaining one-sample T-tests). In the case of the IAT, the hypothesized value is zero, or no bias. An IAT score that is significantly different from zero would indicate bias in the population. Thus, the one-sample T-test referenced here tested whether the study population's IAT score was significantly different than zero.

215.  Generally, ANOVA, or Analysis of Variance, is a series of statistical techniques that segment the observed variance in a dataset into the sources of variance, allowing for the comparison of the means between two or more groups. For example, is the variance in a sample (e.g., measured height) attributable to differences between two groups (such as Democrats and Republicans), or is it due to other, unexplained or unmeasured variation within the group (such as how much coffee they had this morning)?

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

*FLORIDA LAW REVIEW* [Vol. 69

### 1. Judges Implicitly Biased Against Asians

Federal and state judges displayed strong to moderate implicit bias against Asians (relative to Caucasians) on the stereotype IAT,[216] such that Asians were associated with negative moral stereotypes (e.g., greedy, dishonest, scheming) and Caucasians were associated with positive moral stereotypes (e.g., trustworthy, honest, generous).

### 2. Judges Implicitly Biased Against Jews

Federal and state judges displayed strong to moderate implicit bias against Jews (relative to Christians) on the stereotype IAT,[217] such that Jews were associated with negative moral stereotypes (e.g., greedy, dishonest, scheming), and Christians were associated with positive moral stereotypes (e.g., trustworthy, honest, generous).

### 3. Federal District Court Judges (Marginal Significance) Gave Longer Sentences to Jewish (vs. Christian) Defendants; State Court Judges Gave Longer Sentences to White (vs. Asian) Defendants

Federal district judges gave (of marginal significance) longer sentences to Jewish defendants than Christian defendants.[218] There were no significant differences in how these judges sentenced White as compared to Asian defendants. Magistrate judges' sentences did not vary significantly based on the defendant's group membership. State judges, contrary to prediction, sentenced White defendants to significantly longer sentences than Asian-American defendants.[219]

---

216. $M = .46$, $t(108) = 9.20$, $p < .001$.

217. $M = .52$, $t(101) = 9.44$, $p < .001$.

218. $F(1, 52) = 2.89$, $p = .095$, $\eta p2 = .05$, MJewish $= 160.12$, SD $= 15.51$, MChristian $= 153.90$, SD $= 6.51$.

219. $F(1, 26) = 6.77$, $p = .05$, $\eta p2 = .21$, MWhite $= 184.00$, SD $= 24.06$, MAsian $= 163.50$, SD $= 14.73$. For an interesting study analyzing Asian defendants in federal sentencing, see Brian D. Johnson & Sara Betsinger, *Punishing the 'Model Minority': Asian-American Criminal Sentencing Outcomes in Federal District Courts*, 47 CRIMINOLOGY 1045, 1075, 1079 (2009) (finding that for white-collar crimes, Asian-American defendants received similar or more lenient sentences to their White counterparts).

**FIGURE 1.**

Mean Sentence (+/- 1 SD) Given by Federal District Judges



**FIGURE 2.**

Mean Sentence (+/- 1 SD) Given by State Court Judges



#### 4. All Judge Cohorts Possessed Similarly Strong Implicit Biases

Each of the three types of judges we tested displayed significant negative implicit biases towards Asians (relative to Caucasians) and Jews (relative to Christians), and there were no statistically significant differences between IAT score and type of judge participant.[220]

---

220. $F_{Asian-Caucasian}(2, 106) = .77$, ns., $F_{Jewish-Christian}(2, 99) = .19$, ns. The scores were: for Federal District Court judges, $M_{Asian-Caucasian} = 0.50$ (SD = 0.55), $M_{Jewish-Christian} = 0.53$ (SD = 0.49); for Federal Magistrate judges, ($M_{Asian-Caucasian} = 0.38$ (SD =

### 5. Male Judges Showed Stronger Anti-Jewish Implicit Bias

There was a significant difference whereby male judges displayed stronger anti-Jewish implicit biases as compared to female judges.[221] For the Asian-Caucasian IAT, there were no statistically significant differences between male and female judges.[222]

**FIGURE 3.**
Mean IAT Scores (+/- 1 SD) for Types of Judge Participants



### 6. Political Party of Appointing President Did Not Predict Different IAT Scores

We were able to categorize federal district court judges based upon the political party of their appointing president. Judges appointed by Republicans appeared to display higher overall IAT bias scores than

---

0.53), $M$Jewish-Christian = 0.46 (SD = 0.57); and for state court judges, *MAsian-Caucasian* = 0.52 (SD = 0.44), $M$Jewish-Christian = 0.54 (SD = 0.64).

221. FJewish-Christian(1, 100) = 4.14, p < .05, ηp2 = .04. For male judges, *MJewish-Christian* = 0.59 (SD = 0.48). For female judges, *M*Jewish-Christian = 0.36 (SD = 0.65).

222. FAsian-Caucasian(1, 107) = 0.16, ns.; FJewish-Christian(1, 121) = 1.69, ns. For male judges, *MAsian-Caucasian* = 0.45 (SD = 0.53). For female judges, *MAsian-Caucasian* = 0.49 (SD = 0.50).

Democrats; however these differences did not reach statistical significance.[223]

### 7. Protestant and Catholic Judges Had Higher Pro-Christian/Anti-Jewish IAT Biases Compared to Judges Who Reported No Religion

Judges who self-identified as Catholic or Protestant displayed significantly higher pro-Christian (anti-Jewish) biases on the Jewish-Christian IAT, as compared to judges who self-identified as affiliated with no religion and as compared to Jewish judges.[224] Jewish judges showed no significant bias towards Jewish or Christian stereotypes.[225] Catholic and Protestant judges did not, however, hold significantly higher implicit biases towards Asians as compared to judges who reported no religion.

### 8. Catholic and Protestant Judges Self-Reported More Agreement with Asian and Jewish Stereotypes, as Compared to "No Religion" Judges (for both Positive Stereotypes and Negative Stereotypes)

There were numerous differences in terms of judges' religion and their agreement with Asian stereotypes. Generally, Catholic and Protestant judges were more likely to self-report anti-Asian stereotypes as compared to judges who affiliated with no religion or as compared to Jewish judges,[226] on the averaged following measures: Asians control America,[227] Asians take jobs,[228] and Asians are cunning.[229] There were no statistically significant differences between religious groups on positive stereotypes of these groups,

---

223. $F_{Asian-Caucasian}(1, 42) = 2.58$, ns., $F_{Jewish-Christian}(1, 43) = 1.00$, ns. For Republican appointees, $M_{Asian-Caucasian} = 0.67$ (SD = 0.61), $M_{Jewish-Christian} = 0.63$ (SD = 0.37). For Democratic appointees, $M_{Asian-Caucasian} = 0.40$ (SD = 0.50), $M_{Jewish-Christian} = 0.48$ (SD = 0.55).

224. $F(3, 92) = 8.46$, $p < .001$, $\eta p2 = .05$, $M_{Catholic} = 0.59$ (SD = 0.58), $M_{Protestant} = 0.71$ (SD = 0.45), $M_{No religion} = 0.32$ (SD = 0.32), $M_{Jewish} = -0.19$ (SD = 0.55).

225. $t(7) = 0.98$, ns. This result may have been due to the small number of Jewish judges (8) who completed this particular IAT. The stats came from a T-test comparing with 0. Prior studies have indicated that Jewish participants have favored Judaism over other religions in attitude IATs. Rudman et al., *supra* note 4, at 446.

226. $F(3, 188) = 5.52$, $p = .001$, $\eta p2 = .08$.

227. $M_{Catholic} = 1.6$ (SD = 1.08), $M_{Protestant} = 1.06$ (SD = 0.87), $M_{Jewish} = 1.42$ (SD = 0.24), $M_{No religion} = 1.23$ (SD = 0.78).

228. $M_{Catholic} = 1.95$ (SD = 1.21), $M_{Protestant} = 1.80$ (SD = 1.17), $M_{Jewish} = 1.06$ (SD = 0.24), $M_{No religion} = 1.33$ (SD = 0.75).

229. $M_{Catholic} = 2.42$ (SD = 1.54), $M_{Protestant} = 2.18$ (SD = 1.46), $M_{Jewish} = 1.78$ (SD = 1.11), $M_{No religion} = 1.72$ (SD = 1.22).

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

including on the following measures[230]: Asians are honest[231] and Asians have good morals.[232]

Catholic judges were also more likely to agree with statements of Jewish stereotypes as compared to Protestant, Jewish, and "no religion" judges on the following measures[233]: Jews control America,[234] Jews take jobs,[235] Jews are cunning.[236] Interestingly, Catholic and Protestant judges were also more likely to agree with the following positive Jewish stereotypes as compared to Jewish judges[237]: Jews are honest[238] and Jews have good morals.[239] These findings indicate that, for at least Protestant judges, they were more likely to self-report agreement with all Jewish stereotypes and not just negative stereotypes.

### 9.  State Judges Were More Anti-Asian in Their Self Reports

State judges, as compared to all federal judges, were more likely to self-report agreement with negative Asian attitudes and stereotypes,[240] including the statements "Asians are trying to control America,"[241] "Asians are taking more than their share of jobs,"[242] and "Asians are cunning."[243]

### 10.  Judges' Self-Reported Agreement with Asian Stereotypes Were Correlated with Their Agreement with Jewish Stereotypes

Agreement with (self-reported) negative stereotypes relating to Asians and (self-reported) negative stereotypes relating to Jews were

---

230.  $F(3, 188) = 0.49$, ns.

231.  MCatholic = 4.28 (SD = 1.93), MProtestant = 4.62 (SD = 1.82), MJewish = 4.11 (SD = 1.68), Mno religion = 4.49 (SD = 1.76).

232.  MCatholic = 4.28 (SD = 1.93), MProtestant = 4.62 (SD = 1.82), MJewish = 4.11 (SD = 1.68), Mno religion = 4.49 (SD = 1.76).

233.  $F(3, 188) = 2.79$, $p = .04$, $\eta p2 = .04$.

234.  MCatholic = 1.71 (SD = 1.2), MProtestant = 1.29 (SD = 0.7), MJewish = 1.22 (SD = 0.73), MNo religion = 1.37 (SD = 0.98).

235.  MCatholic = 1.8 (SD = 1.23), MProtestant = 1.47 (SD = 0.93), MJewish = 1.33 (SD = 0.77), MNo religion = 1.44 (SD = 0.98).

236.  MCatholic = 2.36 (SD = 1.48), MProtestant = 2.15 (SD = 1.46), MJewish = 1.78 (SD = 1.26), MNo religion = 1.91 (SD = 1.31).

237.  $F(3, 188) = 2.26$, $p = .08$, $\eta p2 = .04$.

238.  MCatholic = 4.97 (SD = 1.61), MProtestant = 4.46 (SD = 1.75), MJewish = 3.78 (SD = 1.86), MNo religion = 4.53 (SD = 2.02).

239.  MCatholic = 4.75 (SD = 1.77), MProtestant = 4.75 (SD = 1.73), MJewish = 4.11 (SD = 1.68), MNo religion = 4.26 (SD = 1.97).

240.  $(F(2, 202) = 5.15$, $p=.007$, $\eta p2=.05)$.

241.  MFD = 1.45 (SD = 0.98), MFM = 1.31 (SD = 0.82), MST = 1.53 (SD = 0.81).

242.  MFD = 1.58 (SD = 1.03), MFM = 1.57 (SD = 1.00), MST = 1.96 (SD = 1.18).

243.  MFD = 2.21 (SD = 1.47), MFM = 1.74 (SD = 1.22), MST = 2.63 (SD = 1.46).

correlated with one another.[244] The more likely a judge was to report agreement with a negative Asian stereotype, the more likely the judge was to similarly report agreement with a negative Jewish stereotype. There was no such correlation for agreement with positive stereotypes: self-reported positive stereotypes relating to Asians and self-reported positive stereotypes relating to Jews were not significantly correlated.[245]

### 11. Federal District Judges' Support for Retribution Predicted Higher Anti-Asian Implicit Bias

In selecting regression models, we were first interested in examining which of our other variable measures—and specifically, our questions regarding judges' retributive or mercy philosophies—served as predictors of judges' implicit bias levels. When analyzing federal district judges, the results of this regression showed that judges' self-reported retributive punishment philosophies (but not their mercy punishment philosophies) predicted anti-Asian implicit biases.[246] This may be best understood by referencing the correlation: the higher the support for retribution, the higher the anti-Asian bias.

### 12. Anti-Jewish, Pro-Christian Implicit Biases Predicted the Sentence Length of Christian Defendant: the Higher the Bias, the Shorter the Sentence

One of the interesting questions raised by IAT research has been whether implicit attitudes and stereotypes predict differences in decision-making and behavior.[247] We therefore conducted a second regression, this time on the judges' sentences, based upon the defendant's group membership. In this analysis, the results showed that pro-Christian, anti-Jewish stereotypes predicted the length of a Christian defendant's sentence, so that the higher the implicit bias (Jew with immorality and Christian with morality), the lesser the sentence was of a Christian

---

244. $r = .56$, $p < .001$.

245. $r = .18$, ns.

246. A regression model on the IAT D score of Asians (Asian IAT $d$ = beta1 x retribution + beta2 x mercy + C ) was predicted by retribution score but not mercy score (Adjusted R square = .10, $F(2, 41) = 3.44$, $p = .05$, beta1 = .35, $t = 2.30$, $p < .05$; beta2 = -.06, $t = 0.39$, ns.). However, the same model of the IAT D score of Jewish was not significant (Adjusted R square = .05, $F(2, 42) = 0.02$, ns.).

247. *See* Anthony G. Greenwald et al., *Understanding and Using the Implicit Association Test: III. Meta-Analysis of Predictive Validity*, 97 J. PERSONALITY & SOC. PSYCHOL. 17, 18 (2009) (finding that IAT scores do indeed predict a range of behaviors and decision-making).

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

defendant.[248] Also, the results showed that retributive attitudes positively predicted the length of a Christian defendant's sentence.[249] We tested the same model (replacing Jewish stereotypes with Asian stereotypes) on the White or Asian defendant condition, however, results were not statistically significant.[250]

## IV. DISCUSSION: ANTI-ASIAN AND ANTI-JEWISH IMPLICIT BIASES

The results of the study raise additional questions not only about how implicit biases may work against Asian-Americans and Jews in the legal system but also trigger questions related to the broader risks of hidden, automatic biases in judicial decision-making. Here, this Article discusses the implications of our direct study findings and considers the implications beyond our study, specifically regarding current legal issues where judicial discretion will likely shape and reshape America.

First and foremost, our findings confirm that the federal and state judges we surveyed indeed harbored strong to moderate negative implicit biases about groups that are largely viewed not as subordinated but rather as American success stories. In light of the heavy ethical burden resting on the shoulders of judges—and lifetime-appointed federal judges in particular—these results are concerning. The biases revealed by the study focused on the judges' implicit judgments of morality, connecting group membership with traits such as *scheming*, *dominating*, and *controlling*, and manifested without regard to judges' length of service, age, or type of judgeship. Thus, the primary message revealed by the study is that implicit biases, even about groups not usually discussed in the national conversation of discrimination, may be lurking as part of a complex, deep, and hidden network of cognitive associations, even in the most egalitarian of judges.

Beyond the mere existence and strength of these biases, though, the study results raise further reason to worry. The results of the study, for example, showed that federal district judges (the very judges who make sentencing determinations for the federal crime we presented) were more likely (of marginal statistical significance) to sentence a Jewish defendant

---

248. For this statistical analysis, we tested a regression model of sentencing behavior (Sentence of Defendant = beta1 x IAT score + beta2 x positive Jewish stereotype + beta3 x negative Jewish stereotype + bata4 x retributive attitude score + beta5 x mercy attitude score + C). We tested the model on the Christian and Jewish defendant conditions separately. The model was significant only on Christian defendant condition (Christian condition: $F(5, 12) = 2.80$, $p = .07$; Jewish condition: $F(5,19) = 1.22$, ns.). The results showed that implicit anti-Jewish (pro-Christian) stereotypes negatively predicted the length of a Christian defendant's sentence. [bata1 = -.69, $t = 3.17$, $p < .01$].

249. bata4 = .55, $t = 2.30$, $p < .05$.

250. Fs < 1.00, ns.

to a longer sentence than an otherwise identical Christian defendant. This finding was (although we initially predicted it), in retrospect, surprising considering that a full 75% of federal district judges sentenced the defendant to the exact minimum sentence of a possible seven-year sentencing range.[251] Thus, it may be informative to note that no judges gave a Christian defendant a sentence longer than 175 months, while eight (of thirty-four) judges sentenced a Jewish defendant to 180 months or more.

Our corresponding finding on state judges' sentencing, however, is more difficult to explain. Those judges were more lenient on Asian white-collar fraud defendants than similarly situated White defendants, a finding that we did not predict and would seem to be made less likely by those judges' self-report of higher agreement with Asian stereotypes (at least relative to the other judge cohorts). One preliminary explanation for this finding, which could be consistent with the judges' stereotype self-reports, however, could be that stereotypes of Asian men as non-threatening would lead to a perceived need for a shorter sentence. Such an interpretation, however, would mean that other stereotypes that we did not test (e.g., Asian men are non-threatening) could, in the sentencing context, exert a stronger influence than the morality-related and financial stereotypes we did test.[252] We also note that our state judge-only pool was the smallest of all three judge cohorts and was spread across jurisdictions with different statutes and legal norms, factors that make our result somewhat more difficult to interpret.

The results of the study also address the current state of implicit bias towards Asian-Americans and Jewish-Americans, suggesting that perhaps there is too little modern focus on bias against these groups. Although some commentators have highlighted a small range of possible biases, some relating, for example, to the way that harms to Asian-Americans are either undervalued or erroneously seen as provoked,[253]

---

251.  We focus on the role of judges in federal white-collar sentencing, without regard to bias, in our companion article, Bennett et al., *supra* note 8. We also note that, in a situation in which judges were more likely to use their discretion to sentence within a range (rather than at the absolute bottom), one could predict that a larger bias would appear.

252.  It is notable, though, that a recent empirical study of actual white-collar sentences found no such difference on sentencing. *See* Johnson & Betsinger, *supra* note 219, at 1047, 1076 (finding that Asian-American and White defendants received similar sentences for white-collar crimes).

253.  *See* Yen, *supra* note 96, at 11–15; *see also* Hutchinson, *supra* note 96, at 95–96 ("The development of sexualized racial stereotypes was a product of and helped to justify the sexual exploitation and domination of Asian American women and control of Asian American people through the law."); *cf.* Chin, *supra* note at 96, at 185 ("Asians and Pacific Islanders make up about 9 percent of California's population and are expected to be almost 12 percent in 2020. But when you look to the municipal courts, 84 percent of the judges in these courts are Caucasian. Asian-Americans hold only 2.9 percent of these positions." (footnotes omitted)).

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

legal literature has far from addressed the way widely held judicial biases relating to these groups may manifest in legal decision-making. Without endeavoring to make more than a few specific law-related claims here, we first broadly suggest that all areas of law in which morality judgments play a role are overdue for investigation, considering the long history of the stereotypes we uncovered. As preliminary specific suggestions, these areas of investigation could include, for example, judgments of intentionality in tort or white-collar criminal law,[254] evaluations of whether, and how, a contract has been breached, considerations of culpability (or punitive damages) in products liability or related cases, and, of course, evaluations of corporate director or officer behavior in the context of fiduciary duties or securities laws violations.

The results of the study also implicate the lack of diversity of America's judicial pool, particularly among federal judges. Of the 100 district court judges who participated in our study, sixty-eight were male while only thirty-two were female, and eighty-seven self-reported as White while only six reported as African-American, and three reported as Asian-American. And yet diversity mattered in our study, as it does more broadly in implicit bias literature. We found, for example, that female judges harbored lower implicit anti-Jewish biases and that Jewish judges did not possess a significant bias that was either pro- or anti-Jewish. These results underscore an important point: not all groups display identical implicit biases.[255] In the broader implicit bias context, although diversity cannot be counted on to eliminate all biases, research has shown that one of the best ways to de-bias others is to view, and have interactions with, leaders who run counter to prevailing stereotypes.[256] These "counter-stereotypical exemplars" are the people who, in turn, through their leadership and actions, act as de-biasing agents, whether or not this de-biasing is intentional. Thus, the results of our study, and related implicit bias work more generally, lead us to support calls for

---

254. Research has shown, for example, that morality information can affect judgments such as those of causation and intentionality. *See* Mark D. Alicke, *Culpable Causation*, 63 J. PERSONALITY & SOC. PSYCHOL. 368, 368 (1992) (finding that morality information affects causation judgments); Joshua Knobe, *Intention, Intentional Action and Moral Considerations*, 64 ANALYSIS 181, 183 (2004) (considering the overlap of morality and intentionality); Justin D. Levinson, *Mentally Misguided: How State of Mind Inquiries Ignore Psychological Reality and Overlook Cultural Differences*, 49 HOW. L.J. 1, 28 (2005) (arguing for psychologically competent legal rules); Justin D. Levinson & Kaiping Peng, *Different Torts for Different Cohorts: A Cultural Psychological Critique of Tort Law's Actual Cause and Foreseeability Inquiries*, 13 SO. CAL. INTERDISC. L.J. 195, 212 (2004).

255. *See* Nosek, *supra* note 74, at 37 (summarizing data from more than 2.5 million IATs).

256. Jerry Kang & Mahzarin R. Banaji, *Fair Measures: A Behavioral Realist Revision of "Affirmative Action,"* 94 CALIF. L. REV. 1063, 1107–08 (2006) (summarizing this research and discussing its broader implications).

greater diversity in judicial appointments. In our view, this call for diversity is now scientific in nature and not entirely about politics.[257]

## CONCLUSION

Federal judges in America continue to preside over a broad slate of cases that stand to potentially transform the way America is defined—on matters as fundamental and contentious as immigration, gun control, the role and identity of corporations, health care, and even matters of life and death (e.g., abortion and the death penalty). As commentators work to dissect these intricate legal issues, much attention has been paid not only to the substantive legal issues themselves in Constitutional context but also to judges' self-reported and expressed predilections, politics, and previous opinions. Little has been said of the role of the way judges perceive these fundamental issues and the actors involved: how individual lives are automatically valued,[258] how corporations are implicitly perceived,[259] and how fundamental legal principles are unconsciously intertwined with group assumptions.[260] This Article suggests, and the empirical study supports the idea, that automatic biases and cognitions indeed influence a much broader range of judicial decisions than has ever been considered. It is only in this broader, more fundamental context that the role of judicial implicit biases and their impact on the legal system can ever fully be considered.

---

257.  Indeed, our study did not show a statistically significant difference in the implicit bias results of federal judges appointed by Republican Presidents compared to those appointed by Democrat Presidents.

258.  *See* Levinson et al., *Devaluing Death*, *supra* note 21, at 567 (discussing how jurors automatically value individual lives).

259.  *See* Justin D. Levinson, *Corporations Law: Biased Corporate Decision-Making?*, *in* IMPLICIT RACIAL BIAS ACROSS THE LAW, *supra* note 21, at 146, 163.

260.  *See* Smith et al., *supra* note 10, at 46.

*Florida Law Review, Vol. 69, Iss. 1 [2017], Art. 2*

**EXHIBIT 3**

# WHITE SUPREMACY FROM THE BENCH

*by*
*Vida B. Johnson\**

*Judges make important decisions in millions of cases a year across the country. Unlike other institutional players and unlike parties and their attorneys, judges are the only players in our adversarial legal system that are by design ostensibly neutral, impartial, and without bias.*

*Unfortunately, that legal fiction is not fact. Some judges do hold racial biases. A judge in Texas used racial slurs to describe Mexicans in his state in 2020. Also in 2020, a white judge in Louisiana referred to a deputy and a court clerk by the N-word, and the same year, a white Colorado judge also used the N-word in a conversation with court staff. A federal judge in Texas stated publicly that Black and Latino people are more violent than white people. A Jacksonville, Florida, judge said that Black people should go "back to Africa." An Ohio judge referred to COVID-19 as the "China Virus." In this Article, I have documented scores of instances of racial bias by judges since the year 2000.*

*Most judges, with years of education beyond that of the average American and with knowledge as to how racial discrimination gets litigated, would not be so careless as to say explicitly racist things, so that members of the public can have access to their words. We have to assume that the distressing stories of racism by judges represent the feelings of many more judges.*

*That members of the bench harbor racist views should not come as a surprise. Judges preside over deeply racists systems. We have long known, for example, that judges sentence Black defendants more harshly than their white counterparts, even controlling for criminal record, employment, and education. There are deep inequities in the legal system. The bench needs to be viewed critically as a tool and enforcer of racial oppression. Deep racial inequities have persisted in our country, and the law has addressed only some of the most egregious. Worse, judges have created legal doctrines to get around legal remedies offered*

---

   \* Associate Professor of Law, Georgetown Law School. Many thanks to Jon Anderson, Elizabeth Chen, Anne Gordon, Carla Laroche, Binny Miller, Abbe Smith, Maneka Sinha, Lucius Outlaw III, and Kate Weisburg. Special thanks to Alexis Foster and Sabrina Pearce for research help. I would also like to thank the incredible student editors at Lewis & Clark Law Review for their careful review and helpful edits, which improved this paper.

*by our elected representatives to keep people of color from recovering in court. White supremacy from the bench is an integral part of our legal system and an integral part of our legacy of racism in the United States.*

Introduction ...................................................................................................... 40
I.     The Business of Judges and Judging......................................................... 46
       A.    Elected or Appointed .................................................................... 47
       B.    Discipline and Removal from Office............................................... 48
       C.    Judges vs. Jurors.......................................................................... 51
       D.    Disqualification and Recusal of Judges ......................................... 53
II.    Explicit Racial Bias in Decision-Making ................................................. 53
III.   The Quiet Part Out Loud........................................................................ 56
       A.    Judicial Misconduct Opinions ....................................................... 57
       B.    Appellate Courts .......................................................................... 60
       C.    Ripped from the Headlines Stories.................................................. 65
IV.    There Is No Reforming This.................................................................... 71
Appendix ............................................................................................................ 80

## INTRODUCTION

Americans are having a national conversation about racism in the criminal legal system. With the proliferation of dash cameras, cell phone cameras, and police body cameras, many interactions between police and civilians are recorded so Americans have been able to see the disparate ways that police treat Black and Brown people when compared to their white counterparts. Television news and social media are filled with recordings of these interactions between police and the American citizenry.

Reformers and abolitionists have justifiably focused efforts in the post-George Floyd and post-Ferguson landscape on the police—an institution, as they describe it, that exists to subjugate people of color in our criminal legal system.[1] Many have focused on the ways that interactions between police and civilians have their roots in white supremacy. Because so many interactions are recorded, Americans have witnessed it with their own eyes.

And while police have enormous power on the streets, as do the prosecutors who bring the cases,[2] judges wield significant power over lives in courtrooms across

---

[1]   *See, e.g.*, *Mass Incarceration and Racial Oppression*, INNOCENCE PROJECT NEW ORLEANS, https://ip-no.org/what-we-do/advocate-for-change/mass-incarceration-and-racial-oppression/ (last visited Apr. 18, 2023).

[2]   *See* ANGELA J. DAVIS, ARBITRARY JUSTICE: THE POWER OF THE AMERICAN PROSECUTOR 5–6 (2007).

America. Judges are decision-makers in many instances, including everything from small claims court to lawsuits involving millions of dollars, or family matters like probate, divorce, custody, abuse, and neglect. And in the criminal context, they hold power over a person's liberty. They sentence, they decide whether evidence should be suppressed, they make decisions about jury selection, and they often have the power to dismiss cases. The power of judges in criminal cases has grown even more so now that we have a system of plea bargains, rather than a system of jury trials.[3] Questions of credibility, relative culpability and responsibility vis-à-vis codefendants, and discretion at sentencing all fall squarely on judges. Doctrines of judicial deference mean that many of a judge's decisions are unreviewable unless it can be shown that the decision caused harm.[4]

I have previously focused on the seemingly intractable problem of white supremacy amongst police.[5] I now turn my attention to the issue of racial bias from the bench. This is a decidedly less high-profile problem than that of interactions between police and ordinary citizens. Interactions between citizens, police, and judges are recorded rarely, especially prior to the COVID-19 pandemic. Most courtrooms do not allow audio or video recording or photography.[6] Defense attorneys and prosecutors are often repeat players who may not want to make waves by reporting bias by a judge towards them or parties because they may worry about retribution by judges who are the decision-makers in most instances in court.[7] But that does not mean that judges do not harbor racial animus. Despite the protection judges are afforded, there have been stories in the media from judicial conduct commissions and appellate courts about bias from the bench and in judges' private lives. This Article documents those stories from across our country to illustrate that the bench is not immune from white supremacy and that the legal system is one that is inherently unfair to people of color. It is the first law review article to focus on explicit racial bias by judges. By grappling with this topic, I hope to focus attention on how our legal system is infected with significant racial bias by even those who are meant to be neutral.

---

[3] Missouri v. Frye, 566 U.S. 134, 143–44 (2012).

[4] *See generally* Cynthia K.Y. Lee, *A New "Sliding Scale of Deference" Approach to Abuse of Discretion: Appellate Review of District Court Departures Under the Federal Sentencing Guidelines*, 35 AM. CRIM. L. REV. 1 (1997).

[5] Vida B. Johnson, *KKK in the PD: White Supremacist Police and What to Do About It*, 23 LEWIS & CLARK L. REV. 205 (2019).

[6] *See History of Cameras in Courts*, ADMIN. OFF. OF THE U.S. CTS., https://www.uscourts.gov/about-federal-courts/judicial-administration/cameras-courts/history-cameras-courts (last visited Apr. 18, 2023).

[7] According to a 2020 report about New York judges, "[a]ttorneys described feeling powerless to raise complaints against judges who engaged in biased behaviors or made racially-charged comments against them or their clients." N.Y. UNIFIED CT. SYS., REPORT FROM THE SPECIAL ADVISER ON EQUAL JUSTICE IN THE NEW YORK STATE COURTS 61 (2020).

While there are many well-meaning judges, it should not be a surprise that there is racial bias among a substantial percentage. The 2009 article, *Does Unconscious Racial Bias Affect Trial Judges?*, found that judges do indeed harbor unconscious racial biases.[8] These implicit biases are common amongst Americans of all races.[9] When these implicit biases belong to actors in the legal system, they cause tremendous harm to people of color, and legal scholars have explored this disappointing phenomenon.

However, this Article focuses not simply on the important issue of judges' implicit racial biases that most Americans hold unconsciously or unwittingly, but also the explicit racial biases of some judges. In many cases, it is difficult to parse the two. When a person commits a racially insensitive act, it is hard to know if the person acted purposefully to hurt or unconsciously. For the victim it may not matter, especially in a legal setting where the outcome—that is, the legal decision—is the same whether the judge is acting on unconscious or conscious bias.

Unfortunately, both types of bias may be more common than many Americans want to believe. A not insignificant percentage of Americans consciously hold disturbing views about race, beyond just implicit thoughts. A 2017 poll found that almost ten percent of Americans thought that it was acceptable to hold neo-Nazi views.[10] The proportion of white Americans who hold those views is likely higher than that of non-white Americans. When one considers that judges are disproportionately white,[11] it is certainly possible that at least ten percent of judges hold explicit racial biases.

While significant harms are inflicted on people of color by police, prosecutors, other state actors, and of course private citizens, these structural and individual inequities are enforced in court by judges. Parties, who are in many instances people of color, seek out judges to resolve their disputes or they are forced into court against their will. However, judges are the only player in our adversarial legal system who are by design ostensibly neutral, impartial, and without bias. Civil lawyers have ethical obligations that require them to advocate for their client, prosecutors may be

---

[8] Jeffry J. Rachlinski, Sheri Lynn Johnson, Andrew J. Wistrich & Chris Guthrie, *Does Unconscious Racial Bias Affect Trial Judges?*, 84 NOTRE DAME L. REV. 1195, 1221–26 (2009).

[9] Tobiasz Trawinski, Araz Aslanian & Olivia S. Cheung, *The Effect of Implicit Racial Bias on Recognition of Other-Race Faces*, 6 COGNITIVE RSCH.: PRINCIPLES & IMPLICATIONS, no. 67, 2021, at 1, 9–13.

[10] ABC NEWS & WASH. POST, TRUMP APPROVAL IS LOW BUT STEADY; ON CHARLOTTESVILLE, LOWER STILL 1 (2017), https://www.langerresearch.com/wp-content/uploads/1190a1TrumpandCharlottesville.pdf.

[11] *See* Democracy & Gov't Reform Team, *Examining the Demographic Compositions of U.S. Circuit and District Courts*, CTR. FOR AM. PROGRESS (Feb. 13, 2020), https://www.americanprogress.org/article/examining-demographic-compositions-u-s-circuit-district-courts/. In New York for example, where almost half of the population is nonwhite, less than a quarter of the judiciary are people of color as of 2020. N.Y. UNIFIED CT. SYS., *supra* note 7, at 32–35.

expected to support law enforcement and vice versa, and the defense attorney must zealously advocate for the accused. Not so for judges. While they are human, and despite what social science tells us about an individual's ability to control their biases, the law tells us to assume that judges are without any bias at all.[12]

Any biases are a delegitimizing force in the system. But holding racial bias is a partiality that undermines the integrity of the entire legal system in our racially diverse country. While one would hope that the defense attorneys, prosecutors, and other lawyers would not hold racial biases, we know of course that they do. Somehow, there is something particularly troubling about a judge, the decision-maker, harboring a prejudice with nothing to do with the facts of a particular case, but merely the color of the litigant's skin.

Sadly, there are judges who hold such explicit racial biases. Many of the stories from courts, the media, and disciplinary boards are unsubtle and harrowing. A judge in Texas used racial slurs to describe Mexicans in his state in 2020.[13] A white judge in Louisiana in 2020 referred to a deputy and a court clerk by the N-word.[14] A white Colorado judge also used the N-word in a conversation with court staff in 2020.[15] An Alabama judge said that the murder of George Floyd by police was justified and that he "pretty much got what he deserved."[16] A federal judge in Texas stated publicly that Black and Latino people are more violent than white people.[17] A

---

[12] Legal Info. Inst., *Unbiased Judge*, CORNELL L. SCH., https://www.law.cornell.edu/constitution-conan/amendment-5/unbiased-judge (citing Snyder v. Massachusetts, 291 U.S. 97, 116–17 (1934)) (last visited Apr. 18, 2023).

[13] Angela Morris, *Texas Judge in Hot Water over Racial Slurs Against Mexicans*, TEX. LAW. (Dec. 22, 2020, 6:31 PM), https://www.bloomberglaw.com/document/X25UC9CS000000?jcsearch=hde45hjeim#jcite; *In re* Luitjen, Pub. Admonition & Ord. of Additional Educ. CJC No. 20-0468 (Tex. Comm'n on Jud. Conduct Dec. 4, 2020), http://www.scjc.texas.gov/media/46826/luitjen20-0468pubadm-oae-12420.pdf.

[14] Lateshia Beachum, *A Judge Resigns After Using the N-Word in Texts that She Says the Public Was Never Meant to See*, WASH. POST (Feb. 27, 2020, 4:31 PM), https://www.washingtonpost.com/nation/2020/02/27/jessie-leblanc-resigns-racial-slur/.

[15] Caitlin O'Kane, *Colorado Judge Resigns After Using N-Word Multiple Times and Using Racially Insensitive Language*, CBS NEWS (Apr. 20, 2021, 6:50 AM), https://www.cbsnews.com/news/natalie-chase-colorado-judge-resigns-N-word/; *In re* Chase, 485 P.3d 65, 65–66 (Colo. 2021).

[16] Debra Cassens Weiss, *Ethics Case Accuses Judge of Making Racist and Sexist Remarks, Mouthing N-Word, Criticizing Overweight People*, ABA J. (May 20, 2021, 3:54 PM), https://www.abajournal.com/news/article/ethics-case-accuses-judge-of-making-racist-and-sexist-remarks-mouthing-f-word-criticizing-overweight-people; Jinks v. Ala. Jud. Inquiry Comm'n, No. 1210133, 2022 Ala. LEXIS 103, at *15–16 (Ala. Oct. 21, 2022).

[17] Ethan Bronner, *Complaint Accuses U.S. Judge in Texas of Racial Bias*, N.Y. TIMES (June 4, 2013), https://www.nytimes.com/2013/06/05/us/federal-judge-in-texas-is-accused-of-racial-bias.html; *In re* Charges of Judicial Misconduct, 769 F.3d 762, 773–75 (D.C. Cir. 2014), *aff'd*, *In re* Complaint of Judicial Misconduct, C.C.D. No. 14-01, at 3, 15 (U.S. Comm. on Jud. Conduct & Disability Feb. 19, 2015), https://www.uscourts.gov/sites/default/files/ccd-14-01order-final-02-19-15.pdf.

Jacksonville, Florida, judge said that Black people should go "back to Africa."[18] A federal judge in Montana used his court email to circulate a racist joke about President Barack Obama in 2012.[19] An Ohio judge referred to COVID-19 as the "China Virus."[20] Altogether, I have documented scores of instances of racial bias by judges since the year 2000,[21] but we should assume these headline-grabbing stories only represent a tiny fraction of the judges who hold conscious racial biases.

Most judges, with years of education beyond that of the average American and a bird's-eye view of how racial discrimination gets litigated, would not be so careless as to say explicitly racist things so that members of the public can have access to their words. We have to assume that the notorious and distressing stories represent the feelings of many more judges with more discretion, thought control, and ability to employ filters to their words.

That members of the bench harbor racist views should not come as a surprise. We have long known, for example, that judges sentence Black defendants more harshly than their white counterparts, even controlling for criminal record, employment, and education.[22] There are deep inequities in the legal system. The bench needs to be viewed critically as a tool and enforcer of racial oppression. Deep racial inequities have persisted in our country and the law has addressed only some of the most egregious.[23] Surveying legal rulings can confirm what a small percentage of judges have shown clearly: the law has been and is manipulated by judges to produce racially biased outcomes, reinforce racial hierarchies, and justify racism by law enforcement, private citizens, and government policies. Indeed, some of the country's legal rules were developed by judges, rather than lawmakers. Worse, judges have

---

[18] Larry Hannan, *Jacksonville Judge Accused of Racist and Sexist Comments Resigns*, FLA. TIMES-UNION (Jan. 23, 2017, 12:40 PM), https://www.jacksonville.com/story/news/crime/2017/01/23/jacksonville-judge-accused-racist-and-sexist-comments-resigns/15739895007/; *In re* Husley, Notice of Formal Charges No. SC16-1278, at 3 (Fla. Jud. Qualifications Comm'n July 19, 2016), https://efactssc-public.flcourts.org/casedocuments/2016/1278/2016-1278_notice_79144.pdf, *voluntarily dismissed*, No. SC16-1278, 2017 Fla. LEXIS 277 (Fla. 2017).

[19] Korva Coleman, *Federal Judge Emails Racist Joke About Obama, then Apologizes*, NPR (Mar. 1, 2012, 10:28 AM), https://www.npr.org/sections/thetwo-way/2012/03/01/147720865/federal-judge-emails-racist-joke-about-obama-then-apologizes; *In re* Complaint of Judicial Misconduct, 751 F.3d 611, 619–21 (U.S. Comm. on Jud. Conduct & Disability Jan. 17, 2014).

[20] Cory Shaffer, *Groups Demand Lake County Judge in Ohio Apologize for Calling Coronavirus 'China Virus' in Bar Association Newsletter*, CLEVELAND.COM (Mar. 6, 2021, 2:32 PM), https://www.cleveland.com/court-justice/2021/03/groups-demand-lake-county-judge-in-ohio-apologize-for-using-racist-term-for-coronavirus-in-bar-association-newsletter.html.

[21] *See* apps.

[22] Mark Hansen, *Black Prisoners Are Given Longer Sentences Than Whites, Study Says*, ABA J. NEWS (Feb. 15, 2013, 7:22 PM), https://www.abajournal.com/news/article/black_prisoners_tend_to_serve_longer_sentences_than_whites; U.S. SENT'G COMM'N, DEMOGRAPHIC DIFFERENCES IN SENTENCING: AN UPDATE TO THE 2012 *BOOKER* REPORT 16–17 (2017).

[23] *See, e.g.*, Brown v. Bd. of Educ., 347 U.S. 483 (1954).

created legal doctrines to get around legal remedies offered by our elected representatives to keep people of color from recovering in court.[24] White supremacy from the bench is an integral part of our legal system and an integral part of our legacy of racism in the United States.

Not only do judges have the opportunity to inflict racial harms, they also arguably reinforce hierarchies that lead to racial biases in the act of judging itself. The judicial system is predicated on the idea that the judge is superior to the parties in front of them. The judge literally sits high, looking down on the litigants and witnesses. In many courtrooms, litigants, witnesses, and the public must stand when a judge enters a room and call the judge "your honor"; most importantly, the judge has the final say over the dispute. The judge's word is law. Given that a disproportionate number of the parties in court are people of color and judges are disproportionately white, racial biases are bolstered by the courtroom setting itself.

While I am certainly not the first person to connect racism from the bench to the corrosive harms our criminal legal system delivers to Black and Latino people,[25] this Article ties those harms to explicit racial bias and posits that it is possible that, where judges have diminished the rights of people of color to uphold white supremacy, they have done so on purpose to harm Blacks, Latinos, Native people, and other people of color. While the actions of police, prosecutors, and other players have resulted in the inescapable racism of our legal system, I argue that the biases of judges are a significant part of the problem as well.

This Article will document explicit racial bias by judges and will proceed in several Parts. The Article will begin with an overview of the judicial system in the United States. In Part II, the Article next describes the racial impact of judicial racial bias. Park III demonstrates that judges across the United States have expressed racial bias by examining media accounts, disciplinary decisions, and appellate court rulings since the year 2000. The Article will conclude in Part IV.

---

[24] Qualified immunity is one example. *See Qualified Immunity*, EQUAL JUST. INITIATIVE, https://eji.org/issues/qualified-immunity/ (last visited Apr. 18, 2023).

[25] *See, e.g.*, Anthony C. Thompson, *Stopping the Usual Suspects: Race and the Fourth Amendment*, 74 N.Y.U. L. REV. 956 (1999); Ekow N. Yankah, *Pretext and Justification: Republicanism, Policing, and Race*, 40 CARDOZO L. REV. 1543 (2019).

## I.  THE BUSINESS OF JUDGES AND JUDGING

There are tens of thousands of judges across the United States and millions of cases that get decided by them. There are more than 1,700 federal judgeships authorized across over 200 federal courts.[26] But state courts make up most of the judiciary. There are another 30,000 judges in state court in this country.[27] Because each state is different, there is no uniform way that judges are chosen, disciplined, or fired.[28]

Each year, over 100 million cases are brought in state courts, and several hundred thousand criminal and civil cases are brought in federal courts.[29] Whether it is a name change, adoption, divorce, lawsuit, criminal case, or probate matter, many Americans will likely appear in front of a judge at some point in their lives. And for those struggling in poverty, they are more likely to be obligated to come to court and spend more time there.[30] Landlord tenant courts, small claims courts, family courts, and the criminal punishment system may play an outsized role in the of lives of America's poor people.[31] Because of years of racial subordination and subjugation via land theft,[32] wage theft,[33] and enslavement, people of color, particularly Black people, are more likely to struggle financially than their white counterparts.[34] As a result, Black people spend disproportionately more time as parties in court hearings than white people do.[35] People of color are very likely to be court involved in some fashion in their lives. That means that people of color are the most likely Americans to be subject to the whims and prejudices of judges.

---

[26]  INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. (IAALS), FAQS: JUDGES IN THE UNITED STATES 3, 10–11 (2014), https://iaals.du.edu/sites/default/files/documents/publications/judge_faq.pdf; *Court Role and Structure*, ADMIN. OFF. OF THE U.S. CTS., https://www.uscourts.gov/about-federal-courts/court-role-and-structure (last visited Apr. 18, 2023).

[27]  IAALS, *supra* note 26, at 3.

[28]  *Id.* at 3–8.

[29]  *Id.* at 3.

[30]  *See* SENT'G PROJECT, REPORT TO THE UNITED NATIONS SPECIAL RAPPORTEUR ON CONTEMPORARY FORMS OF RACISM, RACIAL DISCRIMINATION, XENOPHOBIA, AND RELATED INTOLERANCE 1, 7–10 (Mar. 2018).

[31]  *See id.* at 7–10; Chris Arnold, *Corporate Landlord Evicts Black Renters at Far Higher Rates than Whites, Report Finds*, NPR (June 3, 2021, 5:01 AM), https://www.npr.org/2021/06/03/1001404416/corporate-landlord-evicts-black-renters-at-far-higher-rates-than-whites-report-f.

[32]  Cheryl I. Harris, *Whiteness as Property*, 106 HARV. L. REV. 1707, 1763–65 (1993).

[33]  *Id.* at 1741.

[34]  *Id.* at 1758–59.

[35]  There is an overrepresentation of Black Americans in the justice system. ELIZABETH HINTON, LESHAE HENDERSON & CINDY REED, VERA INST. OF JUST., AN UNJUST BURDEN: THE DISPARATE TREATMENT OF BLACK AMERICANS IN THE CRIMINAL JUSTICE SYSTEM (May 2018), https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf.

It is acknowledged by the legal system that most judges make mistakes.[36] Mistakes caused by judges are why there are appellate courts—to revisit decisions of judges. The assurance of appellate review to fix mistakes may be mostly symbolic. Most trial court decisions stand. Courts of appeals rarely reverse trial judges.[37] Appellate court judges are also judges and prone to the same cognitive biases as lower court judges.[38]

## A.   Elected or Appointed

Judges get their jobs in a few different ways. Judges are either elected or appointed depending on the jurisdiction. In 26 states, judges are appointed by the governor, and in the others, judges must run for office.[39] In some of those states the elections are partisan, in which a political party must be declared by the candidate, while in some states the elections are nonpartisan.[40]

Some believe that judges who do not have to run for election and re-election are likely to be less captive to the interests of others than those who need to solicit donations and votes.[41] On the other hand, elected judges are more accountable to the community they serve and are easier to be rid of than those with long appointments.[42] Terms for judicial tenure vary in state courts.[43]

---

[36]   *See, e.g.*, FED. R. CIV. P. 60(b).

[37]   Barry C. Edwards, *Why Appeals Courts Rarely Reverse Lower Courts: An Experimental Study to Explore Affirmation Bias*, 68 EMORY L.J. ONLINE 1035 (2019).

[38]   Allison P. Harris & Maya Sen, *Bias and Judging*, 22 ANN. REV. POL. SCI. 241, 245 (2019).

[39]   *Judicial Selection: Significant Figures*, BRENNAN CTR. FOR JUST., https://www.brennancenter.org/our-work/research-reports/judicial-selection-significant-figures (Oct. 11, 2022).

[40]   *Id.*

[41]   For example, Justice O'Connor explained:
   We of course want judges to be impartial, in the sense of being free from any personal stake in the outcome of the cases to which they are assigned. But if judges are subject to regular elections they are likely to feel that they have at least some personal stake in the outcome of every publicized case.
Republican Party of Minn. v. White, 536 U.S. 765, 788–89 (2002) (O'Connor, J., concurring); David Schultz, Minnesota Republican Party v. White *and the Future of State Judicial Selection*, 69 ALBANY L. REV. 985, 1010 (2006) ("[A]n appointed judiciary best promotes its independent role in a democracy as serving as a defender of minority rights, often despite majoritarian preferences."); *see also* Dmitry Bam, *Recusal Failure*, 18 N.Y.U. J. LEGIS. & PUB. POL'Y 631 (2015).

[42]   Melinda Gann Hall, *The Controversy Over Electing Judges and Advocacy in Political Science*, 30 JUST. SYS. J. 284, 285–86 (2009).

[43]   IAALS, *supra* note 26, at 6 ("In three states . . . judges enjoy life tenure or service to a mandatory retirement age of 70. . . . In many commission-based appointment states, judges serve a short initial term—typically at least one to three years—before being reselected for a full term. . . . In states where judges do not enjoy life tenure, judicial terms range in length from four years to 15 years.").

Federal judges are appointed. Article III federal judges are appointed by the President for lifetime tenure.[44] This appointment often starts with a U.S. senator—who is from the same party as the President and from the state where there is a federal judicial vacancy—nominating the candidate to the President. Then the full Senate must confirm the candidate before they are installed as a federal associate judge.[45] Other federal court judges, like magistrates, are usually appointed by the district judges of the court in which they serve.[46] District of Columbia judges are also appointed by the President of the United States, but first suggested to the President through a judicial nominating committee since there are no senators representing the nation's capital.[47]

Whether appointed or elected, most judges, as a result of having achieved their status, are extremely well connected politically. Either they were able to win an election and attract donors to do so, or they had a connection to a U.S. senator. As will be shown, judges—state and federal, elected and appointed—have demonstrated racial bias. The political capital possessed by many judges may insulate them from serious consequences from a scandal or from reversal by appellate courts in all but the most egregious circumstances.

## B.   Discipline and Removal from Office

Because of their lifetime tenure, federal judges can only be removed if impeached.[48] States judges who are elected can be removed by being voted out of office, but they can also be removed by state impeachment processes.[49]

Though these mechanisms exist for removal of judges, they are rarely employed. Federal judges must be impeached by Congress.[50] Since 1803, more than

---

[44]  U.S. CONST. art. III, § 1; *Article III Judges*, ADMIN. OFF. OF THE U.S. CTS., https://www.uscourts.gov/judges-judgeships/about-federal-judges (last visited Apr. 18, 2023).

[45]  *Federal Judicial Nominations: 9 Steps from Vacancy to Confirmation*, CTR. FOR AM. PROGRESS (Jan. 29, 2013), https://www.americanprogress.org/article/federal-judicial-nominations-9-steps-from-vacancy-to-confirmation/.

[46]  *See* 28 U.S.C. § 631(a) ("Where there is more than one judge of a district court, the appointment . . . shall be by the concurrence of a majority of all the judges of such district court, and when there is no such concurrence, then by the chief judge."); *see also Article III Judges*, *supra* note 44 (explaining that bankruptcy judges are appointed "by a majority of the judges of the judges of the U.S. Court of Appeals for their circuit").

[47]  Jud. Nomination Comm'n, *JNC Application Process*, DC.GOV, https://jnc.dc.gov/node/488382 (last visited Apr. 18, 2023).

[48]  U.S. CONST. art. III, § 1; Douglass Keith, *Impeachment and Removal of Judges: An Explainer*, BRENNAN CTR. JUST., https://www.brennancenter.org/our-work/analysis-opinion/impeachment-and-removal-judges-explainer (May 6, 2022).

[49]  *See* Keith, *supra* note 48.

[50]  *See* U.S. CONST. art. I, § 2, cl. 5; *id.* art. III, § 1.

two hundred years ago, just over a dozen federal judges have been impeached.[51] Only two state judges have been removed from the bench via impeachment processes in the last few decades.[52]

In addition to removal from office through impeachment, judges can also be disciplined short of removal from the bench. The behavior of judges is governed by the ethical canons of the state in which they preside or by the federal judicial canons, the *Code of Conduct for U.S. Judges*.[53] The procedures for the discipline and sanctioning of judges at the state level vary wildly by jurisdiction. Sanctions can range from a private letter of reprimand to leave without pay to a recommendation that they be removed from the bench.[54]

Even when a judge faces discipline, the process is a long one. Judicial officers are often afforded significant due process during these proceedings.[55] They are generally allowed to confront witnesses, call their own witnesses, and put on other evidence.[56] There are appellate processes that follow the initial determination in the event that the judge is found to have violated an ethical rule.[57]

Judges can face discipline for a variety of transgressions, from failing to report financial interests to not working when required to abuses of power.[58] Nevertheless, accountability for judges is rare. Although thousands of complaints are filed against judges every year, fewer than one percent are believed to result in significant judicial discipline.[59] According to reporting by *NBC News*, even in states where public sanctions exist and discipline is employed, states choose to reprimand judges outside of public view more often.[60] For example, between 2016 and 2020 in Pennsylvania,

---

[51] *See Impeachments of Federal Judges*, FED. JUD. CTR., https://www.fjc.gov/history/judges/impeachments-federal-judges (last visited Apr. 18, 2023).

[52] Keith, *supra* note 48 (citing *Methods of Removing State Judges*, AM. JUDICATURE SOC'Y (2012), https://web.archive.org/web/20130115105653/https://ajs.org/ethics/eth_impeachement.asp).

[53] CODE OF CONDUCT FOR U.S. JUDGES vol. 2, pt. A, ch. 2 (ADMIN. OFF. OF THE U.S. CTS. 2019).

[54] CYNTHIA GRAY, AM. JUDICATURE SOC'Y, STATE JUST. INST., A STUDY OF STATE JUDICIAL DISCIPLINE SANCTIONS 6, 85 app. (2002).

[55] *See generally* Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 JUST. SYS. J. 405, 409–14 (2007) (discussing the constitutional due process considerations in the various forms of judicial disciplinary proceedings).

[56] *See* MODEL RULES FOR JUD. DISCIPLINARY ENF'T §§ 2, r. 14 and 3, r. 22 (AM. BAR ASS'N 2018).

[57] Gray, *supra* note 55, at 416–17.

[58] RULES FOR JUD.-CONDUCT & JUD.-DISABILITY PROC.§ 320 (ADMIN. OFF. OF THE U.S. CTS. 2019).

[59] Erik Ortiz, *Robed in Secrecy: How Judges Accused of Misconduct Can Dodge Public Scrutiny*, NBC NEWS (Dec. 26, 2021, 5:27 PM), https://www.nbcnews.com/news/us-news/robed-secrecy-judges-accused-misconduct-can-dodge-public-scrutiny-rcna7638.

[60] *Id.*

formal public charges were filed in 17 cases while private letters of reprimand were used in 172 cases during that same period.[61]

The discipline of judges is also often opaque to outsiders, difficult to navigate, and hard to understand. Despite a judge's role as a public servant, issues of employment are often treated very secretively and shielded from the public's view in most instances.

Judges are very powerful and many may fear them.[62] Judicial conduct commission members may not be lawyers or judges depending on the state.[63] Generally, individuals who may have to work with a particular judge in the future may not want to make a complaint because they worry about the proceedings lacking confidentiality or someone who has seen an abuse of power by a judge may not feel empowered to register their concerns. It is also likely that those who benefit from a judge's bias, like prosecutors, have little incentive personally or institutionally to report it.

In addition to the lack of incentives, fear, and trepidation involved in reporting judges, some states make reporting judicial bias difficult.[64] Some states only accept complaints made by mail, rather than email or phone.[65] Alabama requires complaints to be notarized.[66] Some states ban anonymous complaints.[67]

The legal system is also difficult to navigate even for attorneys. As a result, many lawyers and nonlawyers alike are unfamiliar with the judicial disabilities and tenure process and may not know that one can even make complaints about judges

---

[61]   *Id.*

[62]   Shelley C. Chapman, *I'm a Judge and I Think Criminal Court Is Horrifying*, MARSHALL PROJECT (Aug. 11, 2016), https://www.themarshallproject.org/2016/08/11/i-m-a-judge-and-i-think-criminal-court-is-horrifying.

[63]   Gray, *supra* note 55, at 406.

[64]   *See, e.g.*, *Complaint Against Judges*, N.H. BAR ASS'N, https://www.nhbar.org/dispute-with-an-attorney/grievances-against-judges/ (last visited Apr. 18, 2023); *see* Michael Berens & John Shiffman, *Holding Judges Accountable*, *in* REUTERS, THE TEFLON ROBE (2020), https://www.reuters.com/investigates/section/usa-judges/ (noting that state judicial oversight commissions in about a dozen states require complaints against judges to be signed and notarized).

[65]   *See* Michael Berens & John Shiffman, *Objections Overruled: Thousands of U.S. Judges Who Broke Laws or Oaths Remained on the Bench*, *in* REUTERS, THE TEFLON ROBE, *supra* note 64; INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. (IAALS), RECOMMENDATIONS FOR JUDICIAL DISCIPLINE SYSTEMS 12 (July 2018).

[66]   *Complaint Process*, ALA. JUD. INQUIRY COMM'N, https://jic.alabama.gov/complaint-process/ (last visited Apr. 18, 2023); Berens & Shiffman, *supra* note 65.

[67]   *See, e.g.*, *Complaint Process*, *supra* note 66; Berens & Shiffman, *supra* note 65; *see* IAALS, *supra* note 65, at 13 (noting that most state judicial conduct commissions require the complainant to identify him or herself on the complaint and sign it).

or that judges can face discipline.[68] It is often the complaints that are well documented and that cannot be ignored that get the attention of bodies with the ability to sanction judges.[69]

State disciplinary bodies are often comprised of other judges and attorneys, arbiters of a judge's fate that may know the judge personally and professionally.[70] These are players with little incentive to hold politically connected judges accountable and a myriad of incentives to look the other way or protect these powerful people.

## C.  *Judges vs. Jurors*

Judges are, in many ways, like jurors. Jurors and judges sometimes have the same function. While judges are the final arbiters of decisions about the law,[71] both judges and juries can make decisions about facts.[72] Judges make fact-finding decisions in evidentiary motions, hearings and in bench trials.[73] In some jurisdictions, judges are the only fact finders in misdemeanor criminal cases, and in many states, judges, rather than jurors, decide facts in family court cases, including divorce, neglect, paternity, custody, and parental rights cases.[74]

It is known, of course, that jurors can harbor racial bias in their decision-making.[75] Many mock jury studies have demonstrated this phenomenon.[76] One study

---

[68]   *See* IAALS, *supra* note 65, at 12–14.

[69]   *See* GRAY, *supra* note 54, at 3 ("Most complaints filed with judicial conduct commissions—generally more than 80%—are dismissed.").

[70]   Gray, *supra* note 55, at 406.

[71]   Sparf v. United States, 156 U.S. 51, 64 (1895).

[72]   *How Courts Work,* AM. BAR ASS'N (Sept. 9, 2019), https://www.americanbar.org/groups/public_education/resources/law_related_education_network/how_courts_work/juryinstruct/.

[73]   FED. R. CIV. P. 52(a).

[74]   *See CSP STAT Criminal*, COURT STATISTICS PROJECT, https://www.courtstatistics.org/court-statistics/interactive-caseload-data-displays/csp-stat-nav-cards-first-row/csp-stat-criminal (last visited Apr. 18, 2023) (under "Select criminal case type," choose "Total Misdemeanor"; then under "Select caseload measure," choose "Bench Trials"; and then under "Year," choose "2021"); Ortiz, *supra* note 59 ("[J]udges exert near-absolute power in deciding who wins custody of children to who can get married to whether people go to jail."); Harold P. Weinberger, Norman C. Simon & Samantha V. Ettari, *Bench Trials (Federal)*, AM. BAR ASS'N (2021), https://www.americanbar.org/groups/tort_trial_insurance_practice/committees/litigation-and-trial-practice/bench-trials-federal/#:~:text=Even%20on%20claims%20for%20which,trial%20before%20any%20dispute%20arises.

[75]   Mike Morrison, Amanda DeVaul-Fetters & Bertram Gawronski, *Stacking the Jury: Legal Professionals' Peremptory Challenges Reflect Jurors' Levels of Implicit Race Bias*, 42 PERSONALITY & SOC. PSYCH. BULL. 1129, 1129–30 (2016).

[76]   Tara L. Mitchell, Ryann M. Haw, Jeffrey E. Pfeifer & Christian A. Meissner, *Racial Bias in Mock Juror Decision-Making: A Meta-Analytic Review of Defendant Treatment*, 29 LAW & HUM. BEHAV. 621, 626 (2005).

of actual criminal trials found that the presence of at least one Black juror increased the chances of an acquittal by 16% in criminal cases, demonstrating that all-white juries are more likely to convict Black defendants.[77]

In 2017, the U.S. Supreme Court tackled the issue of bias in jury deliberation in a case called *Pena-Rodriguez v. Colorado*.[78] Post-verdict jurors reported bias expressed by at least one juror against the defendant and a defense witness during deliberations because of their Mexican heritage and non-citizen status with respect to the witness.[79] Juror deliberations are held in confidence and take place outside of public view. The Court's decision in *Pena-Rodriguez* was the first to pierce that secrecy to vacate a conviction.[80]

Jurors may be more racially representative of the community than judges.[81] A 2019 report by the Center for American Progress showed that only 10% of lower federal court judges were Black, 7% were Hispanic, and 4% percent were Asian.[82] This means that white people are overrepresented and people of color are underrepresented as judges, given that non-Hispanic white people make up less than 60% of the American population, Hispanic people of any race make up 18.7%, Black people make up 12.1%, and Asian people make up 6% of the U.S. population.[83]

Decision-making by judges is arguably more secretive than that of jurors. Judges do not have to negotiate with others for unanimity as jurors do, so there is no reason to say aloud his or her actual reasoning. There is no one to confront a judge about why a decision is made or question them like a juror may face. On the other hand, judges may explain for the record why they credit a particular witness in a contested hearing. Implicit biases, like why a judge may trust the demeanor of a police witness over that of a criminal defendant during a motions hearing, may not enter into a judge's consciousness.[84] Further, any explicit bias that the judge

---

[77] Shamena Anwar, Patrick Bayer & Randi Hjalmarsson, *The Impact of Jury Race in Criminal Trials*, 127 Q. J. ECON. 1017, 1035–36 tbl.V (2012).

[78] 137 S. Ct. 855 (2017).

[79] *Id.* at 861–62.

[80] *Id.* at 874–75 (Alito, J., dissenting).

[81] Juries are perceived as more racially and ethnically representative than judges. Mary R. Rose, Christopher Ellison & Shari Seidman Diamond, *Preferences for Juries over Judges Across Racial and Ethnic Groups*, 89 SOC. SCI. Q. 372, 375 (2008).

[82] Democracy & Gov't Reform Team, *supra* note 11.

[83] Nicholas Jones, Rachel Marks, Roberto Ramirez & Merarys Ríos-Vargas, *2020 Census Illuminates Racial and Ethnic Composition of the Country*, U.S. CENSUS BUREAU (Aug. 12, 2021), https://www.census.gov/library/stories/2021/08/improved-race-ethnicity-measures-reveal-united-states-population-much-more-multiracial.html.

[84] Rodney J. Uphoff, *On Misjudging and Its Implications for Criminal Defendants, Their Lawyers and the Criminal Justice System*, 7 NEV. L.J. 521, 536–37 (2007) (explaining the difficulties of proving a biased judge's implicit biases).

may have can be carefully covered up with language that is devoid of evidence of bias.

Given that we know that all-white juries are more likely to convict Black defendants, and given that in many communities, judges are more likely to be white than the populations they serve, there is reason to worry that judges are just as, if not more, likely to succumb to racial bias in their decision-making as jurors are.

Jury bias is an important consideration when contemplating judicial bias. Studies and cases illustrate the existence of jury bias, and when one considers that judges may also harbor bias just as jurors do, it is reasonable to conclude that judges may harbor biases at the same, or even higher, rates as jurors.

### D.  Disqualification and Recusal of Judges

We know that judges possess bias in other contexts, and there are systems that try to address that type of unfairness. A judge can recuse him or herself from a case, or a party can make a motion for that relief in which the party states why it believes that the judge should not decide the case. Judges are expected to recuse themselves from a matter where they have an actual bias or prejudice against or in favor of a party.[85] In addition, they should recuse themselves as fact finders even if there is an appearance of partiality or impropriety to the public.[86] So even if there is no actual bias, it would be easy to imagine a situation where, based on a prior ruling or a relationship with a party or witness, in order to maintain the reputation of the court as a place where neutrality and fairness are expected, a judge should recuse himself or herself. Nevertheless, one legal scholar has stated that it is the most biased judges who are the least likely to recuse themselves.[87]

## II.  EXPLICIT RACIAL BIAS IN DECISION-MAKING

Judges play a big role in the lives of anyone involved in criminal cases and civil disputes like divorce, child custody, landlord tenant cases, or other lawsuits. Unfortunately, we know that judges have demonstrated biases by sentencing Black, Native, and Latino people more harshly than their white counterparts.[88] Judges are

---

[85]  MODEL CODE OF JUD. CONDUCT Canon 2 (AM. BAR ASS'N 2020).

[86]  *Id.*

[87]  Uphoff, *supra* note 84, at 537.

[88]  SUSAN NEMBHARD & LILY ROBIN, URB. INST., RACIAL AND ETHNIC DISPARITIES THROUGHOUT THE CRIMINAL LEGAL SYSTEM 6 (Aug. 2021), https://www.urban.org/sites/default/files/publication/104687/racial-and-ethnic-disparities-throughout-the-criminal-legal-system.pdf; David S. Abrams, Marianne Bertrand & Sendhil Mullainathan, *Do Judges Vary in Their Treatment of Race?*, 41 J. LEGAL STUD. 347, 350, 355–56 (2012) (finding that, while judges in Cook County, Illinois, differed in the degree to which race influenced their sentencing decisions, Black defendants "receive[d] longer sentences on average and [were] more than 30 percent more likely to be incarcerated than [were] white defendants").

more likely to sentence Black defendants to jail than white defendants, even when one controls for criminal record and offense severity.[89] Judges also sentence Black defendants to longer prison terms than white defendants.[90] This has had grave ramifications, not only for the person whose liberty is deprived, but for the family of the person sentenced and their entire community. Incarceration causes deep trauma,[91] loss of generational wealth for the family,[92] increased chances of incarceration for the children of those incarcerated,[93] and loss of business for the neighborhood in which the person lives.[94] Racial bias, conscious or not, is extraordinarily damaging.

Unfortunately, sentencing is not the only place where we know that judges have exhibited racial biases. Because judges are prone to overvalue police knowledge,[95] they may be more likely to accept the testimony of white police offers over that of Black defendants. This means that Fourth and Fifth Amendment motions are likely to be resolved in favor of the government, rather than the individual who may have had his constitutional rights violated. It also means that where there are bench trials, instead of jury trials, it is likely that the defendant will be convicted.[96]

The judicial harms inflicted on Black and Brown people in the legal system are not confined to criminal cases. Black parents are more likely to lose their children to the foster system.[97] Subjugated racial groups are more likely to be evicted from

---

[89]    James C. McKinley Jr., *Study Finds Racial Disparity in Criminal Prosecutions*, N.Y. TIMES (July 8, 2014), https://www.nytimes.com/2014/07/09/nyregion/09race.html (discussing BESIKI LUKA KUTATELADZE & NANCY R. ANDILORO, NAT'L CRIM. JUST. REFERENCE SERV., DOC. NO. 247227, PROSECUTION AND RACIAL JUSTICE IN NEW YORK COUNTY—TECHNICAL REPORT (July 2014)).

[90]    U.S. SENT'G COMM'N, *supra* note 22, at 2.

[91]    Mika'il DeVeaux, *The Trauma of the Incarceration Experience*, 48 HARV. C.R.–C.L. L. REV. 257, 259 (2013).

[92]    TERRY-ANN CRAIGIE, AMES GRAWERT & CAMERON KIMBLE, BRENNAN CTR. FOR JUST., CONVICTION, IMPRISONMENT, AND LOST EARNINGS: HOW INVOLVEMENT WITH THE CRIMINAL JUSTICE SYSTEM DEEPENS INEQUALITY 6, 18–19 (2020).

[93]    Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, NAT'L. INST. JUST. J., May 2017, at 1, 2.

[94]    Melissa S. Kearney, *The Economic Challenges of Crime & Incarceration in the United States*, BROOKINGS (Dec. 22, 2014), https://www.brookings.edu/opinions/the-economic-challenges-of-crime-incarceration-in-the-united-states/.

[95]    *See* Anna Lvovsky, *The Judicial Presumption of Police Expertise*, 130 HARV. L. REV. 1995, 2002 (2017); Julia Simon-Kerr, *Systemic Lying*, 56 WM. & MARY L. REV. 2175, 2207–08 (2015); Keith Swisher, *Pro-Prosecution Judges: "Tough on Crime," Soft on Strategy, Ripe for Disqualification*, 52 ARIZ. L. REV. 317, 329 (2010).

[96]    *See generally* KUTATELADZE & ANDILORO, *supra* note 89.

[97]    Sarah Gonzalez & Jenny Ye, *Black Mothers Judged Unfit at Higher Rate than White Mothers in NJ*, WNYC NEWS (May 26, 2015), https://www.wnyc.org/story/black-parents-nj-lose-custody-their-kids-more-anyone-else/; Michelle Aslam, *In Travis County, Black Children More*

their homes than their white counterparts.[98] Immigrants of color are more likely to be denied entry to, or excluded from, the United States than white immigrants.[99] These traumatic, life-altering decisions and civil and criminal losses to families of color are presided over by judges. While police, prosecutors, social workers, and private individuals play roles in these harms, much of this structural racism is enforced by judges.

While it is the parties who have the most at stake in court, it is not simply parties who experience racism at the hands of judges. Many attorneys of color have experienced racism by judges; for example, many have the experience of being asked whether they are the indigent defendant despite being dressed in professional clothing.[100] Court staff have also experienced racism by judges.[101] A Black detective in West Virginia was called "boy" by a magistrate there.[102] The judge was given a written admonishment and ordered to do sensitivity training.[103] Enduring a humiliating indignity, potentially in public, as a person simply trying to carry out one's job is not a trivial thing.

Judicial officers reveal racial biases from the bench in rendering their opinions, expressing their views in casual conversation with members of the courthouse staff, or in private conversation with friends or family members. Some of the headline-

*Likely to Be Taken from Parents*, TEX. OBSERVER (June 1, 2021, 9:00 AM), https://www.texasobserver.org/in-travis-county-black-children-more-likely-to-be-taken-from-parents/; Shanta Trivedi, *Police Feed the Foster Care-to-Prison Pipeline by Reporting on Black Parents*, NBC NEWS (July 29, 2020, 1:18 PM), https://www.nbcnews.com/think/opinion/police-feed-foster-care-prison-pipeline-reporting-black-parents-ncna1235133; Dorothy Roberts & Lisa Sangoi, *Black Families Matter: How the Child Welfare System Punishes Poor Families of Color*, APPEAL (Mar. 26, 2018), https://theappeal.org/black-families-matter-how-the-child-welfare-system-punishes-poor-families-of-color-33ad20e2882e/.

[98]  Peter Hepburn, Renee Louis & Matthew Desmond, *Racial and Gender Disparities Among Evicted Americans*, EVICTION LAB (Dec. 16, 2020), https://evictionlab.org/demographics-of-eviction/.

[99]  Emily Ryo & Reed Humphrey, *The Importance of Race, Gender, and Religion in Naturalization Adjudication in the United States*, 119 PROCS. NAT'L ACAD. SCIS., Feb. 22, 2022, at 3–4 , tbl.1, No. e2114430119; Charles Kamasaki, *US Immigration Policy: A Classic, Unappreciated Example of Structural Racism*, BROOKINGS (Mar. 26, 2021), https://www.brookings.edu/blog/how-we-rise/2021/03/26/us-immigration-policy-a-classic-unappreciated-example-of-structural-racism/.

[100]  It has even happened to Bryan Stevenson, a prominent human rights attorney and founder of the Equal Justice Initiative. Brief but Spectacular, *On America's Racial Terrorism, 'Our Silence Has Condemned Us,'* PBS NEWS HOUR, at 00:13 (Apr. 13, 2017), https://www.pbs.org/newshour/brief/212675/bryan-stevenson.

[101]  *See, e.g.*, *In re* Chase, 485 P.3d 65, 65–66 (Colo. 2021); *In re* Booras, 500 P.3d 344, 346 (Colo. 2019).

[102]  *In re* Chapman, Complaint No. 22-2006, at 1 (Jud. Investigation Comm'n of W. Va. May 16, 2006), http://www.courtswv.gov/legal-community/JICAdmonishments/2006/22-2006,%20Magistrate%20Brenda%20Chapman.pdf.

[103]  *Id.* at 3.

grabbing stories told in this Article are the result of judges' friends and acquaintances who go to the press with information about what judges said, not at a work setting, but at home or other private setting.[104]

Much of the racism I describe in the following Part is difficult to parse from structural racism and unconscious bias. Many judges themselves know that the criminal legal system is racist.[105] While some judges may take steps to address systemic and structural racism in the legal system, like attending unconscious bias training, others do not.[106] Perhaps some become judges to address racial bias and to be a fair judge righting the wrongs of the legal system.

Others may want to be judges because it not only gives them tremendous power over other people, but also because it gives them tremendous power over Black and Latino people in particular. Nevertheless, judges have tremendous power in our legal system. We have a system in which biases that are not complained about have no remedies, and even where there are objections about the conduct of the judge, we have legal rules in place that give judges the benefit of the doubt that they are neutral. Thus, whether intentional or not, the entire legal system does little to address the biases of judges.

## III.  THE QUIET PART OUT LOUD

The only way we know for certain what any other person is thinking is when they express it. This is, of course, also true for judges. Instances of explicit racial bias only become clear when a judge writes or says something that shows his or her thoughts. This Part documents over 50 instances of explicit racial bias by judges that my research has uncovered.[107] I focused only on incidents that took place between the years 2000 until 2022 to illustrate that this is not simply a problem of once upon a time. This means, for example, that older instances of explicit racial bias by judges, like Supreme Court Justice Hugo Black's membership in the Ku Klux Klan before he joined the court will not be discussed here.[108]

---

[104]  *See, e.g.*, Jaclyn Peiser, *A Video Filled with Racist Slurs Was Taken at a Louisiana Judge's Home. She Apologized and Went on Unpaid Leave*, WASH. POST (Dec. 16, 2021, 7:33 AM), https://www.washingtonpost.com/nation/2021/12/16/judge-michelle-odinet-racist-video-leave/.

[105]  *See, e.g.*, Anna-Leigh Firth, *Most Judges Believe the Criminal Justice System Suffers from Racism*, NAT'L JUD. COLL. (July 14, 2020), https://www.judges.org/news-and-info/most-judges-believe-the-criminal-justice-system-suffers-from-racism/.

[106]  For example, only 14 states held implicit bias trainings by the National Consortium on Racial and Ethnic Fairness in the Courts in 2014. *Implicit Bias Training*, NAT'L CONSORTIUM ON RACIAL & ETHNIC FAIRNESS IN THE CTS., https://www.national-consortium.org/implicit-bias/implicit-bias-training (last visited Apr. 18, 2023).

[107]  *See* apps.

[108]  William E. Leuchtenburg, *A Klansman Joins the Court: The Appointment of Hugo L. Black*, 41 U. CHI. L. REV. 1, 12–13 (1973).

Also omitted from this Part are instances of bias that may only be implicit and not a conscious thought about a person's race. Also not included in this Part are instances of judicial sexism, homophobia, or transphobia. I have chosen to include antisemitism and Islamophobia for two reasons. I recognize that both are discrimination based on religion, but both forms of hatred are predicated on the belief that people who adhere to these religions are members of an inferior race, regardless of whether such a thing as race even exists. This type of bias is often accompanied by racism as well. For the same reason, I have also included incidents of bias that could be described as xenophobia, where the person is nonwhite. By making these choices and limiting my research, I do not mean to suggest that sexism, homophobia, or transphobia are not significant problems in our judicial system. Of course, all types of biases against people based on immutable characteristics are wrong and should be condemned in anyone, especially judges.

I have divided into three parts the most common ways that instances of judicial racial bias come to light to those of us in the legal field—published judicial disciplinary outcomes, appellate decisions, and stories from the media. Of course, once a case makes its way into the public's awareness, say a viral video or audio recording of a judge using a racial epithet, there may be an inquiry into that judge's conduct by the state disciplinary board, and it could impact appeals of decisions by that judge. I have attempted to limit any repetition of the same incident reported in multiple arenas, but because some states shield the identity of the judge being investigated,[109] it is hard to accurately determine distinct incidents.

## A.   *Judicial Misconduct Opinions*

As discussed above, judges can face discipline when they misbehave. The sanctions can vary wildly. Judges can face mild rebukes or can face impeachment and removal from office. The American Bar Association has model, unenforceable guidelines that advise anything from private admonishments to removal from office for misbehavior.[110]

Judicial conduct commissions can be called on to address issues of racial bias by judges. Some state judicial commissions, such as the California Commission on Judicial Performance (CJP), publish reports on judicial misconduct involving various forms of bias.[111] The CJP's reports detail insults and assumptions directed towards courtroom staff, attorneys, and parties. For instance, California called out a

---

[109]   Berens & Shiffman, *supra* note 65 (documenting judicial disciplinary opinions around the country, and noting that "3,613 cases from 2008 through 2018 in which states disciplined wayward judges but kept hidden from the public key details of their offenses—including the identities of the judges themselves").

[110]   MODEL RULES FOR JUD. DISCIPLINARY ENF'T § 3, r. 17.4 (AM. BAR ASS'N 2018).

[111]   *See, e.g.*, *Annual Reports*, STATE OF CAL. COMM'N ON JUD. PERFORMANCE, https://cjp.ca.gov/annual_reports/ (last visited Apr. 18, 2023).

judge for characterizing the behavior of spitting and throwing rocks as "the kind of behavior I see in Middle Eastern clients," and of dragging someone by the hair as "almost always a Hispanic client."[112] Another judge made a joke about getting Black defendants to plead guilty by coming out to the bench in a white sheet and pointy hat.[113] There were also racist comments made to courtroom players, rather than to the litigants themselves. For example, a judge told a lawyer from Ecuador to "lose the accent."[114] In 2017, California publicly censured a judge for a number of reasons, including commenting on a criminal defense attorney's accent, then asking if she was a citizen of Mexico.[115] When she replied she was an American citizen, he replied, "I wasn't planning on having you deported."[116] A 2018 CJP decision publicly censured a judge after he retired due to his voluminous political, racist, anti-Muslim, anti-Black, and anti-immigrant Facebook posts.[117]

Other state judicial conduct commissions investigate and reprimand their judges. A South Dakota judge used an offensive term for Native Americans and faced consequences.[118] A Texas judge was publicly admonished and ordered to receive 11 hours of instruction after saying that a Black defendant who had been arrested for public intoxication should "be hung . . . with a fucking noose around his neck."[119] A West Virginia judge told racist jokes and sent other inappropriate messages to a member of the public.[120] According to a report, a judge in Colorado allegedly referred to his courtroom clerk as "the little Mexican."[121] A Massachusetts judge made derogatory comments about immigrants at the border in a Facebook

---

[112] Public Admonishment of Judge Nancy Pollard, 2011 Ann. Rep. 17, 17–18 (Cal. Comm'n on Jud. Performance July 13, 2011).

[113] Public Admonishment of Judge Harvey Giss, 2011 Ann. Rep. 16, 17 (Cal. Comm'n on Jud. Performance Mar. 16, 2011); *see also* Public Admonishment of Judge Richard S. Flier (Cal. Comm'n on Jud. Performance May 30, 1995), https://cjp.ca.gov/wp-content/uploads/sites/40/2016/08/Flier_95.pdf (publicly admonishment judge for calling an adult Black criminal defendant a "good boy").

[114] *In re* Van Voorhis, 48 Cal. 4th CJP Supp. 257, 276 (Cal. Comm'n on Jud. Performance 2003).

[115] *In re* Kreep, 5 Cal. 5th CJP Supp. 1, 27 (Cal. Comm'n on Jud. Performance 2017).

[116] *Id.*

[117] Public Censure of Former Commissioner Joseph J. Gianquinto, 2018 Ann. Rep. 33, 33–34 (Cal. Comm'n on Jud. Performance Aug. 22, 2018).

[118] *In re* Fuller, 798 N.W.2d 408, 415, 421 (S.D. 2011).

[119] *In re* Baldwin, Pub. Reprimand & Ord. of Additional Educ., CJC Nos. 19-1291, 19-1160, at 1–2, 4 (Tex. Comm'n on Jud. Conduct Apr. 9, 2021), http://www.scjc.texas.gov/media/46829/baldwin19-1297-19-1160pubrep-oae4921.pdf.

[120] Public Admonishment of Charles N. Poe, Complaint No. 17-2021, at 2 (Jud. Investigation Comm'n of W. Va. Mar. 12, 2006), http://www.courtswv.gov/legal-community/JICAdmonishments/2021/17-2021MagCharlesPoe.pdf.

[121] *In re* Chase, 485 P.3d 65, 65–66 (Colo. 2021).

post.[122] A judge in North Carolina made disparaging comments about Mexican men's treatment of women in a case involving a man of Mexican heritage.[123] The judge ruled against the man in a civil family court matter.[124]

In Mississippi, a judge was found to have been in violation of judicial canons in that state for telling Black attorneys that "all you African-Americans can go to hell" during a drug court conference in which she was in a breakout session.[125] A different Mississippi judge was removed from office, even though he'd already lost his bid for re-election, for assaulting a Black man and calling him the N-word.[126]

A South Carolina magistrate judge said that one of the courthouse clerks was "dating [N-word]s," so, "there was no telling what we might catch using the same bathroom as her."[127] And although the Louisiana Supreme Court found that a judge there harbored a bias "against African Americans," the court characterized it as "implicit bias" despite the fact that the judge said a number of things that suggested he was consciously thinking about the race of Black litigants, like "African American[s] talk about all kind of crazy things at all times. So you don't know when they mean anything. You don't even know what—if they talk to you about certain thing[s] this minute, the next minute, they talk to you about something else."[128]

While I have collected dozens of examples of judicial censure or admonition for racially charged comments,[129] state judicial conduct commissions rarely sanction judges despite thousands of complaints filed every year.[130] Oklahoma, for example, has not publicly sanctioned any judges in over a decade for any reason.[131] This is despite the fact that at least one judge there used a derogatory term for non-citizens.[132] It seems unlikely that judges there have made no transgressions worthy of discipline. There are a number of potential reasons for this lack of public discipline.

---

[122] Duty to Report Perceived Judicial Misconduct, CJE Op. No. 2021-01 (Mass. Comm. on Jud. Ethics July 21, 2021), https://www.mass.gov/opinion/cje-opinion-no-2021-01.

[123] *In re* Badgett, 666 S.E.2d 743, 745 (N.C. 2008).

[124] *Id.*

[125] Miss. Comm'n on Jud. Performance v. Boland, 975 So. 2d 882, 884–85 (Miss. 2008).

[126] Miss. Comm'n on Jud. Performance v. Weisenberger, 201 So. 3d 444, 446–47, 450–52 (Miss. 2016).

[127] *In re* Hutchins, 661 S.E.2d 343, 345 (S.C. 2008).

[128] *In re* Gremillion, 204 So. 3d 183, 190, 194 (La. 2016).

[129] *See* app. B.

[130] Michael Berens & John Shiffman, *Emboldened by Impunity: With 'Judges Judging Judges,' Rogues on the Bench Have Little to Fear, in* REUTERS, THE TEFLON ROBE, *supra* note 64 (explaining that judicial conduct commissions in 38 states "issue private sanctions when judges misbehave"); *see also* GRAY, *supra* note 54, at 91–98 tbl.II.

[131] Berens & Shiffman, *supra* note 130.

[132] *Judge Refuses to Recuse Himself from Trial, Says He's Not a Racist,* NEWS 9 (Dec. 13, 2010, 11:26 AM), https://www.news9.com/story/5e34fe2ae0c96e774b368f69/judge-refuses-to-recuse-himself-from-trial-says-hes-not-a-racist.

The Illinois Judicial Inquiry Board misplaced or lost hundreds of complaints against judges.[133] Some commissions also chose to sanction on other grounds to avoid embarrassing a judge.[134] And many commissions are underfunded and understaffed.[135] Understaffing of these commissions, indifference to these important issues, and general neglect to the discipline of judges allows judges behavior to go uncorrected. It allows bad judges to keep judging, and ultimately means that the racism of judges is sanctioned and allowed to continue. Of course, this hurts no one more than people of color who must appear before the racist tribunals.

Even when disciplinary bodies do take action against judicial bias, they often take only symbolic steps—like a letter of reprimand—that allow judges to remain on the bench. For example, a New Jersey judge made antisemitic and racist quips from the bench and was admonished for doing so,[136] served several more years as a judge, retired at mandatory retirement age, and then was celebrated in the press for his sense of humor.[137] As of 2023, he was an attorney at a law firm that lauds his time on the bench.[138] He prospers, the law firm benefits, and racism endemic to our legal system continues to benefit whiteness.

## B.   *Appellate Courts*

In courts of record, anything a judge says in open court during the pendency of a case is recorded by an electronic recording system or a live court reporter.[139] As a result, what is said about a person's race during trial or jury selection is recorded. When arguments are made at the trial level that a judge has expressed a bias or made a biased observation in jury selection, courts of appeals have the opportunity to decide whether the trial judge's conduct warrants relief from the higher court.[140] Such complaints are rare.

---

[133]   Berens & Shiffman, *supra* note 130.

[134]   *See, e.g.*, GRAY, *supra* note 54, at 47 (discussing Miss. Jud. Performance Comm'n v. Just. Ct. Judge, 580 So. 2d 1259, 1264 (Miss. 1991)).

[135]   *See, e.g.*, Kent Faulk, *Disorder in the Court: Alabama Commission that Investigates Misconduct on the Bench Faces Loss of Only Investigator,* ALABAMA.COM (Aug. 6, 2013, 7:18 PM), https://www.al.com/spotnews/2013/08/alabama_judicial_inquiry_commi.html.

[136]   *In re* Wertheimer, Formal Complaint, ACJC No. 2009-245, at 2 (N.J. Advisory Comm. on Jud. Conduct Aug. 5, 2009), https://www.njcourts.gov/sites/default/files/acjc/WertheimerComplaint.pdf, *dismissed*, 13 A.3d 355 (N.J. 2011).

[137]   Julia Terruso, *Union County Judge, Known for Sense of Humor, Retires After 28 Years*, NJ.COM (Feb. 12, 2012, 1:30 PM), https://www.nj.com/news/2012/02/union_county_superior_court_ju.html.

[138]   *William L'E. Wertheimer*, DUGHI, HEWIT & DOMALEWSKI, https://www.dughihewit.com/attorneys/william-le-wertheimer/ (last visited Apr. 18, 2023).

[139]   Legal Info. Inst., *Court Reporter,* CORNELL L. SCH., https://www.law.cornell.edu/wex (last visited Apr. 18, 2023).

[140]   Norris v. United States, 709 F. App'x 952, 957 (11th Cir. 2017).

Analysis of whether the bias exposed is worthy of overturning a judge's ruling is done under legal standards that grant deference to judges' decisions.[141] At times, courts of appeals do not use words that accuse the judge of racial bias or prejudice, but instead use other words to describe the conduct.

One would expect, then, for there to be a great deal of opportunities for courts of appeals to address racial bias in decision-making. However, we know that appellate courts do not address every instance of racial discrimination or errant comment made by a trial judge. Not even close. Not every case gets taken up on appeal. When a party prevails or gets a requested resolution like a settlement, there would be no avenue for appeal.[142] Another reason is that appellate courts, in general, only address issues preserved on the record.[143] So if trial counsel fails to make an objection, some judicial racism may go unchallenged. Unrepresented people may not know that they should appeal or challenge a ruling. There are several instances where a racist remark by a judge may not get objected to by either party. An attorney too afraid of the consequences of offending the judge in that case or future cases may make a quick calculus not to raise the issue. A party may be friendly with or fond of the judge and may not want to hurt the judge's feelings by raising an issue that might tarnish the judge's reputation or harm their relationship. An attorney who was unbothered by the comment or agrees with the judge is unlikely to raise the issue and preserve it for appeal.[144] Further, the lawyer or party may not be sophisticated enough to recognize the meaning of the offensive remark or comment. Indeed, one judge in Florida used a relatively obscure Italian slur for Black people in a case that came to light.[145] It is anyone's guess how long he had used the term in court before anyone understood the word's meaning.

I have documented a surprisingly small number of courts of appeals cases from across the country in this Article that tackle racial bias by a trial judge.[146] I have a few theories as to why this might be. First, courts of appeals may decide to focus rulings on a different legal issue to protect a judge's reputation.

---

[141] *See generally* Richard L. Marcus, *Slouching Toward Discretion*, 78 NOTRE DAME L. REV. 1561 (2003); Robert G. Bone, *Who Decides? A Critical Look at Procedural Discretion*, 28 CARDOZO L. REV. 1961 (2007).

[142] *See* Uphoff, *supra* note 87, at 536–37; Bone, *supra* note 141, at 1981–85.

[143] *See* FED. R. APP. P. 10.

[144] *See* Uphoff, *supra* note 87, at 536–37.

[145] Aris Folley, *Miami Judge Faces Suspension for Using Racial Slur to Refer to Black Defendant*, HILL (May 22, 2018, 10:35 AM), https://thehill.com/blogs/blog-briefing-room/news/388758-miami-judge-faces-suspension-for-using-racial-slur-to-refer-to; *In re* Millan, Notice of Formal Charges No. SC18-775, at 1–2 (Fla. Jud. Qualifications Comm'n May 21, 2018), https://efactsssc-public.flcourts.org/casedocuments/2018/775/2018-775_notice_84109_notice2dformal20charges.pdf.

[146] *See* app. A.

Courts of appeals are deferential towards judges. In a Missouri case, a judge was alleged to have not fairly considered a *Batson* challenge[147] because the judge claimed he did not know who was white and who was Black (despite the fact that the judge presided over the first trial).[148] In denying the *Batson* challenge, the appellate court excluded evidence that the same judge had previously made a racist joke amongst other judges about how there were not any Black judges to cook for the white judges.[149] If one appellate court is willing to give a judge who made jokes at the expense of Black judges the benefit of the doubt that he cannot observe whether a person is Caucasian or African-American, how many more courts have simply sidestepped allegations of racism altogether?

In another case, the Eleventh Circuit failed to reverse a conviction and vacate a life sentence handed out by a federal judge who was recorded by his mistress discussing the case and the Black defendant's race.[150] According to the court, the district court did not err when it found that the defendant "failed to prove . . . there existed 'a serious risk of actual bias'" that would violate his rights.[151] The court also affirmed the same trial court's decision not to credit testimony that the judge used the N-word, despite the other evidence of his racial bias.[152] In this 2017 opinion, the court omitted that the district court judge was convicted of crimes himself, that the defendant was convicted of forcing mostly white women into prostitution, and significant portions of the conversation between the judge and his mistress that put the conversation in context.[153] Instead, the Eleventh Circuit defended the disgraced judge's words by pointing out that he was not the first person in the conversation to mention race.[154] The Eleventh Circuit's unwillingness to fully engage with the facts in order to protect the reputation of the judge and the system at the expense of someone sentenced by that judge is emblematic of the issues of racism in the criminal legal system.

On occasion, courts of appeals tackle issues of racism without naming it as racism. In a District of Columbia criminal case, a judge exposed her biases against

---

[147]   Under *Batson v. Kentucky*, the Equal Protection Clause prohibits using peremptory strikes to exclude jurors on the basis of race. 476 U.S. 79, 89 (1986).

[148]   Smulls v. State, 71 S.W.3d 138, 147 (Mo. 2002).

[149]   *Id.* at 148–49.

[150]   Norris v. United States, 709 F. App'x 952, 954–55, 957–58 (11th Cir. 2017).

[151]   *Id.* at 958 (quoting Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 884 (2009)).

[152]   *Id.*

[153]   The *Norris* defendant had previously appealed the district court judge's ruling in 2016. Norris v. United States, 820 F.3d 1261 (11th Cir. 2016), *aff'd in part, rev'd in part Norris*, 709 F. App'x 952. In its 2016 opinion, the Eleventh Circuit provided more context surrounding the judge's alleged racial bias and mental incompetence, and remanded the case for an evidentiary hearing to consider whether the judge was actually biased against the defendant. *Id.* at 1263–64, 1266.

[154]   *Norris*, 709 F. App'x at 957.

people from El Salvador after finding an accused Salvadoran man guilty in a bench trial.[155] After finding the defendant guilty of misdemeanor child sex abuse, the judge spoke about her belief that men from El Salvador sexualize girls at a young age.[156] While the District of Columbia Court of Appeals did reverse the trial judge, the opinion never uses the words race, racism, or xenophobia but instead discusses the case in terms of bias and whether an objective person might think that the judge may have ruled based on biases.[157] The appellate court goes out of its way to protect the judge's feelings and her reputation in its ruling by stating, "we do not draw any conclusion that the judge had an actual bias which influenced the verdict, or that the musings were not well intentioned. . . ."[158] Words of comfort or apology were not offered to the man convicted by the trial judge. The court's empathy towards the biased judge over the man convicted and sentenced by her is troubling.

In an unpublished opinion, the Court of Appeals for the state of Michigan remanded a case for a new sentencing hearing before a different judge after a trial judge sentenced a Salvadoran man for sexual assault far higher than what the sentencing guidelines called for.[159] The ruling was based in part on a statement the trial judge made at sentencing; the trial judge stated: "You, sir, are fodder for the people who believe that a wall should be built to keep Mexicans out of this country."[160] The appellate court made clear that it did not consider the judge's comments proof that "race, ethnicity, alienage, [or] national origin was used to impose [the] sentence" but found the comments "troubling."[161] Instead, the court seemed primarily to remand the case because the prosecutor did not oppose a new sentencing hearing.[162] One judge filed a concurrence in the case because of "the severity of the trial court's misconduct in discussing the race, ethnicity, nationality, sexuality, or religious beliefs of a criminal defendant while passing sentence."[163]

The concurring judge wrote that the trial judge's conduct "makes a mockery of our justice system and the fundamental rights critical to a civilized people. This Court has a duty to take note of and stand up to such abuses of authority."[164] That only one judge from the panel was willing to point out how damaging the conduct of the trial judge was, is disappointing to say the least.

---

[155]  Mejia v. United States, 916 A.2d 900, 901–02 (D.C. 2007).

[156]  *Id.*

[157]  *Id.* at 903.

[158]  *Id.*

[159]  People v. Deleon, No. 337134, 2019 WL 637793 (Mich. Ct. App. Feb. 14, 2019).

[160]  *Id.* at *4.

[161]  *Id.*

[162]  *Id.* at *6.

[163]  *Id.* at *6 (Krause, J., concurring).

[164]  *Id.*

I found only a few cases in which a court expressed outrage about a white judge's treatment of a Black litigant. In an opinion issued in 2021, a panel of appellate judges in New York reduced a man's sentence after the white judge called a 41-year-old Black man "retarded" and suggested that his brain was not fully developed.[165] When the man called the judge racist, the judge ordered him gagged with masking tape.[166] The appellate court called the judge's comments "utterly racist," with "no place in our system of justice."[167] The appellate court also referred to the judge's order that the man be gagged as "draconian," and the man was resentenced to a five-year sentence from the previous sentence of 15 years.[168]

In 2020, the Supreme Court denied certiorari to a Jewish man convicted of murder and sentenced to death.[169] The Texas judge who presided over his trial was both racist and antisemitic.[170] Years after the 2003 trial, when the judge was no longer on the bench, a news outlet reported that he regularly used the N-word to refer to Black defendants and had created a trust for his children which included a clause that kept them from receiving the money if they married anyone who was nonwhite or non-Christian.[171] Additionally, shortly after the defendant's trial, the judge referred to him as a "fucking Jew."[172] On a subsequent writ of habeas corpus application, a Texas appellate court granted the man a new trial in 2022.[173]

With so few cases since 2000 where courts of appeals have addressed racism from trial courts, there must be a reason. Of course, most judges rule carefully and avoid slurs and offensive language. As discussed earlier, every instance of racism in a courtroom will not be objected to and taken up to a court of appeals. Also, for an appellate court to take up an issue, a party must file an appeal and brief the issue. So, choices by counsel may limit the number of cases heard by appellate courts.

But, nevertheless, there exists a discrepancy between the number of cases ruled on by judges who have been disciplined because of complaints against them and the appellate courts who address the issue that suggests that appellate courts are not being asked to rule on the issue or are avoiding it in their opinions. Even when they do rule, courts sometimes decide cases on other grounds. When courts avoid

---

[165] People v. Johnson, 150 N.Y.S.3d 401, 409 (N.Y. App. Div. 2021).

[166] *Id.* at 408.

[167] *Id.* at 409.

[168] *Id.* at 409–10.

[169] Halprin v. Davis, 140 S. Ct. 1200 (2020).

[170] *Id.* at 1200–01 (Sotomayor, J., statement respecting denial of certiorari).

[171] Naomi Martin, *White, Straight and Christian: Dallas County Candidate Admits Rewarding His Kids if They Marry Within Race*, DALL. MORNING NEWS (May 18, 2018, 5:24 PM), https://www.dallasnews.com/news/2018/05/18/white-straight-and-christian-dallas-county-candidate-admits-rewarding-his-kids-if-they-marry-within-race/.

[172] *Halprin*, 140 S. Ct. at 1200 (Sotomayor, J., statement respecting denial of certiorari).

[173] *Ex Parte* Halprin, No. WR-77,175-05, 2022 WL 1501022 (Tex. Crim. App. May 11, 2022) (not designated for publication).

squarely addressing allegations of racism by judges, appellate judges protect and re-inforce white supremacy in the trial courts.

Courts of appeals judges who sit in judgment of trial court judges are, of course, judges. It is not hard to imagine that they relate to and empathize with the judges whose conduct and reasoning they are reviewing. Appellate judges are disproportionately white,[174] and may empathize less with the litigant and their plight than with the judge. Courts of appeals judges also are part of the same work community as trial judges. They may work in the same building, attend the same conferences, and are members of the same profession. They share socioeconomic status and educational background.[175] They likely shared similar career paths.[176] They may know each other socially as a result of their shared identities, professions, and income.

Courts of appeals can avoid ruling on an issue of judicial bias if they can find another legal issue on which to reverse. It may be much easier intellectually for a judge to find that a colleague committed an error in legal reasoning or applied the wrong standard than to recognize that they operated because of racial animus or unconscious bias. Judges have myriad reasons not to find that their colleague committed an error, not just in legal reasoning, but as a human being. Judges have many reasons to give each other the benefit of the doubt.

## C.  Ripped from the Headlines Stories

I have documented well over a dozen instances of racial bias just from news stories that have taken place since the year 2000.[177] When these newsworthy cases are combined with the instances of racial bias from judicial misconduct decisions and published appellate decisions, there are scores of instances of demonstrable explicit racial bias by judges in American courts.

In December 2021, a news story broke about a Louisiana criminal court judge after a video of her surfaced of she and her family watching a security video of a car break-in at her home.[178] She and her children are heard using the N-word to

---

[174]  Democracy & Gov't Reform Team, *supra* note 11.

[175]  *See generally* Michele Benedetto Neitz, *Socioeconomic Bias in the Judiciary*, 61 CLEV. ST. L. REV. 137 (2013).

[176]  Lawyers who used to work for the government are overrepresented on the bench. Clark Neily, *Are a Disproportionate Number of Federal Judges Former Government Advocates?*, CATO INST. (May 27, 2021), https://www.cato.org/study/are-disproportionate-number-federal-judges-former-government-advocates.

[177]  *See* app. C.

[178]  Peiser, *supra* note 104; Leslie Turk, *Racist Remarks Captured in Video of Lafayette Judge's Family Cheering Footage of Foiled Burglary*, CURRENT (Dec. 13, 2021), https://thecurrentla.com/2021/racist-remarks-captured-in-video-of-lafayette-judges-family-cheering-footage-of-foiled-burglary/; *see also In re* Odinet, 328 So. 3d 1166 (La. 2021).

describe the Black alleged perpetrator of the car break-in outside of her home.[179] It is clear from the video that the judge used the N-word as she observed the confrontation between her adult children and the man, and then again repeated the slur as the family laughs at the security video of the incident.[180] At one point she says, "it's a [N-word], like a roach."[181] The judge claimed no memory of her comments and blamed sedatives for her words.[182] She eventually resigned from her position.[183]

But unfortunately, that is not the only story about judges that made headlines in the news for racism. A state district court judge in Texas used racial slurs to describe Mexicans in his state in 2020.[184] A white judge in Louisiana in 2020 referred to a deputy and a court clerk by the N-word.[185] A white Colorado judge also used the N-word in a conversation with her court staff in 2020.[186] A probate judge in Alabama is alleged to have used many different racial slurs, including mouthing the N-word to his clerk, though he denies having done so.[187] He also implied that the murder of George Floyd by police was justified and that Floyd "pretty much got what he deserved."[188]

A judge in Pittsburgh referred to a black juror as "Aunt Jemimah" during a 2020 trial.[189] A Jacksonville, Florida, judge said that Black people should "go back to Africa."[190] A different Florida judge for the Miami-Dade Circuit called a Black

---

[179] Peiser, *supra* note 104.

[180] *Id.*

[181] *Id.*

[182] *Id.*

[183] Vimal Patel, *Louisiana Judge Who Used Racial Slur in Video Resigns*, N.Y. TIMES (Jan. 1, 2022), https://www.nytimes.com/2022/01/01/us/michelle-odinet-resigns-racial-slur.html.

[184] Morris, *supra* note 13; *see also In re* Luitjen, Pub. Admonition & Ord. of Additional Educ. CJC No. 20-0468 (Tex. Comm'n on Jud. Conduct Dec. 4, 2020), http://www.scjc.texas.gov/media/46826/luitjen20-0468pubadm-oae-12420.pdf.

[185] Beachum, *supra* note 14.

[186] O'Kane, *supra* note 15; *see also In re* Chase, 485 P.3d 65, 65–66 (Colo. 2021).

[187] Cassens Weiss, *supra* note 16; *see also* Jinks v. Ala. Jud. Inquiry Comm'n, No. 1210133, 2022 Ala. LEXIS 103, at *15–16 (Ala. Oct. 21, 2022).

[188] Cassens Weiss, *supra* note 16.

[189] Mark Scolforo, *Judge Faces Ethics Charges Over Racist, Demeaning Comments*, ABC NEWS (Aug. 12, 2020, 1:12 PM), https://abcnews.go.com/US/wireStory/judge-faces-ethics-charges-racist-demeaning-comments-72335001; *In re* Tranquilli, Complaint No. 4 JD 2020, at 5 (Pa. Ct. of Jud. Discipline Aug. 12, 2020), https://www.pacourts.us/Storage/media/pdfs/20210604/133958-file-9822.pdf.

[190] Hannan, *supra* note 18; *see also In re* Husley, Notice of Formal Charges, No. SC16-1278, at 3 (Fla. Jud. Qualifications Comm'n July 19, 2016), https://efactssc-public.flcourts.org/casedocuments/2016/1278/2016-1278_notice_79144.pdf, *voluntarily dismissed*, No. SC16-1278, 2017 Fla. LEXIS 277 (Fla. 2017).

man a racial slur and, when confronted, resigned from the bench.[191] An Ohio judge referred to COVID-19 as the "China Virus."[192] A judge in Washington state said disparaging things about the father of a black man killed by police.[193]

A Kansas judge referred to a Black man as "boy" and used sexist terms towards women in a different context—he blamed his conduct on poor sleep due to a back problem.[194] A California judge made remarks to a Black defendant about "shucking and jiving."[195] A 2006 article about New York's secondary court system documented a judge asking a Lebanese woman if she was a terrorist, and a different judge using the N-word in open court to explain to a Black defendant, who the village judge had convicted in a bench trial, that the word "colored" used by a witness was not offensive.[196] A Wisconsin judge used derogatory terms, including "[N-word], wops, and [J]ews," to describe a diverse neighborhood.[197] An Indiana judge used a racial slur in a dispute involving the judge and her ex-girlfriend, who is Black.[198] A

---

[191]   David Ovalle, *Miami Judge Who Used an Obscure Racial Slur Resigns from the Bench*, MIA. HERALD (July 13, 2018, 8:04 PM), https://www.miamiherald.com/news/local/article214845940.html; *see also In re* Millan, Notice of Formal Charges, No. SC18-775, at 2 (Fla. Jud. Qualifications Comm'n May 21, 2018), https://efactssc-public.flcourts.org/casedocuments/2018/775/2018-775_notice_84109_notice2dformal20charges.pdf, *voluntarily dismissed*, No. SC18-775, 2018 WL 4179591 (Fla. 2018).

[192]   Shaffer, *supra* note 20.

[193]   Associated Press, *Judge Who Made Racist Comments on Hot Mic Intends to Retire*, SEATTLE TIMES (June 4, 2021, 5:12 AM), https://www.seattletimes.com/seattle-news/washington-judge-who-made-racist-comments-on-hot-mic-says-hell-retire/; *see also In re* Zimmerman, Statement of Charges, CJC No. 10260-F-193, at 2 (Wash. Comm'n on Jud. Conduct Dec. 3, 2021), https://www.cjc.state.wa.us/materials/activity/public_actions/open_cases/10260SoCFinal.pdf.

[194]   Tim Carpenter, *Judge Accused of Bigotry, Racism in Disciplinary Case Seeks Mercy from Supreme Court*, KAN. REFLECTOR (Oct. 30, 2020, 6:22 PM), https://kansasreflector.com/2020/10/30/judge-accused-of-bigotry-racism-in-disciplinary-case-seeks-mercy-from-supreme-court/; Associated Press, *Kansas Judge Accused of Racial Bias with Cases Under Review*, NBC NEWS (Dec. 6, 2019, 9:12 AM), https://www.nbcnews.com/news/us-news/kansas-judge-accused-racial-bias-cases-under-review-n1097061; *see also In re* Cullins, 481 P.3d 774, 776–77 (Kan. 2021).

[195]   *Ventura County Judge Censured for Offensive Remarks*, AP NEWS (Mar. 25, 2020), https://apnews.com/article/censures-ca-state-wire-california-courts-b71b52b2cd144f058db920400af9a260; *see also* Public Censure of Judge Jeffrey Bennett, 2020 Ann. Rep. 37, 37 (Cal. Comm'n on Jud. Performance Mar. 25, 2020).

[196]   William Glaberson, *In Tiny Courts of N.Y., Abuses of Law and Power*, N.Y. TIMES (Sept. 25, 2006), https://www.nytimes.com/2006/09/25/nyregion/25courts.html.

[197]   Daniel Bice, *Judge's Racial, Ethnic Slurs Set off a Tempest*, MILWAUKEE J. SENTINEL (June 27, 2010), https://archive.jsonline.com/watchdog/noquarter/97280534.html/; *see also* Opinion, *Hard to See the Point*, MILWAUKEE J. SENTINEL (July 2, 2010), https://archive.jsonline.com/news/opinion/97700364.html/.

[198]   Jeff D. Gorman, *Judge Gets Lifetime Ban for Bad Calls and Slur*, COURTHOUSE NEWS SERV. (Feb. 17, 2015), https://www.courthousenews.com/judge-gets-lifetime-banfor-bad-calls-and-slur/; *see also In re* Bennington, 24 N.E.3d 958, 964 (Ind. 2015).

Massachusetts judge retired with a six-figure pension after referring to a litigant as a "field [N-word]" in a conversation with another judge.[199] A South Carolina judge, who presided over a bond decision in the racially-motivated shooting at a Black church by a white man,[200] had been previously censured in 2003 for use of the N-word.[201] He had used the word in addressing a Black defendant on his motion for bail reduction.[202]

It is not just state court judges who make headlines. Federal judges have embarrassed the bench too. Students reported a federal judge in Texas who stated publicly that Black and Latino people are more violent than white people during an event at the University of Pennsylvania in 2013.[203] A federal judge in Montana used his court email to circulate a racist joke about President Obama in 2012.[204] He claimed that he circulated the email, which he had received from his brother, because he was not a fan of then-President Obama, and not because he was racist.[205]

News reports of judges' racist conduct may illustrate that the system for reporting judges has failed to be accessible. My research found cases that started with a

---

[199]  Kevin Rothstein, *5 Investigates Obtains Secret Report into Judge's Use of Racial Slur*, WCVB (Mar. 16, 2017, 6:30 PM), https://www.wcvb.com/article/5-investigates-obtains-secret-report-into-judges-use-of-racial-slur/9143783; *see also* Press Release, Massachusetts Commission on Judicial Conduct Resolves Complaint Against Retired Judge Michael C. Creedon Through Agreed Disposition (Oct. 17, 2016), https://www.mass.gov/news/massachusetts-commission-on-judicial-conduct-resolves-complaint-against-retired-judge-michael-c-creedon-through-agreed-disposition.

[200]  Keith O'Shea, Darran Simon & Holly Yan, *Dylann Roof's Racist Rants Read in Court*, CNN (Dec. 14, 2016, 10:28 AM), https://www.cnn.com/2016/12/13/us/dylann-roof-murder-trial/index.html. At the 2015 pretrial hearing, the judge described victims on both sides of the church massacre. Abby Phillip, *The Charleston Magistrate Who Sparked a Debate About Who Is a Victim*, WASH. POST (June 21, 2015), https://www.washingtonpost.com/national/the-charleston-magistrate-who-sparked-a-debate-about-who-is-a-victim/2015/06/21/ef340330-184a-11e5-93b7-5eddc056ad8a_story.html (reporting that the judge opened the bond hearing with a statement that "[w]e have victims, nine of them. But we also have victims on the other side . . . . There are victims on this young man's side of the family").

[201]  Steve Almasy, *Church Shooting Judge Used N-Word in Court, Received Reprimand*, CNN (June 20, 2015, 2:55 PM), https://www.cnn.com/2015/06/19/us/church-shooting-judge-reprimand/index.html; *see also In re* Gosnell, 621 S.E.2d 659 (S.C. 2005).

[202]  *In re Gosnell*, 621 S.E.2d at 660–61.

[203]  Bronner, *supra* note 17; *see also In re* Charges of Judicial Misconduct, 769 F.3d 762, 773–75 (D.C. Cir. 2014), *aff'd*, *In re* Complaint of Judicial Misconduct, C.C.D. No. 14-01, at 3, 15 (U.S. Comm. on Jud. Conduct & Disability Feb. 19, 2015), https://www.uscourts.gov/sites/default/files/ccd-14-01order-final-02-19-15.pdf.

[204]  Bill Mears, *Judge Apologizes for Forwarding a Racist E-Mail Aimed at Obama*, CNN (Mar. 1, 2012, 9:18 PM), https://www.cnn.com/2012/03/01/justice/montana-judge-racist-message/index.html; *see also In re* Complaint of Judicial Misconduct, 751 F.3d 611, 619–21 (U.S. Comm. on Jud. Conduct & Disability Jan. 17, 2014).

[205]  Mears, *supra* note 204.

report to the media rather than the applicable disciplinary body. A benefit for an individual of going to the media, as opposed to a disciplinary body, about a judge who has said or done something racist, is anonymity. A reporter is more interested in proof than identifying the person reporting the conduct, whereas a disciplinary board often allows the accused person to confront their accuser, so the identity of the person making the accusation is shared with the judge.[206] A person who wants some accountability for a judge who reports to a newspaper or television outlet does not have to worry about retaliation from the judge or an institutional player like a prosecutor or defender's office. And in most instances, the media has little incentive to protect the judge's reputation, the way a colleague sitting on another court or on a disciplinary board might. Similarly, going to the media delivers much quicker results than an opaque and slow disciplinary process. It should worry anyone who cares about fairness, justice, or the integrity of the system that the media is often a better option than our current judicial disciplinary system for those who want to report racially offensive behavior by a judge.

Despite the advantages offered by going to the media to report judicial bias, reliance on news media for reporting judicial bias is not a sufficient solution. For an instance of racial bias to make headlines, the media must know about the allegation of bias. However, not every jurisdiction allows cameras in courthouses.[207] Most run-of-the-mill cases are hardly worthy of news attention and would not warrant reporters or even spectators from the general public. In any event, just like complaints, for the media to learn of a story involving a judge, someone must alert the media to the story. Fear of repercussions from the person tipping off the media may exist, depending on the role of the person reporting, especially considering that in most cases there are only a finite number of people in the courtroom—the litigants, their attorneys if the party is represented by counsel, their families, and courtroom staff. Additionally, an individual who has witnessed racially biased conduct or statements by a judge may not possess any familiarity with reaching out to the media, may not want attention, may agree with the behavior, or lack the necessary motivation to report it.

---

[206] *See* Gray, *supra* note 55, at 416–17 (discussing judges' due process rights in judicial disciplinary proceedings); *see also* IAALS, *supra* note 65, at 13 (noting that, while "total anonymity precludes asking questions of, or providing feedback to, complainants, it protects vulnerable complainants," and discussing numerous examples of individuals who were "unwilling to complain without anonymity or, at a minimum, an assurance of confidentiality in the early stages of the investigation").

[207] *See, e.g.*, FED. R. CRIM. P. 53 (prohibiting broadcasting and taking photographs in criminal proceedings in federal courts). *But see* SARAH J. ECKMAN, CONG. RSCH. SERV., R44514, VIDEO BROADCASTING FROM THE FEDERAL COURTS: ISSUES FOR CONGRESS 10 (2019) (noting that most state courts and a few federal district courts and circuit courts allow recordings "under certain, limited circumstances").

Altogether I have documented over two dozen media reports of instances of racial bias by judges since 2000. We should assume, however, even when taken together, these headline-grabbing stories only represent a tiny fraction of the judges who hold racial bias. There are stories about judges saying offensive things left out of this discussion because the judges did not clearly show explicit bias.[208] It is also worth explaining that other types of bias, like homophobia or misogyny, have also been shown amongst judges, but were not included in this discussion of racial bias.[209] As suggested earlier, most judges should be savvy enough not to say their racist thoughts aloud.

Some will argue that this is a very small number, especially when one considers that there are tens of thousands of judges in the United States in state and federal courts.[210] But this misses the point. Even one of these incidents seriously undermines our understanding of "justice," and we know that these judges that have been caught expressing racially biased thoughts do not represent the full number of judges who have these thoughts and impulses but are mature and sophisticated enough to resist expressing them aloud. Further, there are likely people in every courthouse around the nation who protect the reputation of judges out of affinity, loyalty, or fear. The fact that there are dozens of these stories of judicial racism should alarm everyone.

When incidents of racial bias take place in a courtroom or by a judge in front of others and it goes unreported, the behavior runs the risk of being reinforced. The judge may take that lack of shock or outrage to mean that the conduct was acceptable and may continue to engage in it. The judge might believe that, with no objections, everyone agrees with him or her and the beliefs are further engrained. Yet, in reality, the judicial officer's respectability, power, and prestige may make court staff or the public too afraid to confront the topic. Or worse, the hearers of the words expressed may believe the statements about the subordinated racial group made by this respected and influential figure as truth. Both phenomena serve only to reinforce white supremacy and further subjugate people of color. White culture benefits

---

[208]  *See, e.g.*, John Seasly, *Cook County Judge, Criticized for 'Insensitive, Improper' Racial Comments, Is Dumped from Bench*, INJUSTICE WATCH (June 5, 2019), https://www.injusticewatch.org/news/2019/cook-county-judge-criticized-for-insensitive-improper-racial-comments-is-dumped-from-bench/; Mark Caudill, *Judge Recuses Himself from Case, Does Not Address Alleged Racist Comments*, MANSFIELD NEWS J. (May 29, 2021, 7:48 AM), https://www.mansfieldnewsjournal.com/story/news/2021/05/29/ansfield-judge-does-not-address-racially-charged-comments/7448161002/.

[209]  *See, e.g.*, Donald Padgett, *Judge Accused of Homophobia, Racism Wants Her Job Back*, ADVOCATE (Sept. 13, 2022, 11:18 AM), https://www.advocate.com/news/2022/9/13/judge-accused-homophobia-racism-wants-her-job-back; Michael Berens & John Shiffman, *Exploiting the Bench: The Long Quest to Stop a 'Sugar Daddy' Judge Accused of Preying on Women, in* REUTERS, THE TEFLON ROBE, *supra* note 64.

[210]  IAALS, *supra* note 26, at 3.

from the racism in the legal system and people of color lose power, wealth, and autonomy.

We know from the structures that give judges the benefit of the doubt and protect them and their reputations that some judges sometimes say racist things. When one looks at the legal system, they may notice that judges make racist decisions, enforce racist laws, protect racism, and manipulate the law to get racist outcomes.

## IV.  THERE IS NO REFORMING THIS

American law and legal identity urge a view of neutrality, with judges as arbiters free from racial bias. Nevertheless, just as Americans possess racial bias, so does its law and its judges. Highlighting just some of the instances of demonstrable explicit and implicit racial bias serves as proof of this inescapable reality.

Courts are meant to be the institutions set up to act as a safeguard for individuals in disputes. However, judges have failed subordinated racial groups by repeatedly removing constitutional and statutory barriers to allow for legal discrimination against them, as seen by the doctrines of qualified immunity, voting rights, the Fourth Amendment, the Sixth Amendments, eminent domain, and others.[211] As Professor Brandon Hasbrouk puts it in his 2022 article, *Movement Judges*, "Supreme Court precedent has been historically rights-restrictive and anti-Black."[212]

Advocacy by judges has impacted every facet of American life, including jury service, where people can live, how they must interact with police, and whether they must live with racial harassment in their employment. Simply put, there is racial bias in our court system; bias infects high courts and trial courts, and civil and criminal cases. There is no question that the criminal legal system is racist. America jails more Black men as a proportion of its population than South Africa did at the height of apartheid.[213]

But it is not simply that judges preside over racist systems—they create them too. Courts invented qualified immunity to protect police from liability.[214] The Civil Rights Act of 1871, also known as the Ku Klux Klan Act, made it a crime for

---

[211]  *See generally* Brandon Hasbrouck, *Movement Judges*, 97 N.Y.U. L. REV. 631 (2022).

[212]  *Id.* at 645.

[213]  Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*, *in* RACE, CRIME, AND PUNISHMENT: BREAKING THE CONNECTION IN AMERICA 23, 28 (Keith O. Lawrence ed., 2011).

[214]  Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982) ("[P]ublic officers require [qualified immunity] protection to shield them from undue interference with their duties and from potentially disabling threats of liability."); *see also* Jamison v. McClendon, 476 F. Supp. 3d 386, 392 (S.D. Miss. 2020) (acknowledging the government's interest in the qualified immunity doctrine, but asserting that the doctrine has gone too far and now serves to shield the police from accountability).

a government agent to deprive someone of their constitutional rights.[215] Section 1 of the Act is now codified as 42 U.S.C. § 1983; it is under this section that most civil actions against police officers are brought by civilians.[216] In interpreting the scope of § 1983, the Supreme Court developed the doctrine of qualified immunity.[217] The Court has since morphed and expanded the doctrine—today, judges may find that police have qualified immunity so long as there is no prior decision putting an officer on notice that the behavior violates a "clearly established law."[218]

As a result of this doctrine, developed in the 1980s, courts assume that if a police officer was working at the time of the incident and there is not a similar or even identical case on point that could warn an officer that the specific conduct was unlawful, the officer's conduct was proper.[219]

Judicial activism is not just aimed at protecting police, but employers as well. Judges have also made it much harder for plaintiffs to successfully prevail in claims

---

[215]   Civil Rights Act of 1871, ch. 22, 17 Stat. 13 (codified as amended at 42 U.S.C. § 1983).

[216]   U.S. COMM'N ON C.R., REVISITING *WHO IS GUARDING THE GUARDIANS?*: A REPORT ON POLICE PRACTICES AND CIVIL RIGHTS IN AMERICA 65 (2000).

[217]   WHITNEY K. NOVAK, CONG. RSCH. SERV., LSB10492, POLICING THE POLICE: QUALIFIED IMMUNITY AND CONSIDERATIONS 2 (2020). The Court established the modern qualified immunity test in a 1982 case in which the Court found for the plaintiff. *Harlow*, 457 U.S. at 817–19. For a discussion of the historical development of the qualified immunity doctrine, see *Jamison*, 476 F. Supp. 3d at 397–409. *See generally* David Rudovsky, *The Qualified Immunity Doctrine in the Supreme Court: Judicial Activism and the Restriction of Constitutional Rights*, 138 U. PA. L. REV. 23 (1989).

[218]   The Court initially held that an officer was entitled to qualified immunity if he or she held a good faith belief that the conduct was proper, despite the statute's silence on a good faith exception. NOVAK, *supra* note 217, at 2 (discussing Pierson v. Ray, 386 U.S. 547, 556–57 (1967)). In *Harlow*, the Court eliminated the subjective good faith element. Instead, the Court ruled that an officer is entitled to qualified immunity unless the officer's conduct violates controlling precedent or, in limited circumstances, if the conduct is obviously unconstitutional. *Harlow*, 457 U.S. at 817–19; *see also* Wilson v. Layne, 526 U.S. 603, 617 (1999); Hope v. Pelzer, 536 U.S. 730, 741 (2002).

[219]   Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. REV. 885, 892–94 (2014). For example, officers were entitled to qualified immunity where their foreseeable actions created the very results they claimed their presence was there to avoid. Ramirez v. Guadarrama, 3 F.4th 129 (5th Cir. 2021). In *Ramirez*, officers responded to a 911 call reporting that a man was threatening to kill himself. Once the officers arrived at the family's home, the man poured gasoline over himself. Aware of the fact that tasing the man would light him on fire, the officer nevertheless tased the gasoline-soaked man. The man died and the family's home was destroyed by the fire set by police. Jacob Sullum, *5th Circuit Grants Qualified Immunity to Cops Who Ignited a Suicidal, Gasoline-Drenched Man by Tasing Him*, REASON (Feb. 18, 2021, 12:15 PM), https://reason.com/2021/02/18/5th-circuit-grants-qualified-immunity-to-cops-who-ignited-a-suicidal-gasoline-drenched-man-by-tasing-him/; *see also* Corbitt v. Vickers, 929 F.3d 1304, 1315–23 (11th Cir. 2019).

of employment discrimination.[220] While serving on the Seventh Circuit before she was a Supreme Court Justice, Amy Coney Barrett upheld the dismissal of a racial discrimination lawsuit where the plaintiff's supervisor called him the N-word.[221] Acknowledging that "[t]he N-word is an egregious racial epithet," she nevertheless found that the plaintiff could not "win simply by proving that the word was uttered. He must also demonstrate that [the supervisor's] use of this word altered the conditions of his employment and created a hostile or abusive working environment."[222] In upholding the dismissal of the lawsuit she and the rest of the panel ignored testimony that the former employee who heard the word uttered at work suffered psychological distress and concluded that he lost his job because of his "poor track record," not due to racial discrimination.[223]

In the 2018 article, *Explicit Bias*, Vanderbilt Law Professor Jessica Clarke illustrates how judges disregard a significant amount of explicit bias—racial, gender, and religious—in employment discrimination law through a doctrine known as "stray remarks" that keeps from jurors' ears racially biased comments made by the employer.[224] The stray remarks doctrine "finds no support in any employment discrimination statute" but has been adopted by courts to limit evidence of discrimination in discrimination cases.[225]

In *Movement Judges*, Professor Hasbrouck illustrates how the Supreme Court has made it harder for people of color to recover in housing discrimination cases under the Fair Housing Act.[226] The Court has made it "impracticable for plaintiffs to carry their burden of proof, while simultaneously making it easy for the state to justify discriminate conduct."[227]

In addition to making employment discrimination easier by individuals, courts have made discrimination by states in voting practices within reach as well. The Supreme Court has eviscerated the protections offered by the 1965 Voting Rights

---

[220] For example, use of the N-word and other racially derogatory terms, even in the presence of the plaintiff, may be insufficient to establish an employment discrimination claim. *See, e.g.*, Frazier v. Sabine River Auth., 509 F. App'x 370, 374 (5th Cir. 2013) (ruling that employer's use of the N-word, the word "Negreet," and a noose gesture "were isolated and not severe or pervasive enough" to create a hostile work environment); Nelson v. United Parcel Serv., Inc., 337 F. App'x 561, 563 (7th Cir. 2019) (holding that supervisor's comment that she was going to "fire that [N-word]" was not direct evidence of racial bias because the decision to fire the plaintiff was made by someone else).

[221] Smith v. Ill. Dep't of Transp., 936 F.3d 554, 560–62 (7th Cir. 2019).

[222] *Id.* at 561.

[223] *Id.*

[224] Jessica A. Clarke, *Explicit Bias*, 113 NW. U. L. REV. 505, 540–47 (2018).

[225] *Id.* at 540.

[226] Hasbrouck, *supra* note 211, at 645 (citing Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc., 576 U.S. 519 (2015)); Fair Housing Act, 42 U.S.C. §§ 3601–3619, 3631.

[227] Hasbrouck, *supra* note 211, at 645.

Act meant to keep states from discriminating against people of color.[228] In the most recent voting rights opinion, the Court allowed Arizona, a swing state, to impose voting restrictions, despite the fact that § 2 of the Voting Rights Act outlaws any discrimination (intentional or not), and despite the lower court's finding that the Arizona laws had a disparate impact on Black and Latino voters.[229] Rather than protect the rights of its citizens, the Court paved the way for disenfranchisement of people of color with the boogeyman of voter fraud.

But this is not the first time that the Supreme Court has limited the protections of the Voting Rights Act for people of color. The Court held that another provision of the Act was unconstitutional in 2013 in the case *Shelby County v. Holder*.[230] Chief Justice Roberts, writing for the majority, struck down the provisions of the Voting Rights Act that mandated that states with a history of discrimination get preclearance before making changes to their voting procedures.[231] Since the Court's decision in *Shelby County*, more than 1,000 polling places in Black neighborhoods have been closed, making it harder for Black people to vote.[232] Judicial activism in this realm undermined democracy to facilitate the disenfranchisement of people of color.

In addition to eroding the statutory protections designed to protect citizens, courts have also limited the protections offered by the U.S. Constitution in many diverse areas in ways that harm Black people and other people of color.

Judges have stripped away individuals' rights in a number of legal decisions that limit the clear text of the Fourth Amendment's prohibition on searches and seizure except with probable cause.[233] The Supreme Court's rulings in *Terry v.*

---

[228]   *Id.* at 642–43; *see* Shelby Cnty. v. Holder, 570 U.S. 529 (2013) (holding that the coverage formula in 42 U.S.C. § 1973b(b) is unconstitutional); *id.* at 560–67 (Ginsburg, J., dissenting) (discussing the origins and gradual deterioration of the Voting Rights Act of 1965).

[229]   Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2330–34 (2021) (construing 42 U.S.C. § 1973(a)); *id.* at 2366–67 (Kagan, J., dissenting).

[230]   570 U.S. 529.

[231]   *Id.* at 536–40, 550–57.

[232]   Matt Vasilogambros, *Polling Places Remain a Target Ahead of November Elections*, PEW (Sept. 4, 2018), https://www.pewtrusts.org/de/research-and-analysis/blogs/stateline/2018/09/04/polling-places-remain-a-target-ahead-of-november-elections; Nicquel Terry Ellis, *Report: Supreme Court Ruling Caused Mass Polling Place Closures Across Southern USA*, USA TODAY (Sept. 12, 2019, 2:59 PM), https://www.usatoday.com/story/news/nation/2019/09/12/report-court-ruling-caused-mass-voting-place-closures-southern-u-s/2272866001/.

[233]   The text of the Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend. IV.

*Ohio*,[234] *Wren v. United States*,[235] and *Illinois v. Wardlow*[236] allowed police to search and seize people on less than probable cause, and scholars have pointed out that the disproportionate victims of these traumatic encounters with the police have been people of color.[237] Of course, suspicion—the currency of Fourth Amendment probable cause justifications—is highly subjective with a long history of police being suspicious of innocuous behavior of Black people, as supported by the statistics about the harassment suffered by Black people at the hands of police.[238]

While the Court ignores race in *Terry*, it embraced its use as a factor to stop people of Mexican descent.[239] In *United States v. Brignoni-Ponce*, the Court sanctioned the border patrol's use of a persons' ethnic appearance as a part of the basis for a Fourth Amendment seizure.[240] The Court wrote: "The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens."[241] Here, it appears that the Court felt fine about American citizens being stopped by the state because of their appearance, so long as they do not appear to be white.

In *Illinois v. Wardlow*, the Supreme Court expanded the impact of *Terry* even further by holding that refusal to cooperate with police (*e.g.*, flight) coupled with presence in a "high crime" neighborhood together provide sufficient reasonable suspicion for an officer to conduct a stop.[242] This was a departure from previous doc-

---

[234]   392 U.S. 1 (1968).

[235]   517 U.S. 806, (1996); *see also* Thompson, *supra* note 25, at 960 ("The Supreme Court's 1996 decision in *Wren v. United States* . . . would seem to remove the Fourth Amendment from the equation.").

[236]   528 U.S. 119 (2000).

[237]   *See, e.g.*, NEMBHARD & ROBIN, *supra* note 88, at 3–4; Emma Pierson, Camelia Simoiu, Jan Overgoor, Sam Corbett-Davies, Daniel Jenson, Amy Shoemaker, Vignesh Ramachandran, Phoebe Barghouty, Cheryl Phillips, Ravi Shroff & Sharad Goel, *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 NATURE HUM. BEHAV. 736 (2020); Edith Perez, Note, *Don't Make a Run for It: Rethinking* Illinois v. Wardlow *in Light of Police Shootings and the Nature of Reasonable Suspicion*, 32 U. FLA. J. L. & PUB. POL'Y 361, 143–45 (2022); Adam B. Wolf, *The Adversity of Race and Place: Fourth Amendment Jurisprudence in* Illinois v. Wardlow*, 528 S. Ct. 673 (2000)*, 5 MICH. J. RACE & L. 711, 716–22 (2000).

[238]   *See* Perez, *supra* note 237, at 146–47; Hunter J. Rodgers, Terry, *Traffic Stops, and Tragedy: Conflicts and Concerns in the Wake of* Kansas v. Glover, 19 SEATTLE J. FOR SOC. JUST. 251, 271–75 (2020).

[239]   Thompson, *supra* note 25, at 977–78 (discussing the Court's attempt "to square [its] refusal to deal with race in *Terry* . . . with the Court's readiness in *Brignoni-Ponce* and *Martinez-Fuerte* to allow race to be a factor in searches and seizures . . . .").

[240]   422 U.S. 873 (1975).

[241]   *Id.* at 886–87. *See generally* Thompson, *supra* note 25, at 976–78.

[242]   Illinois v. Wardlow, 528 U.S. 119, 124–25 (2000).

trine that allowed citizens to refuse to cooperate with police without creating suspicion that would legally justify a seizure.[243] Because Black people and Latino people are more likely to reside in "high crime" communities, they are more likely to be subject to over policing. [244] The impact of *Wardlow* is that police can justify encounters in which a person of color flees police, without additional reason beyond presence in a neighborhood that the police have deemed to have above average crime. Yet the Court showed little interest in discussing how its decision would impact people of color.[245] On the other hand, some state courts and lower federal courts now recognize that Black people have innocent and good reasons to run from the police.[246]

The Supreme Court in *Whren* allowed police to stop a person based on his race as long as there was some other legal basis for the stop, even if it was pretextual.[247] Again, it is judges that have allowed police to stop, harass, and search people based on their race as long as there is a legal excuse or believed excuse. Legal scholar and Professor Ekow Yankah has written, "the Supreme Court has consciously obscured the corrosive role race plays in the everyday experiences of so many."[248] These cases, taken individually, but certainly when taken together, illustrate a judicial system that is unbothered by the daily harassment suffered by people of color by the state.

The racism endemic to our legal system is no surprise given the country's history of enslavement, Jim Crow, and other instances of legalized subjugation that have been propped up by our legal system. While legal observers can point to instances in which our courts ended legal racial discrimination in some fashion to outlaw some forms of discrimination, strengthen individual rights and constitutional protections, such as *Shelley v. Kramer*,[249] *Brown v. Board of Education*,[250] *Loving v. Virginia*,[251] and *Batson v. Kentucky*,[252] subsequent court decisions have indeed

---

[243] *Id.* at 124; *see* Wolf, *supra* note 237, at 714–15 (discussing Florida v. Bostick, 501 U.S. 429, 437 (1991)).

[244] *See* Lauren J. Krivo, Christopher J. Lyons & María B. Vélez, *The U.S. Racial Structure and Ethno-Racial Inequality in Urban Neighborhood Crime, 2010-2013*, 7 SOCIO. RACE & ETHNICITY 350, 351 (2021) (discussing ethnoracial inequality in high crime neighborhoods, and whether "these inequalities reflect differences in offending or some combination of racialized enforcement (*e.g.*, differential policing or profiling of non-White neighborhoods")).

[245] *See* Jonathan Bender, Illinois v. Wardlow: *The Supreme Court Dodges the Race Bullet in Fourth Amendment Terry Stops*, 78 DENV. U. L. REV. 125, 143–45 (2000).

[246] *See, e.g.*, Commonwealth v. Warren, 58 N.E.3d 333, 342 (Mass. 2016); Miles v. United States, 181 A.3d 633, 641–42 (D.C. 2018).

[247] Whren v. United States, 517 U.S. 806, 816 (1996).

[248] Yankah, *supra* note 25, at 1550.

[249] 334 U.S. 1 (1948).

[250] 347 U.S. 483 (1954).

[251] 388 U.S. 1 (1967).

[252] 476 U.S. 79 (1986).

gone in the other direction since the 1982 decision in *Kemp* that allowed discrimination to go unchecked unless an individual can prove intentional racism. Meanwhile, racial discrimination in jury selection persists[253] and schools are still segregated in most American cities.[254]

For the reasons discussed in this Article, narratives of neutrality or colorblindness can no longer be meaningfully sustained about judges, or the laws enforced and created by them. Our legal system has so much racism baked into it, and judges create it, protect it, and sustain it.

We simply have to confront that some judges harbor explicit racial bias, as exposed in this Article, while most others likely suffer from implicit racial bias. Removing individual judges with the poor judgment to use racial slurs or make offensive comments in a public courtroom might symbolize that courts will not tolerate racism, but what it actually does is simply prop up the institution as a neutral or even benign one, when in fact the actions of most courts suggest otherwise. Occasional discipline or even removing a judge here or there may help legitimize a racially problematic system without acknowledging the true extent of the significant problem of racism built into our way of resolving disputes and attempts at addressing public safety.

While it may be disappointing to a society, media, and a legal profession that reveres judges to realize that judges may be no less racist than other players in the legal system, this truth must be confronted. Hate crimes have increased in the United States.[255] Domestic terrorism by those with far-right views is the biggest threat to our national security.[256] Membership in white supremacist groups is on the rise, with some groups gaining increased political influence.[257] White supremacist propaganda is also more pervasive than in any other time in recent history.[258]

---

[253] James E. Coleman, Jr., *The Persistence of Discrimination in Jury Selection: Lessons from North Carolina and Beyond*, CHAMPION, June 2018, at 28.

[254] Sequoia Carrillo & Pooja Salhotra, *The U.S. Student Population Is More Diverse, But Schools Are Still Highly Segregated*, NPR (July 14, 2022, 5:13 AM), https://www.npr.org/2022/07/14/1111060299/school-segregation-report.

[255] Christina Carrega & Priya Krishnakumar, *Hate Crime Reports in US Surge to the Highest Level in 12 Years, FBI Says*, CNN (Oct. 26, 2021, 2:05 PM), https://www.cnn.com/2021/08/30/us/fbi-report-hate-crimes-rose-2020/index.html; Press Release, FBI Nat'l Press Off., FBI Releases 2020 Hate Crime Statistics (Aug. 30, 2021), https://www.fbi.gov/news/pressrel/press-releases/fbi-releases-2020-hate-crime-statistics.

[256] Joanna Walters & Alvin Chang, *Far-Right Terror Poses Bigger Threat to US than Islamist Extremism Post-9/11*, GUARDIAN (Sep. 8, 2021, 3:00 PM), https://www.theguardian.com/us-news/2021/sep/08/post-911-domestic-terror.

[257] CASSIE MILLER & RACHEL CARROLL RIVAS, S. POVERTY L. CTR., THE YEAR IN HATE & EXTREMISM 2021, at 5–8, 10–12 (2022).

[258] *White Supremacist Propaganda Spikes in 2020*, ANTI-DEFAMATION LEAGUE (May 3, 2022), https://www.adl.org/white-supremacist-propaganda-spikes-2020; Kanishka Singh, *White Supremacist Propaganda in U.S. Hit Record in 2020, Group Says*, REUTERS (Mar. 17, 2021, 2:40 AM),

And white supremacist viewpoints have once again entered mainstream political discourse.[259] Judges are part of these systems and are just as vulnerable to the propaganda and packaging of these worldviews as any other member of the public, whether or not we want to acknowledge and confront it.

White judges benefit from the legal systems that reward them with the most power, the most money, and the most prestige of any other player in the system. Most judges have no incentive to challenge the racist status quo that benefits them and their families.

It is important to remember that judges have chosen, as a career, to sit in judgment of others. This system is built on the idea that judges are wiser than the rest of us and that that they can and should resolve the disputes of others. This system says that judges alone are the arbiters of the behavior of others. Armed police officers enforce judges' orders—this is a significant power. Viewpoints that further the belief that individual judges are worthy of their superior role, and that the litigants who appear before them are the inferior party,[260] may be very attractive to some who seek out the profession. The legal system supports that viewpoint.

And every day a disproportionate number of white people sit in judgment over a disproportionate number of people of color. Thus, because the system is set up for white judges to be superior to Black parties, the daily experience of judging may reinforce both implicit and explicit racial biases. This racial hierarchy exists even when its devoid of racial slurs. Not only do people who are attracted to the view that they are superior pursue judicial appointments, but this view is supported and reinforced in the act of judging itself.

Reformers might advocate for things like bias training, proportional prosecutions, financial incentives, or public disciplinary boards. Indeed, the American Bar Association urged in 2020 that state court judges undergo training on implicit racial bias.[261] However, while judges are offered implicit bias training, bias training is rarely *required* for judges; rather, it is usually simply offered to them.[262] Hours of bias training simply cannot be sufficient to undo a mindset, a career of experiences,

---

https://www.reuters.com/article/us-usa-white-supremacy/white-supremacist-propaganda-in-u-s-hit-record-in-2020-group-says-idUSKBN2B917P.

[259] Simon Clark, *How White Supremacy Returned to Mainstream Politics*, CTR. FOR AM. PROGRESS (July 1, 2020), https://www.americanprogress.org/article/white-supremacy-returned-mainstream-politics/.

[260] Many people are also treated as inferior by judges, as Professor Abbe Smith points out in her article, *Judges as Bullies*. *See generally* Abbe Smith, *Judges as Bullies*, 46 HOFSTRA L. REV. 253 (2017).

[261] RESOL. 116G (AM. BAR ASS'N 2020); Melissa Heelan Stanzione, *ABA Group Urges Implicit Bias Training for Judges, Lawyers*, BLOOMBERG L. (July 28, 2020, 1:51 AM), https://news.bloomberglaw.com/us-law-week/proposal-seeks-implicit-bias-training-for-judges-lawyers.

[262] For example, in New York, bias training is generally not required. N.Y. UNIFIED CT. SYS., *supra* note 7, at 47.

and ingrained beliefs perhaps held since childhood. Nor do implicit racial biases get at explicit racism. Decades ago in his 1997 article, *Affirmative Action and the Criminal Law*, Professor Paul Butler argued that there exists in law a tension between the ideals of equality and the reality of white supremacy and argued for a race-conscious approach to the criminal legal system.[263] Pleas for change have gone ignored. No action has been taken in any way to meaningfully reform the judicial system.[264] Just as racial justice activists have called for the abolition of police and prison, we should similarly call for our system of resolving disputes—courts, as they exist now—to be abolished and replaced with another system.

As discussed earlier, instances of judicial misconduct do not always get reported. There is a myriad of disincentives to reporting a judge, and the process is difficult and opaque. Complaints are lost, dismissed, or not credited. Even in the rare case in which a judge is disciplined, he or she may very well simply return to their positions. For example, a recent *Reuters* investigation showed that thousands of judges were disciplined for displays of bias, breaking the law, or other misconduct, yet 90% were allowed to retake the bench.[265]

Our legal system puts too much power over millions of disputes and thus, millions of human lives, into the hands of the purportedly infallible. That system refuses to acknowledge the bias at play in our incredibly flawed legal scheme. A system that recognizes the fallibility of our system, and all of the individual players in it, is the only one that will bring fewer harms to people of color. Throughout the history of our legal system, much effort has been spent on trying to give this flawed system legitimacy and to insist in its fairness, despite the ample evidence to the contrary.

There is no way to extinguish racism from our judicial system, especially if we refuse to admit it is there. The laws enforced are often rooted in white supremacy. The punishments and resolutions the legal system offers are often racist. The act of judging itself reinforces white supremacy. The number of racist incidents in judges' private and professional lives documented here makes the point.

---

[263] Paul Butler, *Affirmative Action and the Criminal Law*, 68 U. COLO. L. REV. 841, 844 (1997).

[264] *See* Alexander, *supra* note 213, at 30.

[265] Berens & Shiffman, *supra* note 65.

## APPENDIX

*Appendix A. Appellate Court Cases*

| Jurisdiction | Cases |
|---|---|
| District of Columbia | Mejia v. United States, 916 A.2d 900 (D.C. 2007). |
| Georgia | Norris v. United States, 709 F. App'x 952 (11th Cir. 2017). |
| Kansas | State v. Smith, 423 P.3d 530 (Kan. 2018). |
| Michigan | People v. Deleon, No. 337134, 2019 WL 637793 (Mich. Ct. App. Feb. 14, 2019). |
| Missouri | Smulls v. State, 71 S.W.3d 138 (Mo. 2002). |
| New York | People v. Johnson, 150 N.Y.S.3d 401 (N.Y. App. Div. 2021). |
| Texas | *In re* Halprin, 788 Fed. App'x 941 (5th Cir. 2019), *cert. denied sub nom.* Halprin v. Davis, 140 S. Ct. 1200 (2020). |

*Appendix B. Judicial Disciplinary Opinions*[1]

| Jurisdiction | Cases |
|---|---|
| Alabama | Jinks v. Ala. Jud. Inquiry Comm'n, No. 1210133, 2022 Ala. LEXIS 103 (Ala. Oct. 21, 2022).<br><br>*In re* Patterson, Final Judgment, No. 62 (Ala. Ct. of the Jud. Oct. 27, 2022), https://judicial.alabama.gov/docs/judiciary/COJ62_FinalJudgment.pdf. |
| Alaska[2] | *In re* Dooley, 376 P.3d 1249 (Alaska 2016). |
| Arizona | *In re* Carpenter, 17 P.3d 91 (Ariz. 2001).<br><br>*In re* Holt, Order, No. 13-035 (Ariz. Comm'n on Jud. Conduct May 31, 2013), https://www.azcourts.gov/portals/137/reports/2013/13-035.pdf.<br><br>*In re* Sulley, Statement of Charges, No. 14-114 (Ariz. Comm'n on Jud. Conduct June 19, 2014), https://www.azcourts.gov/portals/137/reports/2014/14-114.pdf, *aff'd*, No. 14-114, 2014 Ariz. LEXIS 175 (Ariz. Sept. 23, 2014). |

---

[1]  Every state and the District of Columbia has established a judicial conduct commission for investigating (and in some cases disciplining) complaints against judges. Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 JUST. SYS. J. 405, 407 tbl.1 (2007). The publication practice of judicial conduct commissions varies—some states post disciplinary opinions on their websites, some summarize the sanctions in annual reports, and in states where the state supreme court issues the sanctions, the sanctions are published in an official reporter. In general, judicial conduct proceedings are confidential, and the complaints are not made public until formal charges are issued. *Id.* at 411–15. A comprehensive analysis is thus difficult (if not impossible), especially considering that fact that "[i]n the vast majority of judicial misconduct cases, judges are disciplined privately." Michael Berens & John Shiffman, *Objections Overruled: Thousands of U.S. Judges Who Broke Laws or Oaths Remained on the Bench*, *in* REUTERS, THE TEFLON ROBE (2020), https://www.reuters.com/investigates/section/usa-judges/; *see also* Gray, *supra*, at 412–13 (explaining that many commissions have the authority to resolve complaints informally or through private sanctions).

[2]  The Alaska Commission on Judicial Conduct publishes annual reports documenting the number of allegations of racial, ethnic, or gender bias in a given year. *See, e.g.*, 2019 ALASKA COMM'N ON JUD. CONDUCT ANN. REP. tbl.10 (2); 2018 ALASKA COMM'N ON JUD. CONDUCT ANN. REP. tbl.10 (2); 2017 ALASKA COMM'N ON JUD. CONDUCT ANN. REP. tbl.10 (9); 2011 ALASKA COMM'N ON JUD. CONDUCT ANN. REP. tbl.10 (3); 2008 ALASKA COMM'N ON JUD. CONDUCT ANN. REP. tbl.10 (1).

| Arkansas | Jud. Discipline & Disability Comm'n v. Maggio, 440 S.W.3d 333 (Ark. 2014). |
| | Letter of Censure and Recommendation to Suspension Without Pay to the Arkansas Supreme Court, from Ark. Jud. Discipline & Disability Comm'n to Judge Bourne (Aug. 1, 2022), https://www.jddc.arkansas.gov/wp-content/uploads/2022/08/Bourne-Sanction-080122.pdf. |
| California[3] | *In re* Van Voorhis, 48 Cal. 4th CJP Supp. 257 (Cal. Comm'n on Jud. Performance 2003). |
| | Public Admonishment of Judge Harvey Giss, 2011 Ann. Rep. 16 (Cal. Comm'n on Jud. Performance Mar. 16, 2011). |
| | Public Admonishment of Judge Nancy Pollard, 2011 Ann. Rep. 17 (Cal. Comm'n on Jud. Performance July 13, 2011). |
| | *In re* Kreep, 5 Cal. 5th CJP Supp. 1 (Cal. Comm'n on Jud. Performance 2017). |
| | Public Censure of Former Commissioner Joseph J. Gianquinto, 2018 Ann. Rep. 33 (Cal. Comm'n on Jud. Performance Aug. 22, 2018). |
| | Public Censure of Judge Jeffrey Bennett, 2020 Ann. Rep. 37 (Cal. Comm'n on Jud. Performance Mar. 25, 2020). |
| Colorado[4] | *In re* Booras, 500 P.3d 344, 346 (Colo. 2019). |
| | *In re* Chase, 485 P.3d 65 (Colo. 2021). |

[3] *See also* CAL. COMM'N ON JUD. PERFORMANCE, SUMMARY OF DISCIPLINE STATISTICS 1990–2009 app. at 14, tbl.A-8.1 (documenting types of conduct resulting in discipline, and reporting nine disciplinary actions taken between 2000 and 2009 due to "Bias/appearance of bias toward a particular class").

[4] The Colorado Commission on Judicial Discipline lists the number of allegations of "bias, prejudice, or lack of impartiality" in its annual reports. *See, e.g.*, 2020 COLO. COMM'N ON DISCIPLINE ANN. REP. 10 (37); 2019 COLO. COMM'N ON DISCIPLINE ANN. REP. 9 (49); 2018 COLO. COMM'N ON DISCIPLINE ANN. REP. 10 (50); 2017 COLO. COMM'N ON DISCIPLINE ANN. REP. 10 (37); 2016 COLO. COMM'N ON DISCIPLINE ANN. REP. 10 (26).

| Connecticut[5] | *In re* Cofield, Memorandum of Decision, No. J2008-079 (Conn. Jud. Rev. Council Feb. 27, 2009), https://portal.ct.gov/JRC/Left-Nav/Public-Hearing/j2008079. |
|---|---|
| Delaware | No relevant reports. |
| District of Columbia | No relevant reports. |
| Florida | *In re* Husley, Notice of Formal Charges, No. SC16-1278 (Fla. Jud. Qualifications Comm'n July 19, 2016), https://efactssc-public.flcourts.org/casedocuments/2016/1278/2016-1278_notice_79144.pdf.<br><br>*In re* Millan, Notice of Formal Charges, No. SC18-775 (Fla. Jud. Qualificatiions Comm'n May 21, 2018), https://efactssc-public.flcourts.org/casedocuments/2018/775/2018-775_notice_84109_notice2dformal20charges.pdf. |
| Georgia | Inquiry Concerning a Judge, 566 S.E.2d 310 (Ga. 2002). |
| Hawaii | No relevant reports. |
| Idaho | No relevant reports. |
| Illinois | *In re* Golniewicz, No. 02 CC 1 (Ill. Jud. Inquiry Bd. Nov. 15, 2004), https://jib.illinois.gov/content/dam/soi/en/web/jib/documents/orders-from-courts-commission/golniewicz.pdf. |
| Indiana | *In re* Bennington, 24 N.E.3d 958 (Ind. 2015). |
| Iowa | No relevant reports. |
| Kansas | *In re* Cullins, 481 P.3d 774 (Kan. 2021). |

---

[5]  The Connecticut Judicial Review Council documents the number of judicial complaints alleging "bias/discrimination/prejudice/partiality *(i.e., ADA, gender, racial, general)*" in its annual reports. *See, e.g.*, 2021 CONN. JUD. REV. COUNCIL ANN. REP. pt. VII, at 10 (30); 2020 CONN. JUD. REV. COUNCIL ANN. REP. pt. VII, at 10 (56); 2019 CONN. JUD. REV. COUNCIL ANN. REP. pt. VII, at 11 (17); 2018 CONN. JUD. REV. COUNCIL ANN. REP. pt. VII, at 11 (35); 2017 CONN. JUD. REV. COUNCIL ANN. REP. pt. VII, at 11 (29).

| Kentucky | *In re* McLaughlin, Public Reprimand (Ky. Jud. Conduct Comm'n Dec. 29, 2014), https://kycourts.gov/Courts/JCC% 20Actions%20Documents/2014PublicReprimandMcLaughlin. pdf. |
|---|---|
| Louisiana | *In re* Ellender, 889 So. 2d 225 (La. 2004).<br><br>*In re* Gremillion, 204 So. 3d 183 (La. 2016).<br><br>*In re* Odinet, 328 So. 3d 1166 (La. 2021). |
| Maine | No relevant reports. |
| Maryland | *In re* Stewart Mays, CJD Nos. 2015-069, 2015-108 (Md. Comm'n on Jud. Disabilities Sept. 20, 2016), https:// mdcourts.gov/sites/default/files/import/cjd/pdfs/cjd2016069x 108chargesexhibita.pdf. |
| Massachusetts | Duty to Report Perceived Judicial Misconduct, CJE Op. No. 2021-01 (Mass. Comm. on Jud. Ethics July 21, 2021), https:// www.mass.gov/opinion/cje-opinion-no-2021-01.<br><br>Press Release, Massachusetts Commission on Judicial Conduct Resolves Complaint Against Retired Judge Michael C. Creedon Through Agreed Disposition (Oct. 17, 2016), https://www. mass.gov/news/massachusetts-commission-on-judicial-conduct-resolves-complaint-against-retired-judge-michael-c-creedon-through-agreed-disposition. |
| Michigan | *In re* Chmura, Formal Complaint, No. 56 (Mich. Jud. Tenure Comm'n 2000), *rev'd*, 626 N.W.2d 876 (Mich. 2001).<br><br>2009 MICH. JUD. TENURE COMM'N ANN. REP. § IV, pt. C.3, at 28.[6] |
| Minnesota | No relevant reports. |
| Mississippi | Miss. Comm'n on Jud. Performance v. Boland, 975 So. 2d 882 (Miss. 2008). |

---

[6] Nonpublic proceeding in which "judge made inappropriate remarks concerning the ethnicity of a party and an attorney."

| | |
|---|---|
| | Miss. Comm'n on Jud. Performance v. Brown, 37 So. 3d 14 (Miss. 2010).<br><br>Miss. Comm'n on Jud. Performance v. Weisenberger, 201 So. 3d 444 (Miss. 2016). |
| Missouri | No relevant reports. |
| Montana | *In re* Complaint of Judicial Misconduct, 751 F.3d 611 (U.S. Comm. on Jud. Conduct & Disability Jan. 17, 2014).[7] |
| Nebraska | *In re* Lindner, 710 N.W.2d 866 (Neb. 2006). |
| Nevada | *In re* Del Vecchio, No. 0802-1008 (Nev. Comm'n on Jud. Discipline Nov. 6, 2008), https://judicial.nv.gov/uploadedFiles/judicialnvgov/content/Discipline/Dicisions/2008-11-06_0802-1008_DelVecchio_FindingsofFactConclusionsofLawandImpositionofDiscpline.pdf. |
| New Hampshire | *In re* Jones, Reprimand, No. JC-10-069-C (N.H. Jud. Conduct Comm. July 9, 2011), https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-07/admnreprimand-judgemichaeljones.pdf. |
| New Jersey | *In re* Convery, Formal Complaint, ACJC Nos. 2008-122, 2008-136 (N.J. Advisory Comm. on Jud. Conduct Apr. 1, 2009), https://www.njcourts.gov/sites/default/files/acjc/ConveryComplaint.pdf, *aff'd* 991 A.2d 213 (N.J. 2010).<br><br>*In re* Citta, Formal Complaint, ACJC Nos. 2008-180, 2008-256 (N.J. Advisory Comm. on Jud. Conduct Apr. 1, 2009), https://www.njcourts.gov/sites/default/files/acjc/CittaComplaint.pdf, *aff'd* 991 A.2d 213 (N.J. 2010).<br><br>*In re* Wertheimer, Formal Complaint, ACJC No. 2009-245 (N.J. Advisory Comm. on Jud. Conduct Aug. 5, 2009), https://www.njcourts.gov/sites/default/files/acjc/WertheimerComplaint.pdf, *dismissed*, 13 A.3d 355 (N.J. 2011). |

---

[7]    In general, complaints against U.S. federal district court judges are investigated by the U.S. Committee on Judicial Conduct and Disability. *See* RULES FOR JUD.-CONDUCT & JUD.-DISABILITY PROC. § 320, art. V (ADMIN. OFF. OF THE U.S. CTS. 2019).

| New Mexico | *In re* Castaneda, Order, No. S-1-SC-35842 (N.M. Feb. 12, 2018), https://www.nmjsc.org/wp-content/uploads/2018/02/35842-Order-Accepting-Resignation.pdf. |
|---|---|
| New York | *In re* Mulroy, 731 N.E.2d 120 (N.Y. 2000). |
| | *In re* Pennington, Determination, 2004 C.J.C. Ann. Rep. 139 (N.Y. Comm'n on Jud. Conduct Nov. 3, 2003). |
| | *In re* Ellis, Determination, 2008 C.J.C. Ann. Rep. 123 (N.Y. Comm'n on Jud. Conduct July 24, 2007). |
| | *In re* Senzer, Determination, 2020 C.J.C. Ann. Rep. 137 (N.Y. Comm'n on Jud. Conduct Oct. 9, 2019). |
| | *In re* Tawil, Determination, 2020 C.J.C. Ann. Rep. 158 (N.Y. Comm'n on Jud. Conduct Dec. 12, 2019). |
| | *In re* Sucher, Stipulation (N.Y. Comm'n on Jud. Conduct Oct. 12, 2021), https://cjc.ny.gov/Determinations/S/Sucher.Paul.E.2021.10.12.STIP.RED.pdf. |
| North Carolina | *In re* Badgett, 666 S.E.2d 743 (N.C. 2008). |
| North Dakota | No relevant reports. |
| Ohio | Disciplinary Counsel v. Cox, 862 N.E.2d 514 (Ohio 2007). |
| | Disciplinary Counsel v. Porzio, 153 N.E.3d 70 (Ohio 2020). |
| | Complaint, Disciplinary Counsel v. Carr, No. 2021-1518, 2022 WL 10205860 (Ohio Oct. 18, 2022). |
| Oklahoma | No relevant reports. |
| Oregon | No relevant reports. |
| Pennsylvania | *In re* Brown, 907 A.2d 684 (Ct. of Jud. Discipline of Pa. 2006). |
| | *In re* Tranquilli, Complaint No. 4 JD 2020 (Pa. Ct. of Jud. Discipline Aug. 12, 2020), https://www.pacourts.us/Storage/media/pdfs/20210604/133958-file-9822.pdf. |
| Rhode Island | No relevant reports. |

| South Carolina | *In re* Gosnell, 621 S.E.2d 659 (S.C. 2005). |
| | *In re* Hutchins, 661 S.E.2d 343 (S.C. 2008). |
| South Dakota | *In re* Fuller, 798 N.W.2d 408 (S.D. 2011). |
| Tennessee | *In re* Lammey, Public Reprimand, Nos. B19-7753, B19-7777 (Tenn. Bd. of Jud. Conduct Nov. 15, 2019), https://www.tncourts.gov/sites/default/files/docs/lammey_reprimand_letter_only_2019_11_18.pdf. |
| | *In re* Ledsinger, Public Reprimand, No. B20-8233 (Tenn. Bd. of Jud. Conduct Sept. 28, 2020), https://www.tncourts.gov/sites/default/files/docs/jere_ledsinger_reprimand_2020_09_28.pdf. |
| Texas | *In re* McElroy, Voluntary Agreement to Resign from Jud. Off. in Lieu of Disciplinary Action, CJC Nos. 00-0454, 00-0640 (Tex. Comm'n on Jud. Conduct Nov. 5, 2001), http://www.scjc.texas.gov/media/46582/mcelroy00-0454-jp00-0640-jpresignation.pdf. |
| | *In re* Zepeda, Voluntary Agreement to Resign from Jud. Off. in Lieu of Disciplinary Action, CJC Nos. 03-0107, 03-0275, 03-0632-JP (Tex. Comm'n on Jud. Conduct Mar. 1, 2004), http://www.scjc.texas.gov/media/46602/zepeda03-0107-jp03-0275-jp03-0632-jpresignation.pdf. |
| | *In re* Charges of Judicial Misconduct, 769 F.3d 762, 773–75 (D.C. Cir. 2014), *aff'd*, *In re* Complaint of Judicial Misconduct, C.C.D. No. 14-01, at 3, 15 (U.S. Comm. on Jud. Conduct & Disability Feb. 19, 2015), https://www.uscourts.gov/sites/default/files/ccd-14-01order-final-02-19-15.pdf. |
| | *In re* Luitjen, Pub. Admonition & Ord. of Additional Educ. CJC No. 20-0468 (Tex. Comm'n on Jud. Conduct Dec. 4, 2020), http://www.scjc.texas.gov/media/46826/luitjen20-0468pubadm-oae-12420.pdf. |
| | *In re* Baldwin, Pub. Reprimand & Ord. of Additional Educ., CJC Nos. 19-1291, 19-1160 (Tex. Comm'n on Jud. Conduct Apr. 9, 2021), http://www.scjc.texas.gov/media/46829/baldwin19-1297-19-1160pubrep-oae4921.pdf. |

| | |
|---|---|
| | *In re* Black, Pub. Warning, CJC Nos. 21-0135, 21-0780, 21-0791, 21-0792, 21-0795 (Tex. Comm'n on Jud. Conduct Apr. 7, 2022), http://www.scjc.state.tx.us/media/46879/black21-0135etalpub-warn-4722.pdf. |
| Utah | No relevant reports. |
| Vermont | No relevant reports. |
| Virginia | No relevant reports. |
| Washington | *In re* Martin, Stipulation, Agreement & Ord. of Censure, CJC No. 4185-F-125 (Wash. Comm'n on Jud. Conduct June 2, 2006), https://www.cjc.state.wa.us/materials/activity/public_actions/2006/4185%20Martin%20Stipulation%20FINAL.pdf.

*In re* Chow, Stipulation, Agreement & Ord. of Admonishment, CJC No. 5299-F-134 (Wash. Comm'n on Jud. Conduct Oct. 24, 2007), https://www.cjc.state.wa.us/materials/activity/public_actions/2007/5299%20Chow%20Stipulation%20Final.pdf.

*In re* Stolz, Stipulation, Agreement & Ord. of Admonishment, CJC No. 5456-F-138 (Wash. Comm'n on Jud. Conduct Aug. 1, 2008), https://www.cjc.state.wa.us/materials/activity/public_actions/2008/5456%20Stolz%20Stipulation.pdf.

*In re* Poyfair, Stipulation, Agreement & Ord. of Censure, CJC No. 6691-F-153 (Wash. Comm'n on Jud. Conduct May 4, 2012), https://www.cjc.state.wa.us/materials/activity/public_actions/2012/6691_Poyfair_Stip.pdf.

*In re* Wulle, Amended Comm'n Decision & Ord., CJC No. 6707-F-154 (Wash. Comm'n on Jud. Conduct Jan. 9, 2013), https://www.cjc.state.wa.us/materials/activity/public_actions/2012/6707_Wulle_Amended_Decision.pdf.

*In re* Ladenburg, Stipulation, Agreement & Ord. of Reprimand, CJC No. 7599-F-163 (Wash. Comm'n on Jud. Conduct Feb. 20, 2015), https://www.cjc.state.wa.us/materials/activity/public_actions/2015/7599_Ladenburg_Stip_v2.pdf. |

| | |
|---|---|
| | *In re* North, Stipulation, Agreement & Ord. of Admonishment, CJC No. 8583-F-174 (Wash. Comm'n on Jud. Conduct Dec. 8, 2017), https://www.cjc.state.wa.us/materials/activity/public_actions/2017/8583FinalStip.pdf. |
| | *In re* Zimmerman, Statement of Charges, CJC No. 10260-F-193 (Wash. Comm'n on Jud. Conduct Dec. 3, 2021), https://www.cjc.state.wa.us/materials/activity/public_actions/open_cases/10260SoCFinal.pdf. |
| | *In re* Mahoney, Stipulation, Agreement & Ord. of Reprimand, CJC No. 10807-F-20 (Wash. Comm'n on Jud. Conduct Sept. 9, 2022), https://www.cjc.state.wa.us/materials/activity/public_actions/2022/10807StipulationFINAL.pdf. |
| West Virginia | *In re* Fouty, No. 5-2000 (Jud. Investigation Comm'n of W. Va. Mar. 1, 2000), http://www.courtswv.gov/legal-community/JICAdmonishments/2000/5-2000%20Magistrate%20Carol%20Fouty.pdf. |
| | Public Admonishment of Charles N. Poe, No. 17-2021 (Jud. Investigation Comm'n of W. Va. Mar. 12, 2006), http://www.courtswv.gov/legal-community/JICAdmonishments/2021/17-2021MagCharlesPoe.pdf. |
| | *In re* Chapman, No. 22-2006 (Jud. Investigation Comm'n of W. Va. May 16, 2006), http://www.courtswv.gov/legal-community/JICAdmonishments/2006/22-2006,%20Magistrate%20Brenda%20Chapman.pdf. |
| Wisconsin[8] | No relevant reports. |
| Wyoming | No relevant reports. |

---

[8] *See* 2021 WIS. JUD. COMM'N ANN. REP. app. at 10, tbl.A-3 (documenting the subjects of judicial complaints resulting in informal resolution, and reporting 65 complaints of "Intemperate courtroom conduct (e.g., yelling, rudeness, inappropriate language)" between 1985 and 2021).

*Appendix C. Media*

| Jurisdiction | Media Citation |
|---|---|
| Alabama | Debra Cassens Weiss, *Ethics Case Accuses Judge of Making Racist and Sexist Remarks, Mouthing N-Word, Criticizing Overweight People*, ABA J. (May 20, 2021, 3:54 PM), https://www.abajournal.com/news/article/ethics-case-accuses-judge-of-making-racist-and-sexist-remarks-mouthing-f-word-criticizing-overweight-people. |
| Arkansas | Max Brantley, *Judge Mike Maggio Withdraws from Court of Appeals Race; Acknowledges Web Postings*, ARK. TIMES (Mar. 5, 2014, 9:49 PM), https://arktimes.com/arkansas-blog/2014/03/05/judge-mike-maggio-withdraws-from-court-of-appeals-race-acknowledges-web-postings. |
| California | *Ventura County Judge Censured for Offensive Remarks*, AP NEWS (Mar. 25, 2020), https://apnews.com/article/censures-ca-state-wire-california-courts-b71b52b2cd144f058db920400af9a260. |
| Colorado | Caitlin O'Kane, *Colorado Judge Resigns After Using N-Word Multiple Times and Using Racially Insensitive Language*, CBS NEWS (Apr. 20, 2021, 6:50 AM), https://www.cbsnews.com/news/natalie-chase-colorado-judge-resigns-N-word/. |
| | Kirk Mitchell, *Colorado Appeals Judge Who Called Colleague "the Little Mexican" in Email Resigns Amid Allegations of Racism, Impropriety*, DENVER POST (Jan. 10, 2019, 5:52 PM), https://www.denverpost.com/2019/01/10/colorado-appeals-judge-laurie-booras-resigns/. |
| Florida | Larry Hannan, *Jacksonville Judge Accused of Racist and Sexist Comments Resigns*, FLA. TIMES-UNION (Jan. 23, 2017, 12:40 PM), https://www.jacksonville.com/story/news/crime/2017/01/23/jacksonville-judge-accused-racist-and-sexist-comments-resigns/15739895007/. |
| | David Ovalle, *Miami Judge Who Used an Obscure Racial Slur Resigns from the Bench*, MIA. HERALD (July 13, 2018, 8:04 PM), https://www.miamiherald.com/news/local/article214845940.html. |

| Georgia | Bill Rankin, *North Georgia Judge Who Used N-Word in Open Court Resigns*, ATLANTA J.-CONST. (Jan. 21, 2016), https://www.ajc.com/news/local/north-georgia-judge-who-used-word-open-courtresigns/n9m4QbAlAXBE63ltR85oTK/. |
|---|---|
| Illinois | Debra Cassens Weiss, *Judge Who Told Black Defendant 'You Were Never a Slave' Fails to Win Retention*, ABA J. (June 6, 2019, 9:26 AM), https://www.abajournal.com/news/article/judge-who-told-black-defendant-you-were-never-a-slave-fails-to-win-retention. |
| Indiana | Jeff D. Gorman, *Judge Gets Lifetime Ban for Bad Calls and Slur*, COURTHOUSE NEWS SERV. (Feb. 17, 2015), https://www.courthousenews.com/judge-gets-lifetime-banfor-bad-calls-and-slur/. |
| Kansas | Tim Carpenter, *Judge Accused of Bigotry, Racism in Disciplinary Case Seeks Mercy from Supreme Court*, KAN. REFLECTOR (Oct. 30, 2020, 6:22 PM), https://kansasreflector.com/2020/10/30/judge-accused-of-bigotry-racism-in-disciplinary-case-seeks-mercy-from-supreme-court/. |
| Louisiana | Lateshia Beachum, *A Judge Resigns After Using the N-Word in Texts that She Says the Public Was Never Meant to See*, WASH. POST (Feb. 27, 2020, 4:31 PM), https://www.washingtonpost.com/nation/2020/02/27/jessie-leblanc-resigns-racial-slur/.<br><br>Jaclyn Peiser, *A Video Filled with Racist Slurs Was Taken at a Louisiana Judge's Home. She Apologized and Went on Unpaid Leave*, WASH. POST (Dec. 16, 2021, 7:33 AM), https://www.washingtonpost.com/nation/2021/12/16/judge-michelle-odinet-racist-video-leave/. |
| Massachusetts | Kevin Rothstein, *5 Investigates Obtains Secret Report into Judge's Use of Racial Slur*, WCVB (Mar. 16, 2017, 6:30 PM), https://www.wcvb.com/article/5-investigates-obtains-secret-report-into-judges-use-of-racial-slur/9143783. |
| Montana | Korva Coleman, *Federal Judge Emails Racist Joke About Obama, then Apologizes*, NPR (Mar. 1, 2012, 10:28 AM), https://www.npr.org/sections/thetwo-way/2012/03/01/147720865/federal-judge-emails-racist-joke-about-obama-then-apologizes. |

| New Jersey | Mary Pat Gallagher, *Two N.J. Judges Face Ethics Charges Over Derogatory Comments from Bench*, LAW.COM (Apr. 7, 2009, 12:00 AM), https://www.law.com/almID/1202429708595/. |
|---|---|
| New York | Graham Rayman, *Upstate NY Judge's Racist Comments from the Bench Get Burglar 10 Years off His Sentence*, N.Y. DAILY NEWS (July 2, 2021, 11:39 AM), https://www.nydailynews.com/new-york/nyc-crime/ny-judge-racist-remarks-20210702-avtcai2dyn cdvhzs2ojbysbixm-story.html.<br><br>William Glaberson, *In Tiny Courts of N.Y., Abuses of Law and Power*, N.Y. TIMES (Sept. 25, 2006), https://www.nytimes.com/2006/09/25/nyregion/25courts.html. |
| Ohio | Cory Shaffer, *Groups Demand Lake County Judge in Ohio Apologize for Calling Coronavirus 'China Virus' in Bar Association Newsletter*, CLEVELAND.COM (Mar. 6, 2021, 2:32 PM), https://www.cleveland.com/court-justice/2021/03/groups-demand-lake-county-judge-in-ohio-apologize-for-using-racist-term-for-coronavirus-in-bar-association-newsletter.html. |
| Oklahoma | *Judge Refuses to Recuse Himself from Trial, Says He's Not a Racist*, NEWS 9 (Dec. 13, 2010, 11:26 AM), https://www.news9.com/story/5e34fe2ae0c96e774b368f69/judge-refuses-to-recuse-himself-from-trial-says-hes-not-a-racist. |
| Oregon | Stephanie Volin, *Exclusive: The Oregon Commission on Judicial Fitness and Disability Drops Mic on Rapping Judge Susie Norby*, MEDIUM (June 4, 2022), https://stephanievolin.medium.com/exclusive-the-oregon-commission-on-judicial-fitness-and-disability-drops-mic-on-rapping-judge-7641df7ceea9. |
| Pennsylvania | David K. Li, *Judge Who Allegedly Called a Juror 'Aunt Jemima' off the Bench in Pennsylvania*, NBC NEWS (Feb. 7, 2020, 12:07 PM), https://www.nbcnews.com/news/us-news/judge-who-allegedly-called-juror-aunt-jemima-bench-pennsylvania-n1132581. |
| South Carolina | Steve Almasy, *Church Shooting Judge Used N-Word in Court, Received Reprimand*, CNN (June 20, 2015, 2:55 PM), https://www.cnn.com/2015/06/19/us/church-shooting-judge-reprimand/index.html. |

| Texas | Angela Morris, *Texas Judge in Hot Water over Racial Slurs Against Mexicans*, TEX. LAW. (Dec. 22, 2020, 6:31 PM), https://www.bloomberglaw.com/document/X25UC9CS000000?jcsearch=hde45hjeim#jcite. |
| | Ethan Bronner, *Complaint Accuses U.S. Judge in Texas of Racial Bias*, N.Y. TIMES (June 4, 2013), https://www.nytimes.com/2013/06/05/us/federal-judge-in-texas-is-accused-of-racial-bias.html. |
| | Jolie McCullough, *Judge in Texas Border Crackdown Accused of Using Racist Slur Against Migrants*, TEXAS TRIBUNE (Aug. 22, 2022, 1:00 PM), https://www.texastribune.org/2022/08/22/texas-migrant-judge-racist-slur/. |
| Virginia | Bill Alexander, *Some Biased Judges Get Caught, Most Don't*, NBC NEWS (Mar. 16, 2004, 10:49 AM), https://www.nbcnews.com/id/wbna4534724. |
| Washington | Associated Press, *Judge Who Made Racist Comments on Hot Mic Intends to Retire*, SEATTLE TIMES (June 4, 2021, 5:12 AM), https://www.seattletimes.com/seattle-news/washington-judge-who-made-racist-comments-on-hot-mic-says-hell-retire/. |
| | Aaron Allen, *NAACP Demands King County Judge's Resignation for Use of the N-Word*, SEATTLE MEDIUM (May 18, 2022), https://seattlemedium.com/naacp-demands-king-county-judges-resignation-for-use-of-the-n-word/. |
| Wisconsin | Daniel Bice, *Judge's Racial, Ethnic Slurs Set off a Tempest*, MILWAUKEE J. SENTINEL (June 27, 2010), https://archive.jsonline.com/watchdog/noquarter/97280534.html/. |